1   Richard J. Pocker
    Nevada Bar No. 003568
2   Dickerson, Dickerson, Consul & Pocker
    777 N. Rainbow Blvd., Suite 350
3   Las Vegas, Nevada  89107
    Telephone: (702) 388-8600
4   Facsimile: (702) 388-0210

5   Scott G. Johnson (CSB #153735) Admitted Pro Hac Vice
    David E. Bland (CSB #150581) Admitted Pro Hac Vice
6   Robins, Kaplan, Miller & Ciresi L.L.P.
    2800 LaSalle Plaza
7   800 LaSalle Ave.
    Minneapolis, Minnesota 955402-2015
8   Telephone:  (612) 349-8500
    Facsimile:  (612) 339-4181     **FILED SEPARATELY**
9
    Attorneys for Defendant FACTORY
10  MUTUAL INSURANCE COMPANY

11
                    IN THE UNITED STATES DISTRICT COURT
12
                       FOR THE DISTRICT OF NEVADA
13

14  COUNTY OF CLARK, a political       ) Case No:  CV-S-02-1258-KJD-RJJ
    subdivision of the State of Nevada, on )
15  behalf of Clark County Department of ) **FACTORY MUTUAL INSURANCE**
    Aviation,                           ) **COMPANY'S NOTICE OF MOTION**
16                                      ) **AND MOTION FOR SUMMARY**
            Plaintiff,                  ) **JUDGMENT; SUPPORTING**
17                                      ) **MEMORANDUM OF POINTS AND**
    vs.                                 ) **AUTHORITIES**
18                                      )
    FACTORY MUTUAL INSURANCE            ) [Statement of Uncontroverted Facts;
19  COMPANY, a Rhode Island             ) Affidavit of Scott G. Johnson; and
    Corporation, and DOES 1-10,         ) Proposed Order filed concurrently
20                                      ) herewith]
            Defendant.                  )
21                                      )
                                        )
22  ──────────────────────────────────── )

23

24  TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

25          PLEASE TAKE NOTICE that Defendant FACTORY MUTUAL

26  INSURANCE COMPANY ("FM") moves this Court, pursuant to Rule 56 of the

27  Federal Rules of Civil Procedure, for summary judgment on all claims asserted by

28  the Plaintiff COUNTY OF CLARK ("CCDOA") against FM.

20078655.1

FM's summary judgment motion is made on the grounds that there are no genuine issues of material fact and that FM is entitled to judgment in its favor as a matter of law because there is no coverage under FM's policy for CCDOA's alleged loss.

This motion is based on the files, records and proceedings herein, the Supporting Memorandum of Points and Authorities, the Statement of Uncontroverted Facts, the Affidavit of Scott G. Johnson and Exhibits thereto, filed concurrently herewith, and on such oral and documentary evidence as may be presented at the hearing of this motion.

DATED: May 26, 2004          ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

By: _____
Scott G. Johnson
Attorneys for Defendant FACTORY   MUTUAL
INSURANCE COMPANY

1

## Memorandum of Points and Authorities

2

### A. Introduction

3    CCDOA seeks insurance coverage for business losses that it sustained after

4    the FAA issued orders grounding all aircraft and requiring airports to implement

5    new security measures after the September 11, 2001 terrorist attack.  Specifically,

6    CCDOA claims that these orders *prevented* ingress to and egress from CCDOA's

7    airports.  But the FM policy provides coverage only when ingress to or egress from

8    an insured location has been prevented and only when that prevention is the direct

9    result of physical damage.

10    Here, the damage to the World Trade Center and Pentagon, located over 2,000

11    miles away, did not prevent ingress to and egress from CCDOA's airports.  Rather,

12    the alleged "prevention" of access was the direct result of the FAA's orders.  And

13    where access is not *prevented* by physical damage, but is instead *prohibited* by order

14    of civil authority, coverage, if any, is provided only under the FM policy's Civil

15    Authority provision.  But the Civil Authority coverage does not apply here because

16    the FAA orders were not the direct result of physical damage, and because there was

17    no physical damage at or within 1,000 feet of CCDOA's airports as required for

18    coverage to apply.

19    Because CCDOA cannot meet its burden of proving coverage under the FM

20    policy, summary judgment must be granted.

21

### B. Factual Background

22    **1.    CCDOA**

23    CCDOA owns and operates McCarran International Airport, North Las Vegas

24    Airport, Henderson Executive Airport, Jean Sport Aviation Center, Overton-Perkins

25    Field, and Searchlight Airfield. (Uncontroverted Fact ("UF") 1.)

26    **2.    The FM Insurance Coverage.**

27    FM issued a first-party property insurance policy to CCDOA effective

28    October 1, 2000.  (UF 2.)  The FM policy provided coverage for both property

1    damage and time element (i.e., business interruption and extra expense) losses,

2    subject to the policy's terms, conditions, exclusions, and limitations. (UF 3.)

3    The property damage section of the policy generally provided coverage for

4    direct physical loss or damage to specified property of CCDOA caused by a non-

5    excluded risk. (UF 4.) For example, if a fire damaged the terminal at McCarran

6    International, the FM policy would provide coverage to repair the damage.

7    In contrast, the time element section of the FM policy provided coverage for

8    business income and extra expense losses that occur when CCDOA's business

9    operations are interrupted as a direct result of physical loss or damage of the type

10   insured by the policy to specified property:

**TIME ELEMENT - SECTION C**

**1.    LOSS INSURED**

A.    This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured by this Policy:

1)    to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;

2)    used by the Insured, or for which the Insured has contracted use;

3)    located at an Insured Location; and

4)    during the Periods of Liability described in this section.

23   (UF 5.)

24   As part of the "Gross Earnings" coverage, the FM policy provided coverage

25   for CCDOA's time element losses when an order of civil authority—that is the

26   direct result of physical damage of the type insured against under FM policy at or

27   within 1,000 feet of an insured location—*prohibited* access to that location:

28

**2.   TIME ELEMENT COVERAGES**

    **A.   GROSS EARNINGS**

        1)   Measurement of Loss:

            a)   The recoverable GROSS EARNINGS loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY: . . .

**4.   PERIOD OF LIABILITY**

    **A.**   The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except LEASEHOLD INTEREST and as shown below, or if otherwise provided under the TIME ELEMENT COVERAGE EXTENSIONS, is as follows:

            \* \* \*

        8)   If an order of civil authority prohibits access to the Insured Location and provided such order is the direct result of physical damage of the type insured against under this Policy at the Insured Location or within 1,000 feet of it, the period of time:

            a)   starting at the time of such physical damage; but

            b) not to exceed 30 consecutive days.

(UF 6, 7.) By way of example, the Civil Authority coverage would apply where police or fire fighters issued an order prohibiting access to one of CCDOA's airports as a direct result of damage at or within 1,000 feet of that airport.

Additionally, the FM policy included several time element coverage extensions. The "Contingent Time Element" coverage is one such extension, and it applies where CCDOA was unable to conduct business operations as a direct result of physical loss or damage at a customer or supplier location:

**3.   TIME ELEMENT COVERAGE EXTENSIONS**

    **A.   CONTINGENT TIME ELEMENT**

        This Policy covers the Actual Loss Sustained and EXTRA EXPENSES incurred

by the Insured during the PERIOD OF LIABILITY:

1)   directly resulting from physical loss or damage of the type insured; and

2)   to property of the type insured,

at any locations of direct suppliers or customers located within the TERRITORY of this Policy.

(UF 8.) This coverage would apply, for example, if the property of the supplier of jet fuel (or any other product) to McCarran International was damaged and, as a direct result, CCDOA's business operations were interrupted.

Another time element coverage extension was the "Ingress/Egress" coverage. This coverage applies where access to an insured location is *prevented* as a direct result of physical loss or damage:

### 3.   TIME ELEMENT COVERAGE EXTENSION

\* \* \*

### C.   INGRESS/EGRESS

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured due to the necessary interruption of the Insured's business due to prevention of ingress to or egress from an Insured Location, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured by this Policy, to the kind of property not excluded by this Policy.

(UF 9.) The Ingress/Egress coverage would apply, for instance, where a collapsed building blocked the only roadway leading to an insured location and, as a direct result, made it physically impossible to get in or out of that location.

Finally, the FM policy included a "Protection and Preservation of Property – Time Element" coverage extension. This coverage applies where CCDOA's business operations were interrupted because it took reasonable measures to temporarily protect its property from immediately impending insured physical loss

or damage at such insured property:

### 3.   TIME ELEMENT COVERAGE EXTENSION

* * *

### E.   PROTECTION AND PRESERVATION OF PROPERTY – TIME ELEMENT

> The Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending physical loss or damage insured by this Policy at such insured property.

(UF 10.) If, for example, CCDOA's business operations were interrupted because it took reasonable measures to temporarily protect insured property and prevent damage from an immediately impending flood, the policy would provide coverage.

### 3.   The September 11, 2001 National Ground Stop Order.

At approximately 8:00 a.m.[1] on September 11, 2001, American Flight 11 took off from Boston's Logan airport for Los Angeles. (UF 12.) Approximately fourteen minutes later, United Flight 175 also took off from Boston's Logan airport for Los Angeles. (UF 13.) At approximately 8:21 a.m., American Flight 77 took off from Washington Dulles airport for Los Angeles. (UF 14.) Around 8:43 a.m., United Flight 93 took off from Newark airport for San Francisco. (UF 15.)

Sometime before 8:46 a.m., American Flight 11 was hijacked. (UF 16.) Shortly thereafter, FAA National Operations Manager Ben Sliney learned of a radio transmission from that plane to the effect that "we have more planes." (UF 20.) As National Operations Manager, Sliney's mandate was to insure the safe and efficient operation of the national airspace system, and, therefore, he had authority to issue orders to insure the safe and efficient operation of that system. (UF 18, 19.)

---

[1]   Unless noted otherwise, all times are Eastern Daylight Time.

1    At approximately 8:46 a.m. American Flight 11 crashed into the World Trade

2  Center's north tower. (UF 21.)  Approximately sixteen minutes later, at 9:02 a.m.,

3  United Flight 175 crashed into the south World Trade Center tower. (UF 22.)

4    Meanwhile, at the FAA National Operations headquarters, the FAA was

5  tracking all "suspicious" aircraft—aircraft that were not on their proper route or

6  were not communicating with the FAA—and recording them on a status board. (UF

7  23.) At one point, there were as many as 10-12 planes on the status board. (UF 24.)

8    After the second crash into the World Trade Center, FAA National Operations

9  Manager Sliney was concerned that hijacked aircraft were being used as guided

10  missiles—i.e., that pilots were purposefully directing planes into buildings.  (UF

11  27.)  And when it became apparent that there were guided missiles flying around,

12  the FAA first decided to stop aircraft from taking off. (UF 25.)  The FAA did this

13  in a series of "ground stop" orders, first in New York, then Boston, then Los

14  Angeles, then most of the East Coast, and finally, at 9:26 a.m., a national ground

15  stop. (UF 25, 28.)

16    A "ground stop is a traffic management tool." (UF 29.)  And National

17  Operations Manager Sliney issued the national ground stop order pursuant to his

18  authority to insure the safe and efficient operation of the national airspace system.

19  (UF 30.)

20    At approximately 9:40 a.m., American Flight 77 crashed into the Pentagon.

21  (UF 31.)  Approximately five minutes later, FAA National Operations Manager

22  Sliney ordered all aircraft to land at the nearest airport as soon as practical.  (UF

23  32.)  Shortly thereafter, at approximately 10:07 a.m., United Flight 93 crashed in

24  Stony Creek Township, Pennsylvania. (UF 33.)

25    Next, and at 10:39 a.m., the FAA, reaffirming its earlier orders, issued a

26  Notice to Airmen (NOTAM) that prohibited takeoffs and landings at all airports:

27        FDC SPECIAL NOTICE. DUE TO EXTRAORDINARY
           CIRCUMSTANCES   AND   FOR   REASONS   OF
28        SAFETY,    ATTENTION    ALL    AIRCRAFT

OPERATORS, BY ORDER OF THE FEDERAL AVIATION COMMAND CENTER ALL AIRPORTS/AIRDROMES ARE NOT AUTHORIZED FOR LANDING AND TAKEOFF. ALL TRAFFIC INCLUDING AIRBORNE AIRCRAFT ARE ENCOURAGED TO LAND SHORTLY. . ..

(UF 34.)

As the NOTAM "reaffirming" the earlier orders makes clear, safety was the reason for the orders. In fact, in his September 20, 2001 Congressional testimony, Secretary of Transportation Norman Mineta confirmed that the FAA's orders were issued to prevent additional aircraft from being used as a terrorist weapon:

> On the morning of September 11th, on the first word of the attack, I moved directly to the Presidential Emergency Operations Center in the White House. As soon as I was aware of the nature and scale of the attack, I called from the White House to order the air traffic system to land all aircraft, immediately and without exception. That was an unprecedented step. *But with the risk of additional flights that might be used as terrorist weapons, I believe that it was the right and necessary step to take.*

(UF 35.)

Similarly, FAA Administrator Jane F. Garvey testified before Congress that the air operations were shut down because of the risk of additional hijackings:

> On the morning of September 11th, there were 4,873 instrument flight rule (IFR) flights operating in U.S. airspace. As soon as Secretary Mineta was aware of the nature and scale of the terrorist attack on New York and Washington–that we were faced with, not one, but four possible hijackings, and several other rumors of missing or unidentified aircraft–the Secretary ordered the air traffic system shut down for all civil operations.

(UF 36.)

**4.    The FAA Issues Safety-Related Security Directives to CCDOA on September 11, 2001.**

No CCDOA property was damaged on September 11, 2001.    (UF 38.) Similarly, there was no immediately impending physical loss or damage at any of CCDOA's airports. (UF 39.)

During the morning of September 11, the FAA issued several security directives to CCDOA. (UF 41.) The security directives contain "security-sensitive information" and cannot be disclosed. (UF 42.) But in general terms, these security directives required CCDOA to go through a "sterilization and a recertification" process. (UF 42.) The "sterilization" required CCDOA to "clear everybody and every unidentified object out." (UF 43.) The recertification required CCDOA to fulfill all of the measures of the airport's security plan and implement any new security measures. (UF 44.)

## 5. The National Ground Stop Was Extended While New Security Measures Designed to Reduce the Likelihood of Additional Terrorist Attacks Were Implemented.

On September 12, 2001, Secretary of Transportation Norman Mineta announced that the FAA was temporarily extending the ground stop order while additional security measures were being completed. (UF 48.) Secretary Mineta said that "Safety is always of paramount importance, and in these extraordinary times we intend to be vigilant." (UF 48.)

The FAA adopted several new security measures and then ordered all airports to implement these security measures before they would be certified to reopen. (UF 44, 47.) These new security measures included: establishment of a 300-foot perimeter for parked vehicles; suspension of curbside check-ins; more frequent searches of carry-on baggage; increased presence of uniformed and plainclothes security personnel; and allowing only passengers with a flight ticket and identification past the security gates. (UF 46.)

These new security measures—like the other FAA orders—were intended to reduce the likelihood of aircraft being hijacked and used in a terrorist attack. (UF 47.) Indeed, as FAA National Operations Manager Sliney put it, the FAA was going to permit only those aircraft that it "deemed to be secure enough not to become a guided missile" to "fly in the national air space system" (UF 47.)

1     Transportation Secretary Mineta ordered the national airspace reopened to

2 commercial aviation at 11:00 a.m. on September 13, 2001. (UF 49.)  By then,

3 McCarran International had already been certified by the FAA to be in compliance

4 with all current security directives. (UF 55.)

5 **6.**   **Nothing Prevented Airplanes From Taking Off or Landing Between**

6     **September 11, 2001 and September 13, 2001.**

7     The FAA *prohibited* aircraft from taking off and landing between the issuance

8 of the September 11 ground stop order and the September 13 reopening of the

9 national air space.  But absolutely nothing *prevented* airplanes from taking off or

10 landing at the nation's airports during that time.

11     For example, a FAA controller cleared a Federal Express airplane for take off

12 from an airport in Great Falls, Montana after the FAA groundstop order was issued.

13 (UF 53.) Additionally, the FAA specifically allowed certain aircraft to take off and

14 land after issuance of the FAA ground stop order and before the September 13

15 reopening of the nation's airspace, including aircraft carrying medical supplies and

16 Federal Reserve checks. (UF 53.)  And on September 12—during the time that

17 CCDOA claims that ingress to or egress from its airports was "*prevented*"—aircraft

18 that were diverted on September 11 were allowed to continue to their original

19 destinations. (UF 48.)  There were two or three such aircraft that took off or landed

20 at CCDOA's McCarran airport on September 12. (UF 54.)

21 **7.**   **CCDOA Submits Claim to FM.**

22     On November 7, 2001, CCDOA notified FM of a claim for "Business

23 interruption loss due to terrorist attack in New York and Washington, DC."   (UF

24 56.)   CCDOA claimed that there was coverage under the FM policy's

25 Ingress/Egress, Contingent Time Element, and Protection and Preservation of

26 Property coverage extensions.  (UF 57.)

27     On April 16, 2002, and after conducting a full and complete investigation, FM

28 denied CCDOA's claim for the following reasons, among others:

1    •    There was no coverage under the Civil Authority coverage because the
2         FAA orders grounding all aircraft did not directly result from physical
3         damage at or within 1,000 feet of any CCDOA airport as required by
4         the policy;

5    •    There was no coverage under the Ingress/Egress provision because
6         ingress to or egress from CCDOA airports was not prevented as a
7         direct result of physical damage of the type insured against as required
8         by the policy;

9    •    There was no coverage under the FM policy's Contingent Time
10        Element coverage because there was no physical loss or damage at any
11        direct supplier or customer location as required by the policy; and

12   •    There was no coverage under the Protection and Preservation of
13        Property – Time Element coverage because there was no immediately
14        impending physical loss or damage at any CCDOA airport as required
15        by the policy.

16   (UF 58.)

17   **8.    CCDOA Sues FM.**

18        On August 30, 2002, CCDOA sued FM for declaratory relief, breach of
19   contract, Unfair Claims Settlement Practices, and bad faith.  (UF 59.)

20   **9.    A Federal District Court In Illinois Granted Summary Judgment to FM**
21        **on the City of Chicago's Identical September 11 Airport Claim.**

22        Like CCDOA here, the City of Chicago—the owner of O'Hare International
23   Airport, Meigs Field, and Chicago Midway Airport—submitted a claim to FM for
24   business interruption losses caused by the FAA's September 11, 2001 ground stop
25   order. *See City of Chicago v. Factory Mut. Ins. Co.*, 2004 U.S. Dist. LEXIS 4266,
26   No. 02 C 7023 (N.D. Ill. March 11, 2004) (notice of appeal filed).  Also as here, FM
27   denied the claim. *Id.* at *3-4.  On March 11, 2004, the Court granted FM summary
28   judgment, finding no coverage for the City's claim. *Id.* at *13.

1    Construing a similar Ingress/Egress coverage provision, the Court found no

2    coverage as a matter of law.  Indeed, the Court found that the *direct* cause of the

3    City's loss was the FAA's ground stop order:

4           More precisely, the direct cause of the business
            interruption suffered by the City was the FAA ground
5           stop order, which was an order of civil authority.

6    *Id.* at *10.  Like the FM policy here, the policy issued to the City provided coverage

7    for the loss of access caused by an order of civil authority only if the order was "the

8    direct result of physical damage of the type insured against under this policy at the

9    described location or within 1,000 feet of it." *Id.* at *11.  The Court found that this

10   limitation defeated coverage because the claimed damage was in New York and

11   Washington D.C. *Id.*

12         The Court further found that the FAA ground stop order was imposed to

13   prevent further terrorist attacks:

14          The ground stop order was ultimately imposed to protect
            against any further terrorist attacks like those that
15          damaged and/or destroyed the World Trade Center and
            the Pentagon.
16
17   *Id.* at *12.  The Court concluded that the damage to the World Trade Center and the

     Pentagon was only an *indirect* cause of the FAA ground stop order and the
18
     policy—like the FM policy here—did not cover "indirect or remote loss or damage":
19
            Thus, although ingress to and egress from the airport[s]
20          were prevented by the FAA's order and were indirectly
            caused by terrorist-inflicted damage, this damage is one
21          of the types of damage excluded by this policy in that it
            was indirect and remote damage inflicted upon the World
22          Trade Center and the Pentagon.

23   *Id.* at *7-8.

24         Lastly, the Court rejected the City's claim that there was coverage under the

25   FM policy's Protection and Preservation of Property coverage provision, which like

26   the one in FM's policy here, is limited to business interruption caused by temporary

27   actions "to prevent immediately impending physical loss or damage insured by this

28   policy." *Id.* at *12.  The Court found "no evidence that the FAA's ground stop was

in any way imposed in order to protect Midway, O'Hare, or Meigs Field from immediately impending physical loss or damage." *Id.*

### C. Argument

1. **Summary Judgment Is Appropriate Where, as Here, There Is No Genuine Issue of Material Fact, and the Moving Party Is Entitled to Judgment as a Matter of Law.**

Under Rule 56(c), summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Fed. R. Civ. P. 56(c).

FM, as the moving party, has the initial burden of demonstrating that summary judgment is proper. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to set forth specific facts demonstrating a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Summary judgment shall be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, at 322.

As the insured, CCDOA bears the burden of proving at trial that its alleged loss falls within the terms of the various provisions under which it seeks coverage. *See, e.g., Lucini-Parish Ins., Inc. v. Buck*, 836 P.2d 627, 629 (Nev. 1992). *See generally* 17 Lee R. Russ, *Couch on Insurance 3d* § 254.11, at 254-27 (2001) ("The principle that the insured has the burden of proving that its claimed loss falls within the coverage of the insurance policy is sufficiently established to be described as 'hornbook law.'"). But as will be seen, CCDOA cannot meet its burden and cannot present evidence that there remain genuine issues for trial.

/ / /

/ / /

/ / /

/ / /

20078655.1                                    14

2.     **The FM Policy's Civil Authority Coverage Does Not Apply Because There Was No Physical Loss or Damage At or Within 1,000 Feet of Any CCDOA Airport.**

Where a governmental authority *prohibits* access to the insured's premises, coverage, if any, potentially exists only under the FM Policy's Civil Authority coverage:

> **2.     TIME ELEMENT COVERAGES**
>
> > **A.     GROSS EARNINGS**
> >
> > > . . . Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY: . . .
>
> **4.     PERIOD OF LIABILITY**
>
> > \* \* \*
> >
> > If an order of civil authority prohibits access to the Insured Location and provided such order is the direct result of physical damage of the type insured against under this Policy at the Insured Location or within 1,000 feet of it, the period of time:
> >
> > a) starting at the time of such physical damage; but
> >
> > b) not to exceed 30 consecutive days.

(UF 6, 7.)

Here, CCDOA's Rule 30(b)(6) designee and Director of Aviation Randall Walker, testified that CCDOA's claimed loss of access was the direct result of the FAA's orders—orders of civil authority:

> Q.     Let's move on to subject matter 2 in Exhibit 1 [the Rule 30(b)(6) deposition notice]: "The manner by which CCDOA claims that ingress to or egress from its airports was prevented on September 11th through the 13th, 2001" Can you describe the manner in which CCDOA claims that ingress to or egress from its airports was prevented on September 11, 2001?
>
> A.     First off, all airplanes were prohibited by federal order from flying, so no airplanes could arrive at our airport or leave from our airport under federal order.
> In addition to that, the terminal needed to be vacated for security reasons, so the terminal was closed to all nonbadged individuals, and the roadways into the

airport were blocked and – to allow the airport to be able to have control of the airport in a sterile environment and be able to do its security checks in accordance with the FAA directives.

(UF 50.)  Mr. Walker further testified that the prevention of ingress and egress began "[a]s soon as the FAA grounded all the aircraft" and ended "[w]hen the FAA authorized aircraft to begin operations into McCarran once again."  (UF 51.)

Thus, any lack of access was the direct result of orders of civil authority.  But there is no coverage here because FM's Civil Authority provision requires that the order of civil authority be the direct result of physical damage at or within 1,000 feet of an insured location, which indisputably did not occur.  (UF 7, 38.)

That is precisely what the court found in the City of Chicago's identical 9/11 airport claim:

> More precisely, the direct cause of the business interruption suffered by the City was the FAA ground stop order, which was an order of civil authority.

*City of Chicago*, 2004 U.S. Dist. LEXIS 4266, at *10.  In *City of Chicago*, the court granted FM summary judgment, reasoning that the policy's Civil Authority provision applied only when the governmental order prohibiting access is the direct result of physical damage of the type insured at or within 1,000 feet of an insured location—something which obviously did not occur.  *Id.* at *10-11.

As in *City of Chicago*, the FM policy's Civil Authority provision provides coverage only when the governmental order prohibiting access is the direct result of physical damage of the type insured at or within 1,000 feet of an insured location.  Thus, and just as in *City of Chicago*, the requirements of FM's Civil Authority provision have not been met.

**3.**     **The FM Policy's Ingress/Egress Coverage Does Not Apply Because Ingress To or Egress From the CCDOA Airports Was Not Prevented As a Direct Result of Physical Damage of the Type Insured.**

The FM Policy's Ingress/Egress coverage extension applies only where ingress to or egress from an insured location was *prevented* "as a *direct* result" of

1    certain physical damage:

2                    **C.      INGRESS/EGRESS**

3              This Policy covers the Actual Loss Sustained and
            EXTRA EXPENSE incurred by the Insured due to
4            the necessary interruption of the Insured's business
            due to prevention of ingress to or egress from an
5            Insured Location, whether or not the premises or
            property of the Insured is damaged, provided that
6            such prevention is a direct result of physical
            damage of the type insured by this Policy, to the
7            kind of property not excluded by this Policy.

8    (UF 9.)  As explained below, CCDOA cannot meet the prerequisites of coverage.

9        **a.     The Damage to the World Trade Center and Pentagon Did Not**

10              **Prevent Ingress to or Egress From CCDOA's Airports.**

11       An insurance "policy must be read as a whole in order to give a reasonable

12   and harmonious meaning and effect to all its provisions." *Nat'l Union Fire Ins. Co.*

13   *v. Reno's Exec. Air, Inc.*, 682 P.2d 1380, 1383 (Nev. 1984).  Where, as here, contract

14   language is unambiguous, a court cannot, under the guise of interpretation, distort

15   the plain meaning of the contract.  *Watson v. Watson*, 596 P.2d 507, 508 (Nev.

16   1979).

17       The Ingress/Egress coverage requires that the "prevention" of ingress to or

18   egress from an insured location be "a *direct* result of physical damage of the type

19   insured."[2]  A "direct" result is one "[m]arked by absence of an intervening agency,

20   instrumentality, or influence . . . ."  *Webster's Third New International Dictionary*

21   640 (1993).  In contrast, an "indirect" result is one "not resulting directly from an

22   action or cause."  *Id.* at 1151.

23       Here, the alleged "prevention" of ingress to and egress from CCDOA's

24   airports did not result directly from the damage to the World Trade Center and

25   Pentagon.  Thus, the alleged "prevention" was not the "direct result" of any physical

26   damage.  Rather, and as conceded by CCDOA's Rule 30(b)(6) designee, CCDOA's

27

28   ———————————

    [2]       "Ingress" means "the act of entering," and "egress" means "the act or right
    of going or coming out."  *Webster's Third New International Dictionary* 727, 1162 (1993).

    20078655.1                           17

1  claimed loss of access to its airports was the "direct result" of the FAA's orders.

2  (UF 40, 50.)  Accordingly, there is no coverage.

3       **b.       "Prevention" Requires a Physical Prevention of Ingress or Egress**.

4       "Prevent" means "to keep from happening or existing . . . make impossible

5  through advance provisions . . . to hold or keep back (one about to act): HINDER,

6  STOP . . . to make something impossible . . . PREVENT implies an insurmountable

7  obstacle or impediment."  *Webster's Third New International Dictionary* 1798

8  (1993).   "Prevention" similarly means "the act of preventing or hindering:

9  obstruction or thwarting of action, access, or approach."  *Id.*

10      Hence, for coverage to exist, there must be some "obstruction" or "thwarting

11 of . . . access" that occurs "as a direct result of physical damage of the type insured."

12 It follows that there must be a *physical* prevention of ingress or egress.

13      Indeed, had "prevention" in the Ingress/Egress coverage meant to include an

14 order of civil authority forbidding access, the word *"prohibited,"* would have been

15 used—just as it is used in the Civil Authority coverage.  The word "prohibit" means

16 "to forbid by authority or command."  *Id.* at 1813.   Notably, CCDOA's Rule

17 30(b)(6) designee used the word "prohibited" to describe the effect of the FAA

18 orders on access to CCDOA's airports:

19      Q.    . . . Can you describe the manner in which CCDOA
         claims that ingress to or egress from its airports was
20       prevented on September 11, 2001?

21      A.    First off, all airplanes were *prohibited* by federal
         order from flying, so no airplanes could arrive at our
22       airport or leave from our airport under federal order. . . .
    (UF 50.)

23
        Q.    What prevented a plane from taking off from any of
24       the CCDOA airports on September 11 after the order?

25      A.    It was in violation of federal directives.

26      Q.    There was nothing wrong with the runways at any
         of the airports, right?
27
        A.    No, runways all functioned fine.
28

20078655.1                                    18

1      Q.    But there was an order from the FAA that said planes could not
2  take off, right?

    A.    Planes were *prohibited* from being in the air space,
3  so therefore they couldn't take off or land.

4  (UF 52.)

5         The fact remains that the FM policy draws a distinction between "*prevention*"

6  and "*prohibits*" when used to describe a lack of access. And this confirms that the

7  Civil Authority and Ingress/Egress coverage provisions are mutually exclusive and

8  apply in different situations. Specifically, the Civil Authority coverage applies only

9  where access is *prohibited* by an order of civil authority. In contrast, the

10  Ingress/Egress coverage applies only where there is a physical *prevention* of access.

11         To summarize, the word "prevention" as used in the FM Policy's

12  Ingress/Egress provision means physical prevention and not a governmental order

13  prohibiting access. While the FAA's September 11 orders may have *prohibited*

14  planes from taking off and landing, they did not *prevent* them from doing so. An

15  airplane could take off or land. And that in fact occurred: a FAA controller cleared

16  a Federal Express airplane for take off from an airport in Great Falls, Montana after

17  the FAA groundstop order was issued. (UF 53.)

18         Similarly, the FAA specifically allowed certain aircraft to take off and land

19  after issuance of the FAA ground stop order and before the September 13 reopening

20  of the nation's airspace, including aircraft carrying medical supplies and Federal

21  Reserve checks. (UF 53.) And on September 12—during the time that CCDOA

22  claims that ingress to or egress from its airports was "prevented"—aircraft that were

23  diverted on September 11 were allowed to continue to their original destinations.

24  (UF 48.) There were two or three such aircraft that took off or landed at CCDOA's

25  McCarran airport on September 12. (UF 54.)

26         In short, there was no "prevention" of ingress to or egress from CCDOA's

27  airports. Summary judgment must be granted.

28

**4.   CCDOA's Interpretation of the Ingress/Egress Coverage Improperly Contradicts Well-Settled Principles of Construction that Contracts Should Be Construed So As to Avoid Rendering Portions of Them Superfluous.**

Because CCDOA cannot establish coverage under the Civil Authority provision (because the FAA orders were not issued as a direct result of physical damage at or within 1,000 feet of its airports), CCDOA now interprets the Ingress/Egress coverage to apply where an order of civil authority prohibits access to an insured location.  But as discussed below, this interpretation improperly renders the entire Civil Authority coverage meaningless, which is contrary to settled Nevada law.

In Nevada, an insurance "policy must be read as a whole in order to give a reasonable and harmonious meaning and effect to all its provisions." *Nat'l Union Fire Ins. Co. v. Reno's Exec. Air, Inc.*, 682 P.2d 1380, 1383 (Nev. 1984).  Thus, a "basic rule of contract interpretation is that '[e]very word must be given effect if at all possible.'" *Musser v. Bank of Am.*, 964 P.2d 51, 54 (Nev. 1998) (quoting in part *Royal Indem. Co. v. Special Serv.*, 413 P.2d 500, 502 (Nev. 1966)).  "A court should not interpret a contract so as to make meaningless its provisions." *Phillips v. Mercer*, 579 P.2d 174, 176 (Nev. 1978).

As demonstrated above, the Civil Authority and Ingress/Egress coverages are two separate, distinct, and mutually exclusive coverages that apply in different situations: the Civil Authority coverage applies only where access is *prohibited* by an order of civil authority, while the Ingress/Egress coverage applies only where there is a physical *prevention* of access.

This distinction has been recognized by courts and commentators.  As one commentator explained:

> • **Civil Authority Coverage.** This coverage insures the policyholder against lost business income and expenses resulting when a governmental authority denies access to the policyholder's premises.  This coverage may

require that damage has been sustained to other property.

\* \* \*

•   **Ingress/Egress Coverage.** This coverage protects against lost business income and extra expense when the policyholder's premises are inaccessible for a reason other than governmental action or authority.

*See* Lorelie S. Masters, *Terrorism Insurance*, Legal Times, Apr. 15, 2002, at 31, *available at* LEXIS, News & Business Library, Legal Times File.

Thus, Civil Authority coverage applies where a  governmental authority prohibits access to the insured premises. *See, e.g., Sloan v. Phoenix of Hartford Ins. Co.*, 207 N.W.2d 434 (Mich. Ct. App. 1973) (governor ordered curfew and closure of places of amusement after widespread rioting which prohibited access to insured's movie theaters).  In contrast, Ingress/Egress coverage applies where a reason other than an order of civil authority—namely physical loss or damage—prevents access to the insured's premises. *See, e.g., Fountain Powerboat Indus., Inc. v. Reliance Ins. Co.*, 119 F. Supp. 2d 552 (E.D.N.C. 2000) (flood blocked access roads).

If, as CCDOA now claims, the Ingress/Egress provision also applies when an order of civil authority (allegedly issued as direct result of physical damage) "prevented" ingress or egress to the insured premises, there would never be a need to resort to the Civil Authority coverage because such coverage is already available under the Ingress/Egress provision. Additionally, applying the Ingress/Egress provision to provide coverage where an order prohibiting access is not the result of physical damage at or within 1,000 feet of the insured location would render that limitation in the Civil Authority provision meaningless.  In short, CCDOA's interpretation renders superfluous the entire Civil Authority provision.  But that "interpretation contradicts the principle discussed above, that contracts should be construed so as to avoid rendering portions of them superfluous." *Musser v. Bank of Am.*, 964 P.2d 51, 54 (Nev. 1998).

Accordingly, CCDOA's attempt to create a second civil authority coverage provision—but one without limits under the Ingress/Egress provision—must be rejected.

## 5.   The FAA Orders Were Not Issued as the Direct Result of Physical Damage.

CCDOA argues that there is Ingress/Egress coverage because the FAA orders were issued as a direct result of physical damage to the World Trade Center and Pentagon. This argument, however, is irrelevant and fails for at least three reasons: (1) CCDOA's claimed prevention of ingress and egress was caused by orders of civil authority, and the Civil Authority coverage does not apply because the FAA orders were not issued as a direct result of physical loss or damage at or within 1,000 feet of any CCDOA airport; (2) there was no physical prevention of access as required by the Ingress/Egress provision; and (3) CCDOA's interpretation of the Ingress/Egress provision improperly renders superfluous the policy's Civil Authority coverage. But in addition, CCDOA is just wrong.

### a.   The FAA's Ground Stop Order Was Issued For Reasons of Safety.

The ground stop order—a traffic management tool—was issued by FAA National Operations Manager Ben Sliney. (UF 25, 29.) As National Operations Manager, Sliney's mandate was to insure the safe and efficient operation of the national airspace system and, thus, he had authority to issue orders to insure the safe and efficient operation of the national airspace system. (UF 18, 19.) Thus, safety and efficiency were what concerned Mr. Sliney.

And safety was the reason for the ground stop order. Indeed, after American Flight 11 was hijacked, Mr. Sliney learned of a radio transmission from that plane to the effect that "we have more planes." (UF 20.) Consequently, the FAA was concerned that additional planes had been hijacked. In fact, the FAA was tracking all "suspicious" aircraft and recording them on a status board. (UF 23.) At one point, there were as many as 10-12 planes on this status board. (UF 24.)

20078655.1                                    22

1     After the second crash into the World Trade Center, Mr. Sliney was

2  concerned that hijacked aircraft were being used as guided missiles. (UF 27.) And

3  when it became apparent that there were guided missiles flying around, the FAA

4  decided to stop aircraft from taking off, first in New York, then Boston, then Los

5  Angeles, then most of the East Coast, and finally, at 9:26 a.m., a national ground

6  stop. (UF 25, 28.) Mr. Sliney issued the national ground stop order pursuant to his

7  mandate to insure the safe and efficient operation of the national airspace system.

8  (UF 30.)

9     Furthermore, "safety" was cited as the reason for the order in the FAA's

10  NOTAM , which "reaffirmed" its earlier orders:

11         FDC SPECIAL NOTICE. DUE TO EXTRAORDINARY
        CIRCUMSTANCES   AND   FOR   REASONS   OF
12        SAFETY,   ATTENTION   ALL   AIRCRAFT
        OPERATORS,  BY  ORDER  OF  THE  FEDERAL
13        AVIATION   COMMAND   CENTER   ALL
        AIRPORTS/AIRDROMES ARE NOT AUTHORIZED
14        FOR LANDING AND TAKEOFF.   ALL TRAFFIC
        INCLUDING   AIRBORNE   AIRCRAFT   ARE
15        ENCOURAGED TO LAND SHORTLY. . ..

16  (UF 34.)

17     As the NOTAM "reaffirming" the earlier orders makes clear, safety was the

18  reason for the orders.  This NOTAM says nothing about the damage to the World

19  Trade Center or Pentagon and instead expressly references "for reasons of safety."

20     This safety-related concern was cited again by Secretary of Transportation

21  Norman Mineta in his September 20, 2001 Congressional testimony:

22         On the morning of September 11th, on the first word of
        the attack, I moved directly to the Presidential Emergency
23        Operations Center in the White House.  As soon as I was
        aware of the nature and scale of the attack, I called from
24        the White House to order the air traffic system to land all
        aircraft, immediately and without exception.  That was an
25        unprecedented step. *But with the risk of additional flights
        that might be used as terrorist weapons, I believe that it
26        was the right and necessary step to take.*

27  (UF 35.)

28

20078655.1                           23

1    Similarly, FAA Administrator Jane F. Garvey testified before Congress that

2    the air operations were shut down because of the risk of additional hijackings:

3           On the morning of September 11th, there were 4,873
            instrument flight rule (IFR) flights operating in U.S.
4           airspace. As soon as Secretary Mineta was aware of the
            nature and scale of the terrorist attack on New York and
5           Washington–that we were faced with, not one, but four
            possible hijackings, and several other rumors of missing
6           or unidentified aircraft–the Secretary ordered the air
            traffic system shut down for all civil operations.
7
      (UF 36.)
8
9           In sum, the ground stop order was issued for reasons of safety not because of

10   damage to the World Trade Center or Pentagon. That is precisely what the Court

11   in *City of Chicago* found:

12          The ground stop order was ultimately imposed to protect
            against any further terrorist attacks like those that
13          damaged and/or destroyed the World Trade Center and
            the Pentagon.

14   *City of Chicago*, 2004 U.S. Dist. LEXIS 4266, at *12.

15          To be sure, the damage to the World Trade Center and Pentagon had already

16   occurred and there would be no rational safety reason to stop all take offs and

17   landings across the United States because of that already-existing damage. But there

18   was a valid safety-related concern that other aircraft may be hijacked and used in a

19   terrorist act. And this safety-related concern about possible additional hijackings

20   and terrorist acts was indisputably the reason for the FAA's order.

21        **b.   The FAA Order to Comply With New Security Directives Was**

22             **Issued For Reasons of Safety.**

23          CCDOA's Rule 30(b)(6) designee also claimed that ingress to and egress from

24   CCDOA airports was "prevented" because "the terminal needed to be vacated for

25   security reasons, so the terminal was closed to all nonbadged individuals, and the

26   roadways into the airport were blocked and – to allow the airport to be able to have

27   control of the airport in a sterile environment and be able to do its security checks

28   in accordance with the FAA directives." (UF 50.)  Again, CCDOA—which bears

the burden of proof—can proffer no evidence that this FAA order was the direct result of any physical damage.

Indeed, CCDOA's Deputy Director of Aviation Rosemary Vassiliadis testified that these measures were undertaken to "assure the best that we could that there wasn't an act of terrorism being planned for that location." (UF 45.) In other words, this FAA order was issued for reasons of safety.

**c.    The Ground Stop Order Was Extended For Reasons of Safety.**

On September 12, 2001, the FAA temporarily extended the ground stop order imposed on September 11. Again, CCDOA can proffer no evidence whatsoever that this order was the "direct result" of the damage to the World Trade Center or Pentagon. Like the other FAA orders, the ground stop was extended for reasons of safety. To be sure, Transportation Secretary Mineta extended the ground stop order "while additional security measures are being completed." (UF 48.) These additional security measures included: establishment of a 300-foot perimeter for parked vehicles; suspension of curbside check-ins; more frequent searches of carry-on baggage; increased presence of uniformed and plainclothes security personnel; and allowing only passengers with a flight ticket and identification past the security gates. (UF 46.)

These additional security measures were intended to reduce the likelihood of aircraft being hijacked and used in a terrorist attack. (UF 47.) In fact, when he announced the order extending the ground stop, Secretary Mineta said that "Safety is always of paramount importance, and in these extraordinary times we intend to be vigilant." (UF 48.) And as FAA National Operations Manager Ben Sliney put it, the FAA was going to permit only those aircraft that it "deemed to be secure enough not to become a guided missile" to "fly in the national air space system" (UF 47.)

In short, there is no evidence that the order extending the September 11 ground stop was issued as a "direct result" of any physical damage.

**6.**    **The Contingent Time Element Coverage Does Not Apply Because CCDOA Did Not Sustain Any Business Interruption Loss Directly Resulting From Physical Damage to Property at a Direct Customer or Supplier Location.**

CCDOA also seeks coverage under the Contingent Time Element coverage:

> **A.**    **CONTINGENT TIME ELEMENT**
>
> This Policy covers the Actual Loss Sustained and EXTRA EXPENSES incurred by the Insured during the PERIOD OF LIABILITY:
>
> 1)    directly resulting from physical loss or damage of the type insured; and
>
> 2)    to property of the type insured, at any locations of direct suppliers or customers located within the TERRITORY of this Policy.

For Contingent Time Element coverage to apply, CCDOA must prove that its alleged business income and extra expense losses were the ***direct*** result of physical loss or damage of the type insured to property of the type insured at locations of CCDOA's ***direct*** suppliers or customers.

To that end, CCDOA relies on damage to a Delta Airlines ticket office and several travel agencies located in the World Trade Center. (UF 40.)[3] But as CCDOA concedes, its airports were not closed because of the damage to the Delta ticket office and travel agencies, but rather "because of the orders from the Federal Aviation Administration that shut down the national air system." (UF 40.)

Hence, The Contingent Time Element coverage does not apply because CCDOA did not sustain any business interruption loss directly resulting from physical damage to property at a direct customer or supplier location.

---

[3]    FM does not concede that the Delta ticket office and travel agencies are "direct suppliers or customers" within the meaning of the Contingent Time Element coverage.

7.  **The Protection and Preservation of Property Provision Does Not Apply Because There Was No Immediately Impending Physical Damage at CCDOA's Airports.**

CCDOA also seeks coverage under the FM policy's "Protection and Preservation of Property – Time Element" provision:

> **E.   PROTECTION AND PRESERVATION OF PROPERTY – TIME ELEMENT**
>
> This policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending physical loss or damage insured by this Policy at such insured property.

(UF 10.)

Thus, this coverage applies only where the insured's business operations were interrupted because the insured took reasonable measures to temporarily protect its property from immediately impending physical loss or damage.  But CCDOA concedes that there was no immediately impending physical loss or damage to any CCDOA property.  (UF 39.)   Therefore, there is no coverage.

8.  **CCDOA's Claims are Barred by the FM Policy's Remote and Indirect Loss Exclusion.**

The FM policy excludes coverage for any indirect or remote loss:

> **5.   EXCLUSIONS**
>
> The following exclusions apply unless specifically stated elsewhere in this Policy:
>
> A.   This Policy excludes:
>
> 1.   indirect or remote loss or damage.

(UF 11.)

"Indirect" loss is one "not resulting directly from an action or cause." *Webster's Third New International Dictionary* 1151 (1993). Similarly, a "remote" loss is one that does "not aris[e] from the effect of that which is primary or

proximate in its action." *Id.* at 1921.

CCDOA's alleged loss—which it claims was caused by physical damage to the World Trade Center and Pentagon located more than 2,000 miles away from its airports—is a classic indirect and remote loss. In fact, the court in the *City of Chicago* matter reached that very conclusion:

> An examination of the listed damage exclusions reveals that 'indirect or remote loss or damage' is excluded by the policy. (*Id.* at 29.) Thus, although ingress to and egress from the airport[s] were prevented by the FAA's order and were indirectly caused by terrorist-inflicted damage, this damage is one of the types of damage excluded by this policy in that it was indirect and remote damage inflicted upon the World Trade Center and the Pentagon.

*City of Chicago*, 2004 U.S. Dist. LEXIS 4266, at *7-8. Thus, CCDOA's claims are excluded.

## 9. Summary Judgment is Appropriate on CCDOA's Unfair Claims Settlement Practices and Bad Faith Claims.

CCDOA's third and fourth claims for relief are for unfair claim settlement practices under Nevada Revised Statute section 686A.310 and bad faith.

Nevada recognizes the existence of an implied covenant of good faith and fair dealing in every insurance contract. *See, e.g., Pemberton v. Farmers Ins. Exch.*, 858 P.2d 380, 382 (Nev. 1993). But to prevail on a bad faith claim, an insured must prove not only that the insurer's denial was without any reasonable basis but that "an actual or implied awareness of the absence of a reasonable basis for denying benefits of the policy." *Am. Excess Ins. Co. v. MGM Grand Hotels, Inc.*, 729 P.2d 1352, 1354-55 (Nev. 1986).

Where an insurer had a reasonable basis to deny the insured's claim, that insurer cannot be found liable for either violating the Unfair Claims Settlement Practices statute or bad faith as a matter of law. *See, e.g., Hummel v. Cont'l Cas. Ins. Co.*, 254 F. Supp. 2d 1183, 1192 (D. Nev. 2003) (Hicks, J.).

In *Hummel*, for example, the insured sought life insurance benefits after her daughter died after overdosing on prescription pain killers. Continental, however,

1   denied coverage based on an exclusion "for any loss caused by or resulting from
2   . . . (8) alcoholic intoxication or influence of drugs unless taken as prescribed by a
3   physician." *Id.* at 1185.  Hummel sued for breach of contract, bad faith, and for
4   violations of the Unfair Claims Settlement Practices statute.  *Id.*  The Court found
5   the exclusion to be ambiguous and contrary to required statutory language.  *Id.* at
6   1188-90.  Nevertheless, the Court granted summary judgment to Continental on
7   Hummel's bad faith and Unfair Claims Settlement Practices statute claims because
8   Continental's interpretation of its policy was reasonable.  *Id.* at 1191-92.

9       Here, FM's interpretation of its policy was not only reasonable, it is also
10   correct.  Accordingly, summary judgment is appropriate on the unfair claim
11   settlement practices and bad faith claims.

12   **10.   Summary Judgment Must Be Granted on CCDOA's Punitive Damages**
13   **Claim Because There is No Evidence of Any Oppression, Fraud, or**
14   **Malice.**

15       Finally, CCDOA asserts a claim for punitive damages.  Punitive damages
16   require more than "bad faith."  *United States Fid. & Guar. Co. v. Peterson*, 540 P.2d
17   1070, 1072 (Nev. 1975) (merely prevailing on a bad faith claim does not entail a
18   showing of sufficient abuse for the awarding of punitive damages).  Instead,
19   punitive damages are available only where "it is proven by clear and convincing
20   evidence that the defendant has been guilty of oppression, fraud, or malice."  Nev.
21   Rev. Stat. § 42.005, subd. (1).

22       Here, and as demonstrated above, CCDOA cannot survive summary judgment
23   on its bad faith claim.  Obviously, "a plaintiff who is not able to survive summary
24   judgment on an insurance bad faith claim, is also unable to survive summary
25   judgment on a related claim for punitive damages." *Adams v. Allstate Ins. Co.*, 187
26   F. Supp. 2d 1207, 1219 (C.D. Cal. 2002).  In any event, there is no evidence, let
27   alone the required clear and convincing evidence, that FM is guilty of oppression,
28   fraud, or malice. Thus, summary judgment must be granted on this claim.

### D. <u>Conclusion</u>

As explained above, the Ingress/Egress coverage applies only when ingress to or egress from an insured location has been prevented and only when that prevention is the direct result of physical damage. Here, the damage to the World Trade Center and Pentagon, located over 2,000 miles away, did not prevent ingress to and egress from CCDOA's airports. Instead, the alleged "prevention" of access was admittedly the direct result of FAA orders. And where access is not prevented by physical damage, but is instead prohibited by order of civil authority, coverage, if any, is provided only under the Civil Authority provision. But this coverage does not apply here because the orders of civil authority were not issued as a direct result of physical damage and because there was no physical damage at or within 1,000 feet of the insured location as required by the policy. CCDOA's contention that the Ingress/Egress provision applies when an order of civil authority "prevented" ingress or egress to the insured premises cannot be accepted because it improperly renders the Civil Authority coverage superfluous.

Additionally, the Contingent Time Element coverage does not apply because CCDOA did not sustain any business interruption loss directly resulting from physical damage to property at a direct customer or supplier location. Similarly, the Protection and Preservation of Property provision does not apply because there was no immediately impending physical damage at CCDOA's airports. Lastly, CCDOA's claims are barred by the policy's Remote and Indirect Loss exclusion.

Because CCDOA cannot meet its burden of proving coverage under the FM policy, summary judgment must be granted on all claims.

DATED: May 26, 2004      ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

By: _____
              Scott G. Johnson
Attorneys for Defendant FACTORY MUTUAL INSURANCE COMPANY

1   Richard J. Pocker
    Nevada Bar No. 003568
2   Dickerson, Dickerson, Consul & Pocker
    777 N. Rainbow Blvd., Suite 350
3   Las Vegas, Nevada 89107
    Telephone: (702) 388-8600
4   Facsimile: (702) 388-0210

5   Scott G. Johnson (CSB #153735) Admitted Pro Hac Vice
    David E. Bland (CSB #150581) Admitted Pro Hac Vice
6   Robins, Kaplan, Miller & Ciresi L.L.P.
    2800 LaSalle Plaza
7   800 LaSalle Ave.
    Minneapolis, Minnesota 955402-2015
8   Telephone: (612) 349-8500
    Facsimile: (612) 339-4181

9
    Attorneys for Defendant FACTORY
10  MUTUAL INSURANCE COMPANY

11              IN THE UNITED STATES DISTRICT COURT

12                 FOR THE DISTRICT OF NEVADA

13

14  COUNTY OF CLARK, a political            )  Case No: CV-S-02-1258-KJD-RJJ
    subdivision of the State of Nevada, on  )
15  behalf of Clark County Department of    )  **FACTORY MUTUAL INSURANCE**
    Aviation,                               )  **COMPANY'S STATEMENT OF**
16                                          )  **UNCONTROVERTED FACTS IN**
            Plaintiff,                      )  **SUPPORT OF ITS MOTION FOR**
17                                          )  **SUMMARY JUDGMENT**
    vs.                                     )
18                                          )  [Notice of Motion and Motion for
    FACTORY MUTUAL INSURANCE                )  Summary Judgment and Supporting
19  COMPANY, a Rhode Island                 )  Memorandum of Points and Authorities;
    Corporation, and DOES 1-10,             )  Affidavit of Scott G. Johnson; and
20                                          )  Proposed Order filed concurrently
            Defendant.                      )  herewith]
21                                          )
                                            )
22  _____        )

23          Pursuant to Local Rule 56-1, Defendant FACTORY MUTUAL INSURANCE

24  COMPANY ("FM") submits the following statement of facts that are not genuinely

    in issue along with the evidence upon which FM relies.
25
    ///
26
    ///
27
    ///
28

20086515.1

1  **A.  CCDOA and the FM Insurance Coverage.**

2  1.  Plaintiff CLARK COUNTY DEPARTMENT OF AVIATION

3  ("CCDOA") operates McCarran International Airport, North Las Vegas Airport,

4  Henderson Executive Airport, Jean Sport Aviation Center, Overton-Perkins Field,

5  and Searchlight Airfield.

6  **[CCDOA Complaint at ¶ 5, attached as Exhibit "1" to**

7  **Affidavit of Scott G. Johnson.]**

8  2.  FACTORY MUTUAL INSURANCE COMPANY ("FM") issued a

9  first-party property insurance policy to CCDOA effective October 1, 2000.

10  **[CCDOA Complaint at ¶ 9, attached as Exhibit "1" to**

11  **Affidavit of Scott G. Johnson.]**

12  3.  The FM policy provided coverage for both property damage and time

13  element (e.g., business interruption and extra expense) losses, subject to the policy's

14  terms, conditions, exclusions, and limitations.

15  **[FM Policy, attached as Exhibit "A" to CCDOA**

16  **Complaint .]**

17  4.  The property damage section of the policy generally provided coverage

18  for physical loss or damage to specified property of CCDOA caused by a non-

19  excluded risk.

20  **[FM Policy at pp. 7-24 , attached as Exhibit "A" to**

21  **CCDOA Complaint.]**

22  5.  The FM policy included the following provision:

23  **TIME ELEMENT - SECTION C**

24  **1.  LOSS INSURED**

25  A.  This Policy insures TIME ELEMENT loss,
   as provided in the TIME ELEMENT
26  COVERAGES, directly resulting from
   physical loss or damage of the type insured
27  by this Policy:

28

1          1)     to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;

          2)     used by the Insured, or for which the Insured has contracted use;

          3)     located at an Insured Location; and

          4)     during the Periods of Liability described in this section.

**[FM Policy at p. 25, attached as Exhibit "A" to CCDOA Complaint.]**

6.     The FM policy included the following provision:

**2.    TIME ELEMENT COVERAGES**

**A.    GROSS EARNINGS**

          1)     Measurement of Loss:

               a)     The recoverable GROSS EARNINGS loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

                    (i)     Gross Earnings;

                    (ii)     less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;

                    (iii)     less ordinary payroll;

                    (iv)     plus all other earnings derived from the operation of the business.

**[FM Policy at pp. 25-26 , attached as Exhibit "A" to CCDOA Complaint.]**

7.    The FM policy included the following provision:

**4.     PERIOD OF LIABILITY**

A.    The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except LEASEHOLD INTEREST and as shown below, or if otherwise provided under the TIME ELEMENT COVERAGE EXTENSIONS, is as follows:

* * *

8)    If an order of civil authority prohibits access to the Insured Location and provided such order is the direct result of physical damage of the type insured against under this Policy at the Insured Location or within 1,000 feet of it, the period of time:

a)    starting at the time of such physical damage; but

b) not to exceed 30 consecutive days.

**[FM Policy at pp. 33, 35 , attached as Exhibit "A to CCDOA Complaint.]**

8.    The FM policy includes the following time element coverage extensions:

**3.     TIME ELEMENT COVERAGE EXTENSIONS**

**A.     CONTINGENT TIME ELEMENT**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSES incurred by the Insured during the PERIOD OF LIABILITY:

1)    directly resulting from physical loss or damage of the type insured; and

2)    to property of the type insured,

at any locations of direct suppliers or customers located within the TERRITORY of this Policy.

The term "supplier or customer" does not include any company supplying to or

receiving from the Insured Location, as described elsewhere in this Policy, electricity, fuel, gas, water, steam, refrigeration, sewage or telecommunications.

**[FM Policy at p. 30, attached as Exhibit "A" to CCDOA Complaint.]**

9.     The FM policy included the following time element coverage extensions:

### 3.     TIME ELEMENT COVERAGE EXTENSIONS

\* \* \*

### C.     INGRESS/EGRESS

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured due to the necessary interruption of the Insured's business due to prevention of ingress to or egress from an Insured Location, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured by this Policy, to the kind of property not excluded by this Policy.

**[FM Policy at p. 31, attached as Exhibit "A" to CCDOA Complaint.]**

10.     The FM policy included the following time element coverage:

### 2.     TIME ELEMENT COVERAGES

\* \* \*

### E.     PROTECTION AND PRESERVATION OF PROPERTY – TIME ELEMENT

The Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending physical loss or damage insured by this Policy at such insured property.

**[FM Policy at p. 31, attached as Exhibit "A" to CCDOA Complaint.]**

11.     The FM policy included the following provision:

     **5.     EXCLUSIONS**

          The following exclusions apply unless specifically
          stated elsewhere in this Policy:

          A.     This Policy excludes:

               1.     indirect or remote loss or damage.

**[FM Policy at p. 21, attached as Exhibit "A" to CCDOA Complaint.]**

**B.     The Events of September 11, 2001.**

12.     At approximately 8:00 a.m. EDT on September 11, 2001, American Airlines Flight 11, a Boeing 767, took off from Boston's Logan airport for Los Angeles.

**[*The FAA Responds*, attached as Exhibit "2" to Affidavit of Scott G. Johnson.]**

13.     At approximately 8:14 a.m. EDT, United Airlines Flight 175, another Boeing 767, also took off from Boston's Logan airport for Los Angeles.

**[*The FAA Responds*, attached as Exhibit "2" to Affidavit of Scott G. Johnson.]**

14.     At approximately 8:21 a.m. EDT, American Airlines Flight 77, a Boeing 757, took off from Washington Dulles airport for Los Angeles.

**[*The FAA Responds*, attached as Exhibit "2" to Affidavit of Scott G. Johnson.]**

15.     At approximately 8:41 a.m. EDT, United Airlines Flight 93, a Boeing 757, took off from Newark airport for San Francisco.

**[*The FAA Responds*, attached as Exhibit "2" to Affidavit of Scott G. Johnson.]**

16.     Sometime before 8:46 a.m. EDT, American Airlines Flight 11 was hijacked.

[*The FAA Responds*, attached as Exhibit "2" to
Affidavit of Scott G. Johnson.]

17.     Benedict Sliney was one of five FAA National Operations Managers and the one on duty on September 11, 2001.

[Deposition of Benedict Sliney at pp. 18:21 - 19:2,
attached as Exhibit "3" to Affidavit of Scott G.
Johnson.]

18.     FAA National Operations Manager Benedict Sliney testified as follows:

Q.     . . . I believe you said as national operations manager, you had complete authority over the entire air traffic system during your assigned shift?

A.     Yes, to ensure the safe and efficient operation of that system, that was my charge and since September 11, they have added secure to that charge, the safe, secure and efficient operation of the national air space system.

[Deposition of Benedict Sliney at p. 19:3-11, attached
as Exhibit "3" to Affidavit of Scott G. Johnson.]

19.     FAA National Operations Manager Benedict Sliney testified as follows:

Q.     As national operations manager, during your shift, were there any limits to your authority?

A.     No, not with respect to a lawful order given to ensure the safe and efficient operation of the national air space system.

[Deposition of Benedict Sliney at p. 20:2-7, attached as
Exhibit "3" to Affidavit of Scott G. Johnson.]

20.     After American Airlines Flight 11 was hijacked, FAA National Operations Manager Benedict Sliney learned of a radio transmission from that plane to the effect that "we have more planes."

1    **[Deposition of Benedict Sliney at pp. 59:14 - 60:14,**

2    **attached as Exhibit "3" to Affidavit of Scott G.**

3    **Johnson.]**

4    21.    At approximately 8:46 a.m. EDT, American Airlines Flight 11 crashed

5    into the north tower of the World Trade Center.

6    **[CCDOA Complaint at ¶ 20, attached as Exhibit "1"**

7    **to Affidavit of Scott G. Johnson.]**

8    22.    At approximately 9:02 a.m. EDT, United Airlines Flight 175 crashed

9    into the south tower of the World Trade Center.

10    **[CCDOA Complaint at ¶ 21, attached as Exhibit "1"**

11    **to Affidavit of Scott G. Johnson.]**

12    23.    On September 11, 2001 at the FAA National Operations headquarters,

13    the FAA was tracking all "suspicious" aircraft—aircraft that were not on their

14    proper route or were not communicating with the FAA—and recording them on a

15    status board.

16    **[Deposition of Benedict Sliney at pp. 29:8-15, 58:2-13,**

17    **attached as Exhibit "3" to Affidavit of Scott G.**

18    **Johnson.]**

19    24.    At one point, there were as many as 10-12 planes on the status board.

20    **[Deposition of Benedict Sliney at p. 44:1-7, attached as**

21    **Exhibit "3" to Affidavit of Scott G. Johnson.]**

22    25.    FAA National Operations Manager Benedict Sliney testified as

23          follows:

24          Q.  Did anyone direct you to issue that national ground
            stop or did you issue it on your own authority?

25
            A.    I don't like those two choices. No one directed me
26          to issue that national ground stop, no one did.

27          Q.    You issued it on your own?

28          A.    I issued it on my own authority. That's somewhat

– the reason I said I didn't like that choice is because I listened to and I have available to me the accumulated wisdom and advice of all those specialists. We regularly met on that day to discuss alternatives and what we should do. When it became apparent that there were essentially missiles flying around, we decided to – we stopped aircraft from taking off first. We did that in a series of movements that are somewhat depicted here. First, we stopped in New York. Then we stopped Boston. Then we stopped – although I don't see it here, we stopped Los Angeles because of the connection with the Los Angeles flights to be sure we stopped everything out there. Then we stopped almost the whole east coast and then the national ground stopped. . . .

**[Deposition of Benedict Sliney at pp. 40:16 - 41:15, attached as Exhibit "3" to Affidavit of Scott G. Johnson.]**

26.   FAA National Operations Manager Benedict Sliney testified as follows:

Q.   You had made another comment during your testimony that you said when it was apparent that there were missiles flying around you stopped aircraft first in

New York, Boston, Los Angeles, the east coast and the national ground stop?

A.   Yes.

Q.   What did you mean when you said it was apparent there were missiles flying around?

A.   That they were purposefully directing planes into buildings or structures or deliberately destroying them. It seemed to me in my mind similar to a missile that we had no control over.

**[Deposition of Benedict Sliney at pp. 57:13 - 58:1, attached as Exhibit "3" to Affidavit of Scott G. Johnson.]**

27.   FAA National Operations Manager Benedict Sliney testified as follows:

Q.   You did have a concern there may be other planes out there that would be used as guided missiles effectively, right?

A.     Not at that juncture. At that juncture, my concern was what was the import of several high-jackings.

Q.     After the World Trade Center had been struck not once, but twice, you had a concern?

A.     Absolutely. That was one of those many factors that was in my mind that I alluded to earlier.

Q.     One of the many factors that fed into your decision to issue the ground stop order, correct?

A.     Correct.

Q.     And the order to direct all planes at the nearest airport, correct?

A.     Correct.

**[Deposition of Benedict Sliney at p. 61:7-23, attached as Exhibit "3" to Affidavit of Scott G. Johnson.]**

28.     The FAA's national ground stop order, which banned takeoffs of all civilian aircraft regardless of destination, was issued at approximately 9:26 a.m. EDT on September 11, 2001.

**[Deposition of Benedict Sliney at pp. 38:20 - 39:3, attached as Exhibit "3" to Affidavit of Scott G. Johnson.]**

29.     A "ground stop is a traffic management tool."

**[Deposition of Benedict Sliney at p. 39:14-15, attached as Exhibit "3" to Affidavit of Scott G. Johnson.]**

30.     FAA National Operations Manager Benedict Sliney testified as follows:

Q.     You mentioned that you had a mandate, I hope I am stating this correctly. If not, please correct me – to ensure the safe and efficient operation of the air traffic system?

A.     Of the national air space system.

Q.     Then you were asked about what orders you could give. You could give orders within that mandate, is that what you said?

A.     That is what I said.

1        Q.    Like the ground stop order being an example?

2        A.    Yes.

3        **[Deposition of Benedict Sliney at p. 57:1-12, attached**

4        **as Exhibit "3" to Affidavit of Scott G. Johnson.]**

5        31.    At approximately 9:40 a.m. EDT, American Airlines Flight 77 crashed

6  into the Pentagon.

7        **[CCDOA Complaint at ¶ 23, attached as Exhibit "1"**

8        **to Affidavit of Scott G. Johnson; Deposition of**

9        **Benedict Sliney at p. 44:11-17, attached as Exhibit "3"**

10        **to Johnson Affidavit.]**

11        32.    At approximately 9:45 a.m., FAA National Operations Manager

12  Benedict Sliney ordered all aircraft to land at the nearest  airport as soon as

13  practical.

14        **[Deposition of Benedict Sliney at p. 45:1-15, attached**

15        **as Exhibit "3" to Affidavit of Scott G. Johnson.]**

16        33.    At approximately 10:07 a.m., United Flight 93 crashed in Stony Creek

17  Township, Pennsylvania.

18        **[CCDOA Complaint at ¶ 25, attached as Exhibit "1"**

19        **to Affidavit of Scott G. Johnson.]**

20        34.    At 10:39 a.m. EDT, the FAA, reaffirming its earlier orders, issued a

21  Notice to Airmen (NOTAM) that read in part:

22        FDC SPECIAL NOTICE. DUE TO EXTRAORDINARY
          CIRCUMSTANCES   AND   FOR   REASONS   OF

23        SAFETY,   ATTENTION   ALL   AIRCRAFT
          OPERATORS,   BY   ORDER   OF   THE   FEDERAL

24        AVIATION   COMMAND   CENTER   ALL
          AIRPORTS/AIRDROMES ARE NOT AUTHORIZED

25        FOR LANDING AND TAKEOFF.   ALL TRAFFIC
          INCLUDING   AIRBORNE   AIRCRAFT   ARE

26        ENCOURAGED TO LAND SHORTLY. . ..

27

28

**[CCDOA Complaint at ¶ 22, attached as Exhibit "1"**

**to Affidavit of Scott G. Johnson; *The FAA Responds*,**

**attached as Exhibit "2" to Johnson Affidavit.]**

35.    Transportation Secretary Mineta provided the following testimony before Congress on September 20, 2001:

> On the morning of September 11th, on the first word of the attack, I moved directly to the Presidential Emergency Operations Center in the White House.  As soon as I was aware of the nature and scale of the attack, I called from the White House to order the air traffic system to land all aircraft, immediately and without exception.  That was an unprecedented step.  But with the risk of additional flights that might be used as terrorist weapons, I believe that it was the right and necessary step to take.

> * * *

> Of course, as we move forward, we must dramatically alter our approach.  As President Bush has said: the world has changed.  I add: so too has the very nature of our national transportation system.

> The events of the past several days requires us to take new steps to move people and commerce safely and efficiently, despite the fact that the nature of the threat has clearly changed.  It is a mission we cannot afford to leave for a later time.

> This Administration is already moving to restore and enhance our air transportation system.  On September 13th, I announced the gradual restoration of flights within the national airspace system.  We took immediate steps to develop heightened security measures to ensure the safety of airline passengers as well as people on the ground.

> * * *

> Because safety is of paramount importance, I required that heightened security measures be in place before any air service resumed.  A thorough search and security check of all airplanes and airports took place before passengers are allowed to enter and board aircraft.

> * * *

> We now face a different security threat not only in transportation, but in all aspects of American life.  We have to be willing to meet that changed threat with additional counter-measures, and still find ways to keep our transportation systems the efficient and vital

circulation system of our economy. We must therefore judge our security options in a different light than we might have judged them in the past.

[Statement of Norman Y. Mineta, Secretary of Transportation, Before the Senate Committee on Commerce, Science, and Transportation at 1 (Sept. 20, 2001), attached as Exhibit "4" to Affidavit of Scott G. Johnson).]

36. FAA Administrator Jane F. Garvey gave the following testimony before Congress:

On the morning of September 11th, there were 4,873 instrument flight rule (IFR) flights operating in U.S. airspace. As soon as Secretary Mineta was aware of the nature and scale of the terrorist attack on New York and Washington–that we were faced with, not one, but four possible hijackings, and several other rumors of missing or unidentified aircraft–the Secretary ordered the air traffic system shut down for all civil operations. . . .

In response to last week's unprecedented attacks, the FAA substantially increased the required security measures for U.S. airports and U.S. air carriers and foreign carriers with flights to the U.S. These measures were implemented immediately. Some are visible to the public, others are not.

[Statement of Jane F. Garvey, FAA Administrator, Before the House Subcommittee on Aviation, Committee on Transportation and Infrastructure, on Aviation Security Following the Terrorist Attack on September 11th at 2 (Sept. 21, 2001), attached as Exhibit "5" to Affidavit of Scott G. Johnson).]

37. CCDOA's Director of Aviation Randall H. Walker was designated to testify on behalf of CCDOA in response to FM's Rule 30(b)(6) deposition notice to CCDOA on the following subject matters:

1. All orders on which CCDOA bases any claim for damages in this litigation including, but not limited to, the date of each such order, the

1    agency issuing each such order, the identity of the recipient of each

2    such order, and the actions taken by CCDOA in response to each such

3    order;

4    2.    The manner by which CCDOA claims that ingress to or egress from its

5    airports was prevented on September 11-13, 2001;

6    3.    The existence of any physical loss or damage to property at any of

7    CCDOA's airports on September 11, 2001;

8    4.    The existence of any immediately impending physical loss or damage

9    to property at any of CCDOA's airports on September 11, 2001;

10   5.    The existence of any physical loss or damage to property at locations

11   of CCDOA's direct suppliers or customers on September 11, 2001;

12   6.    The extent of any loss or damage to CCDOA caused by any physical

13   loss or damage to property at locations of CCDOA's direct suppliers

14   or customers on September 11, 2001.

15   **[Deposition of Randall H. Walker at p. 10:8-17,**

16   **attached as Exhibit "6" to Affidavit of Scott G.**

17   **Johnson; Rule 30(b)(6) Deposition Notice to CCDOA,**

18   **attached as Exhibit "7" to Johnson Affidavit.]**

19   38.   No CCDOA property was damaged on September 11, 2001.

20   **[Deposition of Randall H. Walker at p. 30:1-10,**

21   **attached as Exhibit "6" to Affidavit of Scott G. Johnson.]**

22   39.   There was no immediately impending physical loss or damage at any

23   of CCDOA's airports on September 11, 2001.

24   **[Deposition of Randall H. Walker at p. 30:11-22,**

25   **attached as Exhibit "6" to Affidavit of Scott G.**

26   **Johnson; Deposition of Rosemary Vassiliadis at p.**

27   **27:20-23, attached as Exhibit "8" to Johnson**

28   **Affidavit.]**

20086515.1                                    14

1    40.    CCDOA's Rule 30(b)(6) designee and Director of Aviation Randall

2  Walker testified as follows:

3          Q.    Let's move on to subject No. 5 in Exhibit 1 [the
      Rule 30(b)(6) deposition notice].  That's "The existence
4      of physical loss or damage to property at locations of
      CCDOA's direct suppliers or customers on September
5      11th, 2001."  Was there any physical loss or damage at
      the locations of any of CCDOA's direct suppliers or
6      customers on September 11?

7          A.    Certainly airlines are our customers; they had
      significant damage.

8
          Q.    What was their damage?
9
          A.    I know some of them had offices in the World
10     Trade Center, for example?

11         Q.    Who had offices in the World Trade Center?

12         A.    I know that Delta did specifically.

13         Q.    Anybody else?

14         A.    Not that I recall.  But I know that Delta did.  Some
      travel agencies I know were in the World Trade Center.
15     New York is a very popular market for Las Vegas in
      terms of customers, and there were travel-related tour
16     wholesalers, travel agencies and those kinds of things that
      had offices in the World Trade Center, yes.

17
          Q.    Any other customers or suppliers that were
18     damaged on September 11, 2001?

19         A.    I don't specifically know every single one, no.

20         Q.    Are you saying that the CCDOA airports were
      closed because of the damage to the Delta office in the
21     World Trade Center and those travel agencies in the
      World Trade Center?

22
          A.    I think that the CCDOA was closed because of the
23     orders from the Federal Aviation Administration that shut
      down the national air system.

24
      **[Deposition of Randall H. Walker at p. 22:4-13,**
25
      **attached as Exhibit "6" to Affidavit of Scott G.**
26
      **Johnson.]**
27

28

1    41.    During the morning of September 11, 2001, the FAA issued several

2    security directives to CCDOA.

3    **[Deposition of Rosemary Vassiliadis at pp. 13:13 -**

4    **14:19, attached as Exhibit "8" to Affidavit of Scott G.**

5    **Johnson.]**

6    42.    CCDOA Deputy Director of Aviation Rosemary Vassiliadis testified

7    as follows:

8    Q.    Are these security directives that you mentioned,
     are they able to be shown to me, for example?

9

10   A.    No, they're not.    They are security-sensitive
     information.

11   Q.    Are you able to describe the contents of them?

12   A.    Generally.

13   Q.    Generally, what were airports supposed to do
     because the national airspace was closed?

14

15   A.    Airports needed to clear everybody out, and we had
     to recertify and sterilize the airport.  So in order to do
     that, we had to, again, clear everyone out, which we did,

16   including vehicles.  I mean, we had to tow vehicles out of
     the garage to be on a perimeter.  And they gave us each

17   and every point that we needed to do.  And then go
     through a sterilization and a recertification process.

18   **[Deposition of Rosemary Vassiliadis at pp. 14:20 -**

19   **15:10, attached as Exhibit "8" to Affidavit of Scott G.**

20   **Johnson.]**

21   43.    CCDOA Deputy Director of Aviation Rosemary Vassiliadis testified

22   as follows:

23   Q.    And then you had to sterilize the airport.  What
     does that mean?

24

25   A.    That means we had to clear everybody out and
     every unidentified object out.

26

27

28

20086515.1                                16

1 **[Deposition of Rosemary Vassiliadis at p. 16:13-16,**

2 **attached as Exhibit "8" to Affidavit of Scott G.**

3 **Johnson.]**

4    44.    CCDOA Deputy Director of Aviation Rosemary Vassiliadis testified

5 as follows:

6 Q.    And then you also mentioned you had to be recertified.

7

8 A.    That's correct.

Q.    What does certification mean?

9

10 A.    The ability to operate, to be the public use facility that we are.

11 Q.    Is that an FAA certification?

12 A    That is correct.

13 Q.    What was involved in the recertification?

14 A    We had to fulfill all the measures of our airport security plan, which was also a security-sensitive

15 document, but it is certified and approved by the FAA. Every airport has to submit that. In addition – in addition

16 to that, there were additional measures that we had to go through that came through – that came to us by these

17 security directives.

18 **[Deposition of Rosemary Vassiliadis at p. 17:9-24,**

19 **attached as Exhibit "8" to Affidavit of Scott G.**

20 **Johnson.]**

21    45.    CCDOA Deputy Director of Aviation Rosemary Vassiliadis testified

22 as follows:

23 Q.    Do you remember any other security directives that you can just describe generally for me that you received

24 on September 11, 2001?

25 A.    All the security directives that we received were measures to secure each property.  You know, each

26 airport.  And that was what was contained in them, the measures that we had to take to assure the best that we

27 could that there wasn't an act of terrorism being planned

28

for that location. I can't really get into the specifics of how they directed us and exactly what they directed us to do.

**[Deposition of Rosemary Vassiliadis at p. 19:1-11, attached as Exhibit "8" to Affidavit of Scott G. Johnson.]**

46.    On or after September 11, 2001, the FAA issued a security directive requiring airport operators to implement new security measures, including establishment of a 300-foot perimeter for parked vehicles, suspension of curbside check-ins, more frequent searches of carry-on baggage, increased presence of uniformed and plainclothes security personnel, and allowing only passengers with a flight ticket and identification past the security gates.

**[Deposition of Rosemary Vassiliadis at pp. 36:20 - 37:10, attached as Exhibit "8" to Affidavit of Scott G. Johnson.]**

47.    FAA National Operations Manager Benedict Sliney testified as follows:

Q.    Did you have any understanding of the reason for those security directives?

A.    Yes.

Q.    What were they?

A.    My understanding is that we were going to permit aircraft to fly in the national air space system, only those aircraft that we deemed to be secure enough not to become a guided missile or at least assure us as much as possible that they would be safely able to be accommodated.

Q.    Is it fair to say that the security directives were intended to reduce the likelihood of people getting weapons on aircraft for example?

A.    Absolutely.

Q.    Reduce the likelihood of another terrorist attack involving airplanes?

A.    Absolutely.

Q.    Is it true that airports would not be certified to

resume operations until they complied with the new FAA security measures.

A.    That's correct.

**[Deposition of Benedict Sliney at pp. 65:24 - 66:21, attached as Exhibit "3" to Affidavit of Scott G. Johnson.]**

48.    On September 12, 2001, United States Secretary of Transportation Norman Mineta issued a press release which included the following:

Secretary of Transportation Norman Y. Mineta has announced the Federal Aviation Administration will allow a limited reopening of the nation's commercial airspace system in order to allow flights that were diverted yesterday to continue to their original destination.

The Secretary also announced that the FAA is temporarily extending the ground stop order imposed yesterday while additional security measures are being completed.

"Safety is always of paramount importance, and in these extraordinary times we intend to be vigilent," Mineta said. . . .

**[FAA Office of Public Affairs Press Release (Sept. 12, 2001), attached as Exhibit "9" to Affidavit of Scott G. Johnson.]**

49.    United States Department of Transportation Secretary Norman Mineta ordered the national airspace reopened to commercial aviation at 11:00 a.m. EDT on September 13, 2001.

**[Deposition of Benedict Sliney at pp. 66:22 – 67:16, attached as Exhibit "3" to Affidavit of Scott G. Johnson; Deposition of Rosemary Vassiliadis at pp. 32:21 - 33:13, attached as Exhibit "8" to Johnson Affidavit; United States Department of Transportation Press Release (Sept. 13, 2001), attached as Exhibit "10" to Johnson Affidavit.]**

50.    CCDOA's Rule 30(b)(6) designee and Director of Aviation Randall Walker testified as follows:

> Q.    Let's move on to subject matter 2 in Exhibit 1 [the Rule 30(b)(6) deposition notice]: "The manner by which CCDOA claims that ingress to or egress from its airports was prevented on September 11th through the 13th, 2001" Can you describe the manner in which CCDOA claims that ingress to or egress from its airports was prevented on September 11, 2001?
>
> A.    First off, all airplanes were prohibited by federal order from flying, so no airplanes could arrive at our airport or leave from our airport under federal order.
> In addition to that, the terminal needed to be vacated for security reasons, so the terminal was closed to all nonbadged individuals, and the roadways into the airport were blocked and – to allow the airport to be able to have control of the airport in a sterile environment and be able to do its security checks in accordance with the FAA directives.

**[Deposition of Randall H. Walker at p. 18:6-24, attached as Exhibit "6" to Affidavit of Scott G. Johnson.]**

51.    CCDOA's Rule 30(b)(6) designee and Director of Aviation Randall Walker testified as follows:

> Q.    When do you claim that the prevention of ingress and egress by aircraft began?
>
> A.    As soon as the FAA grounded all the aircraft.
>
> * * *
>
> Q.    And when do you claim that the prevention of ingress and egress by aircraft ended?
>
> A.    When the FAA authorized aircraft to begin operations into McCarran once again.

**[Deposition of Randall H. Walker at p. 20:12-14; p. 20:19-22, attached as Exhibit "6" to Affidavit of Scott G. Johnson.]**

52.    CCDOA's Rule 30(b)(6) designee and Director of Aviation Randall Walker testified as follows:

20086515.1

20

Q.    What prevented a plane from taking off from any of the CCDOA airports on September 11 after the order?

A.    It was in violation of federal directives.

Q.    There was nothing wrong with the runways at any of the airports, right?

A.    No, runways all functioned fine.

Q.    But there was an order from the FAA that said planes could not take off, right?

A.    Planes were prohibited from being in the air space, so therefore they couldn't take off or land.

**[Deposition of Randall H. Walker at p. 22:4-13, attached as Exhibit "6" to Affidavit of Scott G. Johnson.]**

53.    FAA National Operations Manager Benedict Sliney testified as follows:

Q.    Were you aware of any planes that took off after the ground stop order?

A.    I'm aware of one in particular.

Q.    What was that?

A.    It was a Fed Ex that a controller cleared for take off out in Great Falls, Montana, despite the controller's knowledge of the national ground stop order.

Q.    What happened in that particular situation?

A.    What happened in what respect sir?

Q.    What happened to the plane for example?

A.    I don't know.

Q.    What happened with the controller?

A.    He was subsequently fired and charged with a federal misdemeanor, for which he was convicted.

Q.    Between the ground stop order on September 11, 2001 and the reopening of the air space on September 13, 2001, there were some flights taking off and landing, right?

A.    There were flights that were granted exceptions, yes – exceptions I should say.

20086515.1

21

Q.     Some of those were flights taking supplies to New York City and Washington, D.C., correct?

A.     There were medical flights. There were medical categories that we allowed after sufficient inquiry to do that. Actually one of the interesting ones was I thought the need for the Federal Reserve to transport checks to various locations. That was one of the exceptions.

**[Deposition of Benedict Sliney at pp. 68:23 - 70:5, attached as Exhibit "3" to Affidavit of Scott G. Johnson.]**

54.     Two or three planes flew into or out of McCarran International Airport on September 12, 2001.

**[Deposition of Rosemary Vassiliadis at pp. 30:13 - 31:17; 36:2-19, attached as Exhibit "8" to Affidavit of Scott G. Johnson).]**

55.     By 8:00 a.m. PDT, McCarran International had been certified by the FAA to be in compliance with all current security directives.

**[Deposition of Rosemary Vassiliadis at pp. 33:8 - 34:12, attached as Exhibit "8" to Affidavit of Scott G. Johnson; CCDOA Press Release, http://cms.mccarran.com/dsweb/Get/Document-230 18/09_01_Airport+Status+0913+afternoon.pdf (Sept. 13, 2001), attached as Exhibit "11" to Affidavit of Scott G. Johnson).]**

**6.     CCDOA Submits Claim to FM.**

56.     On November 7, 2001, CCDOA notified FM of a claim for "Business interruption loss due to terrorist attack in New York and Washington, DC."

**[Property Loss Notice (Nov. 7, 2001), attached as Exhibit "12" to Affidavit of Scott G. Johnson;**

1      **Deposition of Lloyd Cutler at pp. 34:18 - 35:9,**

2      **attached as Exhibit "13" to Johnson Affidavit.]**

3      57.   CCDOA claimed that there was coverage for its loss under the FM

4  policy's Ingress/Egress Time Element Extension, Contingent Time Element

5  Extension, and Protection and Preservation of Property provision.

6      **[Letter from CCDOA's R. Ross Johnson to FM's**

7      **Jeffrey Casillas (Feb. 22, 2002), attached as Exhibit**

8      **"B" to CCDOA's Complaint; Deposition of R. Ross**

9      **Johnson at pp. 24:23 - 25:19, attached as Exhibit "14"**

10     **to Johnson Affidavit.]**

11     58.   On April 16, 2002, FM denied CCDOA's claim for the following

12 reasons, among others:

13     •      There was no coverage under the FM policy's Civil Authority coverage

14            because the FAA orders grounding all aircraft did not directly result

15            from physical damage at any CCDOA airport or within 1,000 feet of

16            them as required by the policy;

17     •      There was no coverage under the FM policy's Ingress/Egress Coverage

18            Extension because ingress to or egress from CCDOA airports was not

19            prevented as a direct result of physical damage of the type insured

20            against as required by the policy;

21     •      There was no coverage under the FM policy's Contingent Time

22            Element coverage because there was no physical loss or damage at any

23            direct supplier or customer location as required by the policy; and

24     •      There was no coverage under the Protection and Preservation of

25            Property – Time Element coverage because there was no immediately

26            impending physical loss or damage at any CCDOA airport as required

27            by the policy.

28

20086515.1                                23

[Letter from FM's Jeffrey C. Casillas to CCDOA's R.
Ross Johnson (Apr. 16, 2002), attached as Exhibit "D"
to CCDOA's Complaint.]

7.   **CCDOA Sues FM.**

59.   On August 30, 2002, CCDOA sued FM for declaratory relief, breach
of contract, Unfair Claims Settlement Practices, and breach of the implied covenant
of good faith and fair dealing.

[CCDOA Complaint, attached as Exhibit "1" to
Affidavit of Scott G. Johnson.]

DATED:  May 24, 2004          ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

By: _____
       Scott G. Johnson
       Attorneys for Defendant FACTORY MUTUAL
       INSURANCE COMPANY

1   Richard J. Pocker
    Nevada Bar No. 003568
2   Dickerson, Dickerson, Consul & Pocker
    777 N. Rainbow Blvd., Suite 350
3   Las Vegas, Nevada 89107
    Telephone: (702) 388-8600
4   Facsimile: (702) 388-0210

5   Patrick E. Shipstead (CA #087170) Admitted Pro Hac Vice
    Scott G. Johnson (CA #153735) Admitted Pro Hac Vice
6   David E. Bland (CA #150581) Admitted Pro Hac Vice
    Robins, Kaplan, Miller & Ciresi L.L.P.
7   600 Anton Boulevard, Suite 1600
    Costa Mesa, California 92626-7147
8   Telephone: (714) 540-6200
    Facsimile: (714) 545-6915

9

10  Attorneys for Defendant FACTORY
    MUTUAL INSURANCE COMPANY

11

12              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF NEVADA

13

14  COUNTY OF CLARK, a political          )  Case No: CV-S-02-1258-KJD-RJJ
    subdivision of the State of Nevada, on )
15  behalf of Clark County Department of  )
    Aviation,                             )  **AFFIDAVIT OF SCOTT G. JOHNSON IN**
16                                        )  **SUPPORT OF FACTORY MUTUAL**
            Plaintiff,                     )  **INSURANCE COMPANY'S MOTION**
17                                        )  **FOR SUMMARY JUDGMENT**
    vs.                                   )
18                                        )
    FACTORY MUTUAL INSURANCE              )  [Notice of Motion and Motion for Summary
19  COMPANY, a Rhode Island               )  Judgment and Supporting Memorandum of
    Corporation, and DOES 1-10,           )  Points and Authorities; Statement of
20                                        )  Uncontroverted Facts; and Proposed Order
            Defendant.                     )  filed concurrently herewith]
21  _____ )

22

23

24  I, Scott G. Johnson, being duly sworn, says:

25      1.    I am an attorney admitted to practice law before the United States District Court

26  for the District of Nevada for this particular case and am a member in the law firm of

27  Robins, Kaplan, Miller & Ciresi L.L.P., attorneys of record for defendant FACTORY

28  MUTUAL INSURANCE COMPANY ("FM") in the above-referenced matter. I have

1   personal knowledge of the matters contained in this declaration and am competent to
2   testify thereto.

3       2.    Attached hereto as Exhibit "1" is a true and correct copy of the Plaintiff's
4   Complaint, including exhibits, filed in this matter and served on FM.

5       3.    Attached hereto as Exhibit "2" is a true and correct copy of The FAA
6   Responds, a document and public record prepared by the Federal Aviation
7   Administration and available at the following web address:
8   http://www.faa.gov/Sept11portraits/chronology.cfm.

9       4.    Attached hereto as Exhibit "3" is a true and correct copy of the deposition
10  testimony and exhibits of Benedict Sliney, taken on April 22, 2004 in this matter.

11      5.    Attached hereto as Exhibit "4" is a true and correct copy of the statement of
12  The Honorable Norman Y. Mineta, United States Secretary of Transportation, given
13  before the United States Senate Committee on Commerce, Science, and Transportation
14  on September 20, 2001.  This statement can be found on the official website for the
15  United States Senate at the following location:   http://www.senate.gov/~commerce/
16  hearings/092001Minetta.pdf.

17      6.    Attached hereto as Exhibit "5" is a true and correct copy of the Statement of
18  Jane F. Garvey, FAA Administrator, Before the House Subcommittee on Aviation,
19  Committee on Transportation and Infrastructure, on Aviation Security Following the
20  Terrorist Attack on September 11th made on September 21, 2001.  This statement can
21  be found on the United States House of Representatives website at the following
22  location: http://www.house.gov.transportation/aviation/09-21-01/garvey.html.

23      7.    Attached hereto as Exhibit "6" are true and correct copies of selected pages
24  of the deposition testimony of Randall H. Walker, taken on April 13, 2004 in this matter.

25      8.    Attached hereto as Exhibit "7" is a true and correct copy of the Federal Rule
26  30(b)(6) Deposition Notice directed to CCDOA. CCDOA designated Randall H. Walker
27  to testify on its behalf in response to the Deposition Notice.

28

1      9.    Attached hereto as Exhibit "8" are true and correct copies of selected pages
2 of the deposition testimony of Rosemary Vassiliadis, taken on April 15, 2004 in this
3 matter.

4      10.   Attached hereto as Exhibit "9" is a true and correct copy of a September 12,
5 2001 press release issued by the FAA Office of Public Affairs.  This press release can
6 be found on the FAA's official website at the following location:
7 http://www.faa.gov/apa/pr/pr.cfm?id=1406.

8      11.   Attached hereto as Exhibit "10" is a true and correct copy of a September 13,
9 2001 press release issued by the United States Department of Transportation.  This press
10 release can be found on the Department of Transportation's official website at the
11 following location: http://www.dot.gov/affairs/dot9601.htm.

12     12.   Attached hereto as Exhibit "11" is a true and correct copy of a CCDOA News
13 Release dated September 13, 2001.  This news release can be found in McCarran
14 International Airport's official website at the following location:
15 http://cms.mccarran.com/dsweb/Get/Document-23018/09_01_Airport+Status+0913+
16 afternoon.pdf.

17     12.   Attached hereto as Exhibit "12" is a true and correct copy of the Acord
18 Property Loss Notice dated November 7, 2001 and sent by CCDOA to FM.  This
19 document was prepared by CCDOA's insurance broker Lloyd Cutler at CCDOA's
20 direction, as he testified to in his deposition at pages 34 and 35.  Attached hereto as
21 Exhibit "13" are true and correct copies of selected pages of the deposition testimony of
22 Lloyd Cutler, taken on April 13, 2004 in this matter.

23     13.   Attached as Exhibit "14" are true and correct copies of selected pages of the
24 deposition testimony of R. Ross Johnson, taken on April 14, 2004 in this matter.

25     FURTHER YOUR AFFIANT SAITH NOT.

26

27

28                             Scott G. Johnson

1
2    SUBSCRIBED and SWORN to before me
     this 24th day of May 2004.
3
     _Mary Alice Boesel_____
4    Notary Public in and for said County and State
5
6    MARY-ALICE BOESEL
     NOTARY PUBLIC - MINNESOTA
7    My Commission Expires Jan. 31, 2005
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**COMP**
STEWART L. BELL
District Attorney
**CIVIL DIVISION**
State Bar No. 000477
By:  **E. LEE THOMSON**
Chief Deputy District Attorney
State Bar No. 001057
500 So. Grand Central Parkway, 5th Floor
P. O. Box 552215
Las Vegas, Nevada 89155-2215
Telephone:  (702) 455-4761

DAVID W. STEUBER, ESQ.[1]
STEPHEN V. MASTERSON, ESQ.
HOWREY SIMON ARNOLD & WHITE, LLP
550 South Hope Street, Suite 1400
Los Angeles, California  90071
Telephone:  (213) 892-1800

Attorneys for **Plaintiff, County of Clark,**
**a political subdivision of the State of Nevada, on behalf of**
**Clark County Department of Aviation**

DISTRICT COURT
CLARK COUNTY, NEVADA

| | |
|---|---|
| COUNTY OF CLARK, a political subdivision of the State of Nevada, on behalf of Clark County Department of Aviation,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>FACTORY MUTUAL INSURANCE COMPANY, a Rhode Island Corporation, and DOES 1-10,<br><br>　　　　　　Defendant. | Case No:  A 4 5 5 7 0 6<br>Dept No:  III<br>**COMPLAINT FOR:**<br>**1. DECLARATORY RELIEF;**<br>**2. BREACH OF CONTRACT;**<br>**3. UNFAIR CLAIM SETTLEMENT PRACTICES (NRS § 686A.310 *et seq.*); and**<br>**4. TORTIOUS BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>　　　**[DEMAND FOR JURY TRIAL]**<br>　　　**ARBITRATION EXEMPTION**<br>　　　**CLAIMED:  Declaratory Relief**<br>　　　**Amount Exceeds $40,000.00** |

---

[1] Mr. Steuber and Mr. Masterson have been retained by the Plaintiff but will not make an appearance in this case until the Court grants the Motion to Associate, which is being filed with the Court.

1    Plaintiff COUNTY OF CLARK, a political subdivision of the State of Nevada, on

2   behalf of Clark County Department of Aviation ("CCDOA") complains of Defendants

3   FACTORY MUTUAL INSURANCE COMPANY ("FM") and DOES 1 through 10, and

4   alleges:

5    **INTRODUCTION AND NATURE OF DISPUTE**

6    1.    CCDOA brings this action against the Defendant insurance company, FM, for

7   insurance coverage under an "FM Global" all risk policy for substantial financial loss

8   sustained by CCDOA as a result of the tragic events of September 11, 2001.

9    2.    On the morning of September 11, 2001, the United States of America suffered

10   the worst peacetime disaster in its history -- or perhaps in all of history.  As all Americans

11   painfully know, terrorist-backed assaults on the World Trade Center and the Pentagon

12   caused great physical devastation and property damage and, worse, the loss of thousands of

13   innocent lives.  The horrible events of 9/11 threw America – and especially America's air

14   traffic and airport facilities - into terrible turmoil.  Air traffic nation-wide was grounded by

15   directive of the Federal Aviation Administration as a result of the tragic events and physical

16   devastation to the World Trade Center and the Pentagon.  Airports throughout America were

17   shut down, not to reopen for days thereafter and not to return to their pre-9/11 levels of

18   activity for many weeks and months later.  The airports of Clark County were no exception.

19   Those airports, notably McCarran International Airport, were shut down immediately after,

20   and as direct result of, the destruction of 9/11.  Access to and from the Clark County airport

21   facilities was prohibited.

22   3.    As a result of the airport closures, CCDOA suffered a substantial loss to its

23   business – just the type of loss covered by the policy of insurance sold to CCDOA by FM for

24   substantial premiums.  But when CCDOA advised FM of its intent to submit a claim under

25   the FM Global policy for its loss, FM did not acknowledge its policy obligations.  Instead,

26   FM's unequivocal and arrogant response was that if CCDOA submitted such a claim, FM

27   would reject the claim and cancel its policy.  Thereafter, when CCDOA did, in fact, submit

28   its claim for loss under the policy, refusing to bend to the threats and pressure exerted by

1    FM, FM categorically denied the claim, refused to honor or acknowledge its policy

2    obligations, and promptly cancelled the three-year policy it had sold to CCDOA after less

3    than two years had elapsed.

4        4.      Because of FM's wrongful, tortious conduct, CCDOA brings this complaint

5    seeking a declaration from this Court as to the rights, duties, and responsibilities of the

6    parties under the FM Global policy, and damages, including punitive damages, for FM's

7    breach of contract, unfair claim settlement practices, and tortious breach of the implied

8    covenant of good faith and fair dealing.

9                        **THE PARTIES**

10        5.      Plaintiff COUNTY OF CLARK is a political subdivision of the State of

11    Nevada, and brings this action on behalf of the Clark County Department of Aviation, which

12    operates McCarran International Airport, North Las Vegas Airport, Henderson Executive

13    Airport, Jean Sport Aviation Center, Overton-Perkins Field and Searchlight Airfield

14    (collectively, the "Clark County Airports") as part of the Clark County Airport System

15    which is publicly owned by Clark County, Nevada. Plaintiff is hereafter referred to as

16    "CCDOA".

17        6.      Defendant FACTORY MUTUAL INSURANCE COMPANY is a Rhode

18    Island corporation, with its principal place of business in Johnston, Rhode Island, licensed to

19    transact business, and transacting business, in the State of Nevada and the County of Clark.

20        7.      Plaintiff CCDOA is ignorant of the true names and capacities, whether

21    individual, associate, partnership, corporate or otherwise, of defendants fictitiously

22    designated herein as DOES 1 through 10, and, therefore, sues those defendants by such

23    fictitious names. Plaintiff will seek leave of Court to amend this Complaint when the true

24    names and capacities of such fictitiously named defendants have been ascertained. Plaintiff

25    is informed and believes and on that basis alleges that DOES 1 through 10, in some way

26    unknown to Plaintiff, have underwritten, provided or issued insurance coverage to Plaintiff

27    for the losses alleged herein or are otherwise responsible for Plaintiff's damages alleged

28    herein, and that DOES 1 through 10 are authorized to, and do, transact business in the State

1   of Nevada and the County of Clark.

2         8.     Plaintiff is informed and believes and thereon alleges that, at all material times

3   herein alleged, the defendants, and each of them, were the agents, servants and employees of

4   the other defendants, and each of them.

5                      **THE INSURANCE POLICY**

6         9.     FM sold FM Global policy number UA864 (the "Policy") to CCDOA for the

7   period October 1, 2000 to October 1, 2003. A true and correct copy of the Policy is attached

8   hereto as Exhibit "A" to this Complaint and incorporated herein by reference as though fully

9   set forth at length. CCDOA paid a substantial premium for the Policy, which provided broad

10   coverage protection to CCDOA and other Named Insureds, all according to the Policy's

11   terms.

12        10.     Under the Policy, CCDOA is the Named Insured, as is any subsidiary,

13   associated or allied company, corporation, firm, organization, and CCDOA's interest in any

14   partnership or joint venture in which CCDOA has management control or ownership.

15        11.     By its express terms, the type of property insured under the Policy includes

16   real property, including buildings, and personal property including improvements and

17   betterments.

18        12.     In addition to providing insurance protection against and coverage for physical

19   loss or damage to CCDOA's real and personal property, the Policy also includes a number of

20   broad, important coverage extensions providing at least $25 million of insurance against

21   economic losses suffered while CCDOA's business is interrupted or diminished regardless

22   of whether any physical loss or damage to CCDOA's own property occurs. As set forth in

23   the following paragraphs, these "business interruption" or "time element" coverage

24   extensions include the Contingent Time Element Extension, the Extended Period of

25   Liability, the Ingress/Egress Time Element Extension, and the Preservation of Property

26   coverage provision.

27        13.     Section 3.A. of the Policy contains the following Contingent Time Element

28   Coverage Extension:

A.   **CONTINGENT TIME ELEMENT**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY:

    1)   directly resulting from physical loss or damage of the type insured and

    2)   to property of the type insured, at any locations of direct suppliers or customers located within the TERRITORY of this Policy. The term "supplier or customer" does not include any company supplying to or receiving from the Insured Location, as described elsewhere in this Policy, electricity, fuel, gas, water, steam, refrigeration, sewage or telecommunications.

14.   The term "EXTRA EXPENSE" is defined in Section 2.B.1) of the Policy to include "Extra expenses to temporarily continue as nearly as normal as practicable the conduct of the Insured's business."

15.   In Section 3.B. of the Policy, the period over which economic loss is recoverable is extended until business income is restored to pre-interruption levels:

B.   **EXTENDED PERIOD OF LIABILITY**

The GROSS EARNINGS coverage is extended to cover the reduction in sales resulting from:

    1)   the interruption of business as covered by GROSS EARNINGS;

    2)   for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred; and

    3)   commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Extension had not been included herein. . . .

1    16.    Section 3.C. of the Policy contains the following Ingress/Egress Time Element

2    Coverage Extension:

3        **C.    INGRESS/EGRESS**

4        This Policy covers the Actual Loss Sustained and EXTRA
         EXPENSE incurred by the Insured due to the necessary
5        interruption of the Insured's business due to prevention of
6        ingress to or egress from an Insured Location, whether or not
         the premises or property of the Insured is damaged, provided
7        that such prevention is a direct result of physical damage of
         the type insured by this Policy to the kind of property not
8        excluded by this Policy.

9

10    17.    Section 3.E. of the Policy provides coverage against loss sustained due to

11    actions taken to protect or preserve property against threatened damage:

12        **D.    PROTECTION AND PRESERVATION OF
                PROPERTY – TIME ELEMENT**
13

14        This Policy Covers Actual Loss Sustained by the Insured for a
         period of time not to exceed 48 hours prior to and 48 hours
15        after the Insured first taking reasonable action for the
         temporary protection and preservation of property insured by
16        this Policy provided such action is necessary to prevent
17        immediately impending physical loss or damage insured by
         this Policy at such insured property. . . .
18

19    18.    To the extent not waived or otherwise excused, CCDOA has complied with all

20    terms and conditions precedent, including payment of undisputed premiums and notice,

21    contained in the Policy and is entitled to all benefits of insurance provided by the Policy.

22                            **FACTUAL BACKGROUND**

23    19.    On September 11, 2001, the United States of America experienced a

24    devastating, coordinated terrorist attack in which commercial aircraft were hijacked and

25    diverted to destroy highly visible and populated American landmarks.  Thousands of

26    innocent lives were lost.  Billions of dollars of real and personal property, including without

27    limitation, buildings, improvements, and betterments, were damaged and destroyed.

28    20.    At 8:48 a.m., American Airlines Flight 11 crashed into the north tower of the

1    World Trade Center.

2    21.    At 9:05 a.m., United Airlines Flight 175 crashed into the south tower of the

3    World Trade Center.

4    22.    As a direct result of the physical damage to the World Trade Center towers

5    caused by the coordinated terrorist attack, all air traffic within the United States was

6    grounded and all United States airports, including the Clark County Airports, were

7    immediately shut down. Specifically, at 9:40 a.m., the Federal Aviation Administration

8    ("FAA") closed all airports by issuing the following Notice to Airmen ("NOTAM"):

9    IFDC 1/9731 FDC SPECIAL NOTICE – DUE TO EXTRAORDINARY
CIRCUMSTANCES AND FOR REASONS OF SAFETY. ATTENTION

10    ALL AIRCRAFT OPERATORS, BY ORDER OF THE FEDERAL

11    AVIATION COMMAND CENTER, ALL AIRPORTS/AIRDROMES
ARE NOT AUTHORIZED FOR LANDING AND TAKEOFF. ALL

12    TRAFFIC INCLUDING AIRBORNE AIRCRAFT ARE ENCOURAGED
TO LAND SHORTLY.

13

14    23.    At 9:43 a.m., American Airlines Flight 77 crashed into the Pentagon.

15    24.    At 9:59 a.m., the south tower of the World Trade Center collapsed.

16    25.    At 10:00 a.m., United Airlines Flight 93 crashed just north of Somerset County

17    Airport outside of Pittsburgh, Pennsylvania, apparently en route to Camp David.

18    26.    At 10:28 a.m., the north tower of the World Trade Center collapsed.

19    27.    All airports, including the Clark County Airports, remained closed through at

20    least September 13, 2001 and access to and from the airports was prohibited.

21    **CCDOA'S COVERED LOSS**

22    28.    As a direct result of the September 11, 2001 terrorist inflicted physical damage

23    to the World Trade Center and Pentagon, CCDOA sustained Actual Loss covered by the

24    Policy due to the necessary interruption of CCDOA's business due to the prevention of

25    ingress to or egress from each of the Clark County Airports.

26    29.    CCDOA also incurred covered EXTRA EXPENSE, including the expense

27    incurred to resume and continue operations at the Clark County Airports as nearly normal as

28    practicable following the devastation of September 11th.

30.     The tragic events of September 11th also caused CCDOA to sustain covered Actual Loss and incur covered EXTRA EXPENSE as a direct result of damage to property of the type insured by the Policy at locations of direct suppliers or customers of the Clark County Airports, including without limitation American Airlines and United Airlines.

31.     CCDOA's covered Actual Loss and EXTRA EXPENSE continued well beyond the resumption of business at the Clark County Airports for an additional length of time required to restore CCDOA's business to the condition that would have existed had no loss occurred.

32.     CCDOA also sustained covered Actual Loss due to reasonable and necessary actions taken to prevent immediately impending covered physical loss or damage threatened or reasonably believed to be threatened by additional terrorist attacks to CCDOA's property on and following September 11th.

33.     CCDOA's Loss sustained exceeds $5,933,244. CCDOA's EXTRA EXPENSE incurred exceeds $597,326. Thus, CCDOA's total Loss insured under the Policy exceeds $6.5 million. CCDOA will seek leave to amend this Complaint when the precise amount of its Loss is determined. The Policy covers CCDOA's Loss.

### FM's HEAVY-HANDED, BAD FAITH RESPONSE TO CCDOA'S LOSS

34.     Prior to submitting a claim for its September 11th related Loss, CCDOA notified FM of that Loss and met with FM to discuss the coverage available under the Policy. During that meeting, FM not only expressed to CCDOA a categorical, no compromise, "no coverage" position without conducting any investigation of the particulars of CCDOA's Loss, but also sought to coerce CCDOA into abandoning its claim *ab initio*.

35. Specifically, FM expressly threatened to cancel the three-year Policy two years into its term if CCDOA ever even submitted a claim for any loss arising out of or resulting from the tragic events of September 11th. FM leveled its threat with full knowledge that the events of September 11th had created a difficult "tight" insurance market and that CCDOA would be severely prejudiced if the Policy were prematurely cancelled in mid-term and CCDOA were forced to attempt to replace the coverage provided by the Policy. FM

1  likewise made its threat despite the fact it knew that CCDOA had been a model policyholder

2  with FM, paying substantial premium dollars to FM over the years and working closely and

3  well with FM to keep claims and risks at a minimum.

4        36.    Despite FM's abusive, coercive, and bad faith threat, CCDOA did submit a

5  timely claim for its Loss and requested that FM honor its duty to pay CCDOA for that Loss.

6  On February 22, 2002, CCDOA wrote to FM providing a detailed explanation of applicable

7  coverage provided under the Policy, among other things, explaining why CCDOA in good

8  faith believed that the claim was covered and asking FM to give serious consideration to

9  CCDOA's claim. A true and correct copy of this CCDOA's February 22, 2002 letter is

10  attached hereto as Exhibit "B." On March 22, 2002 CCDOA submitted a Sworn Statement

11  in Proof of Loss Associated With September 11, 2001 Terrorist Attacks. A true and correct

12  copy of CCDOA's Proof of Loss is attached hereto as Exhibit "C."

13        37.    Instead of honoring its coverage obligations, FM disclaimed any responsibility

14  to reimburse CCDOA for its Loss or any portion of it. Specifically, by letter dated April 16,

15  2002, FM relied on blatantly inaccurate and tortured readings of policy language and

16  inaccurate factual recitations to deny any obligation under the Policy. A true and correct

17  copy of FM's April 16, 2002 letter is attached hereto as Exhibit "D."

18        38.    By letter dated April 30, 2002, CCDOA explained why FM's denial of

19  coverage was wrong and asked FM to reconsider. A true and correct copy of CCDOA's

20  April 30, 2002 letter is attached hereto as Exhibit "E."

21        39.    Despite CCDOA's April 30, 2002 letter, FM persisted in its refusal to honor its

22  obligations under the Policy. By letter dated May 28, 2002, FM relied on further distortion

23  and augmentation of the actual language of the Policy to restate its unsupportable denial of

24  coverage. A true and correct copy of FM's May 28, 2002 letter is attached hereto as Exhibit

25  "F."

26        40.    In retaliation for CCDOA's decision to submit a claim for the insurance

27  benefits due under and covered by the Policy, FM cancelled the Policy which, by its terms,

28  was originally underwritten for the three-year period from October 1, 2000 to October 1,

1   2003.  By letter dated June 25, 2002, FM stated that coverage would terminate effective

2   October 1, 2002.  In a thinly-veiled allusion to CCDOA's refusal to forgo insurance proceeds

3   for its September 11th related Loss, FM cited only a supposed "fundamental divergence

4   between our companies on issues relating to the provision and purpose of first-party property

5   insurance as well as the application of material policy provisions."  FM acknowledged that it

6   had not stated the facts on which its cancellation decision was based, but referred CCDOA to

7   its rights under Nevada law and promised to provide those facts within six days of receipt of

8   a written request. A true and correct copy of FM's June 25, 2002 letter is attached hereto as

9   Exhibit "G."

10      41.     By letter dated July 2, 2002, CCDOA made a written request for information

11  relating to the facts on which FM's decision to terminate coverage was based.  A true and

12  correct copy of CCDOA's July 2, 2002 letter is attached hereto as Exhibit "H."

13      42.     Despite CCDOA's request, FM again failed to state the facts on which its

14  decision to cancel the Policy was based and, instead, through a letter dated July 11, 2002,

15  made only the conclusory statement that "In our judgment it is unlikely that any future

16  insurance relationship with [CCDOA] could be mutually satisfactory."  A true and correct

17  copy of FM's July 11, 2002 letter is attached hereto as Exhibit "I."

## FIRST CAUSE OF ACTION

### [Declaratory Relief]

20      43.     CCDOA re-alleges and incorporates by reference paragraphs 1 through 42

21  above as though set forth fully herein.

22      44.     CCDOA therefore seeks a judicial declaration as to the duties and obligations

23  of FM to reimburse CCDOA under the Policy, confirming CCDOA's contentions, as set

24  forth above, are correct, including without limitation that is Loss is covered under the Policy.

25  A declaration is appropriate at this time in order that the parties' dispute may be resolved and

26  the parties may be aware of their respective rights and obligations.

27  / / /

28  / / /

## SECOND CAUSE OF ACTION

### [Breach of Contract]

45.     CCDOA re-alleges and incorporates by reference paragraphs 1 through 44 above as though set forth fully herein.

46.     FM has breached its insurance Policy with CCDOA by refusing to reimburse CCDOA for its losses insured under the Policy.

47.     As a direct and proximate result of the acts of FM, CCDOA has been injured in the amount of at least $6.5 million, which has not yet been precisely ascertained, plus interest.  When the precise amount of damages is known, CCDOA will seek leave to amend this Complaint.

## THIRD CAUSE OF ACTION

### [Unfair Claim Settlement Practices]

48.     CCDOA re-alleges and incorporates by reference paragraphs 1 through 47 above as though set forth fully herein.

49.     Through the conduct described above, FM has engaged in Unfair Claim Settlement practices prohibited by NRS §686A.310, including but not limited to: (a) misrepresenting pertinent facts or insurance policy provisions relating to coverage at issue; (b) failing to adopt and implement reasonable standards for the prompt investigation and processing of claims; (c) failing to effectuate prompt, fair and equitable settlement of claims in which FM's liability has become clear; (d) compelling CCDOA to instigate the instant litigation to recover amounts due under the Policy; (e) attempting to compel and coerce CCDOA to abandon its claim by threatening to cancel the Policy; (f) failing to comply with the provisions of NRS 687B.310 to 687B.390 or 678B.410; and ( g) failing to provide a reasonable explanation of the basis for denial of CCDOA's claim.

50.     As a direct and proximate result of the acts of FM, CCDOA has been injured in the amount of at least $6.5 million, which has not yet been precisely ascertained, plus interest.  When the precise amount of damages is known, CCDOA will seek leave to amend this Complaint.

51.     FM's unreasonable conduct described above was and is despicable and was done to vex and injure CCDOA with a willful conscious disregard for CCDOA's rights, constituting oppression, fraud and/or malice.  FM ignored CCDOA's interests and concerns, consciously placed its own economic interests first, with the intent to injure CCDOA. CCDOA therefore is entitled to recover all attorney's fees it reasonably has incurred in its efforts to obtain Policy benefits that wrongfully were withheld in bad faith by FM and to recover punitive damages from FM in an amount sufficient to punish FM and to make an example of FM in order to deter similar conduct in the future.

## FOURTH CAUSE OF ACTION

### [Tortious Breach of the Implied Covenant of Good Faith and Fair Dealing]

52.     CCDOA re-alleges and incorporates by reference paragraphs 1 through 51 above as though set forth fully herein.

53.     Implied in the Policy is a covenant that FM would act in good faith and deal fairly with CCDOA, that FM would do nothing to interfere with the rights of CCDOA to receive the benefits of the Policy, and that FM would give the same level of consideration to the interests of CCDOA as FM gives to its own interests.

54.     In breach of this covenant, FM did the things and committed the acts alleged above for the purpose of consciously and unreasonably withholding from CCDOA the rights and benefits to which CCDOA was entitled under the Policy without any legitimate basis for doing so and without considering the interests of CCDOA to the same extent as FM considered its own interests.

55.     The acts of FM are inconsistent with the reasonable expectations of their insured, are contrary to established practices and legal requirements, and constitute bad faith.

56.     Accordingly, CCDOA is entitled to recover all attorney's fees that it reasonably has incurred in its efforts to obtain Policy benefits that wrongfully were withheld in bad faith by FM.

57.     FM's unreasonable conduct described above was and is despicable and was done to vex and injure CCDOA with a willful conscious disregard for CCDOA's rights,

1   constituting oppression, fraud and/or malice.  FM ignored CCDOA's interests and concerns,

2   consciously placed its own economic interests first, with the intent to injure CCDOA.

3   CCDOA therefore is entitled to recover punitive damages from FM in an amount sufficient

4   to punish FM and to make an example of FM in order to deter similar conduct in the future.

5   WHEREFORE, Plaintiff CCDOA prays for judgment as follows:

6   ## ON THE FIRST CAUSE OF ACTION

7   1.   For a declaration that CCDOA's contentions as set forth above are correct,

8   including without limitation that its Loss is covered under the Policy;

9   ## ON THE SECOND CAUSE OF ACTION

10  2.   For damages according to proof at the time of trial, but no less than $6.5

11  million, plus interest;

12  ## ON THE THIRD CAUSE OF ACTION

13  3.   For damages according to proof at the time of trial, but no less than $6.5

14  million, plus interest;

15  4.   For its reasonable attorney's fees incurred in its efforts to obtain the benefits

16  due under the Policy;

17  5.   For punitive damages in an amount sufficient to punish FM and to make an

18  example of FM in order to deter similar conduct in the future;

19  ## ON THE FOURTH CAUSE OF ACTION

20  6.   For damages according to proof at the time of trial, but no less than $6.5

21  million, plus interest;

22  7.   For its reasonable attorney's fees incurred in its efforts to obtain the benefits

23  due under the Policy;

24  8.   For punitive damages in an amount sufficient to punish FM and to make an

25  / / /

26  / / /

27  / / /

28  / / /

1    example of FM in order to deter similar conduct in the future;

2                              **ON ALL CAUSES OF ACTION**

3         9.      For its costs of suit incurred herein; and

4         10.     For such other and further relief as may be deemed just and proper.

5         DATED this 30th day of August 2002.

6                                          STEWART L. BELL
                                           DISTRICT ATTORNEY
7                                          State Bar No. 000477

8

9                                   By: _____

10                                         E. LEE THOMSON
                                           Chief Deputy District Attorney
11                                         State Bar No. 001057
                                           500 So. Grand Central Parkway, 5th Floor
12                                         P. O. Box 552215
                                           Las Vegas, Nevada  89155-2215
13                                         Attorney for **Plaintiff**
                                           **County of Clark, a political subdivision**
14                                         **of the State of Nevada, on behalf of**
                                           **Clark County Department of Aviation**
15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FM** Global

Account No.  1-33186
Policy No.   UA864

# TABLE OF CONTENTS
## (Order In Which They Appear)

Page No.

**DECLARATIONS PAGE**

**DECLARATIONS - SECTION A**

1.  NAMED INSURED AND MAILING ADDRESS ...................................................................... 1
2.  POLICY DATES .................................................................................................................... 1
3.  TERRITORY ......................................................................................................................... 1
4.  INSURED LOCATION .......................................................................................................... 1
5.  CURRENCY ......................................................................................................................... 2
6.  LIMITS OF LIABILITY ......................................................................................................... 2
7.  PREMIUM ............................................................................................................................ 3
8.  PREMIUM PAYABLE ........................................................................................................... 3
9.  VALUE REPORTING PROVISIONS ..................................................................................... 3
10. WAITING PERIOD ............................................................................................................... 4
11. DEDUCTIBLES ................................................................................................................... 4

**PROPERTY DAMAGE - SECTION B**

1.  PROPERTY INSURED .......................................................................................................... 7
2.  PROPERTY EXCLUDED ...................................................................................................... 7
3.  ADDITIONAL COVERAGES ................................................................................................ 8
    A.  ACCOUNTS RECEIVABLE ......................................................................................... 8
    B.  AUTOMATIC COVERAGE .......................................................................................... 9
    C.  BRANDS AND LABELS ............................................................................................. 10
    D.  CONSEQUENTIAL REDUCTION IN VALUE ............................................................. 10
    E.  CONTROL OF DAMAGED PROPERTY ...................................................................... 10
    F.  DEBRIS REMOVAL ................................................................................................... 11
    G.  DECONTAMINATION COSTS ................................................................................... 11
    H.  DEFERRED PAYMENTS ........................................................................................... 11
    I.  DEMOLITION AND INCREASED COST OF CONSTRUCTION ................................... 12
    J.  EARTH MOVEMENT ................................................................................................. 13
    K.  ERRORS AND OMISSIONS ...................................................................................... 13
    L.  EXPEDITING COSTS ................................................................................................ 13
    M.  FINE ARTS .............................................................................................................. 14
    N.  FLOOD ..................................................................................................................... 14
    O.  LAND AND WATER CONTAMINANT OR POLLUTANT CLEANUP, REMOVAL AND
        DISPOSAL ............................................................................................................... 15
    P.  PROFESSIONAL FEES ............................................................................................. 15
    Q.  PROTECTION AND PRESERVATION OF PROPERTY ............................................... 15
    R.  SERVICE INTERRUPTION PROPERTY DAMAGE ..................................................... 16
    S.  TAX TREATMENT OF PROFITS ............................................................................... 17
    T.  TEMPORARY REMOVAL OF PROPERTY ................................................................. 17
    U.  TRANSPORTATION .................................................................................................. 17
    V.  VALUABLE PAPERS AND RECORDS ....................................................................... 19
4.  APPLICATION OF POLICY TO DATE OR TIME RECOGNITION ........................................ 20
5.  EXCLUSIONS ..................................................................................................................... 21

**FM Global**

# TABLE OF CONTENTS
## (Order In Which They Appear)

**Page No.**

**TIME ELEMENT - SECTION C**

| | | |
|---|---|---|
| 1. | LOSS INSURED | 25 |
| 2. | TIME ELEMENT COVERAGES | 25 |
| | A. GROSS EARNINGS | 25 |
| | B. EXTRA EXPENSE | 26 |
| | C. LEASEHOLD INTEREST | 27 |
| | D. RENTAL INSURANCE | 28 |
| | E. COMMISSIONS, PROFITS AND ROYALTIES | 28 |
| 3. | TIME ELEMENT COVERAGE EXTENSIONS | 30 |
| | A. CONTINGENT TIME ELEMENT | 30 |
| | B. EXTENDED PERIOD OF LIABILITY | 30 |
| | C. INGRESS/EGRESS | 31 |
| | D. ON PREMISES SERVICES | 31 |
| | E. PROTECTION AND PRESERVATION OF PROPERTY – TIME ELEMENT | 31 |
| | F. RELATED REPORTED VALUES | 32 |
| | G. RESEARCH AND DEVELOPMENT | 32 |
| | H. SERVICE INTERRUPTION TIME ELEMENT | 32 |
| 4. | PERIOD OF LIABILITY | 33 |
| 5. | TIME ELEMENT EXCLUSIONS | 35 |

**LOSS ADJUSTMENT AND SETTLEMENT - SECTION D**

| | | |
|---|---|---|
| 1. | LOSS ADJUSTMENT/PAYABLE | 37 |
| 2. | CURRENCY FOR LOSS PAYMENT | 37 |
| 3. | VALUATION | 37 |
| 4. | LOSS CONDITIONS | 40 |
| | A. REQUIREMENTS IN CASE OF LOSS | 40 |
| | B. COMPANY OPTION | 41 |
| | C. ABANDONMENT | 41 |
| | D. SUBROGATION | 41 |
| | E. APPRAISAL | 41 |
| | F. SUIT AGAINST THE COMPANY | 42 |
| 5. | SETTLEMENT OF CLAIMS | 42 |
| 6. | COLLECTION FROM OTHERS | 43 |
| 7. | PARTIAL PAYMENT OF LOSS SETTLEMENT | 43 |

**GENERAL PROVISIONS - SECTION E**

| | | |
|---|---|---|
| 1. | ADDITIONAL INSURABLE INTERESTS/CERTIFICATES OF INSURANCE | 44 |
| 2. | CANCELLATION/NON-RENEWAL | 44 |
| 3. | INSPECTIONS | 44 |
| 4. | PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS | 45 |
| 5. | LIBERALIZATION | 45 |
| 6. | MISREPRESENTATION AND FRAUD | 45 |
| 7. | LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS | 45 |
| 8. | OTHER INSURANCE | 47 |
| 9. | POLICY MODIFICATION | 47 |

# TABLE OF CONTENTS
## (Order In Which They Appear)

**Page No.**

10.   REDUCTION BY LOSS .................................................................................................. 48
11.   SUSPENSION.................................................................................................................. 48
12.   TITLES .......................................................................................................................... 48
SCHEDULE OF LOCATIONS..........................................................................................Appendix A



# DECLARATIONS - SECTION A

**1.   NAMED INSURED AND MAILING ADDRESS**

Clark County Department of Aviation and any subsidiary, associated or allied company, corporation, firm, organization, and Clark County Department of Aviation's interest in any partnership or joint venture in which Clark County Department of Aviation has management control or ownership as now constituted or hereafter is acquired, as the respective interest of each may appear; all hereafter referred to as the "Insured", including legal representatives.

5757 Wayne Newton Blvd.
Las Vegas, NV 89119

**2.   POLICY DATES**

|  |  |
|---|---|
| FROM: | 01 October, 2000 |
| TO: | 01 October, 2003 |
| TERM: | 03 years, 00 months, 00 days |

As respects any property located in Canada, the term of coverage under this Policy will not exceed 12 months. However, coverage for such locations will be automatically renewed for subsequent periods of one year unless cancelled under the terms of this Policy or limited by the expiration date on the Declarations Page of this Policy.

**3.   TERRITORY**

This Policy covers Insured Locations in:

A.   Canada.

B.   The United States of America.

C.   The Commonwealth of Puerto Rico.

**4.   INSURED LOCATION**

A.   The coverages under this Policy apply to an Insured Location unless otherwise provided.

Insured Location is a location:

1)   listed on a Schedule of Locations attached to this Policy.

2)   covered as a Miscellaneous Unnamed Location.

3)   covered under the terms and conditions of the Automatic Coverage or Errors and Omissions provisions.

B.  References and Application.  The following term(s) wherever used in this Policy means:

   1)  Location:

      a)  as specified in the schedule of locations, except for Miscellaneous Unnamed Locations; or

      b)  if not so specified or if a Miscellaneous Unnamed Location, a building, yard, dock, wharf, pier or bulkhead (or any group of the foregoing) bounded on all sides by public streets, clear land space or open waterways, each not less than fifty feet wide. Any bridge or tunnel crossing such street, space or waterway will render such separation inoperative for the purpose of this References and Application.

## 5.   CURRENCY

All amounts, including deductibles and limits of liability, indicated in this Policy are in the currency of the United States of America, except for Insured Locations in Canada where such amounts will be in Canadian currency.  Losses will be adjusted and paid as provided in the CURRENCY FOR LOSS PAYMENT clause of the LOSS ADJUSTMENT AND SETTLEMENT section.

Premium for this Policy is in the currency of the United States of America except for the premium applying for Insured Locations in Canada where such amounts will be in Canadian currency.

## 6.   LIMITS OF LIABILITY

The Company's maximum limit of liability in a single occurrence regardless of the number of Locations or coverages involved will not exceed the Policy limit of liability of $1,567,393,000, except as follows.  When a limit of liability for a Location or other specified property is shown, such limit will be the maximum amount payable for any loss or damage arising from physical loss or damage at such Location or involving such other specified property.

Miscellaneous Unnamed Locations: $25,000,000 per Location

If a lesser limit of liability is stated below or elsewhere in this Policy, the lesser limit will apply. The limits of liability stated below or elsewhere in this Policy are part of and not in addition to the Policy limit of liability.

Limits of liability stated below apply in the aggregate per occurrence for all Locations and coverages involved.

When a limit of liability is shown as applying in the Aggregate During Any Policy Year, the Company's maximum limit of liability will not exceed such limit during any policy year regardless of the number of locations and coverages involved.

In the event an occurrence results in liability payable under more than one policy issued to the Named Insured by the Company, or its representative companies, the maximum amount payable in the aggregate under all such policies will be the applicable limit(s) of liability indicated in this Policy regardless of the number of coverages, locations or perils involved.

### Limits of Liability

| | |
|---|---|
| $25,000,000 applies to each of the following: | COMMISSIONS, PROFITS AND ROYALTIES; CONTINGENT TIME ELEMENT; DEFERRED PAYMENTS; ERRORS AND OMISSIONS; SERVICE INTERRUPTION PROPERTY DAMAGE and SERVICE INTERRUPTION TIME ELEMENT combined as respects all specified services interrupted; EXPEDITING COSTS and EXTRA EXPENSE combined |
| $25,000,000: | TRANSPORTATION, but not to exceed a $10,000,000 limit for TIME ELEMENT |
| $50,000: | LAND AND WATER CONTAMINANT OR POLLUTANT CLEANUP, REMOVAL AND DISPOSAL in the Aggregate During Any Policy Year |
| $100,000,000: | EARTH MOVEMENT in the Aggregate During Any Policy Year |
| $100,000,000: | FLOOD in the Aggregate During Any Policy Year |

### Time Limits

In addition to the time limits shown elsewhere in this Policy, the following apply:

| | |
|---|---|
| 90 day period: | AUTOMATIC COVERAGE |
| 30 day period: | INGRESS/EGRESS |
| 60 day period: | EXTENDED PERIOD OF LIABILITY |

## 7.  PREMIUM

This Policy is issued in consideration of an initial premium.  If the term of this Policy is longer than one year, for each subsequent year of coverage, premium will be due at the anniversary and will be subject to rules and rates in effect at that time.

## 8.  PREMIUM PAYABLE

Kellogg-Cutler Associates, Inc. pays the premium under this Policy, and any return of the paid premium accruing under this Policy will be paid to the account of  Kellogg-Cutler Associates, Inc.

## 9.  VALUE REPORTING PROVISIONS

The Insured will provide the Company 100% values by location as of the inception date of this Policy and annually thereafter, unless otherwise shown.

These statement(s) of values are due no later than sixty (60) days from the due date(s) shown below.

| Values as Of | Due Date | Type of Values |
|---|---|---|
| 01 October | 01 October | Property values in accordance with the VALUATION clause of the LOSS ADJUSTMENT AND SETTLEMENT section. |
| 01 October | 01 October | In addition, Stock and Supplies on the average and maximum values based on the previous 12 month period. |
| 01 October | 01 October | Time Element values anticipated for the 12 months following the "Value as Of" date, and the actual Time Element values for the previous 12 month period. |

## 10.  WAITING PERIOD

For the purposes of applying SERVICE INTERRUPTION Coverage, the Waiting Period is 12 hours.

## 11.  DEDUCTIBLES

In each case of loss covered by this Policy, the Company will be liable only if the Insured sustains a loss in a single occurrence greater than the applicable deductible specified below, and only for its share of that greater amount.

Unless otherwise stated below:

A.    When this Policy insures more than one location, the deductible will apply against the total loss covered by this Policy in any one occurrence.

B.    If two or more deductibles provided in this Policy apply to a single occurrence, the total to be deducted will not exceed the largest deductible applicable, unless otherwise provided.

Policy Deductible(s)

$10,000 combined all coverages, except as follows.

Exceptions to Policy Deductible(s)

Earth Movement

$100,000 combined all coverages

Fine Arts

$1,000 combined all coverages

FM Global

Account No.   1-33186
Policy No.   UA864

Flood

$100,000 combined all coverages

Boiler and Machinery

$10,000 Property Damage

24 Hours Equivalent Time Element

References and Application. The following term(s) means:

1)   Boiler and Machinery:

    A.   Physical loss or damage both originating within:

        1.   Boilers, fired or unfired pressure vessels, vacuum vessels, and pressure piping, all normally subject to vacuum or internal pressure other than static pressure of contents, excluding:

            (a)  waste disposal piping;

            (b)  any piping forming part of a fire protective system;

            (c)  furnaces; and

            (d)  any water piping other than:

                (1)  boiler feed water piping between the feed pump or injector and the boiler;

                (2)  boiler condensate return piping; or

                (3)  water piping forming part of a refrigerating or air conditioning system used for cooling, humidifying or space heating purposes

        2.   All mechanical, electrical, electronic or fiber optic equipment; and

    B.   Caused by, resulting from, or consisting of:

        1.   Mechanical breakdown; or

        2.   Electrical or electronic breakdown, or

        3.   Extremes or changes of temperature; or

        4.   Rupture, bursting, bulging, implosion, or steam explosion.

Boiler and Machinery as used in this Policy will not mean:

A.  Physical loss or damage caused by or resulting from any of the following regardless of any other cause or event contributing concurrently or in any other sequence to the loss:

1.  Combustion explosions, except from within combustion gas turbines; or

2.  Explosions from liquids coming in contact with molten materials; or

3.  Accidental discharge, escape, leakage, back-up, or overflow to the open of any material from confinement within piping, plumbing systems, or tanks except from property described in item 1 above; or

4.  Fire, or from the use of water or other means to extinguish a fire.

2)  Hours Equivalent:

The 100% hourly Time Element value at the location where the physical damage occurs. The term "location where the physical damage occurs" means the entire premises identified as an Insured Location. In determining the 100% hourly Time Element value, due consideration shall be given to the experience of the business before the loss and the probable experience thereafter.

## PROPERTY DAMAGE - SECTION B

1. **PROPERTY INSURED**

   This Policy insures the following property, unless otherwise excluded elsewhere in this Policy, located at an Insured Location or within 1,000 feet thereof, to the extent of the interest of the Insured in such property.

   A.   Real Property, including new buildings and additions under construction at an Insured Location, in which the Insured has an insurable interest.

   B.   Personal Property:

   1)   owned by the Insured, including the Insured's interest as a tenant in improvements and betterments.  In the event of physical loss or damage, the Company agrees to accept and consider the Insured as sole and unconditional owner of improvements and betterments, notwithstanding any contract or lease to the contrary.

   2)   of officers and employees of the Insured.

   3)   of others in the Insured's custody to the extent the Insured is under obligation to keep insured for physical loss or damage insured by this Policy.

   4)   of others in the Insured's custody to the extent of the Insured's legal liability for physical loss or damage to Personal Property.  The Company will defend that portion of any suit against the Insured that alleges such liability and seeks damages for such insured physical loss or damage.  The Company may, without prejudice, investigate, negotiate and settle any claim or suit as the Company deems expedient.

   This Policy also insures the interest of contractors and subcontractors in insured property during construction at an Insured Location or within 1,000 feet thereof, to the extent of the Insured's legal liability for insured physical loss or damage to such property.  Such interest of contractors and subcontractors is limited to the property for which they have been hired to perform work and such interest will not extend to any TIME ELEMENT coverage provided under this Policy.

2. **PROPERTY EXCLUDED**

   This Policy excludes:

   A.   currency, money, precious metal in bullion form, notes, or securities.

   B.   land, water or any other substance in or on land; except this exclusion does not apply to:

   1)   land improvements consisting of landscape gardening, roadways and pavements, but not including any fill or land beneath such property.

   2)   water that is contained within any enclosed tank, piping system or any other processing equipment.

C.   animals, standing timber, growing crops.

D.   watercraft or aircraft, except when unfueled and manufactured by the Insured.

E.   vehicles of officers and employees of the Insured or vehicles otherwise insured for physical loss or damage.

F.   underground mines or mine shafts or any property within such mine or shaft.

G.   dams and dikes.

H.   property in transit, except as otherwise provided by this Policy.

I.   property sold by the Insured under conditional sale, trust agreement, installment plan or other deferred payment plan after delivery to customers, except as provided by the DEFERRED PAYMENTS coverage of this Policy.

## 3.   ADDITIONAL COVERAGES

This Policy includes the following Additional Coverages for physical loss or damage insured by this Policy.

These Additional Coverages:

1)   are subject to the applicable limit of liability;

2)   will not increase the Policy limit of liability; and

3)   are subject to the Policy provisions, including applicable exclusions and deductibles,

all as shown in this section and elsewhere in this Policy.

## A.   ACCOUNTS RECEIVABLE

This Policy covers any shortage in the collection of accounts receivable, resulting from insured physical loss or damage to accounts receivable records while anywhere within this Policy's TERRITORY, including while in transit.  The Company will be liable for the interest charges on any loan to offset impaired collections pending repayment of such sum uncollectible as the result of such loss or damage.  Unearned interest and service charges on deferred payment accounts and normal credit losses on bad debts will be deducted in determining the recovery.

1)   In the event of loss to accounts receivable records, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding accounts receivable.

2)   The Insured agrees to use any suitable property or service:

a)   owned or controlled by the Insured; or

FM

     b)  obtainable from other sources,

in reducing the loss under this Additional Coverage.

3)  This Policy covers any other necessary and reasonable costs incurred to reduce the loss, to the extent the losses are reduced.

4)  If it is possible to reconstruct accounts receivable records so that no shortage is sustained, the Company will be liable only for the reasonable and necessary cost incurred for material and time required to re-establish or reconstruct such records, and not for any costs covered by any other insurance.

5)  ACCOUNTS RECEIVABLE Exclusions:  The following exclusions are in addition to the EXCLUSIONS clause of this section:

This Additional Coverage does not insure against shortage resulting from:

     a)  bookkeeping, accounting or billing errors or omissions; or

     b)  (i)  alteration, falsification, manipulation; or

          (ii)  concealment, destruction or disposal,

of accounts receivable records committed to conceal the wrongful giving, taking, obtaining or withholding of money, securities or other property; but only to the extent of such wrongful giving, taking, obtaining or withholding.

6)  The settlement of loss will be made within 90 days from the date of physical loss or damage.  All amounts recovered by the Insured on outstanding accounts receivable on the date of loss will belong and be paid to the Company up to the amount of loss paid by the Company.  All recoveries exceeding the amount paid will belong to the Insured.

## B.   AUTOMATIC COVERAGE

This Policy covers insured property at any Location rented, leased or purchased by the Insured after the inception date of this Policy.  This coverage applies from the date of rental, lease or purchase.

This Additional Coverage does not apply to property insured in whole or in part by any other insurance policy.

This coverage will apply until whichever of the following occurs first:

1)  The Location is bound by the Company.

2)  Agreement is reached that the Location will not be insured under this Policy.

FM Global

3) The Time Limit shown in the LIMITS OF LIABILITY clause in the DECLARATIONS section has been reached.  The Time Limit begins on the date of rental, lease or purchase.

## C.  BRANDS AND LABELS

If branded or labeled property insured by this Policy is physically damaged and the Company elects to take all or any part of that property, the Insured may at the Company's expense:

1) stamp "salvage" on the property or its containers; or

2) remove or obliterate the brands or labels,

if doing so will not damage the property.  In either event, the Insured must relabel such property or its containers to be in compliance with any applicable law.

## D.  CONSEQUENTIAL REDUCTION IN VALUE

This Policy covers the reduction in value of insured merchandise that is a part of pairs, sets, or components, directly resulting from physical loss or damage insured by this Policy to other insured parts of pairs, sets or components of such merchandise.  If settlement is based on a constructive total loss, the Insured will surrender the undamaged parts of such merchandise to the Company.

## E.  CONTROL OF DAMAGED PROPERTY

This Policy gives control of physically damaged property consisting of finished goods manufactured by the Insured as follows:

1) The Insured will have full rights to the possession and control of damaged property in the event of insured physical damage to such property provided proper testing is done to show which property is physically damaged.

2) The Insured using reasonable judgment will decide if the physically damaged property can be reprocessed or sold.

3) Property so judged by the Insured to be unfit for reprocessing or selling will not be sold or disposed of except by the Insured, or with the Insured's consent.

4) Any salvage proceeds received will go to the:

   a) Company at the time of loss settlement; or

   b) Insured if received prior to loss settlement and such proceeds will reduce the amount of loss payable accordingly.

## F.   DEBRIS REMOVAL

This Policy covers the reasonable and necessary costs incurred to remove debris from an Insured Location that remains as a direct result of physical loss or damage insured by this Policy.

This Additional Coverage does not cover the costs of removal of:

1)   contaminated uninsured property; or

2)   the contaminant in or on uninsured property,

whether or not the contamination results from insured physical loss or damage. Contamination includes, but is not limited to, the presence of pollution or hazardous material.

## G.   DECONTAMINATION COSTS

If insured property is contaminated as a direct result of physical damage insured by this Policy and there is in force at the time of the loss any law or ordinance regulating contamination, including but not limited to the presence of pollution or hazardous material, then this Policy covers, as a direct result of enforcement of such law or ordinance, the increased cost of decontamination and/or removal of such contaminated insured property in a manner to satisfy such law or ordinance.  This Additional Coverage applies only to that part of insured property so contaminated as a direct result of insured physical damage.

The Company is not liable for the costs required for removing contaminated uninsured property nor the contaminant therein or thereon, whether or not the contamination results from an insured event.

## H.   DEFERRED PAYMENTS

This Policy covers insured physical loss or damage to Personal Property of the type insured sold by the Insured under a conditional sale or trust agreement or any installment or deferred payment plan and after such property has been delivered to the buyer.  Coverage is limited to the unpaid balance for such property.

In the event of loss to property sold under deferred payment plans, the Insured will use all reasonable efforts, including legal action, if necessary, to effect collection of outstanding amounts due or to regain possession of the property.

There is no liability under this Policy for loss:

1)   pertaining to products recalled including, but not limited to, the costs to recall, test or to advertise such recall by the Insured.

2)   from theft or conversion by the buyer of the property after the buyer has  taken possession of such property.

3)  to the extent the buyer continues payments.

4)  not within the TERRITORY of this Policy.

## I.   DEMOLITION AND INCREASED COST OF CONSTRUCTION

1)  This Policy covers the reasonable and necessary costs incurred, described in item 3 below, to satisfy the minimum requirements of the enforcement of any law or ordinance regulating the demolition, construction, repair, replacement or use of buildings or structures at an Insured Location, provided:

   a)  such law or ordinance is in force on the date of insured physical loss or damage; and

   b)  its enforcement is a direct result of such insured physical loss or damage.

2)  This Additional Coverage does not cover loss due to any law or ordinance with which the Insured was required to comply had the loss not occurred.

3)  This Additional Coverage, as respects the property insured in item 1 above, covers:

   a)  the cost to repair or rebuild the physically damaged portion of such property with materials and in a manner to satisfy such law or ordinance; and

   b)  the cost:

      (i)  to demolish the physically undamaged portion of such property insured; and

      (ii) to rebuild it with materials and in a manner to satisfy such law or ordinance,

   to the extent that such costs result when the demolition of the physically damaged insured property is required to satisfy such law or ordinance.

4)  This Additional Coverage excludes any costs incurred as a direct or indirect result of enforcement of any laws or ordinances regulating any form of contamination including but not limited to the presence of pollution or hazardous material.

5)  The Company's maximum liability for this Additional Coverage at each Insured Location in any occurrence will not exceed the actual cost incurred in demolishing the physically undamaged portion of the property insured in item 1 above plus the lesser of:

   a)  the reasonable and necessary actual cost incurred, excluding the cost of land, in rebuilding on another site; or

   b)  the cost of rebuilding on the same site.

## J.   EARTH MOVEMENT

This Policy covers physical loss or damage caused by or resulting from Earth Movement.

This Additional Coverage does not apply to loss or damage caused by or resulting from flood; rising waters; waves; tide or tidal water; the release of water; the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom, surface water or sewer back-up resulting from any of the foregoing; all regardless of any other cause or event contributing concurrently or in any other sequence to the loss.

1)  References and Application.  The following term(s) wherever used in this Policy means:

   a)  Earth Movement:

   Any natural or man-made earth movement including, but not limited to earthquake, landslide or subsidence, regardless of any other cause or event contributing concurrently or in any other sequence of loss.  However, physical damage by fire, explosion, or sprinkler leakage resulting from Earth Movement will not be considered to be loss by Earth Movement within the terms and conditions of this Policy.  All earth movements within a continuous 72 hour period will be considered a single Earth Movement.

## K.   ERRORS AND OMISSIONS

If physical loss or damage is not payable under this Policy solely due to an error or unintentional omission:

1)  in the description of where insured property is physically located;

2)  to include any Location:

   a)  owned, rented or leased by the Insured on the effective date of this Policy; or

   b)  purchased, rented or leased by the Insured during the term of this Policy; or

3)  that results in cancellation of the property insured under this Policy;

this Policy covers such physical loss or damage, to the extent it would have provided coverage had such error or unintentional omission not been made.

It is a condition of this Additional Coverage that any error or unintentional omission be reported by the Insured to the Company when discovered and corrected.

## L.   EXPEDITING COSTS

This Policy covers the reasonable and necessary costs incurred to pay for the temporary repair of insured damage to insured property and to expedite the permanent repair or replacement of such damaged property.

This Additional Coverage does not cover costs:

1)   recoverable elsewhere in this Policy; or

2)   of permanent repair or replacement of damaged property.

## M.   FINE ARTS

This Policy covers insured physical loss or damage to Fine Arts articles while anywhere within this Policy's TERRITORY, including while in transit.

1)   This Additional Coverage excludes loss or damage if the Fine Arts cannot be replaced with other of like kind and quality, unless it is specifically declared to the Company.

2)   FINE ARTS Exclusion: The exclusions in the EXCLUSIONS clause of this section do not apply to FINE ARTS coverage except for A1, A2, A6, B1, B2, B3a, B4, B5, and B6. In addition, as respects FINE ARTS, the following exclusions apply:

This Policy does not insure against:

a)   deterioration, wear and tear or inherent vice.

b)   loss or damage from any repairing, restoration or retouching process.

3)   References and Application.  The following term(s) wherever used in this Policy means:

a)   Fine Arts:

Paintings; etchings; pictures; tapestries; rare or art glass; art glass windows; valuable rugs; statuary; sculptures; antique furniture; antique jewelry; bric-a-brac; porcelains; and similar property of rarity, historical value, or artistic merit excluding automobiles, coins, stamps, furs, jewelry, precious stones, precious metals, watercraft, aircraft, money, securities.

## N.   FLOOD

This Policy covers physical loss or damage caused by or resulting from Flood.

1)   References and Application.  The following term(s) wherever used in this Policy means:

a)   Flood:

Flood; rising waters; waves; tide or tidal water; the release of water, the rising, overflowing or breaking of boundaries of natural or man-made bodies of water; or the spray therefrom, surface waters or sewer back-up resulting from any of the foregoing; regardless of any other cause or event contributing concurrently or in any other sequence of loss.  However, physical damage by fire, explosion or sprinkler leakage resulting from Flood is not considered to be loss by Flood within the terms and conditions of this Policy.

FM Global

## O.   LAND AND WATER CONTAMINANT OR POLLUTANT CLEANUP, REMOVAL AND DISPOSAL

This Policy covers the reasonable and necessary cost for the cleanup, removal and disposal of contaminants or pollutants from uninsured property consisting of land, water or any other substance in or on land at the Insured Location if the release, discharge or dispersal of contaminants or pollutants is a direct result of insured physical loss or damage to insured property.

This Policy does not cover the cost to cleanup, remove and dispose of contaminants or pollutants from such property:

1) at any location insured for Personal Property only.

2) at any property insured under AUTOMATIC COVERAGE, ERRORS AND OMISSIONS or Miscellaneous Unnamed Location coverage provided by this Policy.

3) when the Insured fails to give written notice of loss to the Company within 180 days after inception of the loss.

## P.   PROFESSIONAL FEES

This Policy covers the actual costs incurred by the Insured, of reasonable fees payable to the Insured's accountants, architects, auditors, engineers, or other professionals and the cost of using the Insured's employees, for producing and certifying any particulars or details contained in the Insured's books or documents, or such other proofs, information or evidence required by the Company resulting from insured loss payable under this Policy for which the Company has accepted liability.

Coverage will not include the fees and costs of attorneys, public adjusters, and loss appraisers, all including any of their subsidiary, related or associated entities either partially or wholly owned by them or retained by them for the purpose of assisting them nor the fees and costs of loss consultants who provide consultation on coverage or negotiate claims.

## Q.   PROTECTION AND PRESERVATION OF PROPERTY

This Policy covers:

1) reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

2) reasonable and necessary:

a) fire department fire fighting charges imposed as a result of responding to a fire in, on or exposing the insured property.

    b) costs incurred of restoring and recharging fire protection systems following an insured loss.

    c) costs incurred for the water used for fighting a fire in, on or exposing the insured property.

This Additional Coverage is subject to the deductible provisions that would have applied had the physical loss or damage occurred.

## R. SERVICE INTERRUPTION PROPERTY DAMAGE

1) This Policy covers insured physical loss or damage to insured property at an Insured Location when such physical loss or damage results from the interruption of the specified incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental occurrence to the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable service.

2) This Additional Coverage will apply when the Period of Service Interruption is in excess of the time shown as Waiting Period in the WAITING PERIOD clause of the DECLARATIONS section.

3) The exclusions in the EXCLUSIONS clause of this section do not apply to SERVICE INTERRUPTION coverage except for:

    a) A1, A2, A3, A6, B1, B2, B5, B6, D1; and

    b) B4 with respect to telecommunications.

4) Additional General Provisions:

    a) The Insured will immediately notify the suppliers of services of any interruption of such services.

    b) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

5) References and Application. The following term(s) means:

    a) Period of Service Interruption:

    The period starting with the time when an interruption of specific services occurs; and ending when with due diligence and dispatch the service could be wholly restored.

### S.    TAX TREATMENT OF PROFITS

This Policy is extended to cover the increased tax liability from an insured loss at an Insured Location if the tax treatment of:

1)   the profit portion of a loss payment under this Policy involving finished stock manufactured by the Insured; and/or

2)   the profit portion of a TIME ELEMENT loss payment under this Policy;

is greater than the tax treatment of profits that would have been incurred had no loss occurred.

### T.    TEMPORARY REMOVAL OF PROPERTY

1)   When insured property is removed from an Insured Location for the purpose of being repaired or serviced or in order to avoid threatened physical loss or damage of the type insured by this Policy, this Policy covers such property:

    a)   while at the location to which such property has been moved; and

    b)   for physical loss or damage as provided at the Insured Location from which such property was removed.

2)   This Additional Coverage does not apply to property:

    a)   insured, in whole or in part, elsewhere in this Policy.

    b)   insured, in whole or in part, by any other insurance policy.

    c)   removed for normal storage, processing or preparation for sale or delivery.

### U.    TRANSPORTATION

1)   This Policy covers the following Personal Property, except as excluded by this Policy, while in transit within the TERRITORY of this Policy:

    a)   owned by the Insured.

    b)   shipped to customers under F.O.B., C & F or similar terms.  The Insured's contingent interest in such shipments is admitted.

    c)   of others in the actual or constructive custody of the Insured to the extent of the Insured's interest or legal liability.

    d)   of others sold by the Insured, that the Insured has agreed prior to the loss to insure during course of delivery.

2) This Additional Coverage excludes:

    a) samples in the custody of salespeople or selling agents.

    b) property insured under import or export ocean marine insurance.

    c) waterborne shipments, unless:

        (i) by inland water; or

        (ii) by coastal shipments.

    d) waterborne shipments via Panama Canal or to and from Alaska, Puerto Rico, and Hawaii.

    e) airborne shipments unless by regularly scheduled passenger airlines or air freight carriers.

    f) property of others, including the Insured's legal liability for it, hauled on vehicles owned, leased or operated by the Insured when acting as a common or contract carrier.

    g) any transporting vehicle.

3) Coverage Attachment and Duration:

    a) This Additional Coverage covers from the time the property leaves the original point of shipment for transit until the property arrives at the destination.

    b) However, coverage on export shipments not insured under ocean cargo policies ends when the property is loaded on board overseas vessels or aircraft. Coverage on import shipments not insured under ocean cargo policies begins after discharge from overseas vessels or aircraft.

4) This Additional Coverage:

    a) covers general average and salvage charges on shipments covered while waterborne.

    b) insures physical loss or damage caused by or resulting from:

        (i) unintentional acceptance of fraudulent bills of lading, shipping or messenger receipts.

        (ii) improper parties having gained possession of property through fraud or deceit.

5) The exclusions in the EXCLUSIONS clause of this section do not apply to TRANSPORTATION coverage except for A1 through A4, B1 through B6, C1, C3, C5, C6, D1 through D3.

**FM** Mutual

6)   Additional General Provisions:

   a)   This Additional Coverage will not inure directly or indirectly to the benefit of any carrier or bailee.

   b)   The Insured has permission, without prejudicing this insurance, to accept:

      (i)   ordinary bills of lading used by carriers;

      (ii)  released bills of lading;

      (iii) undervalued bills of lading; and

      (iv)  shipping or messenger receipts.

   c)   The Insured may waive subrogation against railroads under side track agreements.

   Except as otherwise stated, the Insured will not enter into any special agreement with carriers releasing them from their common law or statutory liability.

## V.   VALUABLE PAPERS AND RECORDS

This Policy covers insured physical loss or damage to VALUABLE PAPERS AND RECORDS while anywhere within this Policy's TERRITORY, including while in transit.

1)   This Additional Coverage excludes loss or damage to:

   a)   property described below, if such property cannot be replaced with other of like kind and quality, unless specifically declared to the Company.

   b)   currency, money or securities.

   c)   property held as samples or for sale or for delivery after sale.

2)   VALUABLE PAPERS AND RECORDS Exclusions:  The exclusions in the EXCLUSIONS clause of this section do not apply to VALUABLE PAPERS AND RECORDS coverage except for A1, A2, A6, B1, B2, B3a, B4, B5, and B6.  In addition, as respects VALUABLE PAPERS AND RECORDS the following exclusions apply:

This Policy does not insure:

   a)   errors or omissions in processing, or copying; all unless physical damage not excluded by this Policy results, in which event, only that resulting damage is insured.

   b)   loss or damage to media, data or programs from errors or omissions in programming or machine instructions; all unless physical damage not excluded by this Policy results, in which event, only that resulting damage is insured.

    c)   deterioration, inherent vice, vermin or wear and tear; all unless physical damage not excluded by this Policy results, in which event, only that resulting damage is insured.

3)   References and Application.  The following term(s) wherever used in this Policy means:

    a)   Valuable Papers and Records:

        (i)   Media, data and programs for electronic, electro-mechanical and electro-magnetic data processing and production equipment.

        (ii)   Written, printed or otherwise inscribed documents and records, including books, maps, films, drawings, abstracts, deeds, mortgages and manuscripts, all of which must be of value to the Insured.

## 4.    APPLICATION OF POLICY TO DATE OR TIME RECOGNITION

A.    With respect to situations caused by the so-called "Year 2000" problem or any other Date or Time Recognition problem by Electronic Data Processing Equipment or Media, this Policy applies as follows.

1)   This Policy does not pay for remediation, change, correction, repair or assessment of any Year 2000 or any other Date or Time Recognition problem in any Electronic Data Processing Equipment or Media, whether preventative or remedial, and whether before or after a loss, including temporary protection and preservation of property.  This Policy does not pay for any TIME ELEMENT loss resulting from the foregoing remediation, change, correction, repair or assessment.

2)   Failure of Electronic Data Processing Equipment or Media to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000, is not physical loss or damage insured against by this Policy.  This Policy does not pay for any such incident or for any TIME ELEMENT loss resulting from any such incident.

Subject to all of its terms and conditions, this Policy does pay for physical loss or damage not excluded by this Policy that results from a failure of Electronic Data Processing Equipment or Media to correctly recognize, interpret, calculate, compare, differentiate, sequence, access or process data involving one or more dates or times, including the Year 2000.  Such covered resulting physical loss or damage does not include any loss, cost or expense described in 1 or 2 above.  If such covered resulting physical loss or damage occurs, and if this Policy provides TIME ELEMENT coverage, then, subject to all of its terms and conditions, this Policy also covers any insured Time Element loss directly resulting therefrom.



B.   References and Application.  The following term(s) wherever used in this Policy means:

   1)   Date or Time Recognition:

   The recognition, interpretation, calculation, comparison, differentiation, sequencing, accessing or processing of data involving one or more dates or times, including the Year 2000.

   2)   Electronic Data Processing Equipment or Media:

   Any computer, computer system or component, hardware, network, microprocessor, microchip, integrated circuit or similar devices or components in computer or non-computer equipment, operating systems, data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, whether the property of the Insured or not.

## 5.   EXCLUSIONS

The following exclusions apply unless specifically stated elsewhere in this Policy:

A.   This Policy excludes:

   1)   indirect or remote loss or damage.

   2)   interruption of business, except to the extent provided by this Policy.

   3)   loss of market or loss of use.

   4)   loss or damage or deterioration arising from any delay.

   5)   mysterious disappearance, loss or shortage disclosed on taking inventory, or any unexplained loss.

   6)   loss from enforcement of any law or ordinance:

      a)   regulating the construction, repair, replacement, use or removal, including debris removal, of any property; or

      b)   requiring the demolition of any property, including the cost in removing its debris;

      except as provided by the DECONTAMINATION COSTS and DEMOLITION AND INCREASED COST OF CONSTRUCTION coverages of this section of this Policy.

B.   This Policy excludes loss or damage directly or indirectly caused by or resulting from any of the following regardless of any other cause or event, whether or not insured under this Policy, contributing concurrently or in any other sequence to the loss:

1) nuclear reaction or nuclear radiation or radioactive contamination.  However:

   a) if physical damage by fire or sprinkler leakage results, then only that resulting damage is insured; but not including any loss or damage due to nuclear reaction, radiation or radioactive contamination.

   b) this Policy does insure physical damage directly caused by sudden and accidental radioactive contamination, including resultant radiation damage, from material used or stored or from processes conducted on the Insured Location, provided that on the date of loss, there is neither a nuclear reactor nor any new or used nuclear fuel on the Insured Location.

2) a) hostile or warlike action in time of peace or war, including action in hindering, combating or defending against an actual, impending or expected attack by any:

     (i)  government or sovereign power (de jure or de facto);

     (ii) military, naval or air force; or

     (iii) agent or authority of any party specified in i or ii above.

     Item iii of this exclusion does not apply to physical loss or damage insured by this Policy done by terrorists or done secretly by a foreign enemy or agent of any government or sovereign power (de jure or de facto), when not in connection with the operations of armed forces in or against the country where the Insured Location is situated.

   b) discharge, explosion or use of any nuclear device, weapon or material employing or involving nuclear fission, fusion or radioactive force, whether in time of peace or war and regardless of who commits the act.

   c) insurrection, rebellion, revolution, civil war, usurped power, or action taken by governmental authority in hindering, combating or defending against such an event.

   d) seizure or destruction under quarantine or custom regulation, or confiscation by order of any governmental or public authority.

   e) risks of contraband, or illegal transportation or trade.

3) any dishonest act, including but not limited to theft, committed alone or in collusion with others, at any time:

   a) by an Insured or any proprietor, partner, director, trustee, officer, or employee of an Insured; or

   b) by any proprietor, partner, director, trustee, or officer of any business or entity (other than a common carrier) engaged by an Insured to do anything in connection with property insured under this Policy.



This Policy does insure acts of direct insured physical damage intentionally caused by an employee of an Insured or any individual specified in b above, and done without the knowledge of the Insured. In no event does this Policy cover loss by theft by any individual specified in a or b above.

4) lack of incoming electricity, fuel, water, gas, steam, refrigerant or telecommunications service or sewerage service caused by an occurrence off the Insured Location, except as provided in SERVICE INTERRUPTION in the PROPERTY DAMAGE or TIME ELEMENT section of this Policy. But, if the lack of such a service directly causes physical damage insured by this Policy on the Insured Location, then only that resulting damage is insured.

5) Earth Movement in California, Alaska, Hawaii and Puerto Rico.

6) Flood in areas designated Zone A or Zone V by the Federal Emergency Management Agency (FEMA).

C. This Policy excludes the following, but, if physical damage not excluded by this Policy results, then only that resulting damage is insured:

1) faulty workmanship, material, construction or design from any cause.

2) loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested, or otherwise worked on.

3) deterioration, depletion, rust, corrosion or erosion, wear and tear, inherent vice or latent defect.

4) settling, cracking, shrinking, bulging, or expansion of:

   a) foundations (including any pedestal, pad, platform or other property supporting machinery).

   b) floors.

   c) pavements.

   d) walls.

   e) ceilings.

   f) roofs.

5) a) changes of temperature damage (except to machinery or equipment); or

   b) changes in relative humidity damage,

**FM** Global

Account No.   **1-33186**
Policy No.   **UA864**

    all whether atmospheric or not.

   6)  insect, animal or vermin damage.

D.   This Policy excludes the following unless directly resulting from other physical damage not excluded by this Policy:

   1)  contamination including but not limited to the presence of pollution or hazardous material.

   2)  shrinkage.

   3)  changes in color, flavor, texture or finish.

FM Global

Account No.   1-33186
Policy No.   UA864

## TIME ELEMENT - SECTION C

**1.    LOSS INSURED**

A.    This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured by this Policy:

1)   to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;

2)   used by the Insured, or for which the Insured has contracted use;

3)   located at an Insured Location; and

4)   during the Periods of Liability described in this section.

B.    This Policy insures TIME ELEMENT loss only to the extent it cannot be reduced through:

1)   the use of any property or service owned or controlled by the Insured;

2)   the use of any property or service obtainable from other sources;

3)   working extra time or overtime; or

4)   the use of inventory,

all whether at an Insured Location or at any other location. The Company reserves the right to take into consideration the combined operating results of all associated, affiliated or subsidiary companies of the Insured in determining the TIME ELEMENT loss.

C.    This Policy covers expenses reasonably and necessarily incurred by the Insured to reduce the loss otherwise payable under this section of this Policy. The amount of such recoverable expenses will not exceed the amount by which the loss has been reduced.

D.    Except as respects LEASEHOLD INTEREST, in determining the amount of loss payable, the Company will consider the experience of the business before and after and the probable experience during the PERIOD OF LIABILITY.

**2.    TIME ELEMENT COVERAGES**

**A.    GROSS EARNINGS**

1)   Measurement of Loss:

a)   The recoverable GROSS EARNINGS loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

(i)   Gross Earnings;

(ii) less all charges and expenses that do not necessarily continue during the interruption of production or suspension of business operations or services;

(iii) less ordinary payroll;

(iv) plus all other earnings derived from the operation of the business.

b) In determining the indemnity payable as the Actual Loss Sustained, the Company will consider the continuation of only those normal charges and expenses that would have been earned had no interruption of production or suspension of business operations or services occurred.

c) There is recovery hereunder but only to the extent that the Insured is:

(i) wholly or partially prevented from producing goods or continuing business operations or services;

(ii) unable to make up lost production within a reasonable period of time, not limited to the period during which production is interrupted;

(iii) unable to continue such operations or services during the PERIOD OF LIABILITY; and

(iv) able to demonstrate a loss of sales for the operations, services or production prevented.

2) References and Application.  The following term(s) means:

Gross Earnings, as used in item 1ai:

a) for manufacturing operations: the net sales value of production less the cost of all raw stock, materials and supplies used in such production; or

b) for mercantile or non-manufacturing operations: the total net sales less cost of merchandise sold, materials and supplies consumed in the operations or services rendered by the Insured.

Any amount recovered under property damage coverage at selling price for loss or damage to merchandise will be considered to have been sold to the Insured's regular customers and will be credited against net sales.

## B.   EXTRA EXPENSE

1) Measurement of Loss:

The recoverable EXTRA EXPENSE loss will be the reasonable and necessary extra costs incurred by the Insured of the following during the PERIOD OF LIABILITY:

a)  Extra expenses to temporarily continue as nearly normal as practicable the conduct of the Insured's business; and

b)  Extra costs of temporarily using property or facilities of the Insured or others,

less any value remaining at the end of the PERIOD OF LIABILITY for property obtained in connection with the above.

2)  EXTRA EXPENSE Exclusions:  As respects EXTRA EXPENSE, the following are also excluded:

a)  Any loss of income.

b)  Costs that normally would have been incurred in conducting the business during the same period had no physical loss or damage occurred.

c)  Cost of permanent repair or replacement of property that has been damaged or destroyed.

d)  Any expense recoverable elsewhere in this Policy.

3)  References and Application.  The following term(s) means:

a)  Normal:

The condition that would have existed had no physical loss or damage occurred.

## C.  LEASEHOLD INTEREST

1)  Measurement of Loss:

The recoverable LEASEHOLD INTEREST incurred by the Insured of the following:

a)  If the lease agreement requires continuation of rent; and if the property is wholly untenantable or unusable, the actual rent payable for the unexpired term of the lease; or if the property is partially untenantable or unusable, the proportion of the rent payable for the unexpired term of the lease.

b)  If the lease is canceled by the lessor pursuant to the lease agreement or by the operation of law; the Lease Interest for the first three months following the loss; and the Net Lease Interest for the remaining unexpired term of the lease.

2)  LEASEHOLD INTEREST Exclusions: As respects LEASEHOLD INTEREST, TIME ELEMENT EXCLUSIONS A, B, and C do not apply and the following applies instead:

This Policy does not insure any increase in loss resulting from the suspension, lapse or cancellation of any license, or from the Insured exercising an option to cancel the lease; or from any act or omission of the Insured that constitutes a default under the lease.

In addition, there is no coverage for the Insured's loss of LEASEHOLD INTEREST directly resulting from physical loss or damage to Personal Property.

3) References and Application.  The following term(s) means:

a)  Lease Interest:

The excess rent paid for the same or similar replacement property over actual rent payable plus cash bonuses or advance rent paid (including maintenance or operating charges) for each month during the unexpired term of the Insured's lease.

b)  Net Lease Interest:

That sum which placed at 6% interest rate compounded annually would equal the Lease Interest (less any amounts otherwise payable hereunder).

## D.    RENTAL INSURANCE

1)  Measurement of Loss:

The recoverable RENTAL INSURANCE loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

a)  The fair rental value of any portion of the property occupied by the Insured;

b)  The income reasonably expected from rentals of unoccupied or unrented portions of such property; and

c)  The rental income from the rented portions of such property according to bona fide leases, contracts or agreements in force at the time of loss,

all not to include noncontinuing charges and expenses.

2)  RENTAL INSURANCE Exclusions:  As respects RENTAL INSURANCE, TIME ELEMENT EXCLUSIONS A does not apply and the following applies instead:

A.  This Policy does not insure any loss of rental income during any period in which the insured property would not have been tenantable for any reason other than an insured loss.

## E.    COMMISSIONS, PROFITS AND ROYALTIES

1)  Measurement of Loss:

a)  The recoverable COMMISSIONS, PROFITS AND ROYALTIES loss is the Actual Loss Sustained by the Insured of the following during the PERIOD OF LIABILITY:

(i)  Commissions, Profits and Royalties;

FM Global

Account No.  1-33186
Policy No.  UA864

(ii) Less noncontinuing expenses and charges during the PERIOD OF LIABILITY.

b) The Commissions, Profits And Royalties payable hereunder will be the Actual Loss Sustained of income to the Insured during the PERIOD OF LIABILITY under any royalty, licensing fee or commission agreement between the Insured and another party which is not realizable due to physical loss or damage insured by this Policy to property of the other party of the type insured by this Policy located within the Policy's TERRITORY.

c) The Insured will influence, to the extent possible, said party(ies) with whom the agreements described above have been made to use any other machinery, supplies or locations in order to resume business so as to reduce the amount of loss hereunder, and the Insured will cooperate with that party in every way to effect this. This Policy does not cover any cost to effect the above unless authorized in advance by the Company.

d) In determining the indemnity payable hereunder, the Company will consider the amount of income derived from such agreements before and the probable amount of income after the date of loss or damage.

e) There is recovery hereunder but only if such loss or damage interrupts the delivery of goods in whole or in part to the Insured or for their account.

2) COMMISSIONS, PROFITS AND ROYALTIES Exclusions: As respects COMMISSIONS, PROFITS AND ROYALTIES, TIME ELEMENT EXCLUSIONS C does not apply.

3) References and Application.  The following term(s) means:

a) Commissions:

   The income that would have been received by the Insured from the sale of goods not owned by the Insured.

b) Profits:

   The amount that would have been received by the Insured from the sale of goods belonging to the Insured, in excess of the cost to the Insured of such goods.

c) Royalties:

   The income the Insured is not able to collect under royalty or licensing agreements.

FM Global

## 3.   TIME ELEMENT COVERAGE EXTENSIONS

### A.   CONTINGENT TIME ELEMENT

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY:

1)   directly resulting from physical loss or damage of the type insured; and

2)   to property of the type insured,

at any locations of direct suppliers or customers located within the TERRITORY of this Policy.

The term "supplier or customer" does not include any company supplying to or receiving from the Insured Location, as described elsewhere in this Policy, electricity, fuel, gas, water, steam, refrigeration, sewage or telecommunications.

### B.   EXTENDED PERIOD OF LIABILITY

The GROSS EARNINGS coverage is extended to cover the reduction in sales resulting from:

1)   the interruption of business as covered by GROSS EARNINGS;

2)   for such additional length of time as would be required with the exercise of due diligence and dispatch to restore the Insured's business to the condition that would have existed had no loss occurred; and

3)   commencing with the date on which the liability of the Company for loss resulting from interruption of business would terminate if this Extension had not been included herein.

EXTENDED PERIOD OF LIABILITY Exclusions:  As respects EXTENDED PERIOD OF LIABILITY, the TIME ELEMENT EXCLUSIONS B of this section does not apply and the following applies instead:

This Policy does not insure against any increase in loss due to fines or damages for breach of contract or for late or noncompletion of orders, or penalties of any nature.

Coverage under this Extension for the reduction in sales due to contract cancellation will include only those sales that would have been earned under the contract during the extended period of liability.

Coverage under this Extension does not apply for more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

**FM**

### C.  INGRESS/EGRESS

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured due to the necessary interruption of the Insured's business due to prevention of ingress to or egress from an Insured Location, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured by this Policy, to the kind of property not excluded by this Policy.

INGRESS/EGRESS Exclusions: As respects INGRESS/EGRESS, the following exclusions are applicable:

This Policy does not insure loss resulting from:

1) lack of incoming or outgoing service consisting of electric, fuel, gas, water, steam, refrigerant, sewerage and telecommunications.

2) picketing or other action by strikers except for physical damage not excluded by this Policy.

This Policy does not provide coverage under this Extension for more than the number of consecutive days shown in the LIMITS OF LIABILITY clause of the DECLARATIONS section.

### D.  ON PREMISES SERVICES

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY directly resulting from physical loss or damage of the type insured to the following property located within 1,000 feet of the Insured Location:

1) Electrical and telecommunications equipment.

2) Electrical, telecommunications, fuel, gas, water, steam, refrigeration and sewerage transmission lines.

### E.  PROTECTION AND PRESERVATION OF PROPERTY – TIME ELEMENT

This Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending physical loss or damage insured by this Policy at such insured property.

This Extension is subject to the deductible provisions that would have applied had the physical loss or damage occurred.

**FM Global**

## F.    RELATED REPORTED VALUES

If reported TIME ELEMENT values include:

1)   locations used by the Insured (such as branch stores, sales outlets and other plants) but not listed on a schedule under this Policy; and

2)   a TIME ELEMENT loss would result at such locations,

3)   from insured physical loss or damage at an Insured Location,

then this Policy provides coverage for such resulting TIME ELEMENT loss in accordance with the coverage applicable at such Insured Location.

## G.    RESEARCH AND DEVELOPMENT

The GROSS EARNINGS coverage is extended to insure the Actual Loss Sustained by the Insured of continuing fixed charges excluding ordinary payroll directly attributable to the interruption of research and development activities, that in themselves would not have produced income during the PERIOD OF LIABILITY.

The PERIOD OF LIABILITY for this TIME ELEMENT COVERAGE EXTENSION will be the period from the time of direct physical loss or damage of the type insured by this Policy to the time when the property could be repaired or replaced and made ready for operations, but not to be limited by the date of expiration of this Policy.

## H.    SERVICE INTERRUPTION TIME ELEMENT

1)   This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the Period of Service Interruption at Insured Locations when the loss is caused by the interruption of incoming services consisting of electricity, gas, fuel, steam, water, refrigeration or from the lack of outgoing sewerage service by reason of any accidental occurrence to the facilities of the supplier of such service located within this Policy's TERRITORY, that immediately prevents in whole or in part the delivery of such usable services.

2)   This Extension will apply when the Period of Service Interruption is in excess of the time shown as Waiting Period in the WAITING PERIOD clause of the DECLARATIONS section.

3)   The exclusions in the EXCLUSIONS clause of the PROPERTY DAMAGE section do not apply to SERVICE INTERRUPTION TIME ELEMENT coverage except for:

a)   A1, A2, A3, A6, B1, B2, B5, B6, D1, and

b)   B4 with respect to telecommunications.

**FM Global**

4) Additional General Provisions:

   a) The Insured will immediately notify the suppliers of services of any interruption of such services.

   b) The Company will not be liable if the interruption of such services is caused directly or indirectly by the failure of the Insured to comply with the terms and conditions of any contracts the Insured has for the supply of such specified services.

5) References and Application. The following term(s) means:

   a) Period of Service Interruption:

      (i) The period starting with the time when an interruption of specified services occurs; and ending when with due diligence and dispatch the service could be wholly restored and the Location receiving the service could or would have resumed normal operations following the restorations of service under the same or equivalent physical and operating conditions as provided by the PERIOD OF LIABILITY clause in this section.

      (ii) The Period of Service Interruption is limited to only those hours during which the Insured would or could have used services(s) if it had been available.

      (iii) The Period of Service Interruption does not extend to include the interruption of operations caused by any reason other than interruption of the specified service(s).

## 4.    PERIOD OF LIABILITY

A.   The PERIOD OF LIABILITY applying to all TIME ELEMENT COVERAGES, except LEASEHOLD INTEREST and as shown below, or if otherwise provided under the TIME ELEMENT COVERAGE EXTENSIONS, is as follows:

1) For building and equipment, the period:

   a) starting from the time of physical loss or damage of the type insured against; and

   b) ending when with due diligence and dispatch the building and equipment could be:

      (i) repaired or replaced; and

      (ii) made ready for operations,

   under the same or equivalent physical and operating conditions that existed prior to the damage.

   c) not to be limited by the expiration of this Policy.

2) For building and equipment under construction:

FM Global

Account No.  1-33186<br>Policy No.  UA864

    a)  the equivalent of the above period of time will be applied to the level of business that would have been reasonably achieved after construction and startup would have been completed had no physical damage happened; and

    b)  due consideration will be given to the actual experience of the business compiled after completion of the construction and startup.

This item does not apply to COMMISSIONS, PROFITS AND ROYALTIES.

3)  For stock-in-process and mercantile stock, including finished goods not manufactured by the Insured, the time required with the exercise of due diligence and dispatch:

    a)  to restore stock in process to the same state of manufacture in which it stood at the inception of the interruption of production or suspension of business operations or services; and

    b)  to replace physically damaged mercantile stock.

This item does not apply to RENTAL INSURANCE.

4)  For raw materials and supplies, the period of time:

    a)  of actual interruption of production or suspension of operations or services resulting from the inability to get suitable raw materials and supplies to replace similar ones damaged; but

    b)  limited to that period for which the damaged raw materials and supplies would have supplied operating needs.

5)  If water:

    a)  used for any manufacturing purpose, including but not limited to as a raw material or for power;

    b)  stored behind dams or in reservoirs; and

    c)  on any Insured Location,

is released as the result of physical damage of the type insured against under this Policy to such dam, reservoir or connected equipment, the Company's liability for the actual interruption of production or suspension of operations or services due to inadequate water supply will not extend beyond 30 consecutive days after the damaged dam, reservoir or connected equipment has been repaired or replaced.

This item does not apply to RENTAL INSURANCE.

6)  For physically damaged exposed films, records, manuscripts and drawings, the time required to copy from backups or from originals of a previous generation.  This time

does not include research, engineering or any other time necessary to restore or recreate lost information.

This item does not apply to RENTAL INSURANCE.

7)  For physically damaged or destroyed data, programs or other software stored on electronic, electro-mechanical, electro-magnetic data processing or production equipment, the time to recreate or restore including the time for researching or engineering lost information.

This item does not apply to RENTAL INSURANCE.

8)  If an order of civil authority prohibits access to the Insured Location and provided such order is the direct result of physical damage of the type insured against under this Policy at the Insured Location or within 1,000 feet of it, the period of time:

a)  starting at the time of such physical damage; but

b)  not to exceed 30 consecutive days.

B.  The PERIOD OF LIABILITY does not include any additional time due to the Insured's inability to resume operations for any reason, including but not limited to:

1)  making changes to equipment.

2)  making changes to the buildings or structures except as provided in the DEMOLITION AND INCREASED COST OF CONSTRUCTION clause in the PROPERTY DAMAGE section.

3)  restaffing or retraining employees.

If two or more Periods of Liability apply such periods will not be cumulative.

## 5.  TIME ELEMENT EXCLUSIONS

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to TIME ELEMENT loss:

This Policy does not insure against:

A.  Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

1)  physical loss or damage not insured by this Policy on or off of the Insured Location.

2)  planned or rescheduled shutdown.

3)  strikes or other work stoppage.

FM Global

    4)  any other reason other than physical loss or damage insured by this Policy.

B.    Any increase in loss due to:

    1)  suspension, cancellation or lapse of any lease, contract, license or orders.

    2)  fines or damages for breach of contract or for late or noncompletion of orders.

    3)  for penalties of any nature.

    4)  any other consequential or remote loss.

C.    Any loss resulting from loss or damage to finished goods manufactured by the Insured, nor the time required for their reproduction.

Account No.  1-33186
Policy No.  UA864

## LOSS ADJUSTMENT AND SETTLEMENT - SECTION D

### 1.    LOSS ADJUSTMENT/PAYABLE

Loss, if any, will be adjusted with and payable to Clark County Department of Aviation, or as may be directed by Clark County Department of Aviation.  Additional insured interests will also be included in loss payment as their interests may appear when named as additional named insured, lender, mortgagee and/or loss payee in the Certificates of Insurance on file with the Company or named below.

### 2.    CURRENCY FOR LOSS PAYMENT

Losses will be adjusted and paid in the currency of the United States of America.  But, in Canada losses will be paid in Canadian currency, unless directed otherwise by the Insured.

### 3.    VALUATION

Adjustment of the physical loss amount under this Policy will be computed as of the date of loss at the location of the loss, and for no more than the interest of the Insured, subject to the following:

A.    On stock in process, the value of raw materials and labor expended plus the proper proportion of overhead charges.

B.    On finished goods manufactured by the Insured, the regular cash selling price at the Location where the loss happens, less all discounts and charges to which the finished goods would have been subject had no loss happened.

C.    On raw materials, supplies and other merchandise not manufactured by the Insured:

    1)    if repaired or replaced, the actual expenditure incurred in repairing or replacing the damaged or destroyed property; or

    2)    if not repaired or replaced, the Actual Cash Value.

D.    On exposed films, records, manuscripts and drawings, that are not Valuable Papers and Records, the value blank plus the cost of copying information from back-up or from originals of a previous generation.  These costs will not include research, engineering or any costs of restoring or recreating lost information.

E.    On property covered under DEFERRED PAYMENTS, the lesser of the:

    1)    total amount of unpaid installments less finance charges.

    2)    Actual Cash Value of the property at the time of loss.

    3)    cost to repair or replace with material of like size, kind and quality.

FM Global

F.   On FINE ARTS articles, the lesser of:

1)   the reasonable and necessary cost to repair or restore such property to the physical condition that existed on the date of loss.

2)   cost to replace the article.

3)   the value, if any, stated on a schedule on file with the Company.

In the event a Fine Arts article is part of a pair or set, and a physically damaged article cannot be replaced, or repaired or restored to the condition that existed immediately prior to the loss, the Company will be liable for the lesser of the full value of such pair or set or the amount designated on the schedule.  The Insured agrees to surrender the pair or set to the Company.

G.   On VALUABLE PAPERS AND RECORDS:

1)   On data, programs or software stored on electronic, electro-mechanical, or electro-magnetic data processing or production equipment:

a)   The cost to repair, replace or restore data, programs or software including the costs to recreate, research and engineer;

b)   If not repaired, replaced or restored within two years from the date of loss, the blank value of the media.

2)   On all other VALUABLE PAPERS AND RECORDS, the lesser of the following:

a)   The cost to repair or restore the item to the condition that existed immediately prior to the loss.

b)   The cost to replace the item.

c)   The amount designated for the item on the schedule on file with the Company.

H.   On property in transit:

1)   Property shipped to or for the account of the Insured will be valued at actual invoice to the Insured.  Included in the value are accrued costs and charges legally due.  Charges may include the Insured's commission as selling agent.

2)   Property sold by the Insured and shipped to or for the purchaser's account will be valued at the Insured's selling invoice amount.  Prepaid or advanced freight costs are included.

3)   Property not under invoice will be valued:

a)   for property of the Insured, at the valuation provisions of this Policy applying at the location from which the property is being transported; or

b)   for other property, at the actual cash market value at the destination point on the date of occurrence,

less any charges saved which would have become due and payable upon arrival at destination.

I.   On all other property, the loss amount will not exceed the lesser of the following:

1)   The cost to repair.

2)   The cost to rebuild or replace on the same site with new materials of like size, kind and quality.

3)   The cost in rebuilding, repairing or replacing on the same or another site, but not to exceed the size and operating capacity that existed on the date of loss.

4)   The selling price of real property or machinery and equipment, other than stock, offered for sale on the date of loss.

5)   The cost to replace unrepairable electrical or mechanical equipment, including computer equipment, with equipment that is the most functionally equivalent to that damaged or destroyed, even if such equipment has technological advantages and/or represents an improvement in function and/or forms part of a program of system enhancement.

6)   The increased cost of demolition, if any, resulting from loss covered by this Policy, if such property is scheduled for demolition.

7)   The unamortized value of improvements and betterments, if such property is not repaired or replaced at the Insured's expense.

8)   The Actual Cash Value if such property is:

a)   useless to the Insured; or

b)   not repaired, replaced or rebuilt on the same or another site within two years from the date of loss.

The Insured may elect not to repair or replace the insured real and/or personal property lost, damaged or destroyed.  Loss settlement may be elected on the lesser of repair or replacement cost basis if the proceeds of such loss settlement are expended on other capital expenditures related to the Insured's operations within two years from the date of loss.  As a condition of collecting under this item, such expenditure must be unplanned as of the date of loss and be made at an Insured Location under this Policy.  This item does not extend to DEMOLITION AND INCREASED COST OF CONSTRUCTION.

The header has image and text.



FM Global

Account No.  1-33186
Policy No.  UA864

References and Application. The following term(s) wherever used in this Policy means:

a) Actual Cash Value:

> The amount it would cost to repair or replace insured property, on the date of loss, with material of like kind and quality, with proper deduction for obsolescence and physical depreciation.

## 4.   LOSS CONDITIONS

### A.   REQUIREMENTS IN CASE OF LOSS

The Insured will:

1) give immediate written notice to the Company of any loss.

2) protect the property from further loss or damage.

3) promptly separate the damaged and undamaged property; put it in the best possible order; and furnish a complete inventory of the lost, destroyed, damaged and undamaged property showing in detail the quantities, costs, Actual Cash Value, replacement value and amount of loss claimed.

4) give a signed and sworn proof of loss to the Company within 90 days after the loss, unless that time is extended in writing by the Company. The proof of loss must state the knowledge and belief of the Insured as to:

   a) the time and origin of the loss.

   b) the Insured's interest and that of all others in the property.

   c) the Actual Cash Value and replacement value of each item and the amount of loss to each item; all encumbrances; and all other contracts of insurance, whether valid or not, covering any of the property.

   d) any changes in the title, use, occupation, location, possession or exposures of the property since the effective date of this Policy.

   e) by whom and for what purpose any location insured by this Policy was occupied on the date of loss, and whether or not it then stood on leased ground.

5) include a copy of all the descriptions and schedules in all policies and, if required, provide verified plans and specifications of any buildings, fixtures, machinery or equipment destroyed or damaged.

6) further, the Insured, will as often as may be reasonably required:

   a) exhibit to any person designated by the Company all that remains of any property;

**FM Global**

Account No.   1-33186
Policy No.   UA864

    b)  submit to examination under oath by any person designated by the Company and sign the written records of examinations; and

    c)  produce for examination at the request of the Company:

        (i)  all books of accounts, business records, bills, invoices and other vouchers; or

        (ii)  certified copies if originals are lost,

at such reasonable times and places that may be designated by the Company or its representative and permit extracts and machine copies to be made.

## B.   COMPANY OPTION

The Company has the option to take all or any part of damaged property at the agreed or appraised value. The Company must give notice to the Insured of its intention to do so within 30 days after receipt of proof of loss.

## C.   ABANDONMENT

There may be no abandonment of any property to the Company.

## D.   SUBROGATION

The Insured is required to cooperate in any subrogation proceedings. The Company may require from the Insured an assignment or other transfer of all rights of recovery against any party for loss to the extent of the Company's payment.

The Company will not acquire any rights of recovery that the Insured has expressly waived prior to a loss, nor will such waiver affect the Insured's rights under this Policy.

Any recovery from subrogation proceedings, less costs incurred by the Company in such proceedings, will be payable to the Insured in the proportion that the amount of:

1)  any applicable deductible; and/or

2)  any provable uninsured loss,

bears to the entire provable loss amount.

## E.   APPRAISAL

If the Insured and the Company fail to agree on the amount of loss, each will, on the written demand of either, select a competent and disinterested appraiser after:

1)  the Insured has fully complied with all provisions of this Policy, including REQUIREMENTS IN CASE OF LOSS; and

2)  the Company has received a signed and sworn proof of loss from the Insured.

FM Global

Each will notify the other of the appraiser selected within 20 days of such demand.

The appraisers will first select a competent and disinterested umpire. If the appraisers fail to agree upon an umpire within 30 days then, on the request of the Insured or the Company, the umpire will be selected by a judge of a court of record in the jurisdiction in which the appraisal is pending. The appraisers will then appraise the amount of loss, stating separately the Actual Cash Value and replacement cost value as of the date of loss and the amount of loss, for each item of physical loss or damage or if, for TIME ELEMENT loss, the amount of loss for each TIME ELEMENT coverage of this Policy.

If the appraisers fail to agree, they will submit their differences to the umpire. An award agreed to in writing by any two will determine the amount of loss.

The Insured and the Company will each:

1)   pay its chosen appraiser; and

2)   bear equally the other expenses of the appraisal and umpire.

A demand for APPRAISAL shall not relieve the Insured of its continuing obligation to comply with the terms and conditions of this Policy, including as provided under REQUIREMENTS IN CASE OF LOSS.

The Company will not be held to have waived any of its rights by any act relating to appraisal.

## F.   SUIT AGAINST THE COMPANY

No suit, action or proceeding for the recovery of any claim will be sustained in any court of law or equity unless:

1)   the Insured has fully complied with all the provisions of this Policy; and

2)   legal action is started within twelve months after inception of the loss.

If under the insurance laws of the jurisdiction in which the property is located, such twelve months' limitation is invalid, then any such legal action needs to be started within the shortest limit of time permitted by such laws.

## 5.   SETTLEMENT OF CLAIMS

The amount of loss, except for ACCOUNTS RECEIVABLE coverage, for which the Company may be liable will be paid within 30 days after:

A.   proof of loss as described in this Policy is received by the Company; and

B.   when a resolution of the amount of loss is made either by:

FM Global

    1)  written agreement between the Insured and the Company; or

    2)  the filing with the Company of an award as provided in the APPRAISAL clause of this section.

## 6.   COLLECTION FROM OTHERS

The Company will not be liable for any loss to the extent that the Insured has collected for such loss from others.

## 7.   PARTIAL PAYMENT OF LOSS SETTLEMENT

In the event of a loss occurring which has been ascertained to be insured loss or damage under this Policy and determined by the Company's representatives to be in excess of the applicable Policy deductible, the Company will advance mutually agreed upon partial payment(s) on the insured loss or damage, subject to the Policy's provisions. To obtain said partial payments, the Insured will submit a signed and sworn Proof of Loss as described in this Policy, with adequate supporting documentation.



## GENERAL PROVISIONS - SECTION E

### 1.   ADDITIONAL INSURABLE INTERESTS/CERTIFICATES OF INSURANCE

Additional insured interests are automatically added to this Policy as their interest may appear when named as additional named insured, lender, mortgagee and/or loss payee in the Certificates of Insurance on a schedule on file with the Company.  Such interests become effective on the date shown in the Certificate of Insurance and will not amend, extend or alter the terms, conditions, provisions and limits of this Policy.

### 2.   CANCELLATION/NON-RENEWAL

This Policy may be:

A.   cancelled at any time at the request of the Insured by surrendering this Policy to the Company or by giving written notice to the Company stating when such cancellation will take effect; or

B.   cancelled by the Company by giving the Insured not less than:

    1)   90 days' written notice of cancellation; or

    2)   10 days' written notice of cancellation if the Insured fails to remit, when due, payment of premium for this Policy; or

C.   non-renewed by the Company by giving the Insured not less than 90 days' written notice of non-renewal.

Return of any unearned premium will be calculated on the customary short rate basis if the Insured cancels and on a pro-rata basis if the Company cancels this Policy.  Return of any unearned premium will be made by the Company as soon as practicable.

### 3.   INSPECTIONS

The Company, at all reasonable times, will be permitted, but will not have the duty, to inspect insured property.

The Company's:

A.   right to make inspections;

B.   making of inspections; or

C.   analysis, advice or inspection report,

will not constitute an undertaking, on behalf of or for the benefit of the Insured or others, to determine or warrant that the insured property is safe or healthful.  This Company will have no liability to the Insured or any other person because of any inspection or failure to inspect.

**FM** Global

Account No.   1-33186
Policy No.   UA864

When the Company is not providing jurisdictional inspections, the Owner/Operator has the responsibility to assure that jurisdictional inspections are performed as required, and to assure that required jurisdictional Operating Certificates are current for their pressure equipment.

## 4. PROVISIONS APPLICABLE TO SPECIFIC JURISDICTIONS

A.   If the provisions of this Policy conflict with the laws of any jurisdictions in which this Policy applies, and if certain provisions are required by law to be stated in this Policy, this Policy will be read so as to eliminate such conflict or deemed to include such provisions for Insured Locations within such jurisdictions.

B.   The Company will provide to the Insured copies of endorsements mandated for use by the laws of provinces in Canada. The endorsements may modify this Policy with respect to any insured property located in the province in which the endorsement applies.

C.   The Company will provide to the Insured copies of endorsements mandated for use by the laws of states in the United States of America. The endorsements may modify this Policy with respect to any insured property located in the state in which the endorsement applies.

## 5. LIBERALIZATION

If during the period that insurance is in force under this Policy, any filed rules or regulations affecting the same are revised by statute so as to broaden the insurance without additional premium charge, such extended or broadened insurance will inure to the benefit of the Insured within such jurisdiction, effective the date of the change specified in such statute.

## 6. MISREPRESENTATION AND FRAUD

This entire Policy will be void if, whether before or after a loss, an Insured has:

A.   willfully concealed or misrepresented any material fact or circumstance concerning this insurance, the subject thereof, any insurance claim, or the interest of an Insured.

B.   made any attempt to defraud the Company.

C.   made any false swearing.

## 7. LENDERS LOSS PAYEE AND MORTGAGEE INTERESTS AND OBLIGATIONS

A.   The Company will pay for loss to specified property insured under this Policy to each specified Lender Loss Payee (hereinafter referred to as Lender) as its interest may appear, and to each specified Mortgagee as its interest may appear, under all present or future mortgages upon such property, in order of precedence of the mortgages.

B.   The interest of the Lender or Mortgagee (as the case may be) in property insured under this Policy will not be invalidated by:

1)   any act or neglect of the debtor, mortgagor, or owner (as the case may be) of the property.



2)  foreclosure, notice of sale, or similar proceedings with respect to the property.

3)  change in the title or ownership of the property.

4)  change to a more hazardous occupancy.

The Lender or Mortgagee will notify the Company of any known change in ownership, occupancy, or hazard and, within 10 days of written request by the Company, may pay the increased premium associated with such known change. If the Lender or Mortgagee fails to pay the increased premium, all coverage under this Policy will cease.

C.   If this Policy is cancelled at the request of the Insured or its agent, the coverage for the interest of the Lender or Mortgagee will terminate 10 days after the Company sends to the Lender or Mortgagee written notice of cancellation, unless:

1)  sooner terminated by authorization, consent, approval, acceptance, or ratification of the Insured's action by the Lender or Mortgagee, or its agent.

2)  this Policy is replaced by the Insured, with a policy providing coverage for the interest of the Lender or Mortgagee, in which event coverage under this Policy with respect to such interest will terminate as of the effective date of the replacement policy, notwithstanding any other provision of this Policy.

D.   The Company may cancel this Policy and/or the interest of the Lender or Mortgagee under this Policy, by giving the Lender or Mortgagee written notice 90 days prior to the effective date of cancellation, if cancellation is for any reason other than non-payment. If the debtor, mortgagor, or owner has failed to pay any premium due under this Policy, the Company may cancel this Policy for such non-payment, but will give the Lender or Mortgagee written notice 10 days prior to the effective date of cancellation. If the Lender or Mortgagee fails to pay the premium due by the specified cancellation date, all coverage under this Policy will cease.

E.   The Company has the right to invoke this Policy's SUSPENSION clause. The suspension of insurance will apply to the interest of the Lender or Mortgagee in any machine, vessel, or part of any machine or vessel, subject to the suspension. The Company will provide the Lender or Mortgagee at the last known address a copy of the suspension notice.

F.   If the Company pays the Lender or Mortgagee for any loss, and denies payment to the debtor, mortgagor or owner, the Company will, to the extent of the payment made to the Lender or Mortgagee be subrogated to the rights of the Lender or Mortgagee under all securities held as collateral to the debt or mortgage. No subrogation will impair the right of the Lender or Mortgagee to sue or recover the full amount of its claim. At its option, the Company may pay to the Lender or Mortgagee the whole principal due on the debt or mortgage plus any accrued interest. In this event, all rights and securities will be assigned and transferred from the Lender or Mortgagee to the Company, and the remaining debt or mortgage will be paid to the Company.



G.   If the Insured fails to render proof of loss, the Lender or Mortgagee, upon notice of the Insured's failure to do so, will render proof of loss within 60 days of notice and will be subject to the provisions of this Policy relating to APPRAISAL, SETTLEMENT OF CLAIMS, and SUIT AGAINST THE COMPANY.

H.   Other provisions relating to the interests and obligations of the Lender or Mortgagee may be added to this Policy by agreement in writing.

## 8.   OTHER INSURANCE

A.   If there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not.

B.   In no event will this Policy apply as contributing insurance.

C.   The Insured is permitted to have other insurance over any limits or sublimits of liability specified elsewhere in this Policy without prejudice to this Policy. The existence of any such insurance will not reduce any limit or sublimit of liability in this Policy. Any other insurance that would have provided primary coverage in the absence of this Policy will not be considered excess.

D.   The Insured is permitted to have other insurance for all, or any part, of any deductible in this Policy. The existence of such other insurance will not prejudice recovery under this Policy. If the limits of liability of such other insurance are greater than this Policy's applicable deductible, this Policy's insurance will apply only after such other insurance has been exhausted.

E.   In the event this Policy is deemed to contribute with other insurance, the limit of liability applicable at each Location, for purposes of such contribution with other insurers, will be the latest amount described in this Policy or the latest Location value on file with the Company.

F.   When this Policy includes property in more than one jurisdiction, separate policies underlying this Policy may be issued by the Company in compliance with jurisdictional requirements. Such underlying policies will not be considered as additional insurance, but as duplicate insurance only.

## 9.   POLICY MODIFICATION

This Policy contains all of the agreements between the Insured and the Company concerning this insurance. The Insured and the Company may request changes to this Policy. This Policy can be changed only by endorsements issued by the Company and made a part of this Policy.

Notice to any agent or knowledge possessed by any agent or by any other person will not:

A.   create a waiver, or change any part of this Policy; or

B.   prevent the Company from asserting any rights under the provisions of this Policy.

FM Global

Account No.   1-33186<br>
Policy No.   UA864

## 10.  REDUCTION BY LOSS

Claims paid under this Policy will not reduce its' limit of liability, except claims paid will reduce any Policy Year Aggregate Limit of Liability.

## 11.  SUSPENSION

On discovery of a dangerous condition, the Company may immediately suspend this insurance on any machine, vessel or part thereof by giving written notice to the Insured.  The suspended insurance may be reinstated by the Company.  Any unearned premium resulting from such suspension will be returned by the Company.

## 12.  TITLES

The titles in this Policy are only for reference.  The titles do not in any way affect the provisions of this Policy.

Printed 13-Nov-2000
GENA



Account No.1-33186
Policy No.UA864

## APPENDIX A

## SCHEDULE OF LOCATIONS:

| Location No. | Index No. | Location Description |
|---|---|---|
| 1-1 | 079301.53 | 5757 Wayne Newton Blvd.<br>Las Vegas, NV 89119<br><br>"McCarran International Airport" |
| 1-2 | 174.35 | 5051 Paradise Road and<br>500 Bell Road<br>Las Vegas, NV 89119<br><br>"Engineering Facility Warehouse" |
| 1-3 | 79301.53 | 2000 E. Patrick Lane; 1769 E. Russell Road<br>and 6020 Spencer Street<br>Las Vegas, NV 89119<br><br>"Airline Ground Support<br>UMC Quick Care<br>Industrial Park" |
| 1-4 | 79450.06 | 2772 Rancho Drive<br>North Las Vegas, NV<br><br>"North Las Vegas Airport" |
| 1-5 | 79312.43 | 105, 115, 125 E. Reno Ave.,<br>Las Vegas, NV 89119<br><br>"Leased Retail Space" |
| 1-6 | 79318.70 | 6330, 6380, 6400 S. Eastern Ave.<br>Las Vegas, NV 89119<br><br>"Office / Retail / Warehouse" |
| 1-7 | 79318.70 | 2450, 2470, 2475 Chandler Ave.<br>Las Vegas, NV 89120<br><br>"Office / Warehouse / Retail" |
| 1-8 | 79318.69 | 6075 S. Eastern Ave.;<br>2200-2350 E. Patrick Lane, and<br>6080 Burnham Ave.<br>Las Vegas, NV 89119<br><br>"Office / Warehouse / Retail" |



Account No.1-33186
Policy No.UA864

# APPENDIX A

## SCHEDULE OF LOCATIONS:

| Location No. | Index No. | Location Description |
|---|---|---|
| 1-9 | 79309.93 | 500 E. Hwy 146 and<br>1400 Executive Airport Dr.<br>Henderson, NV 89012<br><br>"Henderson Executive Airport" |
| 1-10 | 79312.43 | 241 E. Reno Ave.<br>Las Vegas, NV 89119<br><br>"B1 Airline Terminal" |
| 1-11 | 174.34 | 1788 E. Russell Road<br>Las Vegas, NV 89119<br><br>"Day Care Center" |
| 1-12 | 178.10 | 1110 Airport Road<br>Overton, NV 89040<br><br>"Overton Perkins Field" |
| 1-13 | 178.11 | 23600 Las Vegas Blvd. So.<br>Jean, NV<br><br>"Jean Sport Aviation Center" |
| 1-14 | Index TBA | Las Vegas Blvd South<br>Las Vegas, NV<br><br>"Serene Mobile Home Park" |
| 1-15 | 174.34 | Kelly Lane & Russell Road<br>Las Vegas, NV |
| 2 | 99999.99 | Miscellaneous Scheduled Locations<br>Various – Las Vegas, NV<br>(Addresses per Schedule on file)<br><br>"Miscellaneous Residences" |

**EXHIBIT "B"**



**LAS VEGAS**

McCARRAN INTERNATIONAL AIRPORT

**Department of Aviation**

**RANDALL H. WALKER**
DIRECTOR

**ROSEMARY A. VASSILIADIS**
DEPUTY DIRECTOR

POSTAL BOX 11005
LAS VEGAS, NEVADA 89111-1005
(702) 261-5211
FAX (702) 597-9553
E-MAIL: webmaster2@mccarran.com

February 22, 2002    **Certified Mail 7000 1670 0010 5029 2420**
**Return Receipt Requested**

Jeffrey Casillas
Operations Vice President/
Los Angeles Operations Claims Manager
Factory Mutual Insurance Company
21860 Burbank Blvd., Suite 300
Woodland Hills, CA 91367

**RECEIVED**
**McCARRAN INT'L AIRPORT**

FEB 27 2002

**ACCOUNTING OFFICE**
2842

Re:    Policy No.: UA864
       Claim Associated With September 11, 2001 Terrorist Attacks

Dear Mr. Casillas:

I enjoyed meeting with you on Thursday, February 7, 2002 regarding Clark County Department of
Aviation's ("Clark County") claim under FM Global policy No. UA864 (1 October 2000 to 1 October
2003) (the "Policy") for loss caused by the terrorist attacks of September 11, 2001. During our meeting,
you requested written articulation of Clark County's position for coverage under the Policy.

As we discussed, there are a number of policy provisions that support coverage for Clark County's loss.
Notably, as we advised, we rely primarily upon the coverage provided under the Policy's Protection and
Preservation of Property section, Section B. 3. Q., page 15; Contingent Time Element Extension, Section
C. 3. A., page 30; and Ingress/Egress Time Element Extension, Section C. 3. C., page 31. Because, to us,
the Ingress/Egress Extension so clearly provides coverage on such a broad basis, the discussion in this
letter will, for now, focus only on that Extension, while deferring a broader discussion of the other two
provisions until a later time. I want to emphasize, however, as we did during our February 7 meeting,
that each of the three provisions, on its face and according to its clear language, is applicable to and
provides broad coverage protection for Clark County's loss resulting from and following the tragic
events of September 11. We are prepared to discuss all of these provisions with you further and
encourage a dialogue as a result of this letter and our February 7 meeting.

The Ingress/Egress provision is found in Section C. 3. C. of the Policy, at page 31 and clearly provides
an express <u>extension</u> to the Policy's standard Time Element Coverages:

C.    INGRESS/EGRESS
      This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the
      Insured due to the necessary interruption of the Insured's business due to the prevention
      of ingress to or egress from an Insured Location, whether or not the premises or property
      of the Insured is damaged, provided that such prevention is a direct result of physical
      damage of the type insured by this Policy, to the kind of property not excluded by this
      Policy. (Policy, p. 31)



**Clark County Board of Commissioners**
Dario Herrera, Chairman • Myrna Williams, Vice Chair
Yvonne Atkinson Gates • Erin Kenny • Mary J. Kincaid-Chauncey • Chip Maxfield • Bruce L. Woodbury

Your Insured, Clark County, sustained the very type of loss and extra expense envisioned by this Extension when, as a direct result of the September 11, 2001 terrorist attacks on the World Trade Center and the Pentagon, its business at McCarran International Airport and other Insured Locations was shut down. Ingress to/Egress from those Locations was clearly prevented, in accordance with the coverage provisions, and significant loss was sustained as a consequence.

For ease of analysis, the Ingress/Egress Extension can be broken down into the following six components:

(1)   "Actual Loss Sustained and EXTRA EXPENSE"
(2)   "due to the necessary interruption of the Insured's business"
(3)   "due to the prevention of ingress to or egress from an Insured Location"
(4)   "whether or not the premises or property of the Insured is damaged"
(5)   "provided that such prevention is a direct result of physical damage of the type insured by this Policy"
(6)   "to the kind of property not excluded by this Policy."

The following simple, step-by-step analysis of these six components leads to the inescapable conclusion that Clark County has suffered a significant covered loss and is entitled to Policy benefits.

### (1) Actual Loss Sustained and Extra Expense

By using the phrase "Actual Loss Sustained," the Ingress/Egress Extension unambiguously and expressly covers Clark County against losses in the form of reduced revenue when Clark County is "wholly or partially prevented from . . . continuing business operations or services." (Policy, p. 26.) Such a loss was indisputably "sustained" by Clark County as a result of the closure of McCarran International Airport and other Clark County locations following the September 11 terrorist attacks.

Likewise, "EXTRA EXPENSE", such as that incurred by Clark County to resume and continue operations "as nearly normal as practicable" following September 11 is also unambiguously and expressly covered. (Policy, p. 27.) And the Policy's Extended Period of Liability section extends coverage for reduced revenue ("reduction in sales") and Extra Expense "for such additional length of time as would be required . . . to restore the Insured's business to the condition that would have existed had no loss occurred." (Policy, p. 30.)

Thus, the first coverage component under Ingress/Egress is clearly satisfied by Clark County's pending claim.

### (2) necessary interruption of the Insured's business

Clark County's "business" was indisputably "interrupted" following and as a direct result of the September 11 attacks, the "necessity" of that interruption cannot seriously or in good faith be questioned. Thus, the second coverage component under Ingress/Egress has also unquestionably been satisfied by the pending claim.

### (3) prevention of ingress to or egress from an Insured Location

Prevention of ingress to and egress from Insured Locations also occurred following and as a direct result of the September 11 attacks. As you know, and as you acknowledged in your November 27, 2001 letter

2

to Randy Walker, all air traffic was grounded by FAA order shortly following the attacks and as a direct result of them. Consequently, Clark County airports, specifically including McCarran, were shut down and ingress to and egress from them was indisputably "prevented." Again, we do not believe there can be a serious or good faith questioning of this "prevention."

Contrary to suggestions in your correspondence and at our meeting, the plain language of the Ingress/Egress coverage does not require "physical" prevention. It simply requires "prevention" resulting from "physical damage of the type insured." The Policy is replete with use of the word "physical" when such a requirement is intended. Its absence here in modifying (or not modifying) "prevention" is significant.

Your November 27, 2001 letter to Mr. Walker states the irrelevant, but nevertheless mistaken, belief that "the nation's airports were never 'closed'" following September 11. In fact, our airports were closed. In addition to the FAA's grounding of all air traffic, government authorities closed McCarran to everyone but certain airport employees.

Moreover, the surprising significance you attempt to place on this mistaken belief of "partial" closure is also unsupportable. First, the undefined term "prevention" cannot be read to require an absolute or total stoppage of all ingress or egress. *See Fountain Powerboat Indus., Inc. v. Reliance Ins. Co.*, 119 F. Supp. 2d 552 (E.D.N.C.) (holding that a policy providing coverage when ingress or egress was "prevented" covered revenue lost when usual routes to the insured location were obstructed making ingress and egress more difficult). Beyond that, the Policy expressly provides coverage for loss when Clark County is "wholly or partially prevented" from conducting its business. (Policy, p. 26.) Any interpretation to the contrary would unreasonably eviscerate the broad coverage "extension" provided by the Ingress/Egress provision and result in a rewriting of the otherwise clear policy language.

### (4) whether or not the premises or property of the Insured is damaged

An important component of the broad coverage provided by the Ingress/Egress Extension is that no damage to the "premises or property of the Insured" is necessary for there to be coverage under the Extension's express wording. Thus, the statement in your November 27, 2001 letter that "[n]o insured property suffered physical loss or damage" is irrelevant to the Ingress/Egress coverage. Again, you seek to rewrite your policy "after the fact" and after it is clear that coverage is provided under express Policy terms as actually written. Physical loss or damage to insured property is expressly not necessary for Ingress/Egress coverage to apply. (Policy, p. 31.)

Your attempt to impose the limitations of section C.4.A.8. onto the Ingress/Egress Extension is misplaced and contrary to the language of both those sections. Specifically, during our meeting and in your November 27 letter, you suggest that there can be no coverage to Clark County's pending claims because "[a]ccess to insured premises was not prohibited or impaired by governmental order because of existing physical loss or damage at or near proximity of the insured premises." The separate coverage provision you reference (C.4.A.8, at page 35) has no application to the Ingress/Egress Extension by the express wording of Section C.4.A. itself. The provisions of Section C.4.A. – including Section C.4.A.8. – unambiguously and expressly do not apply "if otherwise provided under the TIME ELEMENT COVERAGE EXTENSIONS." (Policy, p. 33.) The Ingress/Egress coverage is one of these "TIME ELEMENT EXTENSIONS" and "provides otherwise" by providing coverage "whether or not the premises or property of the Insured is damaged" and subject to the "number of consecutive days shown in the Limits of Liability clause . . ." (Policy, p. 31). Accordingly, the circumstances and limitations of Section C.4.A.8. have no application to Clark County's claim by express Policy terms.

3

Moreover, the Policy cannot be rewritten after the fact to turn the relatively obscure provisions of Section C.4.A.8. into an exclusionary provision or a limitation on the broad Ingress/Egress Extension. Exclusions in a policy must be clear and clearly stated. Thus, "[a]ny attempt to restrict insurance coverage must be done clearly and explicitly." *Farmers Ins. Exchange v. Young*, 108 Nev. 328, 330 (1992). Similarly, the Policy cannot be interpreted to limit or nullify the broad promise of coverage under the Ingress/Egress Extension by imposing the contrary or limiting provisions of Section C.4.A.8. (which, again, does not even apply to the Ingress/Egress Extension by the express terms of C.4.A.) *See National Union Fire Ins. Co. of the State of PA, Inc. v. Reno's Executive Air, Inc.*, 100 Nev. 360, 366 (1984)("When a policy has been issued which purportedly provides coverage but whose exclusionary provisions as interpreted by the insurer would narrow the coverage to defeat the purpose of the insurance, the policy must be construed against the insurer.").

**(5) provided that such prevention is the direct result of physical damage of the type insured by this Policy**

As all Americans painfully know, America was thrown into a terrible turmoil after the 9/11 tragedy. And there can be no dispute that the FAA grounding of air traffic nation-wide was the "direct result" of the tragic events and physical devastation to the World Trade Center and the Pentagon. The shutdown of Clark County's airports was also, unquestionably, the "direct result" of that "physical damage" to the World Trade Center and the Pentagon.

You have not disputed – indeed, you cannot honestly and in good faith dispute – the fact that the damage to the World Trade Center and the Pentagon are "physical damage of the type insured by this Policy." In our conversations, however, you have exhibited a misconception of the meaning of the phrase "direct result." Contrary to your apparent misinterpretation, "direct," unlike "immediate," does not refer to the last cause in a chain of events. The Policy uses the word "immediate" rather than "direct" to impose the kind of "next in line" requirement you seem to have in mind. For example, the Service Interruption Time Element Extension requires an accidental occurrence that "immediately prevents" delivery of services. No such "immediacy" link is imposed in the Ingress/Egress Extension.

By contrast, the Ingress/Egress Extension speaks of a "direct result" that requires only that the damage to the World Trade Center and the Pentagon be the "efficient proximate cause" of the prevention of ingress or egress. *See Chlor Alkali Co., Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 863 F. Supp. 1226 (D. Nev. 1994)(explaining that "[t]he efficient proximate cause is not necessarily the last in a chain of events" and that "[t]he efficient proximate cause doctrine . . . looks to the quality of the links in the chain to determine which is the predominant cause."). The efficient proximate cause is "'the one that sets others in motion.'" *Id.* Clark County's losses were clearly "set in motion" by the September 11 attacks. In other words, Clark County's losses were "directly caused" by the physical damage to the World Trade Center and the Pentagon. Thus, again, this coverage component of the Ingress/Egress Extension has clearly been satisfied by Clark County's pending claim.

**(6) to the kind of property not excluded by this Policy**

Both the World Trade Center and the Pentagon also are unquestionably "the kind of property not excluded" under the Policy – namely, they are/were "buildings" which are expressly covered by the Policy. (Policy, p. 7.) This sixth and final coverage requirement is clearly satisfied.

\* \* \* \* \*

4

I hope that the foregoing discussion has adequately explained Clark County's coverage position under, at least, the Ingress/Egress Extension and cleared away any confusion that may have limited your understanding of the coverage provided for Clark County's losses. We are, of course, prepared to discuss this matter further with you and would welcome any comments or response you may have. In the meantime, we will proceed to finalize our claim submission.


Sincerely,

R. Ross Johnson
Assistant Director of Aviation, Finance


cc:   Randall H. Walker
      Rosemary Vassiliadis
      Marc Traasdahl



      Mr. Lloyd W. Cutler, CPCU
      KELLOG, CUTLER, YENCHEK, LADUKE, HOLMES INSURANCE SERVICES
      330 E. Charleston Blvd.
      Las Vegas, NV 89104

      Mr. Thomas R. Mury
      DELOITTE & TOUCHE
      Dispute Consulting Services
      695 Town Center Drive, Suite 1200
      Costa Mesa, CA 92626-7188

      Mr. Rod Fisher
      Vice President, Operations Manager
      FM GLOBAL
      21860 Burbank Boulevard, Suite 300
      Woodland Hills, CA 91367

      Mr. Gerry L. Alonso, RPA
      Vice President, Western Division Claims Manager
      FM GLOBAL
      Granite Park One, 5800 Granite Parkway, Suite 600
      Plano, TX 75024

Mr. David W. Steuber
Partner
HOWREY, SIMON, ARNOLD & WHITE ATTORNEYS AT LAW
550 South Hope Street, Suite 1400
Los Angeles, CA  90071-2627

6

**EXHIBIT "C"**



**LAS VEGAS**

McCARRAN INTERNATIONAL AIRPORT

# Department of Aviation

**RANDALL H. WALKER**
DIRECTOR

**ROSEMARY A. VASSILIADIS**
DEPUTY DIRECTOR

POSTAL BOX 11005
LAS VEGAS, NEVADA 89111-1005
(702) 261-5211
FAX (702) 597-9553
E-MAIL: webmaster2@mccarran.com

March 22, 2002

Jeffrey Casillas
Operations Vice President/
Los Angeles Operations Claims Manager
Factory Mutual Insurance Company
21860 Burbank Blvd., Suite 300
Woodland Hills, CA 91367

RECEIVED
McCARRAN INT'L AIRPORT

MAR 25 2002

ACCOUNTING OFFICE 2862

Re:   Policy No.: UA864
      <u>Sworn Statement in Proof of Loss Associated With September 11, 2001 Terrorist
      Attacks</u>

Dear Mr. Casillas:

Enclosed with this letter is the Clark County Department of Aviation's completed "Sworn Statement in Proof of Loss" that represents the submission of a claim for losses sustained by the Clark County Department of Aviation due to the interruption of business caused by the tragic events of September 11, 2001.

Also enclosed with this letter is a copy of the letter I sent dated February 22, 2002 outlining the Clark County Department of Aviation's coverage position of FM Global's policy related to this loss. I have also enclosed several schedules that outline our calculation of the lost revenue and additional expense that resulted from this interruption of business.

If you have any questions related to these documents, please call Marc Traasdahl at 702-261-5113. Thank you for your cooperation in this matter.

Sincerely,

R. Ross Johnson
Assistant Director of Aviation, Finance

RRJ:mz

Enclosure



**Clark County Board of Commissioners**
Dario Herrera, Chairman • Myrna Williams, Vice Chair
Yvonne Atkinson Gates • Erin Kenny • Mary J. Kincaid-Chauncey • Chip Maxfield • Bruce L. Woodbury

Jeffrey Casillas
March 22, 2002
Page Two

cc:    Randall H. Walker
Rosemary Vassiliadis
Marc Traasdahl

Mr. Lloyd W. Cutler, CPCU
KELLOG, CUTLER, YENCHEK, LADUKE, HOLMES NSURANCE SERVICES
330 E. Charleston Blvd.
Las Vegas, NV 89104

Mr. Thomas R. Mury
DELOITTE & TOUCHE
Dispute Consulting Services
695 Town Center Drive, Suite 1200
Costa Mesa, CA 92626-7188

Mr. Rod Fisher
Vice President, Operations Manager
FM GLOBAL
21860 Burbank Boulevard, Suite 300
Woodland Hills, CA 91367

Mr. Gerry L. Alonso, RPA
Vice President, Western Division Claims Manager
FM GLOBAL
Granite Park One, 5800 Granite Parkway, Suite 600
Plano, TX 75024

Mr. David W. Steuber
Partner
HOWREY, SIMON, ARNOLD & WHITE ATTORNEYS AT LAW
550 South Hope Street, Suite 1400
Los Angeles, CA 90071-2627

## SWORN STATEMENT IN PROOF OF LOSS

Claim no.  1

| | |
|---|---|
| $1,567,393,000 | UA864 |
| AMOUNT OF POLICY AT TIME OF LOSS | POLICY NO. |
| 1 October, 2000 | Kellogg, Cutler, Yenchek, La Duke, Holmes Ins. Services |
| DATE ISSUED | AGENCY AT |
| 1 October, 2001 | Lloyd W. Cutler, CPCU |
| DATE EXPIRES | AGENT |

To the <u>Factory Mutual Insurance Company</u> of <u>Johnston, Rhode Island</u>. At time of loss, by the above indicated policy of insurance you insured **The Clark County Department of Aviation and other entities as per the Named Insured provision of the Policy** against loss by **Interruption of the Insured's business** to the property described under Schedule "A", according to the term and conditions of the said policy and all forms, endorsement, transfers and assignments attached thereto.

1. **Time and Origin:** A **Interruption of the Insured's business** loss occurred about the hour of **08:00** o'clock **AM.**, on the **11th** day of **September, 2001**. The cause and origin of the loss were: **The damage to, destruction of, and collapse of buildings at the World Trade Center in New York City and the Pentagon in Washington, D.C. and the resulting order of federal authorities closing the national airspace.**

2. **Occupancy:** The building described, or containing the property described, was occupied at the time of the loss as follows, and for no other purpose whatever: **NA**

3. **Title and Interest:** At the time of the loss the interest of your insured in the property described therein was **NA**. No other person or persons had any interest therein or incumbrance thereon, except: **NA**.

4. **Changes:** Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described, except: **NONE**

5. **Total Insurance:** The total amount of insurance upon the property described by this policy was, at the time of the loss **$1,567,393,000**, as more particularly specified in the apportionment attached under Schedule "C", besides which there was no policy or other contract of insurance, written or oral, valid or invalid.

6. The **Actual Cash Value** of said property at the time of loss was ....................................... **NA**          .

7. The **Whole Loss and Damage** was ............................................................................. **$6,530,570**          .

8. The **Amount Claimed** under the above numbered policy is ............................................. **$6,530,570**          .

The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights.

Clark County Department of Aviat

State of _NEVADA_

County of _CLARK_

by: _____

_R. Ron John_ Insured

Subscribed and sworn to before me this _22nd_ day of _MARCH , 2002_

_Deborah L. Weakland_ Notary Public

600-5-59
Document1
(REV. 4/12/2001)

Page 1 of 2 (Both must be completed)

DEBORAH L. WEAKLAND
Notary Public State of Nevada
No.87-2092-1
My appt. exp. June 7, 2005

Insured: **Clark County Department of Aviation**          Loss No. _____1_____

## SCHEDULE "A" - POLICY FORM

Policy Form No. _____UA864_____          Dated ____1 October, 2000_____
Item 1. $ _5,933,244_____ on _Loss of Revenue due to events of 9-11-01_____
Item 2. $ __597,326_____ on _Extra Expense due to events of 9-11-01_____
Item 3. $ _____ on _____
Item 4. $ _____ on _____
Situated _____
Coinsurance, Average, Distribution, or Deductible Clauses, if any __$10,000_____
Loss, if any, payable to __Clark County Department of Aviation____

## SCHEDULE "B"

### STATEMENT OF ACTUAL CASH VALUE AND LOSS AND DAMAGE

|         |  | ACTUAL CASH VALUE | LOSS AND DAMAGE |
|---------|--|-------------------|-----------------|
|         |  |                   |                 |
|         |  |                   |                 |
|         |  |                   |                 |
|         |  |                   |                 |
|         |  |                   |                 |
|         |  |                   |                 |
|         |  |                   |                 |
| Totals: |  |                   |                 |

## SCHEDULE "C" - APPORTIONMENT

| POLICY NO. | EXPIRES | NAME OF COMPANY | ITEM NO. INSURES | PAYS | ITEM NO. INSURES | PAYS |
|------------|---------|-----------------|------------------|------|------------------|------|
|            |         |                 |                  |      |                  |      |
|            |         |                 |                  |      |                  |      |
|            |         |                 |                  |      |                  |      |
|            |         |                 |                  |      |                  |      |
| Totals:    |         |                 |                  |      |                  |      |

_____Adjuster

## RECEIPT FOR PAYMENT

Received of_____ (insurer) of_____
                                              Dollars ($_____ )
in full satisfaction and indemnity for all claims and demands upon said company on account of said loss and damage
and the said policy is hereby _____ (State whether **Reduced, Reduced and Reinstated** or
**Canceled** by payment.)

Dated _____    _____
                                                                                The Insured
Dated _____    _____
600-5-59
Document1
(REV 4/12/2001)



**LAS VEGAS**

McCARRAN INTERNATIONAL AIRPORT

February 22, 2002

**Department of Aviation**

**RANDALL H. WALKER**
DIRECTOR

**ROSEMARY A. VASSILIADIS**
DEPUTY DIRECTOR

POSTAL BOX 11005
LAS VEGAS, NEVADA 89111-1005
(702) 261-5211
FAX (702) 597-9553
E-MAIL: webmaster2@mccarran.com

Certified Mail  7000 1670 0010 5029 2420
Return Receipt Requested

Jeffrey Casillas
Operations Vice President/
Los Angeles Operations Claims Manager
Factory Mutual Insurance Company
21860 Burbank Blvd., Suite 300
Woodland Hills, CA  91367

**RECEIVED**
McCARRAN INT'L AIRPORT

FEB 27 2002

**ACCOUNTING OFFICE**
2812

Re:   Policy No.: UA864
Claim Associated With September 11, 2001 Terrorist Attacks

Dear Mr. Casillas:

I enjoyed meeting with you on Thursday, February 7, 2002 regarding Clark County Department of Aviation's ("Clark County") claim under FM Global policy No. UA864 (1 October 2000 to 1 October 2003) (the "Policy") for loss caused by the terrorist attacks of September 11, 2001. During our meeting, you requested written articulation of Clark County's position for coverage under the Policy.

As we discussed, there are a number of policy provisions that support coverage for Clark County's loss. Notably, as we advised, we rely primarily upon the coverage provided under the Policy's Protection and Preservation of Property section, Section B. 3. Q., page 15; Contingent Time Element Extension, Section C. 3. A., page 30; and Ingress/Egress Time Element Extension, Section C. 3. C., page 31. Because, to us, the Ingress/Egress Extension so clearly provides coverage on such a broad basis, the discussion in this letter will, for now, focus only on that Extension, while deferring a broader discussion of the other two provisions until a later time. I want to emphasize, however, as we did during our February 7 meeting, that each of the three provisions, on its face and according to its clear language, is applicable to and provides broad coverage protection for Clark County's loss resulting from and following the tragic events of September 11. We are prepared to discuss all of these provisions with you further and encourage a dialogue as a result of this letter and our February 7 meeting.

The Ingress/Egress provision is found in Section C. 3. C. of the Policy, at page 31 and clearly provides an express <u>extension</u> to the Policy's standard Time Element Coverages:

C.   INGRESS/EGRESS
This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured due to the necessary interruption of the Insured's business due to the prevention of ingress to or egress from an Insured Location, whether or not the premises or property of the Insured is damaged, provided that such prevention is a direct result of physical damage of the type insured by this Policy, to the kind of property not excluded by this Policy. (Policy, p. 31)



**Clark County Board of Commissioners**
Dario Herrera, Chairman • Myrna Williams, Vice Chair
Yvonne Atkinson Gates • Erin Kenny • Mary J. Kincaid-Chauncey • Chip Maxfield • Bruce L. Woodbury

Your Insured, Clark County, sustained the very type of loss and extra expense envisioned by this Extension when, as a direct result of the September 11, 2001 terrorist attacks on the World Trade Center and the Pentagon, its business at McCarran International Airport and other Insured Locations was shut down. Ingress to/Egress from those Locations was clearly prevented, in accordance with the coverage provisions, and significant loss was sustained as a consequence.

For ease of analysis, the Ingress/Egress Extension can be broken down into the following six components:

    (1)     "Actual Loss Sustained and EXTRA EXPENSE"
    (2)     "due to the necessary interruption of the Insured's business"
    (3)     "due to the prevention of ingress to or egress from an Insured Location"
    (4)     "whether or not the premises or property of the Insured is damaged"
    (5)     "provided that such prevention is a direct result of physical damage of the type insured by this Policy"
    (6)     "to the kind of property not excluded by this Policy."

The following simple, step-by-step analysis of these six components leads to the inescapable conclusion that Clark County has suffered a significant covered loss and is entitled to Policy benefits.

### (1) Actual Loss Sustained and Extra Expense

By using the phrase "Actual Loss Sustained," the Ingress/Egress Extension unambiguously and expressly covers Clark County against losses in the form of reduced revenue when Clark County is "wholly or partially prevented from . . . continuing business operations or services." (Policy, p. 26.) Such a loss was indisputably "sustained" by Clark County as a result of the closure of McCarran International Airport and other Clark County locations following the September 11 terrorist attacks.

Likewise, "EXTRA EXPENSE", such as that incurred by Clark County to resume and continue operations "as nearly normal as practicable" following September 11 is also unambiguously and expressly covered. (Policy, p. 27.) And the Policy's Extended Period of Liability section extends coverage for reduced revenue ("reduction in sales") and Extra Expense "for such additional length of time as would be required . . . to restore the Insured's business to the condition that would have existed had no loss occurred." (Policy, p. 30.)

Thus, the first coverage component under Ingress/Egress is clearly satisfied by Clark County's pending claim.

### (2) necessary interruption of the Insured's business

Clark County's "business" was indisputably "interrupted" following and as a direct result of the September 11 attacks, the "necessity" of that interruption cannot seriously or in good faith be questioned. Thus, the second coverage component under Ingress/Egress has also unquestionably been satisfied by the pending claim.

### (3) prevention of ingress to or egress from an Insured Location

Prevention of ingress to and egress from Insured Locations also occurred following and as a direct result of the September 11 attacks. As you know, and as you acknowledged in your November 27, 2001 letter

to Randy Walker, all air traffic was grounded by FAA order shortly following the attacks and as a direct result of them. Consequently, Clark County airports, specifically including McCarran, were shut down and ingress to and egress from them was indisputably "prevented." Again, we do not believe there can be a serious or good faith questioning of this "prevention."

Contrary to suggestions in your correspondence and at our meeting, the plain language of the Ingress/Egress coverage does not require "physical" prevention. It simply requires "prevention" resulting from "physical damage of the type insured." The Policy is replete with use of the word "physical" when such a requirement is intended. Its absence here in modifying (or not modifying) "prevention" is significant.

Your November 27, 2001 letter to Mr. Walker states the irrelevant, but nevertheless mistaken, belief that "the nation's airports were never 'closed'" following September 11. In fact, our airports were closed. In addition to the FAA's grounding of all air traffic, government authorities closed McCarran to everyone but certain airport employees.

Moreover, the surprising significance you attempt to place on this mistaken belief of "partial" closure is also unsupportable. First, the undefined term "prevention" cannot be read to require an absolute or total stoppage of all ingress or egress. *See Fountain Powerboat Indus., Inc. v. Reliance Ins. Co.*, 119 F. Supp. 2d 552 (E.D.N.C.) (holding that a policy providing coverage when ingress or egress was "prevented" covered revenue lost when usual routes to the insured location were obstructed making ingress and egress more difficult). Beyond that, the Policy expressly provides coverage for loss when Clark County is "wholly or partially prevented" from conducting its business. (Policy, p. 26.) Any interpretation to the contrary would unreasonably eviscerate the broad coverage "extension" provided by the Ingress/Egress provision and result in a rewriting of the otherwise clear policy language.

### (4) whether or not the premises or property of the Insured is damaged

An important component of the broad coverage provided by the Ingress/Egress Extension is that no damage to the "premises or property of the Insured" is necessary for there to be coverage under the Extension's express wording. Thus, the statement in your November 27, 2001 letter that "[n]o insured property suffered physical loss or damage" is irrelevant to the Ingress/Egress coverage. Again, you seek to rewrite your policy "after the fact" and after it is clear that coverage is provided under express Policy terms as actually written. Physical loss or damage to insured property is expressly not necessary for Ingress/Egress coverage to apply. (Policy, p. 31.)

Your attempt to impose the limitations of section C.4.A.8. onto the Ingress/Egress Extension is misplaced and contrary to the language of both those sections. Specifically, during our meeting and in your November 27 letter, you suggest that there can be no coverage to Clark County's pending claims because "[a]ccess to insured premises was not prohibited or impaired by governmental order because of existing physical loss or damage at or near proximity of the insured premises." The separate coverage provision you reference (C.4.A.8, at page 35) has no application to the Ingress/Egress Extension by the express wording of Section C.4.A. itself. The provisions of Section C.4.A. – including Section C.4.A.8. – unambiguously and expressly do not apply "if otherwise provided under the TIME ELEMENT COVERAGE EXTENSIONS." (Policy, p. 33.) The Ingress/Egress coverage is one of these "TIME ELEMENT EXTENSIONS" and "provides otherwise" by providing coverage "whether or not the premises or property of the Insured is damaged" and subject to the "number of consecutive days shown in the Limits of Liability clause . . ." (Policy, p. 31). Accordingly, the circumstances and limitations of Section C.4.A.8. have no application to Clark County's claim by express Policy terms.

Moreover, the Policy cannot be rewritten after the fact to turn the relatively obscure provisions of Section C.4.A.8. into an exclusionary provision or a limitation on the broad Ingress/Egress Extension. Exclusions in a policy must be clear and clearly stated. Thus, "[a]ny attempt to restrict insurance coverage must be done clearly and explicitly." *Farmers Ins. Exchange v. Young*, 108 Nev. 328, 330 (1992). Similarly, the Policy cannot be interpreted to limit or nullify the broad promise of coverage under the Ingress/Egress Extension by imposing the contrary or limiting provisions of Section C.4.A.8. (which, again, does not even apply to the Ingress/Egress Extension by the express terms of C.4.A.) *See National Union Fire Ins. Co. of the State of PA, Inc. v. Reno's Executive Air, Inc.*, 100 Nev. 360, 366 (1984)("When a policy has been issued which purportedly provides coverage but whose exclusionary provisions as interpreted by the insurer would narrow the coverage to defeat the purpose of the insurance, the policy must be construed against the insurer.").

**(5) provided that such prevention is the direct result of physical damage of the type insured by this Policy**

As all Americans painfully know, America was thrown into a terrible turmoil after the 9/11 tragedy. And there can be no dispute that the FAA grounding of air traffic nation-wide was the "direct result" of the tragic events and physical devastation to the World Trade Center and the Pentagon. The shutdown of Clark County's airports was also, unquestionably, the "direct result" of that "physical damage" to the World Trade Center and the Pentagon.

You have not disputed – indeed, you cannot honestly and in good faith dispute – the fact that the damage to the World Trade Center and the Pentagon are "physical damage of the type insured by this Policy." In our conversations, however, you have exhibited a misconception of the meaning of the phrase "direct result." Contrary to your apparent misinterpretation, "direct," unlike "immediate," does not refer to the last cause in a chain of events. The Policy uses the word "immediate" rather than "direct" to impose the kind of "next in line" requirement you seem to have in mind. For example, the Service Interruption Time Element Extension requires an accidental occurrence that "immediately prevents" delivery of services. No such "immediacy" link is imposed in the Ingress/Egress Extension.

By contrast, the Ingress/Egress Extension speaks of a "direct result" that requires only that the damage to the World Trade Center and the Pentagon be the "efficient proximate cause" of the prevention of ingress or egress. *See Chlor Alkali Co., Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 863 F. Supp. 1226 (D. Nev. 1994)(explaining that "[t]he efficient proximate cause is not necessarily the last in a chain of events" and that "[t]he efficient proximate cause doctrine . . . looks to the quality of the links in the chain to determine which is the predominant cause."). The efficient proximate cause is "'the one that sets others in motion.'" *Id.* Clark County's losses were clearly "set in motion" by the September 11 attacks. In other words, Clark County's losses were "directly caused" by the physical damage to the World Trade Center and the Pentagon. Thus, again, this coverage component of the Ingress/Egress Extension has clearly been satisfied by Clark County's pending claim.

**(6) to the kind of property not excluded by this Policy**

Both the World Trade Center and the Pentagon also are unquestionably "the kind of property not excluded" under the Policy – namely, they are/were "buildings" which are expressly covered by the Policy. (Policy, p. 7.) This sixth and final coverage requirement is clearly satisfied.

* * * * *

I hope that the foregoing discussion has adequately explained Clark County's coverage position under, at least, the Ingress/Egress Extension and cleared away any confusion that may have limited your understanding of the coverage provided for Clark County's losses. We are, of course, prepared to discuss this matter further with you and would welcome any comments or response you may have. In the meantime, we will proceed to finalize our claim submission.

Sincerely,

R. Ross Johnson
Assistant Director of Aviation, Finance

cc:     Randall H. Walker
        Rosemary Vassiliadis
        Marc Traasdahl


        Mr. Lloyd W. Cutler, CPCU
        KELLOG, CUTLER, YENCHEK, LADUKE, HOLMES INSURANCE SERVICES
        330 E. Charleston Blvd.
        Las Vegas, NV 89104

        Mr. Thomas R. Mury
        DELOITTE & TOUCHE
        Dispute Consulting Services
        695 Town Center Drive, Suite 1200
        Costa Mesa, CA 92626-7188

        Mr. Rod Fisher
        Vice President, Operations Manager
        FM GLOBAL
        21860 Burbank Boulevard, Suite 300
        Woodland Hills, CA 91367

        Mr. Gerry L. Alonso, RPA
        Vice President, Western Division Claims Manager
        FM GLOBAL
        Granite Park One, 5800 Granite Parkway, Suite 600
        Plano, TX 75024

Mr. David W. Steuber
Partner
HOWREY, SIMON, ARNOLD & WHITE ATTORNEYS AT LAW
550 South Hope Street, Suite 1400
Los Angeles, CA  90071-2627

Clark County Department of Aviation
McCarran International Airport
Business Interruption Loss due to September 11, 2001

| | 2000 | Projection 2001 | Actual 2001 | Loss of Revenue Total | Loss of Revenue To Nov 12 | Loss of Revenue 60 Days |
|---|---|---|---|---|---|---|
| **Landing Fees** | | | | | | |
| **Scheduled Carriers** | | | (6 month 1.12%) | | | |
| September | 2,223,322 | 2,248,223 | 1,910,305 | 337,918 | | 337,918 |
| October | 2,326,390 | 2,352,446 | 2,163,701 | 188,745 | | 188,745 |
| November | 2,234,012 | 2,259,033 | 2,018,476 | 240,557 | 96,223 | 96,223 |
| | | | | | | |
| **Charter Carriers** | | | (6 month -16.84%) | | | |
| September | 225,247 | 187,315 | 191,983 | (4,668) | | (4,668) |
| October | 298,867 | 248,538 | 183,737 | 64,801 | | 64,801 |
| November | 250,289 | 208,140 | 167,095 | 41,045 | 16,418 | 16,418 |
| | | | | | | |
| **Mail Charters** | | | (6 month -7.22%) | | | |
| September | 47,705 | 44,261 | 42,685 | 1,576 | | 1,576 |
| October | 47,928 | 44,468 | 54,140 | (9,672) | | (9,672) |
| November | 48,644 | 45,132 | 54,693 | (9,561) | (3,824) | (3,824) |
| | | | | | | |
| **Aircraft Service Fees** | | | | | | |
| **Fuel Flowage Fees** | | | (6 month -5.84%) | | | |
| September | 191,267 | 180,097 | 164,154 | 15,943 | | 15,943 |
| October | 191,373 | 180,197 | 137,907 | 42,290 | | 42,290 |
| November | 199,577 | 187,922 | 150,170 | 37,752 | 15,101 | 15,101 |
| | | | | | | |
| **Ground Handling** | | | (6 month Average) | | | |
| September | 124,769 | 138,347 | 118,281 | 20,066 | | 20,066 |
| October | 144,218 | 138,347 | 122,058 | 16,289 | | 16,289 |
| November | 135,033 | 138,347 | 100,612 | 37,735 | 15,094 | 15,094 |
| | | | | | | |
| **Rental Fees** | | | | | | |
| **Private Tenants** | | | (3 month 32.37%) | | | |
| September | 88,476 | 117,116 | 89,016 | 28,100 | | 28,100 |
| October | 96,212 | 127,356 | 96,770 | 30,586 | | 30,586 |
| November | 99,492 | 131,698 | 100,545 | 31,153 | 12,461 | 12,461 |

Notes: ATM fees dependant upon px traffic and First USA Credit could not access secured area for 2 months @ 10,000 e.

| | 2000 | Projection 2001 | Actual 2001 | Loss of Revenue Total | Loss of Revenue To Nov 12 | Loss of Revenue 60 Days |
|---|---|---|---|---|---|---|
| **Usage Fees** | | | | | | |
| **Per Enplanement(Ticket Counter)** | | | (6 month 18.06%) | | | |
| September | 63,773 | 75,290 | 49,873 | 25,417 | | 25,417 |
| October | 73,946 | 87,301 | 70,012 | 17,289 | | 17,289 |
| November | 65,897 | 77,798 | 58,144 | 19,654 | 7,862 | 7,862 |
| | | | | | | |
| **CIT Per Pax Fee** | | | (6 month -10.01%) | | | |
| September | 252,617 | 227,103 | 150,081 | 77,022 | | 77,022 |
| October | 306,873 | 275,879 | 162,547 | 113,332 | | 113,332 |
| November | 286,358 | 257,436 | 155,278 | 102,158 | 40,863 | 40,863 |

Clark County Department of Aviation
McCarran International Airport
Business Interruption Loss due to September 11, 2001

| | 2000 | Projection 2001 | Actual 2001 | Loss of Revenue Total | To Nov 12 | 60 Days |
|---|---|---|---|---|---|---|
| **Passenger Facility Charge (PFC)** | | | **(6 month 5.03%)** | | | |
| September | 3,658,561 | 3,842,587 | 2,599,760 | 1,242,827 | | 1,242,827 |
| October | 3,861,791 | 4,056,039 | 3,211,657 | 844,382 | | 844,382 |
| November | 3,392,182 | 3,562,809 | 2,903,994 | 658,815 | 263,526 | 263,526 |
| | | | | | | |
| **Concession Fees** | | | | | | |
| **Gaming** | | | **(6 month -0.36%)** | | | |
| September | 2,244,686 | 2,236,605 | 2,081,565 | 155,040 | | 155,040 |
| October | 2,837,747 | 2,827,531 | 3,134,194 | (306,663) | | (306,663) |
| November | 2,578,329 | 2,569,047 | 2,442,877 | 126,170 | 50,468 | 50,468 |
| | | | | | | |
| **Transportation Concessions** | | | | | | |
| **Busses** | | | **(6 month 27.49%)** | | | |
| September | 28,583 | 36,440 | 18,109 | 18,331 | | 18,331 |
| October | 38,871 | 49,557 | 20,895 | 28,662 | | 28,662 |
| November | 36,147 | 46,084 | 16,856 | 29,228 | 11,691 | 11,691 |
| | | | | | | |
| **Limousines** | | | **(2 month 55.72%)** | | | |
| September | 241,231 | 375,645 | 327,026 | 48,619 | | 48,619 |
| October | 260,183 | 405,157 | 373,119 | 32,038 | | 32,038 |
| November | 221,095 | 344,289 | 368,099 | (23,810) | (9,524) | (9,524) |
| | | | | | | |
| **Rent Cars - On Airport** | | | **(6 month 0.77%)** | | | |
| September | 1,272,910 | 1,282,711 | 1,149,742 | 132,969 | | 132,969 |
| October | 1,449,287 | 1,460,447 | 1,292,709 | 167,738 | | 167,738 |
| November | 1,359,009 | 1,369,473 | 1,156,171 | 213,302 | 85,321 | 85,321 |
| | | | | | | |
| **Rent Cars - Off Airport** | | | **(6 month -8.61%)** | | | |
| September | 264,485 | 241,713 | 205,148 | 36,565 | | 36,565 |
| October | 277,649 | 253,743 | 225,804 | 27,939 | | 27,939 |
| November | 232,984 | 212,924 | 189,154 | 23,770 | 9,508 | 9,508 |
| | | | | | | |
| **Taxis** | | | **(6 month 5.65%)** | | | |
| September | 206,650 | 218,326 | 150,150 | 68,176 | | 68,176 |
| October | 253,750 | 268,087 | 259,800 | 8,287 | | 8,287 |
| November | 216,950 | 229,208 | 180,000 | 49,208 | 19,683 | 19,683 |
| | | | | | | |
| **Sales Concessions** | | | | | | |
| **Advertising** | | | **(6 month 2.37%)** | | | |
| September | 825,347 | 844,908 | 792,472 | 52,436 | | 52,436 |
| October | 846,189 | 866,244 | 766,953 | 99,291 | | 99,291 |
| November | 860,526 | 880,920 | 798,701 | 82,219 | 32,888 | 32,888 |
| | | | | | | |
| **Bars** | | | **(6 month -3.62%)** | | | |
| September | 128,702 | 124,043 | 99,553 | 24,490 | | 24,490 |
| October | 157,733 | 152,023 | 151,319 | 704 | | 704 |
| November | 141,110 | 136,002 | 134,189 | 1,813 | 725 | 725 |

Clark County Department of Aviation
McCarran International Airport
Business Interruption Loss due to September 11, 2001

| | 2000 | Projection 2001 | Actual 2001 | Loss of Revenue Total | To Nov 12 | 60 Days |
|---|---|---|---|---|---|---|
| **Restaurants** | | | **(6 month 9.13%)** | | | |
| September | 269,000 | 293,560 | 215,477 | 78,083 | | 78,083 |
| October | 196,188 | 214,100 | 327,779 | (113,679) | | (113,679) |
| November | 290,467 | 316,987 | 290,378 | 26,609 | 10,644 | 10,644 |
| **Catering** | | | **(6 month 7.62%)** | | | |
| September | 260,217 | 280,046 | 230,466 | 49,580 | | 49,580 |
| October | 253,202 | 272,496 | 189,440 | 83,056 | | 83,056 |
| November | 242,168 | 260,621 | 160,165 | 100,456 | 40,182 | 40,182 |
| **Clothing Shops** | | | **(6 month 11.09%)** | | | |
| September | 58,560 | 65,054 | 45,288 | 19,766 | | 19,766 |
| October | 72,666 | 80,725 | 63,638 | 17,087 | | 17,087 |
| November | 60,153 | 66,824 | 55,738 | 11,086 | 4,434 | 4,434 |
| **Gift Shops** | | | **(6 month 1.36%)** | | | |
| September | 481,475 | 488,023 | 365,291 | 122,732 | | 122,732 |
| October | 569,868 | 577,618 | 546,673 | 30,945 | | 30,945 |
| November | 484,356 | 490,943 | 403,686 | 87,257 | 34,903 | 34,903 |
| **Lockers** | | | **(6 month -3.78%)** | | | |
| September | 4,424 | 4,257 | - | 4,257 | | 4,257 |
| October | 2,534 | 2,438 | - | 2,438 | | 2,438 |
| November | 3,984 | 3,833 | - | 3,833 | 1,533 | 1,533 |
| **Passenger Service** | | | **(6 month 0.66%)** | | | |
| September | 57,344 | 57,722 | 54,698 | 3,024 | | 3,024 |
| October | 63,528 | 63,947 | 44,734 | 19,213 | | 19,213 |
| November | 62,557 | 62,970 | 33,364 | 29,606 | 11,842 | 11,842 |
| **Specialty Shops** | | | **(6 month 4.59%)** | | | |
| September | 139,662 | 146,072 | 107,567 | 38,505 | | 38,505 |
| October | 164,625 | 172,181 | 151,435 | 20,746 | | 20,746 |
| November | 143,740 | 150,338 | 134,113 | 16,225 | 6,490 | 6,490 |
| **Parking** | | | | | | |
| **Employee Parking** | | | **No Loss** | | | |
| **Public Parking** | | | **(5 month 17.39%)** | | | |
| September | 885,395 | 1,039,365 | 816,762 | 222,603 | | 222,603 |
| October | 961,827 | 1,129,089 | 1,000,294 | 128,795 | | 128,795 |
| November | 907,108 | 1,064,854 | 952,223 | 112,631 | 45,052 | 45,052 |
| **Parking Meters** | | | **(5 month 37.47%)** | | | |
| September | 153,039 | 210,383 | 132,537 | 77,846 | | 77,846 |
| October | 176,271 | 242,320 | 124,283 | 118,037 | | 118,037 |
| November | 188,626 | 259,304 | 116,515 | 142,789 | 57,116 | 57,116 |

Clark County Department of Aviation
McCarran International Airport
Business Interruption Loss due to September 11, 2001

| | 2000 | Projection 2001 | Actual 2001 | Loss of Revenue Total | To Nov 12 | 60 Days |
|---|---|---|---|---|---|---|
| **Valet Parking** | | | (5 month 23.77%) | | | |
| September | 122,796 | 151,985 | - | 151,985 | | 151,985 |
| October | 131,476 | 162,728 | - | 162,728 | | 162,728 |
| November | 134,061 | 165,927 | - | 165,927 | 66,371 | 66,371 |
| | | | | | | |
| **Park A Lot** | | | (6 month 5.58%) | | | |
| September | 18,150 | 19,163 | 18,710 | 453 | | 453 |
| October | 31,125 | 32,862 | 8,313 | 24,549 | | 24,549 |
| November | 19,950 | 21,063 | - | 21,063 | 8,425 | 8,425 |
| | | | | | | |
| **Jet A Fuel Tax** | | | (6 month -.32%) | | | |
| November | 1,033,693 | 1,030,385 | 1,107,246 | (76,861) | | (76,861) |
| December | 1,024,605 | 1,021,326 | 956,416 | 64,910 | | 64,910 |
| January | 1,068,302 | 1,064,883 | 854,620 | 210,263 | 84,105 | 84,105 |
| | | | | | | |
| Totals | | | | 7,486,616 | 1,035,581 | 5,933,244 |

McCarran International Airport
Business Interruption Loss due to September 11, 2001
Historical Revenue and Trends

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | FY Total | FY % Growth | 6 mo Ttl (Mar - Aug) | 6 mo pr to Sept Growth |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Landing Fees** | | | | | | | | | | | | | | | | |
| **Scheduled Carriers** | | | | | | | | | | | | | | | | |
| FY2000 | 1,938,147 | 1,987,304 | 2,006,210 | 2,168,372 | 2,093,105 | 2,131,479 | 2,160,010 | 2,090,847 | 2,274,247 | 2,206,440 | 2,253,256 | 2,155,137 | 25,484,574 | | 13,286,387 | 1.12% |
| FY2001 | 2,173,208 | 2,224,079 | 2,223,332 | 2,326,390 | 2,234,072 | 2,204,553 | 2,243,176 | 2,045,559 | 2,297,196 | 2,189,206 | 2,257,546 | 2,172,564 | 26,590,811 | 4.34% | 13,435,406 | |
| FY2002 | 2,242,726 | 2,276,158 | 1,910,305 | 2,163,701 | 2,041,876 | | | | | | | | | | | |
| | 3.20% | 2.34% | -14.08% | -6.99% | -8.65% | | | | | | | | | | | -16.84% |
| **Charter Carriers** | | | | | | | | | | | | | | | | |
| FY2000 | 248,781 | 237,738 | 241,559 | 253,839 | 235,668 | 229,871 | 255,315 | 264,494 | 310,379 | 289,259 | 275,048 | 224,309 | 3,066,260 | | 1,565,416 | |
| FY2001 | 233,579 | 233,842 | 225,247 | 298,867 | 230,289 | 222,878 | 203,842 | 221,734 | 253,531 | 233,804 | 200,227 | 198,215 | 2,774,165 | -9.53% | 1,301,847 | -5.84% |
| FY2002 | 214,104 | 201,856 | 191,983 | 183,737 | 167,095 | | | | | | | | | | | |
| | -8.34% | -13.31% | -14.77% | -38.52% | -33.24% | | | | | | | | | | | |
| **Multi Charters** | | | | | | | | | | | | | | | | |
| FY2000 | 27,327 | 28,318 | 30,909 | 34,629 | 45,195 | 51,655 | 44,149 | 46,805 | 51,525 | 47,691 | 49,405 | 50,912 | 508,520 | | 296,342 | |
| FY2001 | 42,838 | 53,931 | 47,705 | 47,928 | 48,644 | 47,648 | 45,655 | 42,301 | 46,803 | 42,609 | 48,718 | 46,147 | 560,967 | 10.31% | 274,949 | -7 |
| FY2002 | 39,513 | 51,159 | 42,685 | 54,140 | 54,693 | | | | | | | | | | | |
| | -7.76% | -5.21% | -10.52% | 12.96% | 12.44% | | | | | | | | | | | |
| **Aircraft Service Fees** | | | | | | | | | | | | | | | | |
| **Fuel Flowage Fees** | | | | | | | | | | | | | | | | |
| FY2000 | 149,838 | 189,848 | 236,410 | 188,858 | 191,670 | 206,295 | 138,855 | 284,653 | 221,890 | 161,764 | 166,919 | 233,369 | 2,372,388 | | 1,113,627 | |
| FY2001 | 155,564 | 174,121 | 191,267 | 191,373 | 199,377 | 164,615 | 180,163 | 154,535 | 198,942 | 157,942 | 171,633 | 159,131 | 2,098,863 | -11.55% | 1,048,593 | -5.84% |
| FY2002 | 203,733 | 157,212 | 164,154 | 137,907 | 150,170 | | | | | | | | | | | |
| | 30.90% | -9.71% | -14.18% | -27.94% | -24.76% | | | | | | | | | | | |
| **Ground Handling** | | | | | | | | | | | | | | | | |
| FY2000 | 68,933 | 60,037 | 60,787 | 67,090 | 65,668 | 71,098 | 64,821 | 67,738 | 80,529 | 67,620 | 73,627 | 114,422 | 862,370 | | 548,373 | |
| FY2001 | 103,795 | 108,380 | 124,769 | 144,218 | 135,033 | 138,016 | 113,944 | 124,366 | 146,369 | 135,922 | 128,673 | 129,250 | 1,532,735 | 77.74% | 830,080 | 51.37% |
| FY2002 | 153,087 | 136,779 | 118,281 | 122,058 | 100,612 | | | | | | | | | | | |
| | 47.49% | 26.20% | -5.20% | -15.37% | -25.49% | | | | | | | | | | | |
| **Rental Fees** | | | | | | | | | | | | | | | | |
| **Airline Tenants** | | | | | | | | | | | | | | | | |
| FY2000 | 57,912 | 49,573 | 46,063 | 49,649 | 52,440 | 47,392 | 50,333 | 50,818 | 57,044 | 69,071 | 180,217 | 87,097 | 797,629 | | 565,138 | |
| FY2001 | 84,978 | 86,731 | 88,476 | 96,212 | 99,492 | 100,953 | 102,738 | 99,434 | 112,425 | 107,013 | 108,152 | 101,640 | 1,188,244 | 48.97% | 670,180 | 18.59% |
| FY2002 | 120,578 | 120,372 | 89,016 | 96,770 | 100,545 | | | | | | | | | | 258,806 | |
| | 41.85% | 38.79% | 0.61% | 0.38% | 1.06% | | | | | | | | | | | |
| **Usage Fees** | | | | | | | | | | | | | | | | |
| **Per Enplanement(Ticket Counter)** | | | | | | | | | | | | | | | | |
| FY2000 | 57,014 | 64,807 | 47,890 | 56,808 | 48,424 | 51,012 | 57,543 | 60,881 | 72,195 | 71,176 | 68,357 | 67,700 | 724,407 | | 417,561 | |
| FY2001 | 67,073 | 69,560 | 63,773 | 73,946 | 65,897 | 64,421 | 57,638 | 63,650 | 83,962 | 80,890 | 77,262 | 80,918 | 849,910 | 17.32% | 492,961 | 18.06% |
| FY2002 | 83,987 | 85,942 | 49,873 | 70,012 | 58,144 | | | | | | | | | | | |
| | 23.56% | 23.55% | -21.80% | -5.32% | -11.77% | | | | | | | | | | | 18.06% |
| **CTT Per Pax Fee** | | | | | | | | | | | | | | | | |
| FY2000 | 302,210 | 303,729 | 309,944 | 262,121 | 245,781 | 243,289 | 252,278 | 378,413 | 388,737 | 322,758 | 257,108 | 256,430 | 3,527,798 | | 1,774,713 | |
| FY2001 | 271,142 | 273,548 | 252,617 | 306,873 | 286,338 | 248,881 | 244,161 | 274,500 | 316,671 | 293,358 | 250,263 | 240,369 | 3,260,741 | -7.57% | 1,597,121 | -10.01% |
| FY2002 | 242,712 | 251,748 | 150,081 | 162,547 | 155,278 | | | | | | | | | | | |
| | -10.49% | -7.97% | -40.59% | -47.03% | -45.77% | | | | | | | | | | | |
| **Passenger Facility Charge (PFC)** | | | | | | | | | | | | | | | | |
| FY2000 | 3,960,498 | 3,914,906 | 3,629,413 | 3,799,337 | 3,335,812 | 3,085,628 | 4,059,408 | 3,954,678 | 4,478,697 | 3,807,277 | 3,914,476 | 3,842,816 | 45,782,946 | | 24,029,830 | |
| FY2001 | 3,979,072 | 4,007,492 | 3,658,561 | 3,861,791 | 3,392,182 | 3,091,550 | 4,466,324 | 4,192,228 | 4,376,172 | 3,912,532 | 4,229,075 | 3,823,556 | 46,990,535 | 2.64% | 25,238,043 | 5.03% |
| FY2002 | 4,403,993 | 4,492,715 | 2,599,760 | 3,211,657 | 2,903,994 | | | | | | | | | | | |
| | 10.68% | 12.11% | -28.94% | -16.84% | -14.39% | | | | | | | | | | | |
| **Concession Fees** | | | | | | | | | | | | | | | | |
| **Gaming** | | | | | | | | | | | | | | | | |
| FY2000 | 2,214,943 | 2,351,100 | 2,018,527 | 2,365,641 | 2,298,165 | 2,443,321 | 1,515,606 | 2,593,066 | 2,778,895 | 2,381,393 | 2,714,268 | 1,916,768 | 27,591,803 | | 14,684,999 | |
| FY2001 | 2,469,575 | 2,424,190 | 2,244,686 | 2,837,747 | 2,578,329 | 2,650,940 | 1,751,781 | 2,321,173 | 2,813,757 | 2,464,038 | 2,377,821 | 2,024,737 | 28,838,774 | 4.59% | 14,632,729 | -0.36% |
| FY2002 | 2,579,389 | 2,372,787 | 2,081,565 | 3,134,194 | 2,442,877 | | | | | | | | | | | |
| | 4.45% | -2.12% | -7.27% | 10.45% | -5.23% | | | | | | | | | | | |

McCarran International Airport
Business Interruption Loss due to September 11, 2001
Historical Revenues and Trends

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | FY Total | FY % Growth | 6 mo. Ttl (Mar - Aug) | 6 mos gr to Sept Growth |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Transportation Concessions** | | | | | | | | | | | | | | | | |
| **Buses** | | | | | | | | | | | | | | | | |
| FY2000 | 14,314 | 16,858 | 24,555 | 18,910 | 20,265 | 22,191 | 23,624 | 28,334 | 36,049 | 26,356 | 25,424 | 24,380 | 311,250 | | | |
| FY2001 | 20,419 | 25,302 | 28,583 | 18,871 | 36,147 | 18,476 | 31,839 | 29,587 | 32,733 | 38,160 | 36,955 | 36,946 | 375,018 | 20.49% | 157,930 | 27.49% |
| FY2002 | 30,019 | 26,525 | 18,109 | 10,895 | 16,836 | | | | | | | | | | 201,338 | |
| Growth | 47.02% | 4.83% | -36.64% | -46.25% | -53.37% | 66.49% Two Month Avg | | | | | | | | | | 23.94% |
| **Limousines** | | | | | | | | | | | | | | | | |
| FY2000 | 226,384 | 236,596 | 338,384 | 257,063 | 223,448 | 198,214 | 216,058 | 230,194 | 258,236 | 241,976 | 250,037 | 242,248 | 2,819,238 | | | |
| FY2001 | 246,298 | 243,155 | 241,231 | 260,183 | 221,095 | 204,759 | 219,353 | 237,316 | 273,009 | 268,721 | 274,832 | 258,510 | 2,948,462 | 4.58% | 1,482,350 | |
| FY2002 | 376,643 | 385,536 | 327,026 | 373,119 | 368,099 | | | | | | | | | | 1,837,251 | |
| Growth | 52.92% | 58.56% | 35.57% | 43.41% | 66.49% Two Month Avg | | | | | | | | | | | 23.94% |
| **Rent Cars - On Airport** | | | | | | | | | | | | | | | | |
| FY2000 | 1,260,774 | 1,379,940 | 1,333,306 | 1,301,447 | 1,372,234 | 1,004,140 | 1,191,044 | 1,235,147 | 1,594,435 | 1,555,106 | 1,498,808 | 1,453,709 | 16,381,099 | | | |
| FY2001 | 1,403,133 | 1,460,185 | 1,272,910 | 1,440,287 | 1,359,009 | 1,104,676 | 1,164,430 | 1,210,928 | 1,686,976 | 1,580,226 | 1,431,455 | 1,411,420 | 16,537,315 | 0.95% | 8,968,056 | |
| FY2002 | 1,443,406 | 1,483,921 | 1,149,742 | 1,292,709 | 1,156,171 | | | | | | | | | | 9,037,404 | |
| Growth | 2.87% | 1.63% | -9.68% | -10.80% | -14.93% | 66.49% Two Month Avg | | | | | | | | | | 0.~% |
| **Rent Cars - Off Airport** | | | | | | | | | | | | | | | | |
| FY2000 | 312,223 | 297,137 | 281,192 | 303,972 | 275,408 | 228,095 | 218,235 | 251,559 | 316,782 | 300,905 | 293,331 | 289,176 | 3,367,655 | | | |
| FY2001 | 299,184 | 295,709 | 264,485 | 277,649 | 233,284 | 201,139 | 171,069 | 207,689 | 277,398 | 276,575 | 273,009 | 250,934 | 3,026,414 | -10.13% | 1,794,777 | |
| FY2002 | 285,115 | 278,746 | 205,148 | 225,804 | 189,154 | | | | | | | | | | 1,640,317 | |
| Growth | -4.69% | -5.77% | -22.43% | -18.67% | -18.81% | | | | | | | | | | | -8.61% |
| **Taxis** | | | | | | | | | | | | | | | | |
| FY2000 | 176,500 | 216,750 | 222,650 | 226,050 | 245,550 | 165,000 | 238,650 | 245,870 | 253,650 | 222,700 | 238,350 | 219,300 | 2,690,020 | | | |
| FY2001 | 189,150 | 216,000 | 206,650 | 233,750 | 216,550 | 137,600 | 238,550 | 241,500 | 281,500 | 241,150 | 224,000 | 219,250 | 2,667,950 | -0.82% | 1,360,250 | |
| FY2002 | 225,350 | 245,850 | 150,150 | 230,000 | 180,000 | | | | | | | | | | 1,437,100 | |
| Growth | 19.14% | 12.72% | -27.34% | 2.38% | -17.03% | | | | | | | | | | | -0.82% |
| **Total Transportation Concession Fees** | | | | | | | | | | | | | | | | |
| FY2000 | 2,028,924 | 2,165,747 | 2,100,781 | 2,329,154 | 2,148,089 | 1,618,590 | 1,926,939 | 2,013,901 | 2,460,250 | 2,348,436 | 2,324,469 | 2,229,876 | 25,699,556 | | | |
| FY2001 | 2,183,340 | 2,259,278 | 2,015,875 | 2,281,950 | 2,067,037 | 1,691,962 | 1,846,027 | 1,944,061 | 2,556,099 | 2,406,449 | 2,359,939 | 2,177,369 | 25,691,386 | -0.03% | 13,812,049 | 2.97% |
| FY2002 | 2,382,412 | 2,459,882 | 1,851,271 | 2,173,049 | 1,911,128 | | | | | | | | | | 14,222,150 | |
| Growth | 9.02% | 7.99% | -8.17% | -4.77% | -7.54% | | | | | | | | | | | |
| **Sales Concessions** | | | | | | | | | | | | | | | | |
| **Advertising** | | | | | | | | | | | | | | | | |
| FY2000 | 705,403 | 706,777 | 763,803 | 735,621 | 742,091 | 799,076 | 791,970 | 780,657 | 775,635 | 830,162 | 835,819 | 900,203 | 9,367,217 | | | |
| FY2001 | 810,077 | 815,597 | 835,347 | 846,189 | 860,536 | 817,474 | 938,346 | 808,891 | 894,239 | 845,725 | 877,472 | 847,357 | 10,187,640 | 8.76% | 4,967,893 | 2.37% |
| FY2002 | 798,448 | 822,578 | 792,472 | 766,953 | 798,701 | | | | | | | | | | 5,085,819 | |
| Growth | -1.44% | 0.81% | -3.98% | -9.36% | -7.18% | | | | | | | | | | | |
| **Bars** | | | | | | | | | | | | | | | | |
| FY2000 | 106,655 | 111,687 | 126,155 | 135,710 | 127,774 | 105,980 | 136,388 | 142,043 | 171,268 | 141,442 | 145,250 | 141,445 | 1,591,697 | | | |
| FY2001 | 123,785 | 133,790 | 128,702 | 157,733 | 141,110 | 128,583 | 138,559 | 144,403 | 173,842 | 138,220 | 135,858 | 128,351 | 1,672,936 | 5.10% | 856,980 | |
| FY2002 | 120,763 | 128,647 | 99,553 | 151,219 | 134,189 | | | | | | | | | | 825,981 | |
| Growth | -2.44% | -3.62% | -22.65% | -4.07% | -4.90% | | | | | | | | | | | |
| **Restaurants** | | | | | | | | | | | | | | | | |
| FY2000 | 271,942 | 225,211 | 218,386 | 240,032 | 229,458 | 193,678 | 222,638 | 235,030 | 271,552 | 243,941 | 244,905 | 256,063 | 2,798,826 | | | |
| FY2001 | 271,330 | 271,142 | 269,000 | 196,188 | 290,467 | 241,381 | 238,467 | 240,350 | 291,725 | 294,883 | 294,000 | 228,950 | 3,128,083 | 11.76% | 1,558,933 | 9.13% |
| FY2002 | 289,683 | 301,955 | 215,477 | 327,779 | 290,378 | | | | | | | | | | 1,701,196 | |
| Growth | 6.76% | 11.36% | -19.90% | 67.07% | -0.03% | | | | | | | | | | | |
| **Catering** | | | | | | | | | | | | | | | | |
| FY2000 | 165,776 | 170,215 | 207,642 | 209,474 | 201,234 | 212,495 | 196,848 | 213,706 | 251,774 | 215,685 | 217,608 | 250,064 | 2,512,521 | | | |
| FY2001 | 219,869 | 231,708 | 260,217 | 233,202 | 242,168 | 268,691 | 212,803 | 214,344 | 266,060 | 231,020 | 229,585 | 273,136 | 2,902,803 | 15.53% | 1,386,708 | 7.62% |
| FY2002 | 244,848 | 244,841 | 235,666 | 189,440 | 160,165 | | | | | | | | | | 1,692,359 | |
| Growth | 10.80% | 7.44% | -11.43% | -23.18% | -33.86% | | | | | | | | | | | |
| **Clothing Shops** | | | | | | | | | | | | | | | | |
| FY2000 | 42,954 | 42,954 | 50,624 | 55,125 | 53,553 | 40,650 | 47,331 | 49,661 | 55,549 | 56,592 | 58,613 | 54,591 | 607,835 | | | |
| FY2001 | 55,314 | 55,110 | 58,560 | 72,666 | 60,115 | 50,472 | 54,705 | 56,740 | 64,347 | 62,333 | 64,347 | 63,015 | 717,858 | 18.10% | 335,769 | |
| FY2002 | 57,797 | 61,084 | 45,288 | 63,638 | 55,738 | | | | | | | | | | 373,019 | |
| Growth | 4.49% | 10.84% | -22.66% | -12.42% | -7.34% | | | | | | | | | | | |
| **Gift Shops** | | | | | | | | | | | | | | | | |
| FY2000 | 461,152 | 414,231 | 450,112 | 553,020 | 483,605 | 363,211 | 426,813 | 497,371 | 457,700 | 505,453 | 445,575 | 459,930 | 5,518,173 | | | |
| FY2001 | 534,175 | 567,015 | 481,275 | 569,868 | 484,336 | 409,550 | 506,780 | 558,162 | 547,309 | 515,380 | 443,467 | 486,365 | 6,057,202 | 9.77% | 2,973,148 | 1.36% |
| FY2002 | 530,878 | 490,104 | 365,291 | 546,673 | 403,686 | | | | | | | | | | 3,013,503 | |
| Growth | -1.12% | -13.66% | -24.13% | -4.07% | -16.66% | | | | | | | | | | | |

**McCarran International Airport**
**Business Interruption Loss due to September 11, 2001**
**Historical Revenue and Trends**

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | FY Total | FY % Growth | 6 mo. Ttl. (Mar - Aug) | 6 mos pr to Sept Growth |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Lockers** | | | | | | | | | | | | | | | | |
| FY2000 | 2,461 | 2,637 | 2,428 | 3,235 | 3,498 | 3,442 | 3,663 | 2,342 | 5,009 | 4,467 | 4,011 | 4,746 | 41,897 | | 23,935 | |
| FY2001 | 4,003 | 3,689 | 4,424 | 2,534 | 3,384 | 3,915 | 3,821 | 3,478 | 3,909 | 4,488 | 4,046 | 4,353 | 46,644 | 11.33% | 24,944 | -3.78% |
| FY2002 | 4,220 | 3,928 | | | | | | | | | | | | | | 0.66% |
| | 5.42% | 6.48% | -100.00% | -100.00% | -100.00% | | | | | | | | | | | |
| **Passenger Service** | | | | | | | | | | | | | | | | |
| FY2000 | 45,589 | 43,987 | 43,631 | 47,849 | 49,375 | 44,970 | 52,623 | 56,837 | 58,854 | 57,870 | 58,573 | 59,474 | 619,622 | | 355,674 | |
| FY2001 | 58,733 | 62,170 | 57,344 | 63,538 | 62,557 | 65,902 | 51,938 | 59,861 | 63,960 | 53,283 | 58,266 | 61,553 | 718,915 | 16.02% | 358,021 | 4.59% |
| FY2002 | 58,938 | 62,221 | 54,698 | 44,734 | 33,364 | | | | | | | | | | | |
| | 0.35% | 0.08% | -4.61% | -29.59% | -46.67% | | | | | | | | | | | |
| **Specialty Shops** | | | | | | | | | | | | | | | | |
| FY2000 | 112,640 | 119,234 | 129,729 | 147,557 | 131,933 | 110,122 | 119,439 | 132,050 | 142,710 | 138,400 | 136,231 | 128,503 | 1,548,538 | | 813,193 | |
| FY2001 | 128,838 | 138,310 | 139,662 | 164,625 | 143,740 | 125,393 | 130,209 | 138,947 | 153,176 | 144,967 | 139,946 | 136,252 | 1,684,265 | 8.76% | 850,513 | |
| FY2002 | 135,516 | 140,656 | 107,567 | 151,435 | 134,113 | | | | | | | | | | | |
| | 5.18% | 1.69% | -22.99% | -8.01% | -6.70% | | | | | | | | | | | |
| **Total Sales Concession Fees** | | | | | | | | | | | | | | | | |
| FY2000 | 2,105,116 | 2,080,649 | 2,237,186 | 2,308,919 | 2,266,493 | 2,116,257 | 2,223,521 | 2,336,511 | 2,417,338 | 2,381,041 | 2,334,672 | 2,601,315 | 27,469,218 | | 14,604,247 | |
| FY2001 | 2,194,707 | 2,473,374 | 2,373,652 | 2,842,734 | 2,473,109 | 2,291,875 | 2,460,412 | 2,360,714 | 2,650,430 | 2,445,314 | 3,423,732 | 2,613,241 | 30,809,274 | 12.16% | 16,016,867 | 9.67% |
| FY2002 | 2,435,723 | 2,448,427 | 2,108,295 | 2,442,378 | 2,286,953 | | | | | | | | | | | |
| | 1.71% | -1.09% | -11.33% | -14.33% | -7.55% | | | | | | | | | | | |
| **Parking** | | | | | | | | | | | | | | | | |
| **Employee Parking** | | | | | | | | | | | | | | | | |
| FY2000 | 85,233 | 107,850 | 95,600 | 97,600 | 94,917 | 99,188 | 136,639 | 118,112 | 99,492 | 99,080 | 98,752 | 101,530 | 1,234,043 | | 641,516 | |
| FY2001 | 127,654 | 115,028 | 101,185 | 102,170 | 102,550 | 108,160 | 143,020 | 118,565 | 106,104 | 105,910 | 107,015 | 123,500 | 1,360,841 | 10.28% | 760,234 | 18.51% |
| FY2002 | 160,815 | 156,890 | 143,195 | 132,510 | 156,988 | | | | | | | | | | | |
| | 26.00% | 36.39% | 41.52% | 29.70% | 33.58% | | | | | | | | | | | |
| **Public Parking** | | | | | | | | | | | | | | | | |
| FY2000 | 839,268 | 882,814 | 805,583 | 556,662 | 869,001 | 799,455 | 715,245 | 722,074 | 804,839 | 859,147 | 936,985 | 945,732 | 10,041,804 | | 5,452,127 | |
| FY2001 | 965,594 | 939,470 | 885,395 | 961,827 | 907,108 | 883,310 | 788,312 | 759,370 | 870,564 | 1,024,037 | 1,112,793 | 1,073,625 | 11,172,865 | 11.26% | 6,326,162 | 16.03% |
| FY2002 | 1,114,209 | 1,130,134 | 816,762 | 1,000,294 | 952,323 | 2 month Avg | 4,647,288 | 5,455,598 | | | | | | | | |
| | 15.35% | 20.29% | -7.73% | 4.00% | 4.97% | | 17.39% | | | | | | | | | |
| **Parking Meters** | | | | | | | | | | | | | | | | |
| FY2000 | 196,640 | 194,745 | 149,672 | 162,488 | 177,122 | 198,673 | 155,110 | 152,503 | 177,526 | 184,978 | 177,400 | 205,764 | 2,132,221 | | 1,167,602 | |
| FY2001 | 211,572 | 210,372 | 153,039 | 176,271 | 188,026 | 216,464 | 163,429 | 151,018 | 186,904 | 255,158 | 233,354 | 277,063 | 2,423,660 | 13.67% | 1,547,378 | 32.59% |
| FY2002 | 293,069 | 302,430 | 132,357 | 124,283 | 116,315 | 5 month Avg | | 990,076 | | | | | | | | |
| | 38.52% | 43.49% | -13.40% | -29.49% | -38.23% | | 37.47% | | | | | | | | | |
| **Valet Parking** | | | | | | | | | | | | | | | | |
| FY2000 | 120,007 | 94,828 | 113,491 | 124,460 | 116,667 | 119,893 | 120,712 | 120,834 | 120,834 | 121,113 | 125,231 | 120,834 | 1,418,904 | | 753,594 | |
| FY2001 | 131,463 | 134,029 | 122,796 | 131,476 | 134,061 | 129,515 | 122,511 | 122,122 | 126,700 | 149,069 | 159,348 | 155,450 | 1,618,540 | 14.07% | 909,728 | 20.~ |
| FY2002 | 159,031 | 160,130 | | | | 5 month Avg | | 632,670 | 783,028 | | | | | | | |
| | 20.97% | 19.47% | -100.00% | -9.87% | -9.87% | | 23.77% | | | | | | | | | |
| **Park A Lot** | | | | | | | | | | | | | | | | |
| FY2000 | 24,120 | 19,800 | 20,824 | 21,840 | 19,740 | 24,480 | 22,824 | 21,030 | 19,720 | 20,432 | 21,640 | 27,960 | 264,430 | | 134,406 | |
| FY2001 | 18,044 | 26,610 | 18,150 | 31,125 | 19,950 | 28,800 | 24,150 | 22,575 | 23,100 | 28,125 | 21,000 | 22,650 | 284,279 | 7.51% | 141,900 | 5.58% |
| FY2002 | 19,873 | 27,150 | 18,710 | 8,313 | | | | | | | | | | | | |
| | 10.15% | 2.03% | 3.09% | -73.29% | -100.00% | | | | | | | | | | | |
| **Total Parking Revenue** | | | | | | | | | | | | | | | | |
| FY2000 | 1,310,979 | 1,326,428 | 1,207,526 | 1,283,217 | 1,298,578 | 1,275,234 | 1,178,640 | 1,180,673 | 1,266,645 | 1,318,382 | 1,395,149 | 1,408,923 | 15,450,394 | | 8,337,445 | |
| FY2001 | 1,482,766 | 1,465,580 | 1,313,566 | 1,434,296 | 1,391,678 | 1,401,040 | 1,282,074 | 1,203,878 | 1,348,687 | 1,594,791 | 1,658,722 | 1,684,229 | 17,271,307 | 11.79% | 9,892,739 | 18.65% |
| FY2002 | 1,783,196 | 1,813,114 | 1,137,652 | 1,428,540 | 1,327,807 | 5 month Avg | | | | | | | | | | |
| | 20.26% | 23.71% | -13.39% | -0.40% | -4.59% | | | | | | | | | | | |
| **Jet A Fuel Tax** | | | | | | | | | | | | | | | | |
| FY2000 | 831,290 | 801,756 | 845,207 | 871,406 | 925,663 | 995,732 | 980,086 | 949,453 | 1,010,079 | 923,740 | 969,474 | 976,918 | 11,140,604 | | 5,950,975 | |
| FY2001 | 1,054,781 | 1,015,983 | 948,333 | 998,734 | 1,033,693 | 1,024,605 | 1,068,302 | 937,704 | 986,029 | 881,132 | 1,082,429 | 957,444 | 11,989,159 | 7.62% | 5,932,017 | -0.32% |
| FY2002 | 1,016,566 | 1,098,417 | 1,002,107 | 854,006 | 1,007,246 | -6.66% | 854,620 | | | | | | | | | |
| | -3.62% | -0.74% | 5.67% | -14.49% | 7.12% | | -20.00% | | | | | | | | | |

**Clark County Department of Aviation - McCarran International Airport**
**Additional Expenses due to September 11, 2001**
**September 11, 2001 thru November 12, 2001**

| New, Additional, or Revised Security Requirement(s) | Actual Direct Cost(s) incurred 9/11/01-01/18/02 | Actual Direct Cost(s) incurred 9/11/01-11/12/01 |
|---|---|---|
| Increased Law Enforcement Officer personnel/overtime | $313,834 | |
| Increased other personnel/overtime | $332,716 | |
| Supplies | $95,776 | |
| Outside services, contractor support, etc. | $1,500,019 | |
| Total | $2,242,345 | |
| | | |
| War Risk Premium | | $ 1,481,800 |
| Total Costs less War Risk Premium | | 760,545 |
| Days (9/11/01 to 01/18/02) | | 129 |
| Costs per day | | 5,896 |
| War Risk Premium Cost per Day | | 4,060 |
| Total Cost per day | | 9,955 |
| Days Covered | | 60 |
| 60 Days of Extra Expenses | | $ 597,326 |

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT

**EXHIBIT "D"**

**FM Global**

Factory Mutual Insurance Company
21860 Burbank Blvd., Suite 300
Woodland Hills, CA 91367
**T: 818 704 1133 F:** 818 340 8654
e-mail: jeffrey.casillas@fmglobal.com

April 16, 2002

RECEIVED
McCARRAN INT'L AIRPORT

APR 19 2002

ACCOUNTING OFFICE

Mr. R. Ross Johnson
Assistant Director of Aviation, Finance
Clark County Department of Aviation
P.O. Box 11005
Las Vegas, NV 89111-1005

Re:   **Clark County Department of Aviation**
      **Las Vegas, NV**
      Loss No. 04309-01-08-01; September 11, 2001
      Index No. 79301.53
      Account No.  1-33186

Dear Mr. Johnson:

This letter will confirm our receipt of your letters dated February 22, and March 22, 2002 regarding the above referenced matter.  Attached to your March 22, 2002 letter was a Sworn Statement in Proof of Loss in the amount of $6,530,570.00.

Factory Mutual Insurance Company ("FM Global") has considered Clark County Department of Aviation's ("Clark County's") claim for losses reportedly caused by the September 11, 2001 coordinated terrorist attack.  Based on FM Global's review of the information provided to date, there is no coverage for Clark County's claimed loss, under FM Global Policy No. UA864, as explained below.

On November 8, 2001, Clark County notified FM Global of a claim for losses reportedly caused by the September 11, 2001 coordinated terrorist attack.  In Clark County's initial notice letter, it reported that the Clark County Airport System, including McCarran International Airport, the North Las Vegas Airport, and the Henderson Executive Airport were closed because of the September 11 terrorist attack.  Clark County further advised that there was a reduction in the number of passengers and airport revenue generating activities.

FM Global insured Clark County for the policy period October 1, 2000 to October 1, 2003, under its Policy No. UA864.  The coverage is subject to the policy's terms, conditions, limitations and exclusions.

Generally, the FM Global policy provides time element (business interruption and extra expense) coverage for interruptions caused by direct physical loss or damage to insured property:

## TIME ELEMENT - SECTION C

**1.     LOSS INSURED**

A.     This Policy insures TIME ELEMENT loss, as provided in the TIME ELEMENT COVERAGES, directly resulting from physical loss or damage of the type insured by this Policy:

1)     to property described elsewhere in this Policy and not otherwise excluded by this Policy or otherwise limited in the TIME ELEMENT COVERAGES below;

2)     used by the Insured, or for which the Insured has contracted use;

3)     located at an Insured Location; and

4)     during the Periods of Liability described in this section.

Here, there was no physical loss or damage to any insured property described in the FM Global policy.  Absent the requisite physical loss or damage to insured property, there can be no time element coverage under this provision.

Clark County asserts that there is coverage under the following ingress and egress provision:

**TIME ELEMENT - SECTION C**

* * *

**3.     TIME ELEMENT COVERAGE EXTENSIONS**

* * *

**C.     INGRESS/EGRESS**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured due to the necessary interruption of the Insured's business due to prevention of ingress to or egress from an

> Insured Location, whether or not the premises or
> property of the Insured is damaged, provided that
> such prevention is a direct result of physical
> damage of the type insured by this Policy, to the
> kind of property not excluded by this Policy.

We believe that Clark County has misconstrued the essential operative facts pertaining to its
claim as applied to this coverage. Ingress to and egress from McCarran International Airport,
North Las Vegas Airport, and the Henderson Executive Airport was not prevented as a "direct
result of physical damage." The physical damage to the World Trade Center ("WTC") and
Pentagon, occurring approximately 2,500 miles away, clearly did not prevent access to these
airports. Rather, the alleged prevention of access was caused by orders of civil authority,
including the FAA order, and was not caused by physical loss or damage

The FM Global policy specifically makes provision for the impact of orders of civil authority on
the period of liability for time element coverages:

**4.    PERIOD OF LIABILITY**

A.    The PERIOD OF LIABILITY applying to all TIME
      ELEMENT COVERAGES, except LEASEHOLD
      INTEREST and as shown below, or if otherwise provided
      under the TIME ELEMENT COVERAGE EXTENSION, is
      as follows:

                          • • •

8)    If an order of civil authority prohibits access
      to the Insured Location and provided such
      order is the direct result of physical damage
      of the type insured against under this Policy
      at the Insured Location or within 1,000 feet
      of it, the period of time:

      a)    starting at the time of such
            physical damage; but

      b)    not to exceed 30 consecutive
            days.

Here, the FAA order in question clearly did not directly result from physical damage at any Clark
County airport or within 1,000 feet of them. To the contrary, the directive arose out of safety
concerns. Even if it could somehow be said that the order directly resulted from and continued
because of the damage to the WTC or Pentagon, the requirements of the civil authority
provision in the policy would not be met, as said damage did not occur "at the insured location
or within 1,000 feet of it."

Clark County also asserts that there is coverage under the following contingent time element provision:

### TIME ELEMENT - SECTION C

* * *

**3. TIME ELEMENT COVERAGE EXTENSIONS**

**A. CONTINGENT TIME ELEMENT**

This Policy covers the Actual Loss Sustained and EXTRA EXPENSE incurred by the Insured during the PERIOD OF LIABILITY:

1) directly resulting from physical loss or damage of the type insured; and

2) to property of the type insured,

at any locations of direct suppliers or customers located within the TERRITORY of this Policy.

The term "supplier or customer" does not include any company supplying to or receiving from the Insured Location, as described elsewhere in this Policy, electricity, fuel, gas, water, steam, refrigeration, sewage or telecommunications.

The contingent time element coverage requires physical loss or damage of the type insured at a direct supplier or customer location. The WTC and Pentagon are not "direct supplier or customer" locations. Therefore, there is no contingent time element coverage under the FM Global policy.

Additionally, Clark County asserts that there is coverage under the following protection and preservation of property provisions of the policy:

### PROPERTY DAMAGE - SECTION B

* * *

**3. ADDITIONAL COVERAGES**

* * *

Clark County Dept. of Aviation                                                                 Page 5
Las Vegas, NV
D/L: Sept. 11, 2001

Q.    **PROTECTION AND PRESERVATION OF PROPERTY**

This Policy covers:

1)    reasonable and necessary costs incurred for actions to temporarily protect or preserve insured property; provided such actions are necessary due to actual, or to prevent immediately impending, insured physical loss or damage to such insured property.

## TIME ELEMENT - SECTION C

\* \* \*

3.    **TIME ELEMENT COVERAGE EXTENSIONS**

\* \* \*

C.    **PROTECTION AND PRESERVATION OF PROPERTY - TIME ELEMENT**

This Policy covers the Actual Loss Sustained by the Insured for a period of time not to exceed 48 hours prior to and 48 hours after the Insured first taking reasonable action for the temporary protection and preservation of property insured by this Policy provided such action is necessary to prevent immediately impending physical loss or damage insured by this Policy at such insured property.

This Extension is subject to the deductible provisions that would have applied had the physical loss or damage occurred.

Both provisions require either actual or immediately impending physical loss or damage insured by the policy to insured property at an insured location. We have not been provided with any information or documentation that demonstrates that there was actual or immediately impending physical loss or damage, or even a threat of such loss or damage, to any of Clark County-owned airports or other insured property at an insured location named in the Clark County Policy. Even if there were such a threat, the closure of the facility was not to protect and preserve the insured property from the only known risk of physical loss; which would have been potential physical damage caused by the hijacked planes. Rather, the closure of the facility was designed to protect and preserve the physical safety of others. For these reasons, there is no coverage under the Protection and Preservation of Property provisions of the policy.

Clark County Dept. of Aviation                                    Page 6
Las Vegas, NV
D/L: Sept. 11, 2001

Finally, assuming for argument's sake, time element coverage were triggered, the following exclusions contained in the policy would preclude coverage:

5.    **TIME ELEMENT EXCLUSIONS**

In addition to the exclusions elsewhere in this Policy, the following exclusions apply to TIME ELEMENT loss:

This Policy does not insure against:

A.    Any loss during any idle period, including but not limited to when production, operation, service or delivery or receipt of goods would cease, or would not have taken place or would have been prevented due to:

• • •

4)    any other reason other than physical loss or damage insured by this Policy.

B.    Any increase in loss due to:

• • •

4)    any other consequential or remote loss

In sum, based on FM Global's review of information and claim submitted to date, there is no coverage under FM Global's policy for Clark County's claim.

FM Global would be pleased to consider any further information or documentation that Clark County wishes to submit relating to any of the issues addressed in this letter. FM Global will review and consider any such information or documentation. In the absence of any additional documentation or information, Clark County may consider this letter to be a denial of its claim and a rejection of the submitted Sworn Statement in Proof of Loss.

You are respectfully advised that neither this letter nor any conduct related to the matter shall be construed as a waiver of, nor shall FM Global be estopped from asserting in the future, any rights or defenses it may have under its policy or any applicable regulation or law. FM Global expressly reserves all such rights and defenses.

Please contact me if you have any questions.

Sincerely,

Jeffrey C. Casillas
Operations Vice President/
Los Angeles Operations Claim Manager

Clark County Dept. of Aviation                                                   Page 7
Las Vegas, NV
D/L: Sept. 11, 2001


cc:     Mr. Lloyd W. Cutler, CPCU
        **KELLOG , CUTLER, YENCHEK, LADUKE, HOLMES**
          INSURANCE SERVICES
        330 E. Charleston Blvd.
        Las Vegas, NV  89104

        Mr. Marc Traasdahl
        CLARK COUNTY NEVADA
        Department of Aviation
        P.O. Box 11005
        Las Vegas, NV  89111-11005

        Ms. Gwyn Taylor
        CLARK COUNTY NEVADA
        Department of Aviation
        P.O. Box 11005
        Las Vegas, NV  89111-11005

        Mr. Thomas Murry
        DELOITTE & TOUCHE
        "Dispute Resolution Services"
        695 Town Center Drive, Suite 1200
        Costa Mesa, CA  92626-7188

# SWORN STATEMENT IN PROOF OF LOSS

Claim no.   1

| $1,567,393,000 | UA864 |
|---|---|
| AMOUNT OF POLICY AT TIME OF LOSS | POLICY NO. |

| 1 October, 2000 | Kellogg, Cutler, Yenchek, La Duke, Holmes Ins. Services |
|---|---|
| DATE ISSUED | AGENCY AT |

| 1 October, 2001 | Lloyd W. Cutler, CPCU |
|---|---|
| DATE EXPIRES | AGENT |

To the <u>Factory Mutual Insurance Company</u> of <u>Johnston, Rhode Island</u>. At time of loss, by the above indicated policy of insurance you insured **The Clark County Department of Aviation and other entities as per the Named Insured provision of the Policy** against loss by **Interruption of the Insured's business** to the property described under Schedule "A", according to the term and conditions of the said policy and all forms, endorsement, transfers and assignments attached thereto.

1. **Time and Origin:** A **Interruption of the Insured's business** loss occurred about the hour of <u>08:00</u> o'clock <u>AM.</u>, on the <u>11th</u> day of <u>September, 2001</u>. The cause and origin of the said loss were: **The damage to, destruction of, and collapse of buildings at the World Trade Center in New York City and the Pentagon in Washington, D.C. and the resulting order of federal authorities closing the national airspace.**

2. **Occupancy:** The building described, or containing the property described, was occupied at the time of the loss as follows, and for no other purpose whatever: **NA**

3. **Title and Interest:** At the time of the loss the interest of your insured in the property described therein was **NA**. No other person or persons had any interest therein or incumbrance thereon, except: **NA**.

4. **Changes:** Since the said policy was issued there has been no assignment thereof, or change of interest, use, occupancy, possession, location or exposure of the property described, except: **NONE**

5. **Total Insurance:** The total amount of insurance upon the property described by this policy was, at the time of the loss **$1,567,393,000**, as more particularly specified in the apportionment attached under Schedule "C", besides which there was no policy or other contract of insurance, written or oral, valid or invalid.

6. **The Actual Cash Value** of said property at the time of loss was ...................................... **NA** .

7. **The Whole Loss and Damage was** ............................................................................ **$6,530,570** .

8. **The Amount Claimed** under the above numbered policy is ............................................. **$6,530,570** .

The said loss did not originate by any act, design or procurement on the part of your insured, or this affiant; nothing has been done by or with the privity or consent of your insured or this affiant, to violate the conditions of the policy, or render it void; no articles are mentioned herein or in annexed schedules but such as were destroyed or damaged at the time of said loss; no property saved has in any manner been concealed, and no attempt to deceive the said company, as to the extent of said loss, has in any manner been made. Any other information that may be required will be furnished and considered a part of this proof.

The furnishing of this blank or the preparation of proofs by a representative of the above insurance company is not a waiver of any of its rights.

Clark County Department of Aviati

State of _NEVADA_                                          by:

County of _CLARK_                                               _R. R_____ Insured

Subscribed and sworn to before me this _22ND_ day of _MARCH, 2002_

_Deborah L. Weakland_                        Notary Public

600-5-59
Document1
(REV. 4/12/2001)

Page 1 of 2 (Both must be completed)



DEBORAH L. WEAKLAND
Notary Public State of Nevada
No.87-2092-1
My appt. exp. June 7, 2005

Insured: **Clark County Department of Aviation**      Loss No. _____1_____

## SCHEDULE "A" - POLICY FORM

Policy Form No. ____UA864_____      Dated ___1 October, 2000_____
Item 1. $ _5,933,244_____ on _Loss of Revenue due to events of 9-11-01____
Item 2. $ __597,326_____ on _Extra Expense due to events of 9-11-01_____
Item 3. $ _____ on _____
Item 4. $ _____ on _____
Situated _____
Coinsurance, Average, Distribution, or Deductible Clauses, if any __$10,000_____
Loss, if any, payable to __Clark County Department of Aviation___

## SCHEDULE "B"

## STATEMENT OF ACTUAL CASH VALUE AND LOSS AND DAMAGE

|  |  | ACTUAL CASH VALUE | LOSS AND DAMAGE |
|---|---|---|---|
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
| Totals: |  |  |  |

## SCHEDULE "C" - APPORTIONMENT

| POLICY NO. | EXPIRES | NAME OF COMPANY | ITEM NO. INSURES | PAYS | ITEM NO. INSURES | PAYS |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
|  |  |  |  |  |  |  |
| Totals: |  |  |  |  |  |  |

_____Adjuster

## RECEIPT FOR PAYMENT

Received of_____ (insurer) of_____
_____ Dollars ($_____ )
in full satisfaction and indemnity for all claims and demands upon said company on account of said loss and damage and the said policy is hereby _____ (State whether **Reduced, Reduced and Reinstated** or **Canceled** by payment.)

Dated _____   _____
                                                                                      The Insured
Dated _____   _____
600-5-59
Document1
(REV 4/12/2001)

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT

EXHIBIT "E"



# LAS VEGAS

McCARRAN INTERNATIONAL AIRPORT

## Department of Aviation

**RANDALL H. WALKER**
DIRECTOR

**ROSEMARY A. VASSILIADIS**
DEPUTY DIRECTOR

POSTAL BOX 11005
LAS VEGAS, NEVADA 89111-1005
(702) 261-5211
FAX (702) 597-9553
E-MAIL: webmaster2@mccarran.com

April 30, 2002

Jeffrey Casillas                          CERTIFIED MAIL#70001670001050292406
Operations Vice President/                   RETURN RECEIPT REQUESTED
Los Angeles Operations Claims Manager
Factory Mutual Insurance Company
21860 Burbank Blvd., Suite 300
Woodland Hills, CA 91367

     Re:    Policy No.: UA864
           Claim Associated With September 11, 2001 Terrorist Attacks

Dear Mr. Casillas:

I write in response to your letter of April 16, 2002 denying coverage for Clark County Department of Aviation's ("Clark County") claim under FM Global policy No. UA864 (1 October 2000 to 1 October 2003) (the "Policy") for loss caused by the terrorist attacks of September 11, 2001. Frankly, I was disappointed by the superficial and dismissive manner in which you disclaimed coverage of Clark County's legitimate and substantial claim. Your failure to counter—or even acknowledge—the points raised in my February 22, 2002 letter reaffirms my belief in the strength of Clark County's arguments for coverage.

While a number of policy provisions, including the Policy's Protection and Preservation of Property section, Section B. 3. Q., page 15; Contingent Time Element Extension, Section C. 3. A., page 30; and Ingress/Egress Time Element Extension, Section C. 3. C., page 31, support coverage for Clark County's loss, my February 22 letter focussed on the clear coverage provided by the broad Ingress/Egress Extension. Although I do not intend to restate the entire content of my February 22 letter, I would like to draw your attention to some of your letter's central deficiencies.

First, my letter explained why, under the plain language of the Policy, the civil authority provisions of section C.4.A.8. cannot be read as a limitation on coverage under the Ingress/Egress Extension:

> "Your attempt to impose the limitations of section C.4.A.8. onto the Ingress/Egress Extension is misplaced and contrary to the language of both those sections. Specifically, during our meeting and your November 27 letter, you suggest that there can be no coverage to Clark County's pending claims because '[a]ccess to insured premises was not prohibited or impaired by governmental order because of existing physical loss or damage at or near proximity of the insured premises.' The separate coverage provision you reference (C.4.A.8, at page 35) has no application to the Ingress/Egress Extension by the express wording of Section C.4.A. itself. The provisions of Section C.4.A. – including Section C.4.A.8. – unambiguously and expressly do not apply 'if otherwise provided under the TIME ELEMENT COVERAGE EXTENSIONS.' (Policy, p. 33.) The Ingress/Egress coverage is one of these 'TIME ELEMENT EXTENSIONS' and 'provides otherwise' by providing coverage 'whether or not the premises or property of the Insured is damaged' and subject to the 'number of consecutive days shown in the Limits of Liability clause . . .' (Policy, p. 31). Accordingly, the circumstances and limitations of Section C.4.A.8. have no application to Clark County's claim by express Policy terms."

1



**Clark County Board of Commissioners**
Dario Herrera, Chairman • Myrna Williams, Vice Chair
Yvonne Atkinson Gates • Erin Kenny • Mary J. Kincaid • Chip Maxfield • Bruce L. Woodbury

"Moreover, the Policy cannot be rewritten after the fact to turn the relatively obscure provisions of Section C.4.A.8. into an exclusionary provision or a limitation on the broad Ingress/Egress Extension. Exclusions in a policy must be clear and clearly stated. Thus, '[a]ny attempt to restrict insurance coverage must be done clearly and explicitly.' *Farmers Ins. Exchange v. Young*, 108 Nev. 328, 330 (1992). Similarly, the Policy cannot be interpreted to limit or nullify the broad promise of coverage under the Ingress/Egress Extension by imposing the contrary or limiting provisions of Section C.4.A.8. (which, again, does not even apply to the Ingress/Egress Extension by the express terms of C.4.A.) *See National Union Fire Ins. Co. of the State of PA, Inc. v. Reno's Executive Air, Inc.*, 100 Nev. 360, 366 (1984)('When a policy has been issued which purportedly provides coverage but whose exclusionary provisions as interpreted by the insurer would narrow the coverage to defeat the purpose of the insurance, the policy must be construed against the insurer.')."

Your letter ignores Clark County's position entirely and, without any explanation, denies coverage based on a misapplication of "the requirements of the civil authority provision in the policy." Your silence suggests that you have no good answer to Clark County's reading of the Policy's actual language.

My February 22 letter also explained that the Policy's requirement that prevention of ingress or egress be a "direct result" of physical damage does not require an immediate causal connection:

"In our conversations . . . you have exhibited a misconception of the meaning of the phrase 'direct result.'  Contrary to your apparent misinterpretation, 'direct,' unlike 'immediate,' does not refer to the last cause in a chain of events.  The Policy uses the word 'immediate' rather than 'direct' to impose the kind of 'next in line' requirement you seem to have in mind.  For example, the Service Interruption Time Element Extension requires an accidental occurrence that 'immediately prevents' delivery of services.  No such 'immediacy' link is imposed in the Ingress/Egress Extension."

"By contrast, the Ingress/Egress Extension speaks of a 'direct result' that requires only that the damage to the World Trade Center and the Pentagon be the 'efficient proximate cause' of the prevention of ingress or egress. *See Chlor Alkali Co., Inc. v. National Union Fire Ins. Co. of Pittsburgh, PA*, 863 F. Supp. 1226 (D. Nev. 1994)(explaining that '[t]he efficient proximate cause is not necessarily the last in a chain of events' and that '[t]he efficient proximate cause doctrine . . . looks to the quality of the links in the chain to determine which is the predominant cause.').  The efficient proximate cause is 'the one that sets others in motion.' *Id.* Clark County's losses were clearly 'set in motion' by the September 11 attacks.  In other words, Clark County's losses were 'directly caused' by the physical damage to the World Trade Center and the Pentagon.  Thus, again, this coverage component of the Ingress/Egress Extension has clearly been satisfied by Clark County's pending claim."

I explained how the shutdown of Clark County's airports was, unquestionably, the "direct result" of "physical damage" to the World Trade Center and the Pentagon. Your letter ignored what I had to say and simply made the incorrect statement that ingress and egress "was not prevented as a 'direct result of physical damage.'" Your bald assertion cannot displace the clear coverage under the actual Policy language.

2

We have given considerable thought to submission of the subject claim and believe that it is a legitimate and clearly covered claim under the FM Policy.  Your letter and our prior meeting have done nothing to change that belief.  Indeed, to the contrary, your failure even to address our coverage analysis, let alone present any arguments to refute it, provides us with a confirmation of the legitimacy of our claim.

Considering our prior and ongoing relationship, we would like to resolve this matter amicably.  Accordingly, Clark County requests that you engage in a meaningful dialogue by considering the positions set out in my February 22 letter and reconsidering your denial of coverage.  I stand ready to meet with you in an attempt to resolve Clark County's claim on a mutually amicable basis.

Sincerely,

R. Ross Johnson
Assistant Director of Aviation, Finance

cc:    Randall H. Walker
       Rosemary Vassiliadis
       E. Lee Thomson
       Marc Traasdahl

       Mr. Lloyd W. Cutler, CPCU
       KELLOG, CUTLER, YENCHEK, LADUKE, HOLMES INSURANCE SERVICES
       330 E. Charleston Blvd.
       Las Vegas, NV  89104

       Mr. Thomas R. Mury
       DELOITTE & TOUCHE
       Dispute Consulting Services
       695 Town Center Drive, Suite 1200
       Costa Mesa, CA  92626-7188

       Mr. Rod Fisher
       Vice President, Operations Manager
       FM GLOBAL
       21860 Burbank Boulevard, Suite 300
       Woodland Hills, CA  91367

       Mr. Gerry L. Alonso, RPA
       Vice President, Western Division Claims Manager
       FM GLOBAL
       Granite Park One, 5800 Granite Parkway, Suite 600
       Plano, TX  75024

       Mr. David W. Steuber, Partner
       HOWREY, SIMON, ARNOLD & WHITE ATTORNEYS AT LAW
       550 South Hope Street, Suite 1400
       Los Angeles, CA  90071-2627

3

**EXHIBIT "F"**

FM Global

Factory Mutual Insurance Company
21860 Burbank Blvd., Suite 300
Woodland Hills, CA 91367
T: **818 704 1133** F: 818 340 8654
e-mail:  jeffrey.casillas@fmglobal.com

May 28, 2002

Mr. R. Ross Johnson
Assistant Director of Aviation, Finance
Clark County Department of Aviation
P.O. Box 11005
Las Vegas, NV 89111-1005

RECEIVED
McCARRAN INTERNATIONAL AIRPORT

MAY 3 0 2002

ASSISTANT DIRECTOR OF AVIATION      1 0 7 0 1
FINANCE

Re:   **Clark County Department of Aviation**
      **Las Vegas, NV**
      Loss No. 04309-01-08-01; September 11, 2001
      Index No. 79301.53
      Account No.  1-33186

Dear Mr. Johnson:

This letter responds to your April 30 letter.  Preliminarily, you claim that FM Global failed to counter or even acknowledge the points raised in your February 22 letter.  We disagree.  But FM Global will do so again, focusing in particular on the portions of the February 22 letter that you address in your April 30 letter.

First, you assert that the civil authority provision cannot be read as a limitation on coverage under the Ingress/Egress provision.  That is not necessary to FM Global's position.  Rather, these are separate and distinct coverage provisions, each with separate and distinct coverage requirements and application.  The facts submitted to date in support of your claim fail to satisfy the requirements of  either provision.

The Ingress/Egress provision potentially provides coverage for a business interruption only where ingress to/egress from an insured location is physically prevented by physical damage of the type insured.  Where, however, access to the insured location is not physically prevented, but is instead prohibited by order of civil authority, coverage if any, for the resulting business interruption is provided by the civil authority provision, if its requirements for coverage are satisfied.  In such circumstances, any "prevention" of access is not "a direct result of physical damage" as would be required by the Ingress/Egress provision.  Rather, it is a direct result of the prohibition on access ordered by the civil authority.

So if there is  "prevention" of ingress to or egress from an insured location and the direct reason for that "prevention" of ingress or egress is an order of civil authority rather than physical damage, the FM Global policy would respond for a period not to exceed 30 days "provided such order is the direct result of physical damage of the type insured against under this Policy at the Insured Location or within 1,000 feet of it."  If, however, the order of civil authority was not the

direct result of physical damage of the type insured against under the policy at the insured location or within 1,000 feet of it, the FM Global policy would not respond.

Here, ingress to or egress from the insured locations were never prevented by physical damage of the type insured. Since there was no prevention as a direct result of physical damage, the ingress/egress provision cannot apply. Simiiarly, since access to an insured location was not prohibited by order or of civil authority which was a direct result of physical damage of the type insured at or within 1,000 feet of an insured location, the civil authority provision does not apply to the claim.

Second, you assert that the FM Global policy's requirement that prevention of ingress or egress be a "direct result" of physical damage does not require an immediate causal connection. Whatever you might mean by this statement, the policy requires that physical damage prevents ingress or egress, i.e., that physical damage must be the "direct" cause of the prevention of ingress or egress. Ingress is defined in the dictionary to mean the act of entering. Similarly, egress is defined to mean the act of going out or leaving. The damage to the World Trade Center and Pentagon did not prevent people from entering or leaving the Clark County airports.

We note your reference to the *Chlor Alkali* case and the efficient proximate cause doctrine. Our understanding of the doctrine is that it may be used to determine whether there is coverage when both covered and excluded perils have contributed to the loss. Under the efficient proximate cause doctrine, if the predominant cause is a covered peril, the loss is covered by the policy, even if other non-covered causes contributed to it; if the predominant cause is an excluded peril, the loss is not covered.

We do not view Clark County's loss as one involving both covered and excluded perils, and thus we do not believe the efficient proximate cause doctrine applies here. Moreover, efficient proximate cause does not mean the *triggering cause*, which is essentially how you have characterized the damage at the World Trade Center and Pentagon. Instead, it refers to the predominant cause, which we understand means the most important cause.

Even if we also assume that ingress to and egress from the Clark County airports was prevented—a fact that you have not yet established—the damage to the World Trade Center and Pentagon was certainly not the cause. The damage to the World Trade Center and Pentagon, occurring approximately 2,500 miles away, clearly did not prevent people from entering or leaving the Clark County airports. If the damage to World Trade Center and Pentagon were the cause, there would still be a lack of access to Clark County's airports today because that damage still exists. Rather, the prevention of access—if there actually was any—was caused by an order of a civil authority.

Third, in our April 16 letter, we advised that FM Global would be pleased to consider any further information or documentation that Clark County wished to submit on any of the issues addressed in our letter. You have not provided any additional information or documentation relating to coverage or the positions you have asserted, so we presume that none exists. If that is in any way incorrect, please let me know.

Clark County Dept. of Aviation                                                          Page 3
Las Vegas, NV
D/L: Sept. 11, 2001

Finally, you have requested a meeting to engage in a meaningful dialogue relating to the
positions set forth in your February 22 letter. We are happy to meet with you to engage in this
dialogue.

You are respectfully advised that neither this letter nor any conduct related to the matter shall be
construed as a waiver of, nor shall FM Global be estopped from asserting in the future, any
rights or defenses it may have under its policy or any applicable regulation or law. FM Global
expressly reserves all such rights and defenses.

Please contact me if you have any questions.

Sincerely,

Jeffrey C. Casillas
Operations Vice President/
Los Angeles Operations Claim Manager


cc:     Mr. Lloyd W. Cutler, CPCU
        KELLOG , CUTLER, YENCHEK, LADUKE, HOLMES
           INSURANCE SERVICES
        330 E. Charleston Blvd.
        Las Vegas, NV  89104

        Mr. Marc Traasdahl
        CLARK COUNTY NEVADA
        Department of Aviation
        P.O. Box 11005
        Las Vegas, NV  89111-11005

        Ms. Gwyn Taylor
        CLARK COUNTY NEVADA
        Department of Aviation
        P.O. Box 11005
        Las Vegas, NV  89111-11005

        Mr. Thomas Mury
        DELOITTE & TOUCHE
        Dispute Consulting Services
        695 Town Center Drive, Suite 1200
        Costa Mesa, CA  92626-7188

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT

EXHIBIT "G"

**BY CERTIFIED MAIL: return receipt requested**

FM Global

RECEIVED
McCARRAN INT'L AIRPORT

JUL 05 2002

ACCOUNTING OFFICE

Factory Mutual Insurance Company
21860 Burbank Boulevard, Suite. 300
Woodland Hills, CA  91367-6493
Tel. (818) 704-1133
FAX (818) 883-0759

Mailing Address:  P. O. Box 9270 – Van Nuys, CA  91409

## NOTICE OF POLICY TERMINATION

June 25, 2002

Mr. Marc Traasdahl, CPA
Manager, Airport Fiscal Services
Clark County Department of Aviation
P. O. Box 11005
Las Vegas, Nevada  89111-1005

RE: Property Insurance Policy UA864
     Insured: Clark County Department of Aviation

Dear Mr. Traasdahl:

The Factory Mutual Insurance Company, Johnston, Rhode Island ("FM Global") hereby provides notice that the referenced policy, issued to Clark County Department of Aviation, will not continue for another policy year.  In accordance with Nevada law, all coverage will cease and terminate as of 12:01 a.m. standard time on the policy anniversary date of October 1, 2002.  FM Global chooses to exercise its right to not enter into a contract for another year due to our determination that there is a fundamental divergence between our companies on issues relating to the provision and purpose of first-party property insurance as well as the application of material policy provisions.

Under Nevada law, you have the right to request information relating to the facts on which our decision to terminate coverage is based.  Within six days of receipt of a written request from you, we will provide any such information accordingly.

Page 1

The foregoing is our notice that FM Global will not continue to afford insurance coverage for your property as of the October 1, 2002 policy anniversary date.

Very truly yours,

Wade A. Pitman, CPCU, ARM
Operations Vice President, Client Service Manager

cc: Mr. Lloyd W. Cutler, CPCU
    Kellogg - Cutler Insurance Services
    330 E. Charleston Blvd.
    Las Vegas, Nevada  89104

Page 2

H

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT

**EXHIBIT "H"**



# LAS VEGAS

McCARRAN INTERNATIONAL AIRPORT

## Department of Aviation

**RANDALL H. WALKER**
DIRECTOR

**ROSEMARY A. VASSILIADIS**
DEPUTY DIRECTOR

POSTAL BOX 11005
LAS VEGAS, NEVADA 89111-1005
(702) 261-5211
FAX (702) 597-9553
E-MAIL: mbraasdad2@co.clark.nv.us

July 2, 2002

**BY CERTIFIED MAIL: return receipt requested**
**7000 1670 0010 5285 5531**

Jeffrey Casillas
Operations Vice President/
Los Angeles Operations Claims Manager
Factory Mutual Insurance Company
21860 Burbank Blvd., Suite 300
Woodland Hills, CA 91367

Re:     Policy No.: UA864
        NOTICE OF POLICY TERMINATION

Dear Mr. Casillas:

I was very disappointed to receive your "Notice of Policy Termination" dated June 25, 2002. As stated in your letter, under Nevada law, we have the right to request information relating to the facts on which your decision to terminate coverage is based. This letter is a formal written request for such information.

Sincerely,

Marc Traasdahl
Manager, Fiscal Services

cc:     Randall H. Walker
        Rosemary Vassiliadis
        E. Lee Thomson
        R. Ross Johnson

        Mr. Lloyd W. Cutler, CPCU
        KELLOG, CUTLER, YENCHEK, LADUKE, HOLMES INSURANCE SERVICES
        330 E. Charleston Blvd.
        Las Vegas, NV 89104

        Mr. David W. Steuber
        Partner
        HOWREY, SIMON, ARNOLD & WHITE ATTORNEYS AT LAW
        550 South Hope Street, Suite 1400
        Los Angeles, CA 90071-2627



**Clark County Board of Commissioners**
Dario Herrera, Chairman • Myrna Williams, Vice Chair
Yvonne Atkinson Gates • Erin Kenny • Mary J. Kincaid • Chip Maxfield • Bruce L. Woodbury

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT

EXHIBIT "I"

FM Global

**VIA FAX: (702) 597-9553**

Factory Mutual Insurance Company
P.O. Box 9270  Van Nuys, CA 91409 USA
T: **818 704 1133** F: 818 883 0759 www.fmglobal.com

July 11, 2002

Mr. Marc Traasdahl
Manager, Fiscal Services
Clark County Department of Aviation
P.O. Box 11005
Las Vegas, Nevada 89111-1005

RECEIVED
McCARRAN INT'L AIRPORT

JUL 1 6 2002

ACCOUNTING OFFICE
30??

RE:    Property Insurance Policy UA864
       Insured: Clark County Department of Aviation

Dear Mr. Traasdahl:

This responds to your July 2 letter to Jeff Casillas (received by FAX and certified mail on July 8) requesting information relating to the facts on which FM Global based its decision to terminate policy coverage on the October 1, 2002 anniversary date.

Our June 25 termination notice refers to the fundamental divergence that exists between our organizations. FM Global's business philosophy leverages loss prevention expertise with significant financial capacity. We must underwrite risks that we fully understand in terms of quality, loss history, potential frequency, and potential magnitude. Moreover, as a mutual company, owned by our policyholders, we are obligated to use our resources in an efficient, economical manner. In our judgment, it is unlikely that any future insurance relationship with Clark County Department of Aviation could be mutually satisfactory. Therefore, we exercised our right to terminate the contract at anniversary, in accordance with Nevada law.

Sincerely,

Wade A. Pitman, CPCU, ARM
Operations Vice President, Client Service Manager

5611228.1

cc:     Mr. Lloyd W. Cutler, CPCU
        **KELLOG , CUTLER, YENCHEK, LADUKE, HOLMES**
        INSURANCE SERVICES
        330 E. Charleston Blvd.
        Las Vegas, NV  89104

Case 2:02-cv-01258-KJD-RJJ   Document 38-4009   Filed 05/27/04   Page 183 of 352



# September 11, 2001

## FAA Respo

*From the takeoff of Flight 11 at 8:00 a.m. to U.S. airspace clear of civil aviation flights at 12:15 p.m., here are the times of key Sept. 11, 2001, events.*

**0800.** American Airlines Flight 11, a Boeing 767 with 92 people on board, takes off from Boston Logan airport for Los Angeles.

**0814.** United Air Lines Flight 175, a Boeing 767 with 65 people on board, takes off from Boston Logan airport for Los Angeles.

**0821.** American Airlines Flight 77, a Boeing 757 with 64 people on board, takes off from Washington Dulles airport for Los Angeles.

**0840.** FAA notifies the North American Aerospace Defense Command's (NORAD) Northeast Air Defense Sector about the suspected hijacking of American Flight 11.

**0841.** United Air Lines Flight 93, a Boeing 757 with 44 people on board, takes off from Newark airport for San Francisco.

**0843.** FAA notifies NORAD's Northeast Air Defense Sector about the suspected hijacking of United Flight 175.

**0846.** (approx.). American Flight 11 crashes into the north tower of the World Trade Center.

**0902.** (approx.). United Flight 175 crashes into the south tower of the World Trade Center.

**0904.** (approx.). The FAA's Boston Air Route Traffic Control Center stops all departures from airports in its jurisdiction (New England and eastern New York State).

**0906.** The FAA bans takeoffs of all flights bound to or through the airspace of New York Center from airports in that Center and the three adjacent Centers - Boston, Cleveland, and Washington. This is referred to as a First Tier groundstop and covers the Northeast from North Carolina north and as far west as eastern Michigan.

**0908.** The FAA bans all takeoffs nationwide for flights going to or through New York Center airspace.

**0924.** The FAA notifies NORAD's Northeast Air Defense Sector about the suspected hijacking of American Flight 77. The FAA and NORAD establish an open line to discuss American 77 and United 93.

**0926.** The FAA bans takeoffs of all civilian aircraft regardless of destination - a national groundstop.

**0940.** (approx.). American Flight 77 crashes into the Pentagon.

**0945.** In the first unplanned shutdown of U. S. airspace, the FAA orders all aircraft to land at the nearest airport as soon as practical. At this time, there were more than 4,500 aircraft in the air on Instrument Flight Rules (IFR) flight plans.

Sept. 11, 2001 Hc

**FAA Portraits**

Hundreds of FAA pe
worked to improve
security and restore
aviation after the ski
were closed on Sept
2001. Here are som
their portraits.
Week of September
Week of September

**In Their Own Wo**

Memories and thoug
from our employees.

Week of September
Week of September
September 11
Week of September
September 18

**Clearing the Ski**

Landing so many pla
so quickly was an
outstanding achieve
A series of articles ir
*Today* explains the
behind-the-scenes
decisions and action



Case 2:02-cv-01258-KJD-RJJ   Document 38-4009   Filed 05/27/04   Page 184 of 352

**1007.** (approx.) United Flight 93 crashes in Stony Creek Township, PA.

**1039.** Reaffirming the earlier order, the FAA issues a Notice to Airmen (NOTAM) that halts takeoffs and landings at all airports.

**1215.** (approx). The airspace over the 48 contiguous states is clear of all commercial and private flights.

**Notes:**
All times are Eastern Daylight. For UTC/Zulu/GMT, add four hours.
Flight departures are actual takeoff times, not scheduled or gate departure times.

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

COUNTY OF CLARK,
a political subdivision
of the State of Nevada,
on behalf of Clark County
Department of Aviation,

       Plaintiff,

   vs                    CV-S-02-1258 KJO-RJJ

FACTORY MUTUAL INSURANCE COMPANY,

       Defendant.



---

     Thursday, April 22, 2004, 10:12 a.m.


     Videotaped Deposition of BENEDICT L.

SLINEY, held at the offices of Federal

Aviation Administration, One Aviation Plaza,

Jamaica, New York, pursuant to Agreement,

before Elisabeth F. Nason, a Notary Public

of the State of New York.


JOB NO. 22155

---

**www.attysweb.com**

46 Corporate Park, Suite 100    445 South Figueroa St., Suite 2950
Irvine, CA 92606           Los Angeles, CA 90071

      phone  877.955.3855
      fax     949.955.3854



**SARNOFF**
*Court Reporters and
Legal Technologies*

1

2       A P P E A R A N C E S:

3

4       HOWREY SIMON ARNOLD & WHITE

5       Attorneys for Plaintiff

6       550 South Hope Street, Suite 1400

7       Los Angeles, California 90071-2627

8       BY: DAVID W. STEUBER, ESQ.

9           STEPHEN V. MASTERSON, ESQ.

10

11      ROBINS, KAPLAN, MILLER & CIRESI LLP

12      Attorneys for Defendant

13      2800 LaSalle Plaza

14      800 LaSalle Avenue

15      Minneapolis, Minnesota 55402-2015

16      BY: SCOTT G. JOHNSON, ESQ.

17

18      FEDERAL AVIATION ADMINISTRATION

19      OFFICE OF REGIONAL COUNSEL

20      Attorneys for Federal Aviation

21      Administration

22      One Aviation Plaza, Room 561

23      Jamaica, New York 11434

24      BY: MARY M. McCARTHY, ESQ.

25

2

1    THE VIDEOGRAPHER:  This is the

2    videographer speaking, Bill Poznanski of

3    Sarnoff Reporting with offices in

4    California.  The day is April 22, 2004.  The

5    time is approximately 10:12 a.m.  We are on

6    the record.  We are at the offices of FAA

7    located at One Aviation Plaza, Jamaica, New

8    York 11434 to take the videotaped deposition

9    of Benedict Sliney in the matter of County

10    of Clark plaintiff, and Factory Mutual

11    Insurance Company, in the US District Court,

12    District of Nevada, CV-S-02-1258 KJO-RJJ.

13    At this point, I would ask counsel present

14    to audibly introduce themselves and who they

15    represent starting with the attorney taking

16    the deposition.

17    MR. STEUBER:  Mr. David Steuber.  I

18    represent the County of Clark, the plaintiff.

19    MR. MASTERSON:  Steve Masterson, also

20    from County of Clark.

21    MR. JOHNSON:  Scott Johnson from the

22    law firm of Robins, Kaplan, Miller & Ciresi

23    representing Factory Mutual Insurance

24    Company.

25    MS. McCARTHY:  I'm Mary McCarthy.  I

3

1          represent the Federal Aviation Administration.

2               THE VIDEOGRAPHER:  Please swear in the

3          witness.

4     B E N E D I C T    L.    S L I N E Y,   called as

5          a  witness, having been duly sworn by a

6          Notary Public, was examined and testified as

7          follows:

8     EXAMINATION BY

9     MR. STEUBER:

10         Q.     Will you please state your full name

11    for the record?

12         A.     Benedict L. Sliney.

13         Q.     As we have introduced ourselves, I'm

14    David Steuber.  We represent the County of Clark

15    and with me is my partner, Steve Masterson and at

16    the farther end of the table is Scott Johnson.

17    He represents Factory Mutual Insurance Company.

18    He will have an opportunity after I'm finished

19    with my questions to ask you a variety of

20    questions should he decide to do so.  I just

21    wanted to basically explain the deposition

22    process to you.  I understand you are a lawyer

23    and you probably know all of this already.

24              Let me explain a little bit for you

25    for purposes of the record.  You have just been

1    sworn in.  You are obviously under oath.

2    Although we are sitting in a comfortable setting

3    in the conference room, the oath carries with it

4    the same solemnity and seriousness as if you were

5    testifying in federal or state court.

6            Additionally, as you can see to my

7    right and your left, the court reporter is taking

8    down everything that is said in the deposition.

9    So I would ask you to follow a couple of ground

10   rules with me and I will try to do the same in

11   terms of speaking audibly, letting one person

12   speak at a time and not stepping on someone's

13   lines so to speak.  The court reporter can only

14   take down the comments of one person at a time.

15            You are also being videographed here.

16   You are sort of under the camera so to speak.

17   You will have an opportunity at the end of the

18   deposition obviously once the court reporter has

19   put together a transcription of the deposition,

20   an opportunity to review the deposition

21   transcript and make whatever changes or

22   corrections or modifications that you feel are

23   appropriate.  We will have an opportunity,

24   Mr. Johnson, Mr. Masterson and I have, will have

25   an opportunity to comment upon any changes that

1   you make, so that could affect your credibility

2   to the extent we would need this at the time of

3   trial.

4           I guess the last thing I would simply

5   comment is that if you don't understand a

6   question, certainly feel free to stop me, ask me

7   to repeat it, rephrase it so that you can

8   understand it.  What we want today is your best

9   recollection, your best testimony in response to

10  questions that you understand.  If you don't

11  understand, let us know.  Having said all of

12  that, I want to also repeat for Ms. McCarthy as

13  well that I understand you are a lawyer, we are

14  not here to ask you for a legal opinion.  We are

15  not here to ask you for contract interpretation.

16  We are not here to ask you for any opinion either

17  for that matter.  We are trying to get at the

18  facts like Joe Friday on Dragnet, that's

19  hopefully all I'm going to be asking and all I

20  intend to ask.  Do you have any questions?

21      A.    I do not.  That was very clear.

22      Q.    What I would like to do is start by

23  asking you about your background, start with

24  where you went to college and we can proceed from

25  there.

1          A.    The relevant portion of it would begin

2     before I went to college.  I joined the Air Force

3     in 1964 as an air traffic controller from 1964 to

4     1968.  I was discharged from the Air Force

5     honorably and hired by the Federal Aviation

6     Administration in February 1969.  I continued my

7     career as air traffic controller with the Federal

8     Aviation Administration.

9               It was during my tenure as air traffic

10    controller at the New York common instrument

11    flight rules room that I finished my

12    undergraduate and attended St. John's University

13    School of Law to obtain my graduate degree during

14    my tenure as air traffic controller.

15         Q.    When did you graduate from St. John's

16    Law School?

17         A.    1978.  I resigned from the agency in

18    1982 following the strike, not over the strike,

19    but a year after the strike.  Essentially in

20    2000, when I retired from law and took a position

21    with the Federal Aviation Administration at the

22    air traffic control system command center in

23    Herndon, Virginia, since that time, I have

24    transferred to New York to be with my family, I

25    should add.  My grandchildren notably.  My wife

7

1       of course I had with me.

2                Now I'm employed here in New York as

3       an operations manager at the New York Terminal

4       Radar Approach Control Facility.

5            Q.    Let me ask a couple of questions about

6       that.   That's a lot of information.   You were an

7       air traffic controller with the FAA from 1969

8       until 1982?

9            A.    Yes, and then in again in 1986 --

10      excuse me, that would be 1985 to '86, then in

11      1988, I worked for them.   In 1990, I worked for

12      them.   I did both jobs.   I was an attorney and

13      was an air traffic controller, maintained my

14      offices during that span from 1978 through today,

15      actually until 2000 when I retired from the law

16      completely.

17           Q.    When you went back with the FAA, you

18      resigned in 1982, then you went back to be an air

19      traffic controller in 1985, '86?

20           A.    Yes.

21           Q.    Then again in 1988?

22           A.    Yes.

23           Q.    Then again in 1990?

24           A.    Yes.

25           Q.    In the entirety of that time frame,

1    were you an air traffic controller in the New

2    York area?

3        A.    Yes.

4        Q.    Particular airport?

5        A.    The New York TRACON, which is an

6    acronym for the terminal radar approach control,

7    supplies or provides radar air traffic control

8    services for the entire metropolitan area, which

9    covers most of New Jersey, portions of

10   Connecticut, all of New York and expanded area of

11   air space that would include all major airports

12   in this area.  I was always employed at that

13   facility in the span we are talking about.

14       Q.    You retired from the law in 2000.  I

15   didn't pick up when you went to the air traffic

16   control command.

17       A.    In July 2000, I went to Virginia and

18   was employed at the air traffic control systems

19   command center.

20       Q.    Where is Herndon located?

21       A.    Due west of Washington, about 15 miles.

22       Q.    To be an air traffic controller, did

23   you have to take an examination, is there any

24   certification for that?

25       A.    The initial training began in the Air

9

1    Force where I got technical training with intense

2    schooling for four months I believe.  Once I get

3    rolling -- it began in the Air Force where I

4    received intensive training as air traffic

5    controller.  Then worked in various air traffic

6    controller facilities where you were trained on

7    the job by someone who is qualified until you are

8    qualified in the accumulation of facilities, adds

9    to the breadth of your knowledge.

10              Then in a similar situation in the FAA

11   when I was hired by them, they sent me to

12   Oklahoma City to the academy for a six month

13   period for education and training.  When I

14   graduated from that facility, I reported to an

15   air traffic controller facility that I began the

16   on-the-job process that I described to you

17   earlier, qualified and then moved on to other

18   facilities.

19       Q.    What we are talking about now in terms

20   of going to the six month academy, that would

21   have been in 1969?

22       A.    Yes.

23       Q.    You went to Oklahoma City.  From the

24   academy, you graduated from the academy and

25   thereafter went to on-the-job training?

10

1      A.    Yes.  At the facility, you receive

2   general training like a lawyer and then you go

3   into the specialty, air, either approach

4   control.  It would be an air traffic control

5   tower or a radar approach control or an air route

6   traffic control center.

7      Q.    Were you qualified with respect to

8   each one of those three areas?

9      A.    No, I stayed in the terminal option,

10   which does not involve the air route traffic

11   control center.  The rest I was qualified in and

12   radar approach control.

13      Q.    That would be the air traffic

14   controller tower and the radar approach?

15      A.    Control, yes.

16      Q.    You were certified in both of those

17   areas, is that the proper way of putting it?

18      A.    Yes, correct.

19      Q.    When in 2000 did you retire from the law?

20      A.    In July 2000, I closed up my law

21   practice.  It took probably two more years to

22   actually close down the business as I'm sure you

23   understand, everything doesn't end on the day you

24   select, so I kept my offices open for two years

25   after that, but once I reported to the Federal

1    Aviation Administration, I had at that point

2    either given all my cases to someone else, my

3    partners had taken them over and I reported to

4    the FAA, so I was done with the law at that point.

5        Q.    You basically were retired from the

6    law in July 2000 and pretty much immediately

7    reported to the FAA?

8        A.    Yes, sir.  They were gracious enough

9    to give me a month vacation at the outset of my

10   tenure with the Federal Aviation Administration

11   and we went to Europe and enjoyed ourselves.

12       Q.    If you can describe for us, what area

13   of the law did you practice or what areas of the

14   law did you practice?

15       A.    I pretty much did anything, but I

16   didn't do divorce and I didn't do criminal after

17   a few skirmishes in those areas.  Essentially my

18   practice evolved around securities and

19   commodities and a brokerage house was my main

20   client.  I practiced in all the federal courts,

21   and on the exchanges, the NASD, before the SEC,

22   the AMEX, in various Wall Street entities.

23       Q.    In July 2000 when you were employed by

24   the FAA in the air traffic controller command

25   center in Herndon, Virginia, what was your title,

12

1    what was your position?

2        A.    I was a traffic management specialist.

3        Q.    What responsibilities did you have as

4    a traffic manager specialist?

5        A.    Traffic management is a process

6    whereby traffic is regulated so as to comply with

7    the capacity of the system.  We look at all the

8    traffic in America and where it wants to go and

9    the route it wants to travel and we essentially

10   speed control those routes to allow as many

11   aircraft as we need or can accommodate into the

12   area that may be under some type of constraint

13   such as weather, sheer volume or any other type

14   of closure or any event that would reduce the

15   capacity of the air traffic system, the national

16   air traffic system.  That's what traffic

17   management provides.

18       Q.    How long did you serve as traffic

19   management specialist?

20       A.    I would say it was not many months.

21   Maybe six, seven, maybe 10 months, sometime

22   before September -- I could tell you exactly.  It

23   would have been until roughly July of 2001, so

24   about a year.

25       Q.    What position did you assume after

1    July 2001?

2        A.    I became a national operations manager.

3        Q.    You held that position on September

4    11, 2001?

5        A.    I did.

6        Q.    Can you compare for us your

7    responsibilities as an air traffic controller and

8    your position as traffic management specialist?

9        A.    It would be a matter of scope.  A

10   national air traffic controller is concerned with

11   the immediacies of keeping aircraft at the

12   required separation and managing that air traffic

13   to and from an airport.

14       Q.    On a localized basis?

15       A.    On an actual real time basis talking

16   to the airplane.  The traffic management has

17   tools at its disposal, which look at all the

18   aircraft coming from all the systems.  Typically

19   a radar controller only looks at 30, 20 miles of

20   air space.  As you get into the air route traffic

21   control center, I may look at 100 miles of air

22   space, but we are charged with the entire

23   national air space system and regulating that and

24   we look at the entire country including overseas

25   flight.  We have a system that depicts every

14

1    flight that is flying now at any time.

2         Q.    Is that also real time?

3         A.    Yes, it's one minute updated.  It's an

4    amalgamation of all the air traffic control

5    center radars in the nation and I look at a

6    mosaic of that.

7         Q.    It was a bigger picture of what you

8    would do as air traffic controller?

9         A.    The big picture, exactly right.  It's

10   a matter of scope scaling down from there

11   preceding right down to the person who says clear

12   to land.

13        Q.    You were a national operations manager

14   from July 2001 around until when?

15        A.    Until I think the end of that year,

16   probably December or January, I will say January '02.

17        Q.    Then what position did you take?

18        A.    Then I was a division manager for

19   tactical operations.  In other words, I was then

20   in charge of the national operations managers, I

21   was put in charge of the entire facility, the air

22   traffic control system command center.

23        Q.    In early '02, you took over the full

24   responsibility of overseeing the air traffic

25   controller system command center in Herndon?

15

1      A.      Yes.

2      Q.      Which would include oversight of all

3  the national operations managers?

4      A.      Correct.

5      Q.      How many national operations managers

6  were there in this time frame of 2001, 2002?

7      A.      There were five.

8      Q.      How were the responsibilities among

9  those five national operations managers broken

10  down, was it by geographical area or a matter of

11  whoever was on a particular shift at a particular

12  time?

13      A.      The national operations manager has

14  complete authority over the national air space

15  system during the time that he or she is on

16  duty.   Usually one is on duty at any given time.

17  If there are two, one is designated as in charge.

18      Q.      How long did you hold the position as

19  division manager for tactical operations?

20      A.      Probably about seven, eight months.

21      Q.      That would take you perhaps into the

22  fall, late 2002, something like that?

23      A.      Yes.

24      Q.      Is that when you then left the command

25  center and moved back to New York?

16

1        A.    Yes.

2        Q.    When you left the command center, what

3   position did you assume here in New York?

4        A.    At this building, I was the 520, which

5   is the branch manager for air space and

6   procedures.  I may be off on the exact

7   nomenclature, but that's the gist of it.

8        Q.    What were your responsibilities in

9   that position?

10       A.    That would be like the R and D of air

11  traffic control, research and development.  We

12  look at ways to improve the existing system.

13       Q.    How long did you hold that position?

14       A.    Thankfully briefly.  They were

15  gracious enough to allow me to return to the New

16  York TRACON where I wanted to go in the first

17  place despite the odyssey to Virginia.  I was

18  there given the position of the operations

19  manager at the New York TRACON and the term

20  national radar approach control.  There are seven

21  operations managers there.  He or she is

22  responsible for the air traffic operations in the

23  entire New York area for their assigned shift,

24  similar to the structure that I described in the

25  command center.

17

1      Q.     You have held that position of

2   operations manager at New York TRACON for how long?

3      A.     That would be since January or February

4   of '03.

5      Q.     That's the current position you hold today?

6      A.     Yes, sir.

7      Q.     In your position as operations manager

8   for New York TRACON, do you report to someone?

9      A.     I do.

10     Q.     To whom or what position do you report to?

11     A.     I report to the manager of the facility.

12     Q.     That would be a division manager as well?

13     A.     No, the structure is different.  It is

14  a unique facility the command center.  It's

15  virtually autonomous and controls the entire

16  country.  The New York TRACON is in a structure

17  in the eastern region and there is a manager of

18  the facility who reports to a division manager

19  here in the region and I report to the manager of

20  that New York TRACON.

21     Q.     Let me return now to September 11,

22  2001.  Your job title on September 11, 2001 was

23  national operations manager?

24     A.     That is correct.

25     Q.     You were one of five national

18

1   operations managers as of September 11, 2001?

2       A.    Yes, but I was the one on duty.

3       Q.    I understand that, yes.  I believe you

4   said as national operations manager, you had

5   complete authority over the entire air traffic

6   system during your assigned shift?

7       A.    Yes, to ensure the safe and efficient

8   operation of that system, that was my charge and

9   since September 11, they have added secure to

10  that charge, the safe, secure and efficient

11  operation of the national air space system.

12      Q.    I believe in one article that I have

13  read, the person holding that position, the

14  national operations manager has been

15  characterized as quote, the chess master of the

16  air traffic system, close quote.  Is that a fair

17  assessment do you believe?

18      A.    I believe it's the product of hyperbole.

19      Q.    In what respect?

20      A.    It's not a game and the person in that

21  position on a day-to-day basis deals with fact

22  and does make moves, but it's not an active

23  on-going thing.  It's more when intervention is

24  required.  The system runs pretty well if you

25  leave it alone.  It's hyperbole, but it's a nice

19

1    phrase.  I read it.

2         Q.    As national operations manager, during

3    your shift, were there any limits to your

4    authority?

5         A.    No, not with respect to a lawful order

6    given to ensure the safe and efficient operation

7    of the national air space system.

8         Q.    In other words, would it be fair to

9    say that as events occurred or were occurring

10   during your shift, whatever day it would be,

11   September 11 or any other day for that matter,

12   you had complete authority subject only to

13   subsequent review or approval from someone over

14   you?

15        A.    I was expected to exercise my good

16   judgement to assure that mandate that I described

17   to you, the safe and efficient operation of the

18   NAS, I would do whatever was necessary to

19   accomplish that.  In hindsight, could I be

20   criticized.  I suppose I could.  That has not

21   happened to me maybe by chance or maybe because

22   the application of thought to fact usually

23   produces very few incorrect results and that's

24   what usually happens in that situation.

25        Q.    During your shift, you were the guy on

1    the line?

2        A.    Correct.

3        Q.    On September 11, 2001, to whom did you

4    report?

5        A.    My immediate superior was at that time,

6    Linda Scheussler.

7        Q.    She was the division manager at the time?

8        A.    Correct, the subsequent position that I

9    occupied.

10        Q.    That was my next question.  She was

11    the division manager when you were the national

12    operations manager and then you subsequently in

13    early 2002, give or take, that's when you assumed

14    division manager?

15        A.    That's correct.

16        Q.    In your position as national

17    operations manager, who reported to you, did anyone?

18        A.    All the employees on an assigned

19    shift.  That would be those traffic management

20    specialists and supervisors in the -- assigned to

21    the east, which is the division of various areas

22    of the country, generally in the eastern portion

23    and in the west.  There is a supervisor for the

24    west and 10 to 15 specialists working for that

25    person.  There is a supervisor in the east, 10 to

1    15 persons working for that person.   There is a

2    unit called severe weather that involves

3    rerouting air traffic around weather or other

4    obstructions to the structure.   That would be

5    another 10 to 12 people there.   There is also

6    something we call the special planning TELCON

7    group that every two hours conducts a telephone

8    conference with all the major airlines and

9    facilities in the nation.   So about 50 people.

10             There are additional elements in

11   there.   There is the national business aircraft

12   association, NBAA.   They have a desk in there.

13   There is the airline pilots, the airlines

14   maintain a desk in there.   There is a military

15   liaison that connects us to the military in that

16   building, ostensibly reporting to me on an

17   assigned shift we are going through.   There are

18   all the support elements, the technician, that's

19   repair.   There is a weather unit that provides up

20   to date meteorology in the entire country.   There

21   is a NOTAM outfit also that issues notices to

22   airmen.

23        Q.   All of these people you are talking

24   about were in the command center?

25        A.   Were in that room.

22

1        Q.    I was going to get into that in a

2   moment or two about the command center itself and

3   the room and the physical qualities of that.

4   What I'm interested in now is the hierarchy if

5   you will, on your shift.  There were a number of

6   traffic management specialists and how were

7   responsibilities divided among those traffic

8   management specialists?

9        A.    The responsibilities are divided up on

10  a geographical basis.  There is a -- for example,

11  in the east, there is a New York position that

12  generally handles the New York airports.  There

13  is a south position that handles Atlanta,

14  Jacksonville and Miami.  There is a position that

15  works Cleveland and Boston.  I'm talking about

16  not airports -- when I say those cities' names,

17  I'm talking about air route traffic control

18  centers, each of them whom have several thousand

19  miles of air space.  So the entire nation is

20  divided up into specialists who operated areas

21  that are contiguous to each other, Boston and

22  Cleveland abut, Washington and DC abut, Atlanta,

23  Jacksonville and Miami are all connected

24  somehow.  Houston, Memphis.  Goes across the

25  country, Los Angeles.  All the centers are

23

1    divided up to a specialist, who handles traffic

2    management specialties for that airport.

3        Q.    On September 11, 2001, how many

4    traffic management specialists would be on duty

5    during your shift?

6        A.    There would be approximately 25 to 30.

7        Q.    Those 25 to 30 would each have a

8    separate geographic area or would there be

9    multiple traffic management specialists

10   responsible for a particular area?

11       A.    A person who is qualified to work in

12   the east, is qualified to work any of the

13   positions in the east.  Whether it be Boston,

14   Cleveland or New York, Washington or Atlanta,

15   Jacksonville, Miami, they would be qualified to

16   work all those positions.  They would be rotated

17   through all those positions for relief breaks,

18   lunch.  They would be rotated in the west.

19   Similarly they are divided geographically and the

20   specialists are all qualified to work in the

21   west.  The severe weather unit wouldn't do that

22   type of activity, although qualified to do so.

23   They concern themselves with looking at routes

24   across the country and adjusting clearances of

25   aircraft to put them on the routes we want them on.

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1      Q.     At this time what I would like to do

2   is actually start going into some of the

3   specifics of what happened on September 11, 2001

4   and ask you a variety of questions about some of

5   the specifics.  On the morning of September 11,

6   you reported to work?

7      A.     I did.

8      Q.     What time did you report?

9      A.     I typically arrived at around 6 a.m.

10     Q.     On September 11, did you arrive at or

11  about 6 a.m.?

12     A.     That's my recollection, yes.

13     Q.     You reported to the command center in

14  Herndon, Virginia?

15     A.     Yes.

16     Q.     On September 11, did you have an

17  assigned shift from X time to Y time?

18     A.     I had the day shift, which would be

19  roughly 7 to 3.

20     Q.     Can you recall when you left the

21  command center on September 11?

22     A.     I left near midnight on that day.

23     Q.     Were you physically present at the

24  command center all day on September 11?

25     A.     Yes.

25

1      Q.     At this point you have described in

2   part the command center.  What I would like to do

3   now is maybe go into a little more depth just in

4   terms of the physical aspects of the structure

5   itself.  Was it a single room for example?

6      A.     Yes.

7      Q.     How big of a room were we talking

8   about?

9      A.     It's about 40 hectares -- no.  It's

10  probably 100 by 40 with a 25 foot ceiling.

11     Q.     When you are talking about 100 by 40?

12     A.     Feet.  It's broken up with operating

13  consoles arranged in a logical order for people

14  to work together.  On the walls of the room are

15  seven screens, 10 feet by 12, which I can display

16  images on.  Typically the images concern areas of

17  the country, weather or air route traffic that we

18  are looking at.  One would always have weather,

19  know the status of the entire air space system.

20  On those screens would be displayed that

21  information.

22     Q.     On September 11, how many people were

23  in the command center in that one room that we

24  are talking about?

25     A.     Including the airways facilities unit,

1      over which I didn't exercise authority except to

2      direct repair of some component, they report to

3      their own system supervisors, airway facilities.

4      There were probably 20 of those individuals and

5      including contractors, which we hire to sustain

6      computer systems and programs.  I would say there

7      were probably 50 to 60 people on that floor and

8      the various elements I described to you earlier,

9      the National Business Aircraft Association, the

10     airline desk.  There is a flight check, there are

11     a lot of people in there that report to me or

12     have access to and reports to me for anything

13     that affects the NAS, the national air space

14     system.

15         Q.    The total, all those groupings was about

16     50 to 60 people?

17         A.    That would be my best guess.

18         Q.    Out of those 50 to 60, that would

19     include the 25 to 30 traffic management specialists?

20         A.    Yes.  Well, that figure would be closer to

21     40, including the supervisors who reported to me also.

22         Q.    On September 11, did the physical

23     layout of the command center differ from what I

24     will compare to a normal day?

25         A.    No, not different.

27

1      Q.     The configuration was all the same on

2   September 11?

3      A.     At the outset.

4      Q.     Did it change during the course of the day?

5      A.     It did.  Not the configuration, but

6   the -- after the airline crashes occurred into

7   the buildings, Ms. Scheussler came out and

8   indicated that she would organize the staff

9   elements to assist me in the operational elements

10  in any way that I required.  Pretty much freed up

11  my desk duties so that I could occupy a position

12  in the middle of the operating floor with the

13  operational elements reporting to me on a real

14  time basis and as often as necessary while

15  Ms. Scheussler operated staff elements to assist

16  that process.  There were additional 30 people

17  probably on the floor after this process began

18  that I just described to you.

19     Q.     In terms of comparing the

20  responsibilities, Ms. Scheussler basically was

21  responsible for organizing the operational

22  aspects of the command center to free you up to

23  basically run the national air space?

24     A.     She actually has authority over all

25  the elements, including the part I was

1    operating.  However, on that day when these

2    events began to unfold, she stated to me that I

3    did not have to -- I could relinquish those

4    duties that involved the telephone essentially

5    and interfacing with other entities, to

6    concentrate on the operation and that she would

7    organize the staff elements to allow me to do so.

8            For example, I had staff individuals

9    who tracked all aircraft who were deemed to be

10   suspicious, which at that point, meant anyone we

11   were not talking to.  They kept that data on the

12   old grease board, like a school teacher's

13   portable chalk board and that was staffed by

14   staff elements who got the data from the

15   operational specialists.

16       Q.    On a normal day, would Ms. Scheussler

17   as the division manager, would she have normally

18   been on the floor?

19       A.    No, she was not on the floor that much

20   that day, but enough to tell me those things,

21   that she would be organizing that and then I saw

22   her periodically throughout the day and evening.

23       Q.    But during the course of September 11,

24   it was your responsibility to oversee the safe,

25   secure and efficient operation of the national

1    air space?

2       A.    The safe and efficient was the mandate

3    prior to 9/11, but certainly that was the mandate.

4       Q.    That was your responsibility on

5    September 11?

6       A.    That was my responsibility, yes.

7       Q.    Were there TV screens on the command

8    center on September 11?

9       A.    The screens I described to you

10   earlier.  I could display CNN or any other signal

11   I wanted to on all of them.

12      Q.    Those were the seven screens you

13   mentioned?

14      A.    Yes, they pretty much gird the room,

15   you know, across one wall at one and a half

16   walls.

17      Q.    I think you said those screens were 10

18   by 12?

19      A.    Yes.

20      Q.    On September 11, were any of these

21   screens turned to a particular station, was it

22   turned to CNN for example?

23      A.    Not until the report of an aircraft

24   hitting the World Trade Center.

25      Q.    That would be the first crash into the

1   tower?

2        A.    Yes, sir.  At that point, I put CNN on

3   two of those screens so they were visible by the

4   east and the west and any other elements.

5        Q.    After the first crash into the World

6   Trade Center towers, you switched two of the

7   screens to CNN?

8        A.    Correct.  I didn't do that.  I

9   directed it.

10        Q.    Is it fair to say that like the rest

11   of America, you were watching the events of 9/11

12   as they happened after that first crash?

13        A.    Absolutely.

14            MR. STEUBER:  At this time, I would

15        like to show you a document that I would ask

16        to have marked as Exhibit 1.  This is a

17        chronology, a time line for September 11

18        that we obtained from and copied from the

19        FAA website.  If you could just take a quick

20        look at that.

21            (Exhibit 1, time line, marked for

22        identification, as of this date.)

23            (Handing.)

24        Q.    Have you seen that time line before or

25   time line like that before?

1    A.    I have not seen this time line

2  before.  I have seen the exact time line that

3  concerns the events that I was engaged in.  This

4  includes other matters that are not within my

5  purview.

6    Q.    As best as you can tell from the

7  events that you were involved with, is it a fair

8  and accurate assessment, Exhibit 1?

9    A.    Yes, it is.  Times are approximately

10  correct.

11    Q.    During the course of my questions from

12  time to time, I will be asking you questions

13  relying on this as somewhat of a road map to give

14  us a sense of where I'm going.  Exhibit 1

15  indicates that at 8:46 a.m. approximately on

16  September 11, American flight 11 crashes into the

17  north tower of the World Trade Center.  To the

18  best of your recollection, is that an accurate

19  statement?

20    A.    Yes, as it says approximately.

21    Q.    Yes, approximately.  It was after this

22  crash at or about 8:46 a.m. that you switched two

23  of the screens to CNN?

24    A.    At first, no one knew if that was

25  American flight 11 that hit the Trade Center.  We

1      knew a plane had hit the Trade Center.  We knew

2      there were high-jackings.  We knew that American

3      11 disappeared from our radar coverage and we

4      couldn't track him.  When the report came from

5      one of the specialists that an aircraft had

6      struck the World Trade Center, we do have CNN on

7      my desk, the national ground stop desk on

8      television.  I had them put that on and they were

9      depicting that image of smoke pouring from the

10     side of the Trade Center.  I had that put on two

11     of the screens and CNN was reporting that a small

12     plane had struck the command center.  It was our

13     respective opinions looking at it, that it was

14     not a small plane and, of course, I feared it was

15     American 11.

16         Q.    You had said I believe that it was

17     your fear that it had struck the command center.

18         A.    Misspoken.  I did misspeak.  I said

19     command center.  I meant Trade Center.  It's all

20     those centers.

21         Q.    Let me also ask in terms of your

22     shift, you mentioned you had a desk, a national

23     operations manager desk with your own TV screen,

24     during a normal shift and I will distinguish a

25     normal shift from what happened on 9/11, but on a

1   normal shift, would you normally be sitting most

2   of your shift or would you be sort of walking

3   about the facility, the center room itself?

4          A.    I would be walking about the facility

5   constantly.  That may differ from manager to

6   manager, but I like to know everything that is

7   going on at all times.

8          Q.    On September 11, I assume you didn't

9   spend much time sitting at your desk?

10         A.    Typically I don't and certainly that

11  day I didn't.  I spent no time at my desk.

12         Q.    Were you on the floor so to speak,

13  were you at the command center when you first

14  learned that a plane had hit the north tower?

15         A.    Yes, I was there from 6 a.m. until

16  about midnight.

17         Q.    How did you first learn that a plane

18  had crashed into the north tower of the World

19  Trade Center?

20         A.    That was communicated to me by someone

21  on my staff.

22         Q.    One of the traffic management

23  specialists?

24         A.    Yes, either that or a supervisor or

25  someone made us aware that a plane -- we monitor

1    CNN news because you get the most up to date news

2    first from them.   Even often before your own

3    components in the field report to you, you may

4    find out something from CNN.   Whoever was

5    monitoring at that time, indicated that we put it

6    on the screens.   I withdraw that.   I believe it

7    was the military liaison who came out to tell me

8    that CNN was showing an aircraft that crashed

9    into the World Trade Center.   It was he and I

10   that had that conversation regarding our belief

11   that that was no small plane despite the report

12   on CNN.

13        Q.    It was your belief that it was

14   American flight 11 although at that time, it had

15   not been confirmed?

16        A.    It had not been confirmed and to be

17   frank, I found it hard to believe because I

18   couldn't conceive of an airline pilot

19   deliberately crashing a plane into a building,

20   even if the high-jacker had a gun to his head, he

21   would have ducked into the East River, the

22   Hudson.   He wouldn't do that.   Those people

23   wouldn't do that.   So I didn't believe it was

24   American 11, but I feared it was because of the

25   size of that crash when I saw it.   That was the

1    perplexing part of it at least in my mind.

2         Q.    You mentioned military specialists.

3    Were there military specialists in the room on

4    September 11 prior to the first crash?

5         A.    They are stationed there at all times.

6         Q.    In the room actually itself?

7         A.    They are in a secure room that has a

8    cypher lock, a lock to get in there, because in

9    that room, we do work of a nature that is

10   secret.  They came from that room and stayed on

11   the floor for the day.  There are several

12   lieutenant colonels, they are all officers, men

13   and women also.  There was a military liaison

14   present on the floor from the time of that crash

15   to my recollection, for the entire day.

16        Q.    When did you first see television

17   footage of a plane crashing into the towers?

18        A.    You mean the second plane that hit?

19        Q.    Either the second plane or was there

20   footage of the first plane you saw?

21        A.    No, it was not on that day I saw a

22   picture, I don't recall that.  I wasn't looking

23   at that screen.  The second one they showed over

24   and over again and I finally at one point shut it

25   off because it was causing upset among a lot of

                                                    36

1    the personnel to see that plane continually run

2    into the trade center, the second aircraft.

3        Q.    As to the first crash, you picked up

4    the TV screening, the TV footage if you will,

5    after the plane had already hit and you saw the

6    smoke coming from the north tower of the World

7    Trade Center?

8        A.    Correct.

9        Q.    On Exhibit 1, right below the last

10    entry that we looked at, it indicates that at

11    approximately 9:02 a.m., United flight 175

12    crashes into the south tower of the World Trade

13    Center.   To the best of your recollection, is

14    that an accurate statement?

15        A.    That is.

16        Q.    You were still on the floor obviously

17    at the command center when that happened?

18        A.    I was.

19        Q.    Did you actually see the United flight

20    175 hit the south tower?

21        A.    As depicted on television, yes.

22        Q.    You were watching one of those two big

23    screens that we were talking about earlier?

24        A.    It was there for me to watch.   Was I

25    watching it, I don't believe so.   My attention

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1     would be called to it and I don't know if I saw

2     it on the first one, but I believe I did.  It's

3     hard to recall exactly.  They showed it so many

4     times, that's what I'm saying.  I believe I saw

5     it when it happened, at least as depicted on

6     television.

7          Q.     You were watching it with others in

8     the command center as well?

9          A.     There are duties, there are activities

10    going on in the fulfillment of those duties, so

11    to the extent that they are able to see the

12    television screen, it's hard to avoid.  They are

13    the size of a small movie screen and they are

14    well-lit in a very visible place up on the wall.

15    So most people would probably have half an eye on

16    that.

17         Q.     Exhibit 1 indicates that at 9:26 a.m.,

18    the FAA bans all takeoffs.  Sorry.

19         A.     That's correct.

20         Q.     The FAA bans takeoffs of all civilian

21    aircraft regardless of destination, a national

22    ground stop.  To the best of your knowledge, at

23    or about 9:26 a.m., did such a ground stop order

24    get issued by the FAA banning takeoffs of all

25    civilian aircraft regardless of destination?

1       A.      Yes, at or about that time.  I'm only

2    quibbling on the exact time because to be frank,

3    the exact time is recorded.  However, I would

4    have to look at that in my notes on that.  I

5    don't have any notes with me, but that seems

6    about correct.  It was following the second crash

7    into the Trade Center is how it's in my mind.

8    After the second crash in the Trade Center, I

9    ordered the national ground stop.

10      Q.      That was my next question.  Did you

11   issue the initial national ground stop order at

12   approximately 9:26 a.m. on 9/11?

13      A.      Yes.  Just so you understand the

14   nexus, a ground stop is a traffic management

15   tool.  A ground stop can be of varying scope.  It

16   can be that we just ground stop Los Angeles or we

17   ground stop a bigger section, so on, so forth.

18   Specialists with their first line supervisors

19   concurrence, have the authority to ground stop

20   any segment of the NAS.  No one had ever issued

21   nor had there ever been a reason for a national

22   ground stop.  That's why that is noteworthy.

23   That's why it had to come from me.

24      Q.      That order, the national ground stop

25   order, was unprecedented in the sense that it had

1    never happened before?

2        A.    Correct.  The national operations

3    manager is informed of all traffic management

4    initiatives such as ground stop, but it takes the

5    form usually that a specialist determines the

6    need for it in concurrence with the other

7    elements, including the airlines and the

8    facilities.  He or she communicates their

9    attention to the first line supervisor who

10   mentions it to me.  In other words, they have the

11   authority, but it travels up the line.  In this

12   case, it emanated, the national ground stop, from

13   the national operations manager on that day.

14       Q.    Which was you?

15       A.    Yes, sir.

16       Q.    Did anyone direct you to issue that

17   national ground stop or did you issue it on your

18   own authority?

19       A.    I don't like those two choices.  No

20   one directed me to issue that national ground

21   stop, no one did.

22       Q.    You issued it on your own?

23       A.    I issued it on my own authority.

24   That's somewhat -- the reason I said I didn't

25   like that choice is because I listened to and I

1       have available to me the accumulated wisdom and

2       advice of all those specialists.  We regularly

3       met on that day to discuss alternatives and what

4       we should do.  When it became apparent that there

5       were essentially missiles flying around, we

6       decided to -- we stopped aircraft from taking off

7       first.  We did that in a series of movements that

8       are somewhat depicted here.  First we stopped New

9       York.  Then we stopped Boston.  Then we

10      stopped -- although I don't see it here, we

11      stopped Los Angeles because of the connection

12      with the Los Angeles flights to be sure we

13      stopped everything out there.  Then we stopped

14      almost the whole east coast and then the national

15      ground stopped.  The to or through orders are

16      pretty comprehensive and the center says it

17      doesn't want traffic to or through its air space,

18      meaning all flights that want to go to the New

19      York metropolitan area in the New York case and

20      all flights that wish to traverse that air space

21      such as every international flight that would

22      come west from that position, would have to go

23      through New York air space to go overseas.

24          Q.    Was it within your authority to issue

25      this national ground stop order?

1    A.    Absolutely.

2    Q.    What did you personally do to issue the

3    order, did you tell someone?  Mechanically what did

4    you do to issue the national ground stop order?

5    A.    I called my supervisors together and

6    told them to stop ground -- stop all aircraft

7    regardless of destination.

8    Q.    They communicated that?

9    A.    To the specialists at first verbally

10   to every center in the country.  The specialists

11   has at his or her disposal, communication

12   consoles that can connect them with almost the

13   entire country at a fingertip.  They were

14   directed verbally to shut down the system, ground

15   stop everyone and that was followed up by an

16   advisory that is communicated electronically.

17   Q.    It's communicated to whom electronically?

18   A.    To all the air route traffic control

19   centers in the nation who then further

20   disseminate that order to all the facilities

21   under their jurisdictions.

22   Q.    Somehow it would get to all the

23   aircraft and all the airports as well?

24   A.    Correct, correct.  It would follow

25   that process I just told you.  It follows one

1   thread to go to the command center to the New

2   York center to the Kennedy tower to the aircraft

3   or approach control to the aircraft, depending on

4   the location of the plane.

5       Q.    Did you advise Ms. Scheussler that you

6   had issued the national ground stop order?

7       A.    Not to my recollection.  I certainly

8   would have briefed her if I saw her come on to

9   the floor as to what was going on.  I would keep

10  her apprised of everything that was going on both

11  in my mind and actually.

12      Q.    But you didn't consult with her prior

13  to issuing that order?

14      A.    I didn't.

15      Q.    Was your decision to order the

16  national ground stop order the product or result

17  of the crashes of American flight 11 and United

18  flight 175 into the World Trade Center towers?

19          MR. JOHNSON:  Objection.  Vague,

20      ambiguous.  Mischaracterizes prior testimony.

21      Q.    You can answer.

22      A.    The second crash prompted me to do

23  something more than we had done and that was -

24  essentially it was the first and -- the second

25  crash, the accumulation of those events and all

43

1     events on-going.   That is to say certainly in my

2     mind with the number of aircraft we had on that

3     status board I told you about earlier.   There

4     were varying amounts of planes on there, anywhere

5     from 10 to 12 as communications were lost from

6     them or they were on routes that they should not

7     have been on, all those were suspicious.   The

8     accumulation of that certainly was in my mind.

9     The second crash was the impetus for me to issue

10    the national ground stop order.

11         Q.     Exhibit 1 further indicates that at

12    approximately 9:40 a.m., American flight 77

13    crashes into the Pentagon.   Again, to the best of

14    your recollection, is that an accurate statement?

15         A.     Yes, it did crash into the Pentagon

16    American flight, time again.   My notes says 43,

17    but it's close enough.

18         Q.     Again, you were at the command center

19    when the crash happened?

20         A.     Correct, yes.

21         Q.     Did you learn of the crash pretty much

22    concurrent with it happening?

23         A.     I was informed -- I had to be informed

24    of it because I took action following that,

25    following the information of the aircraft crash.

44

1      Q.      Exhibit 1 next indicates that at 9:45

2  a.m., quote, in the first unplanned shutdown of

3  US air space, the FAA orders all aircraft to land

4  at the nearest airport as soon as practical.  At

5  this time, there were more than 4,500 aircraft in

6  the air on instrument flight rules IFR flight

7  plans, closed quote.

8              To the best of your recollection, on

9  or about 9:45 a.m., was such a shutdown ordered

10 directing all aircraft to land issued by the FAA?

11     A.      Yes.

12     Q.      Again sir, did you issue the initial

13 order shutting down the national air space on

14 approximately 9:45 a.m. on September 11?

15     A.      Yes.

16     Q.      Did you issue that order much as you

17 did with respect to the ground stop order that

18 you just testified about, in terms of the

19 consultation with your supervisors, your air

20 traffic specialists, get input from them and then

21 you made the decision?

22     A.      Yes.  Well, in this instance, we had

23 discussed -- prior to American 77 crashing into

24 the Pentagon, we had discussed -- by we, I mean

25 the people I called together in the middle of the

1    floor, which would have not only been my

2    specialists and supervisors, but the military,

3    the airlines, the business aircraft owners

4    association and any other elements that could

5    provide me with information.   During one of those

6    meetings or following one of those larger

7    meetings, my supervisors and I discussed what

8    further steps we could take.   We discussed the

9    option of landing everybody.   That was in my mind

10   and I didn't act on that information immediately,

11   in other words, following that discussion, but I

12   had it in my mind, we had discussed it and that I

13   did mention to Linda Scheussler who had come on

14   to the floor shortly after that meeting and I

15   filled her in on what was going on.   I indicated

16   that I'm giving some thought to shutting down the

17   entire NAS.

18        Q.    NASS is national air space system?

19        A.    National air space system.

20        Q.    Did she concur?

21        A.    Her response was I should do whatever

22   I thought was necessary operationally.

23        Q.    After American flight 77 crashed, you

24   thought it was operationally necessary to issue

25   the shutdown order directing all aircraft to land?

46

1          A.      It was my intention following that

2     crash that I land all those aircraft and my order

3     actually was that all aircraft had to land

4     regardless of destination.

5          Q.      Did anyone direct you to issue that

6     shutdown order?

7          A.      No.

8          Q.      You made that on your own authority?

9          A.      Yes.

10          Q.      I asked you this with respect to the

11     ground stop order, I will ask you with respect to

12     the shutdown order.  Was it within your authority

13     to issue that air space shutdown order?

14          A.      In hindsight, yes.  And certainly in

15     my mind I had no doubt that I had the authority

16     to do that, although it had never been done

17     before, so I don't think it had ever come up in

18     discussion as to the scope of the authority.

19          Q.      Combining this shutdown order

20     directing all flights to land with your prior

21     ground stop order directing all flights not to

22     take off, is it fair to say that all air traffic

23     in the United States national air space was shut

24     down?

25          A.      In short order, yes.  It took a while

47

1    to accomplish that, much to the credit of the

2    thousands of air traffic controllers and pilots

3    and crews and airports in Canada and all of those

4    people who contributed on that day to put those

5    aircraft down.

6        Q.    But the intent was nothing would be

7    coming in, nothing going out in the airports

8    within the United States?

9        A.    Absolutely correct.  There was also an

10   order -- I would have to look at the exact time

11   line that banned any further aircraft from

12   entering the United States.  They were turned

13   back at the borders, that was earlier.  I don't

14   see it in your document.

15       Q.    In terms of your issuance of the

16   shutdown order, mechanically did you follow the

17   same process as you just described for us with

18   respect to the ground stop order?

19       A.    Correct.

20       Q.    You collected your supervisors, advised

21   them of the order and they then disseminated the

22   information as you described to us?

23       A.    Yes.  Some people would say I was loud

24   and they could hear the orders.

25       Q.    It says on Exhibit 1 that this was the

1    first unplanned shutdown.  Let me ask you this.

2    At the time almost a 35 year veteran or certainly

3    more than a 30 year veteran of the FAA, had any

4    unplanned order shutting down national air space

5    ever been issued prior to September 11?

6         A.    Not to my knowledge.

7         Q.    Again, we are talking about an

8    unprecedented order in the United States?

9         A.    Yes, sir.

10        Q.    Was your decision to issue the order

11   shutting down the national air space, the product

12   of or the result of the crashes of American 11

13   and United 175 into the World Trade Center towers

14   earlier on 9/11?

15             MR. JOHNSON:   Objection to the form of

16        the question.  Vague, ambiguous.  Calls for

17        a legal conclusion.

18        A.    It was part of the equation that was

19   motivating me to take action on that day.

20   Certainly, given the enormity of those acts, it

21   was a significant part, but it was not the sole

22   reason.

23        Q.    Let me ask you this.  Would it be fair

24   and accurate to say that those crashes, American

25   flight 11 and United flight 175 into the World

1    Trade Center towers, set in motion the FAA's

2    subsequent regulatory orders and specifically I'm

3    talking about your ground stop order and your

4    order shutting down the national air space?

5         MR. JOHNSON:  Objection.  Vague,

6         ambiguous.  Calls for a legal conclusion.

7         A.    I'm not clear on that either.  Sorry.

8    I'm not clear what you are asking.

9         Q.    I'm asking, did those crashes, the

10   American flight 11 and United flight 175 into the

11   World Trade Center towers on September 11, set in

12   motion the FAA's subsequent regulatory orders,

13   the ground stop order and the order shutting down

14   the national air space?

15        MR. JOHNSON:  Objection.  Vague,

16        ambiguous.  Calls for a legal conclusion.

17        A.    Those were my orders and as I

18   indicated earlier, the crash itself was the

19   impetus, but it was the totality of events then

20   occurring.  The amount of unknown aircraft.  The

21   catalyst, if you will, was certainly the second

22   crash for my ground stop order and the crash into

23   the Pentagon was certainly the catalyst that

24   prompted me to do something right then on the

25   land order.  I directed everyone to land.

1    Q.    In your mind, could you have justified

2    those orders, the ground stop order and the order

3    shutting down the national air space and the

4    impact on the United States air traffic, without

5    something tangible to point to and rely on for

6    the basis of those orders such as the crashes?

7    A.    Those thoughts were never in my mind.

8         MR. JOHNSON:  Objection.  Vague and

9         ambiguous.

10   Q.    Let me ask you in another way.  If

11   only the high-jackings of the flights had been

12   reported without any resulting crashes into the

13   World Trade Center towers, would you have issued

14   the ground stop and shut down orders?

15        MR. JOHNSON:  Objection.  Calls for

16        speculation.

17        MS. McCARTHY:  I think you are getting

18        into opinion.

19        MR. STEUBER:  So you won't let him answer.

20   A.    Well, look, counsel thinks it's opinion.

21   I don't want to give any opinion.

22   Q.    Our deal was no opinion testimony, I

23   will certainly live with that.  Exhibit 1

24   indicates further that at 10:39 a.m., quote,

25   reaffirming the earlier order, the FAA issues a

1    notice to airmen, a NOTAM that halts takeoffs and

2    landings at all airports.  To the best of your

3    recollection, at or about 10:39 a.m. on September

4    11, was a NOTAM issued by the FAA halting

5    takeoffs and landings at all airports?

6         A.   Yes, it didn't halt them, it stated in

7    that system, the NOTAM system, which is available

8    to a lot more people than the air traffic control

9    facilities, but any private pilot, it's stated in

10   that NOTAM that no takeoffs or landings are

11   authorized at any civil airport in America.

12        Q.   Did you consider that NOTAM to be a

13   reaffirmation of your prior ground stop and orders?

14        A.   I considered it just a follow-up removing

15   any ambiguity of the extent of the earlier order.

16        Q.   Did you issue the order directing that

17   such a NOTAM be sent?

18        A.   I didn't.  That would have been a

19   normal follow-up to the orders I had given

20   earlier carried out by specialists who are

21   charged with those responsibilities that

22   probably -- actually that NOTAM issuance probably

23   came from headquarters.  Even though issued out

24   of my facility -- not my facility.

25        Q.   The last time entry on Exhibit 1 reads

52

1    that at approximately 12:15, quote, the air space

2    over the 48 contiguous states is clear of all

3    commercial and private flights, closed quote.

4              To the best of your knowledge, had the

5    air space over the 48 contiguous states been

6    cleared of all commercial and private flights at

7    or about 12:15?

8        A.    At or about that time, yes, sir.

9        Q.    So I'm clear, this meant that until

10   further order, all of the US airports in the

11   contiguous 48 states couldn't have any flights

12   taking off or landing?

13       A.    Barring military or given permission,

14   we began a process almost immediately after

15   shutting down the system of granting exceptions

16   from people to get airborne.  There were -- at

17   least the one that comes to mind is the rescue

18   helicopter to get people injured in an accident.

19   The specialist brought that to me and they were

20   requesting permission to travel to get the

21   victims and I gave them permission to do that.

22       Q.    But functionally the airports were

23   shut down?

24       A.    Absolutely.

25       Q.    You mentioned you believed that an order

53

1   had been issued closing the air space in the Los

2   Angeles area.   What was the Los Angeles area?

3        A.     The Los Angeles center would encompass

4   LAX Airport and the air space around that,

5   100,000 square miles air space.   We ground

6   stopped all air space takeoffs in Los Angeles

7   after New York and Boston because during one of

8   those meetings, the specialist noted the

9   connection between the destination of the

10  aircrafts that crashed or were high-jacked.   We

11  definitely ground stopped LAX even though it

12  doesn't appear here.

13       Q.     LAX was exclusive, LAX you are talking

14  about?

15       A.     Why don't you be more specific and ask

16  me if it included any other airport you were

17  interested in.

18       Q.     Did it include other airports?

19       A.     Did it include McCaron, no.

20            MR. STEUBER:   I have nothing further

21       at this time.

22            MR. JOHNSON:   Do you want to take a

23       break or keep going?

24            THE WITNESS:   The golf course awaits.

25  EXAMINATION BY

MR. JOHNSON:

Q.    I want to ask a couple of general
questions, one that wasn't asked and some people
may not know what the FAA is.  Can you tell us?

A.    The Federal Aviation Administration.

Q.    What does the FAA do?

A.    Among other things, it provides --
regulates the national air space system.  It also
provides certification in other areas of the FAA,
such as for flight crews, safety inspections, the
new -- what is the new agency.

Q.    Transportation safety?

A.    Yes.  They may have taken some of
those duties, but the part I'm concerned with is
the national air space system.

Q.    What is the relationship between the
FAA and the United States Department of
Transportation?

A.    The Department of Transportation --
the Federal Aviation Administration is contained
within the Department of Transportation.

Q.    There are a couple of photographs on
the wall to your right.  Can you identify those
folks?

A.    That's Mr. Mineta on the left and our

1    new administrator, Ms. Blakey.

2         Q.    Who is Mr. Mineta?

3         A.    He is the Department of Transportation

4    secretary.

5         Q.    He had that same position on September

6    11, 2001, right?

7         A.    He did.

8         Q.    The woman you said?

9         A.    Ms. Blakey is the exact

10   pronunciation.  She is new to the Federal Aviation

11   Administration.  She succeeded Ms. Garvey who was

12   the administrator of the FAA on that date and she

13   is the current administrator on this date.

14        Q.    Jean Garvey?

15        A.    Yes.

16        Q.    Is safety important to the FAA?

17        A.    It's equal mandate with the mandate

18   safety and efficient.  You can't have one without

19   the other.

20        Q.    Does safety play a decision in virtually

21   all of the decisions that the FAA makes?

22        A.    Every decision would be screened for

23   safety.  So yes, even though that may not be the

24   motivation, certainly you are not going to do

25   anything that is not safe.

56

1    Q.    You mentioned that you had a mandate,

2    I hope I am stating this correctly.  If not,

3    please correct me -- to ensure the safe and

4    efficient operation of the air traffic system?

5    A.    Of the national air space system.

6    Q.    Then you were asked about what orders

7    you could give.  You could give orders within

8    that mandate, is that what you said?

9    A.    That is what I said.

10   Q.    Like the ground stop order being an

11   example?

12   A.    Yes.

13   Q.    You had made another comment during

14   your testimony that you had said when it was

15   apparent that there were missiles flying around,

16   you stopped aircraft first in New York, Boston,

17   Los Angeles, the east coast and the national

18   ground stop?

19   A.    Yes.

20   Q.    What did you mean when you said it was

21   apparent there were missiles flying around?

22   A.    That they were purposefully directing

23   planes into buildings or structures or

24   deliberately destroying them.  It seemed to me in

25   my mind similar to a missile that we had no

1    control over.

2         Q.    You mentioned that in the national

3    command center, there was a grease board or

4    status board that you described?

5         A.    Yes, sir.

6         Q.    You were noting flight numbers of

7    aircraft on there?

8         A.    All aircraft that were deemed

9    suspicious at that point and suspicious was

10   defined as anyone not on their proper route or

11   anyone not on radio communication with us.

12        Q.    This is on September 11, 2001?

13        A.    Yes, sir.

14        Q.    How many planes were on that grease board?

15        A.    It varied as communications would

16   develop.  When a system with three or four

17   thousand planes in it, there are going to be

18   some -- as a routine matter, are going to lose

19   communication periodically over segments of their

20   flights or deviate from their assigned routes for

21   one reason or another.  On this day, given the

22   crashes into the World Trade Center, all those

23   flights were defined as suspect and we tracked

24   them until they were either accounted for or not,

25   not meant that they had crashed.

1          MR. JOHNSON:  Mark this as exhibit 2.

2          (Exhibit 2, article from USA Today,

3     marked for identification, as of this date.)

4          (Handing.)

5          MR. JOHNSON:  I have marked as Exhibit

6     2, an article from USA Today.  I'm not sure

7     the date of the article, but shortly after

8     September 11, 2001.

9     Q.     Do you remember seeing this article?

10    A.     Yes, sir.

11    Q.     You were interviewed for this article,

12    right?

13    A.     Yes, sir.

14    Q.     I want to ask about some of the

15    statements attributed to you and some of the

16    other things that the article attributes to you.

17    On page 3 of Exhibit 2, there is a mention that

18    you learned of a radio transmission quote, we

19    have some planes, closed quote; is that correct?

20    A.     That is correct.

21    Q.     When did you learn about this radio

22    transmission quote, we have some planes, closed

23    quote?

24    A.     Shortly after the first aircraft was

25    high-jacked.

59

1      Q.     That was according to Exhibit 1, that was?

2      A.     Approximately 8:30 is my recollection.

3   Little after 8:30.

4      Q.     That was American flight 11?

5      A.     That is correct.

6      Q.     Where did that radio transmission come

7   from?

8      A.     It was reported to me by someone on my

9   staff on that day that the -- I believe the

10  Boston center controllers had overheard cockpit

11  conversation wherein a voice was heard to say we

12  have more planes, not some planes.  That's my

13  recollection.  That is not accurate in my

14  recollection.

15     Q.     Did you take that to mean that there

16  may be more high-jackers out there?

17     A.     I didn't know what that meant at that

18  point.  It struck me as chilling.  The high-jacks

19  were not unusual in my experience and there were

20  a few of them, quite a few of them in the 70's

21  and earlier.  The usual treatment of a high-jack

22  was to isolate them, let them go where they

23  wanted to go.

24          They typically land, got money or food

25  or went to Cuba or exchanged it or did something,

1    but they always resolved peacefully.  So those

2    words, if accurate, and bear in mind, the

3    information is only received in the blind over an

4    airway, over a transmitter, they couldn't be sure

5    if it was them, but to me it was a chilling

6    statement.

7         Q.    You did have a concern there may be

8    other planes out there that would be used as

9    guided missiles effectively, right?

10        A.    Not at that juncture.  At that

11   juncture, my concern was what was the import of

12   several high-jackings.

13        Q.    After the World Trade Center had been

14   struck not once, but twice, you had a concern?

15        A.    Absolutely.  That was one of those

16   many factors that was in my mind that I alluded

17   to earlier.

18        Q.    One of the many factors that fed into

19   your decision to issue the ground stop order, correct?

20        A.    Correct.

21        Q.    And the order to direct all planes at

22   the nearest airport, correct?

23        A.    Correct.

24        Q.    On September 11, 2001 after you issued

25   the ground stop order or the order to land all

1    aircraft, did you have any communications with

2    either Jane Garvey or Norman Mineta?

3         A.    I didn't.

4         Q.    I see statements they attribute the

5    decisions to themselves as making those

6    decisions.  Did you see those?

7         A.    Success has many authors.

8         Q.    You are the one who made the order,

9    right?

10        A.    That is correct, and I didn't consult

11   Ms. Garvey nor Mr. Mineta, nor anyone, other than

12   my own staff.

13             MR. JOHNSON:  Mark this as Exhibit 3.

14             (Exhibit 3, release from Department of

15        Transportation, marked for identification,

16        as of this date.)

17             (Handing.)

18             THE WITNESS:  Do you wish me to read

19        this, sir?

20             MR. JOHNSON:  Yes.

21        Q.    Let me just ask you if you recognize

22   the text of this?

23        A.    I don't.  I don't know who Victor

24   White is.

25        Q.    It looks to me like some sort of a

1   release from the Department of Transportation.

2   Can you identify as such or not?

3           THE VIDEOGRAPHER:  I didn't hear you

4       say who the release was from.

5           MR. JOHNSON:  The Department of

6       Transportation.

7       A.    I have never seen this nor the text before.

8       Q.    In the second paragraph of the statement

9   from Mr. Mineta, he says these terrorist acts are

10  designed to steal the confidence of Americans.  We

11  will restore that confidence, we have already taken

12  some first steps as a precaution.  I ordered the FAA

13  to ground all air traffic at least as of tomorrow

14  afternoon.  Do you see that?

15      A.    Yes.

16      Q.    Did you view that order to ground all

17  commercial aircraft as a precaution?

18      A.    I didn't have that in my mind if

19  that's what you are asking me as a precaution.

20      Q.    Right.

21          MR. JOHNSON:  Mark this as Exhibit 4.

22          (Exhibit 4, release from the

23      Department of Transportation, marked for

24      identification, as of this date.)

25          (Handing.)

1       Q.    Mr. Sliney, I have handed you Exhibit

2    4.  It appears to be another release from the

3    Department of Transportation dated September 12,

4    2001.  Have you ever seen this before?

5       A.    I have not.

6       Q.    In the second paragraph, it reads, the

7    Secretary also announced that the FAA is

8    temporarily extending the ground stop order

9    imposed yesterday while additional security

10   measures are being completed.  Do you see that?

11      A.    Yes, sir.

12      Q.    Are you familiar with that?

13      A.    I'm familiar with the length of time

14   that transpired before we allowed any flights to

15   depart.  We did extend the -- mechanically, it's

16   not exactly that, but this is a press release for

17   the public.  No one was allowed to take off or

18   land until the Secretary of Transportation or the

19   Federal Aviation Administration determined

20   otherwise.

21      Q.    Your order was given on September 11,

22   2001, right?

23      A.    Correct.

24      Q.    It was in place until sometime on

25   September 13, 2001, correct?

1      A.    Pretty much, yes.

2      Q.    Are you familiar with these additional

3 security measures that are referenced in Exhibit 4?

4      A.    I believe those refer to the screening

5 of passengers and the security of the aircraft

6 access.  I believe the -- that is to say

7 maintenance crews and all that.  They had to

8 complete a certain level -- show a certain level

9 of security before they were allowed to enter the

10 system again.

11      Q.    There were some security directives

12 issued after the ground stop order, right?

13      A.    That's not my department, but yes, I

14 was aware of the increased security requirements.

15      Q.    You have some general familiarity with

16 them; is that right?

17      A.    Specific in that we were called upon

18 to look at in detail, the increased requirements

19 and to make a judgement in the days following as

20 to who complied with them and then I also had

21 access to people in headquarters who could help

22 me make that determination if there was any doubt

23 in my mind.

24      Q.    Did you have any understanding of the

25 reason for those security directives?

1      A.      Yes.

2      Q.      What were they?

3      A.      My understanding is that we were going

4  to permit aircraft to fly in the national air

5  space system, only those aircraft that we deemed

6  to be secure enough not to become a guided

7  missile or at least assure us as much as possible

8  that they would be safely able to be

9  accommodated.

10      Q.      Is it fair to say that the security

11  directives were intended to reduce the likelihood

12  of people getting weapons on aircraft for

13  example?

14      A.      Absolutely.

15      Q.      Reduce the likelihood of another

16  terrorist attack involving airplanes?

17      A.      Absolutely.

18      Q.      Is it true that airports would not be

19  certified to resume operations until they

20  complied with the new FAA security measures?

21      A.      That's correct.

22      Q.      Do you remember the national air space

23  being open effective 11 a.m. eastern time on

24  September 13, 2001?

25      A.      I would have to consult my notes as to

1    the exact time.  But yes, that does comport

2    somewhat with my recollection.

3              MR. JOHNSON:  Mark this as 5.

4              (Exhibit 5, document, marked for

5         identification, as of this date.)

6              (Handing.)

7         Q.    Does Exhibit 5 refresh your

8    recollection as to when the national air space

9    system was reopened to commercial aviation?

10        A.    It states it was effective 11 a.m.

11   eastern time Thursday, the 13th of September,

12   2001.

13        Q.    Is that consistent with your

14   recollection?

15        A.    Yes, sir.  You did ask me that.

16   Sorry.

17        Q.    After the ground stop order, was there

18   anything that prevented a plane from taking off

19   at one of the airports in the United States?

20        A.    After the ground stop order?

21        Q.    Right.

22        A.    Of September 11?

23        Q.    Right.

24        A.    You mean was there any physical restraint?

25              MR. JOHNSON:  Right.

1          MR. STEUBER:  I will object.  I think

2      it calls for a legal opinion with respect to

3      the definition of prevent.

4      Q.    Could a plane have taken off?

5      A.    I believe he wouldn't have received an

6  air traffic control clearance.  Could a plane

7  take off without being detected from an airport.

8      Q.    Or a rogue pilot could have taken off,

9  right?

10         MR. STEUBER:  Objection.  Calls for

11      speculation.

12      A.    I agree it is possible.  If you want

13  me to say that.  It's certainly speculative on my

14  part.

15      Q.    Doing so would have been in violation

16  of the FAA order, right?

17      A.    Absolutely.  Bear in mind that radar

18  coverage extends over pretty much the entire

19  United States.  Had an unidentified aircraft

20  departed, in all likelihood we would have tracked

21  that and notified the military, who at that point

22  were actively occupying the sky.

23      Q.    Were you aware of any planes that took

24  off after the ground stop order?

25      A.    I'm aware of one in particular.

1     Q.    What was that?

2     A.    It was a Fed Ex that a controller

3  cleared for takeoff out in Great Falls, Montana,

4  despite the controller's knowledge of the

5  national ground stop order.

6     Q.    What happened in that particular

7  situation?

8     A.    What happened in what respect, sir?

9     Q.    What happened to the plane for example?

10    A.    I don't know.

11    Q.    What happened with the controller?

12    A.    He was subsequently fired and charged

13  with a federal misdemeanor, for which he was

14  convicted.

15    Q.    Between the ground stop order on

16  September 11, 2001 and the reopening of the air

17  space on September 13, 2001, there were some

18  flights taking off and landing, right?

19    A.    There were flights that were granted

20  exceptions, yes -- exceptions I should say.

21    Q.    Some of those were flights taking

22  supplies to New York City and Washington, D.C.,

23  correct?

24    A.    There were medical flights.  There

25  were medical categories that we allowed after

1    sufficient inquiry to do that.  Actually one of

2    the interesting ones was I thought the need for

3    the Federal Reserve to transport checks to

4    various locations.  That was one of the

5    exceptions.

6          Q.    Was it more than one plane?

7          A.    At that point, in the command center

8    we set up a telephone circular if you want to

9    call it that, in one of our large conference

10   rooms with 15 to 20 telephones and persons to

11   handle nothing but request for exceptions such as

12   railroad track inspections and agriculture

13   planes, myriad of flights all in business.

14         Q.    Were the crisis counselors of American

15   Airlines allowed to fly to the site of those

16   crashes?

17         A.    I don't know that for a fact.

18              MR. JOHNSON:  That's all the questions

19   I have.  Thank you very much.

20              MR. STEUBER:  One or two if I may.

21   BY MR. STEUBER:

22         Q.    Mr. Sliney, you mentioned there were

23   certain flight exceptions granted on an emergency

24   basis.  Are you aware whether there were any

25   flight exceptions granted with respect to McCaron

70

1    Airport or for Las Vegas airports for the shutdown

2    period between September 11 and September 13?

3         A.    I couldn't say for certain whether

4    they were or were not.  Someone from that airport

5    did or had or had not made a request.  There were

6    thousands of requests handled by virtually hundred

7    several people.  The ones that were granted were on

8    a medical emergency basis or some other emergency

9    basis.  In some cases, authority for certain flights

10   came from headquarters, the higher-ups.

11        Q.    As you sit here today, you are not

12   aware of any exceptions granted for the McCaron

13   or Las Vegas airports?

14        A.    I'm not.

15             MR. STEUBER:  Thank you.  Nothing further.

16             MR. JOHNSON:  Nothing further.

17             MR. STEUBER:  Thank you very much.

18        Ms. McCarthy, thank you very much as well.

19             THE VIDEOGRAPHER:  This concludes the

20        videotaped deposition of Benedict Sliney,

21        and tape one, which is the only tape.  The

22        time is 11:47 a.m.  Going off the record.

23

24

25

71

1
2                          _____
                          BENEDICT L. SLINEY
3
4
5
6          Subscribed and sworn to before me
7
8          this ___ day of _____, 2004.
9
10
11          _____
12          Notary
13
14
15
16
17
18
19
20
21
22
23
24
25

72

1                          I N D E X

2

3        Witness                Examination By              Page

4

5        Benedict L. Sliney    Mr. Steuber                4, 71

6

7                              Mr. Johnson                   55

8

9

10

11

12

13

14

15

16

17

18

19

20       MOTIONS:

21

22

23

24

25

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

1

2                          EXHIBITS

3

4      For  Id.        Description                       Page

5

6         1            time line                          31

7         2            article from USA Today             59

8         3            release from Department of

9                      Transportation                     62

10        4            release from the Department of

11                     Transportation                     63

12        5            document                           67

13

14

15

16

17

18

19

20

21

22

23

24

25

SARNOFF COURT REPORTERS AND LEGAL TECHNOLOGIES
877.955.3855

```
 1              C E R T I F I C A T E
 2    STATE OF NEW YORK       )
 3                           ss:
 4    COUNTY OF NEW YORK      )
 5
 6            I, ELISABETH F. NASON, a Notary Public
 7       within and for the State of New York, do
 8       hereby certify:
 9            That BENEDICT L. SLINEY, the witness
10       whose deposition is hereinbefore set forth,
11       was duly sworn by me and that such
12       deposition is a true record of the testimony
13       given by the witness.
14            I further certify that I am not
15       related to any of the parties to this action
16       by blood or marriage, and that I am in no
17       way interested in the outcome of this
18       matter.
19            IN WITNESS WHEREOF, I have hereunto
20       set my hand this 3rd day of May, 2004.
21
22
23
24                        Elisabeth F. Nason
25                    ELISABETH F. NASON
```

# Errata Sheet

**Pg/Ln**

**Correction**

___/___     Change from:_____
              Change to:_____

___/___     Change from:_____
              Change to:_____

___/___     Change from:_____
              Change to:_____

___/___     Change from:_____
              Change to:_____

___/___     Change from:_____
              Change to:_____

___/___     Change from:_____
              Change to:_____

___/___     Change from:_____
              Change to:_____

___/___     Change from:_____
              Change to:_____

___/___     Change from:_____
              Change to:_____

___/___     Change from:_____
              Change to:_____

___/___     Change from:_____
              Change to:_____

___/___     Change from:_____
              Change to:_____

___/___     Change from:_____
              Change to:_____

Signature:_____ Date:_____



# September 11, 2001

## FAA Respo

*From the takeoff of Flight 11 at 8:00 a.m. to U.S. airspace clear of civil aviation flights at 12:15 p.m., here are the times of key Sept. 11, 2001, events.*

**0800.** American Airlines Flight 11, a Boeing 767 with 92 people on board, takes off from Boston Logan airport for Los Angeles.

**0814.** United Air Lines Flight 175, a Boeing 767 with 65 people on board, takes off from Boston Logan airport for Los Angeles.

**0821.** American Airlines Flight 77, a Boeing 757 with 64 people on board, takes off from Washington Dulles airport for Los Angeles.

**0840.** FAA notifies the North American Aerospace Defense Command's (NORAD) Northeast Air Defense Sector about the suspected hijacking of American Flight 11.

**0841.** United Air Lines Flight 93, a Boeing 757 with 44 people on board, takes off from Newark airport for San Francisco.

**0843.** FAA notifies NORAD's Northeast Air Defense Sector about the suspected hijacking of United Flight 175.

**0846.** (approx.). American Flight 11 crashes into the north tower of the World Trade Center.

**0902.** (approx.). United Flight 175 crashes into the south tower of the World Trade Center.

**0904.** (approx.). The FAA's Boston Air Route Traffic Control Center stops all departures from airports in its jurisdiction (New England and eastern New York State).

**0906.** The FAA bans takeoffs of all flights bound to or through the airspace of New York Center from airports in that Center and the three adjacent Centers - Boston, Cleveland, and Washington. This is referred to as a First Tier groundstop and covers the Northeast from North Carolina north and as far west as eastern Michigan.

**0908.** The FAA bans all takeoffs nationwide for flights going to or through New York Center airspace.

**0924.** The FAA notifies NORAD's Northeast Air Defense Sector about the suspected hijacking of American Flight 77. The FAA and NORAD establish an open line to discuss American 77 and United 93.

**0926.** The FAA bans takeoffs of all civilian aircraft regardless of destination - a national groundstop.

**0940.** (approx.). American Flight 77 crashes into the Pentagon.

**0945.** In the first unplanned shutdown of U. S. airspace, the FAA orders all aircraft to land at the nearest airport as soon as practical. At this time, there were more than 4,500 aircraft in the air on Instrument Flight Rules (IFR) flight plans.

Sept. 11, 2001 Ho

**FAA Portraits**

Hundreds of FAA pe
worked to improve
security and restore
aviation after the ski
were closed on Sept
2001. Here are som
their portraits.
Week of September
Week of September

**In Their Own Wo**

Memories and thoug
from our employees.

Week of September
Week of September
September 11
Week of September
September 18

**Clearing the Ski**

Landing so many pla
so quickly was an
outstanding achiever
A series of articles in
*Today* explains the
behind-the-scenes
decisions and action



Case 2:02-cv-01258-KJD-RJJ   Document 38-4009   Filed 05/27/04   Page 262 of 352

**1007.** (approx.) United Flight 93 crashes in Stony Creek Township, PA.

**1039.** Reaffirming the earlier order, the FAA issues a Notice to Airmen (NOTAM) that halts takeoffs and landings at all airports.

**1215.** (approx). The airspace over the 48 contiguous states is clear of all commercial and private flights.

**Notes:**
All times are Eastern Daylight. For UTC/Zulu/GMT, add four hours.
Flight departures are actual takeoff times, not scheduled or gate departure times.

**EXHIBIT 2**





# Part I: Terror attacks brought drastic decision: Clear the skies

By Alan Levin, Marilyn Adams and Blake Morrison, USA TODAY

Capt. Jim Hosking is stunned as he reads the message from the cockpit printer aboard United Flight 890. On most days, messages sent to the Boeing 747 are ordinary: maintenance items or reports of bad weather. On this day, Sept. 11, before sunrise over the Pacific Ocean, the warning is unlike any he has seen. *Hijackings? Terrorist attack?* Taking off from Narita, Japan, just hours before, Hosking, 56, looked forward to heading home to Los Angeles, where his wife would be waiting. But reading the message, sent at 9:37 a.m. Eastern Time, the pilot of 34 years wonders: What the hell happened down there? And then, even more chilling: *What's going to happen up here?*



In this two-part series, USA TODAY reconstructs how the unprecedented order to clear the skies on Sept. 11 played out.

"SHUT DOWN ALL ACCESS TO FLIGHT DECK." In the cabin behind him sit 243 passengers — all of them strangers to Hosking. He turns toward first officer Doug Price. "Get out the crash ax," Hosking tells him.

At the Federal Aviation Administration's command center in Herndon, Va., air traffic managers also struggle to make sense of what's happening.

Already, terrorists have deliberately flown two jets into the World Trade Center. The hijackings are unlike anything anyone has seen. In the past, hijackers commandeered passenger jets for political reasons. Pilots were told to cooperate with them, to take the hijackers wherever they wanted to go.

Today, the hijackers don't want to go anywhere. They just want the jets.

At the FAA's command center, managers can think of only one way to stop them. Minutes after another jet smashes into the Pentagon at 9:38 a.m., the managers issue an unprecedented order to the nation's air traffic controllers:

Empty the skies.

Land every flight.

Fast.





By Robert Hanashiro, USA TODAY
On Sept. 11, 2001, United Airlines Captain Jim Hosking received a message during a flight from Japan to LAX. The message read, "There has been a terrorist attack against United Airlines and American Airlines aircraft. We are advised there may be additional hijackings in progress. Shut down all access to the flight deck. Unable to elaborate further."

No one can be certain how difficult this task will prove.

But for an air traffic control system sometimes paralyzed by a patch of bad weather, the order seems overwhelming. Almost 4,500 planes will have to land within hours, many at airports hundreds of miles from where they were headed.

The situation could be worse. On this day, the weather is pristine over most of the nation. And the early hour means most West Coast flights haven't even taken off.

Still, the skies have never been emptied before, and controllers, pilots and aviation officials have never faced such pressure. Rerouting so many flights seems a logistical nightmare with no margin for error.

And no one knows how many terrorists might still be in the air. During these hours, those who run the nation's aviation system will come to believe as many as 11 flights have been hijacked.

This is the story of the four most critical hours in aviation history — an ordeal that began at 8:15 a.m., when the first indication that something was wrong came during a telephone call to American Airlines.

*8:15 a.m.: 3,624 planes in the sky*

**Intruders in the cockpit**

The call doesn't make any sense. Not at first.

**Key times**

8:46 — American Airlines Flight 11 hits the north tower of the World Trade Center.
9:03 — United Airlines Flight 175 hits the south tower.
9:03-9:07 — New York and Boston regions' air traffic control officials stop takeoffs and landings. The New York Port Authority closes Newark International Airport.
9:08-9:11 — Departures are stopped nationwide for aircraft heading to or through New York and Boston regions' airspace.
9:25 — Federal Aviation Administration stops takeoffs nationwide.
9:35 — United Airlines Flight 93 begins unauthorized climb, raising concerns it has been hijacked.
9:38 — American Airlines Flight 77 crashes into the Pentagon.
9:45 —FAA orders all aircraft to land as soon as possible.
9:59 — Trade Center's south tower collapses.
10:06 — United Airlines Flight 93 crashes in Shanksville, Pa.
10:29 —North tower collapses.

At American Airlines' operations center in Fort Worth, manager Craig Marquis talks to a reservations agent in North Carolina. The agent isn't sure what to do.

On another line, the agent is speaking with a flight attendant who's in the air but can't reach the pilots on her jet. The agent wants to transfer the call to Marquis but the phone system won't let her. So she begins to relay messages coming from the back of American Flight 11, a Boeing 767 heading from Boston to Los Angeles.

Aboard, flight attendant Betty Ong tells what's unfolding.

Marquis, a blunt-spoken veteran, isn't sure what to make of the call. *Is the woman even a flight attendant?* he wonders. He checks his computer as he listens on the phone. *There she is. Betty Ong. And she is on that flight.*

Ong can't contact the pilots, the agent says. That's why she's calling. Why doesn't she just walk up to the cockpit and bang on the door? But as he listens — as Ong, in hushed tones, tells of a passenger dead and a crewmember dying, of the jet's erratic path and intruders in the cockpit — Marquis realizes that Ong can do little.

*The flight has been hijacked.*

As Marquis, 45, considers what he can do, air traffic controllers at the FAA's Boston Center reach the same conclusion. Flight 11 has stopped talking. Its pilots don't respond to calls; its transponder signal has disappeared. Worse, controllers report hearing a man with a strange accent in the cockpit.

*"We have some planes,"* he says through an open mike. "Just stay quiet and you will be OK."

Could more hijackers be out there?

In the FAA's command center in Herndon, Ben Sliney learns of the radio transmission. The words will haunt him all morning. "We have some planes."

*Some? How many?*

Sept. 11 is Sliney's first day on the job as national operations manager, the chess master of the air traffic system. The New Yorker, a lawyer who once sued the FAA on behalf of air traffic controllers, now walks the floor of the center — a room that resembles NASA's Mission Control.



By Tim Dillon, USA TODAY

Ben Sliney, the national operations manager at the FAA's command center in Herndon, Va., was on duty at the center on Sept. 11.

Loud and forceful, Sliney fits the mold of others there. After managers at the center were criticized for not taking enough action to prevent record flight delays in 1999, the specialists were urged to speak freely during crises. That way, those in charge would have the information they needed to make sound decisions. On this day, that policy will be put to the test, and the center is deafening, like the New York Stock Exchange when everyone's trying to sell.

*"We have some planes..."*

Sliney can't shake the words. *Are there more hijackers out there?*

**8:30 a.m.: 3,786 planes**

**"Wow, look at that!"**

In the FAA's largest air traffic facility in New York state — a warehouse-like structure on Long Island, an hour east of Manhattan — manager Mike McCormick rushes to the banks of radar screens where controllers are trying to track Flight 11.

The former Marine presses his cordless phone to one ear as he talks to officials at other facilities in the New York area. But the other ear is doing most of the listening — to the radio reports of pilots who are watching the jet's progress.

Over New York, Flight 11 has begun to descend. Not into JFK or LaGuardia or Newark International Airport but into the city itself.

*It must have electrical problems*, he thinks. *That's probably why the transponder is off.* McCormick calls another air traffic center that hands off flights to New York's three major airports. Flight 11, he warns, might try an emergency landing.

In Fort Worth, Gerard Arpey, American Airline's executive vice president for operations, hears about the Ong call and the strange transmissions from Flight 11. In his 20 years with American, Arpey, 43, has grown used to stories about misbehaving passengers — the drunks and disorderlies that airlines encounter. *But this*, he thinks, *this seems more than that. This sounds real.*

He tries to reach his boss, CEO Don Carty, but Carty isn't in yet. Then he heads to the airline's command center, where top operations officials gather only in the event of an emergency. *They're all here*, Arpey thinks as he walks through the door.

All but Craig Marquis.

Just down the hall, in the airline's operations center, Marquis hasn't left the phone. Still listening to the relayed words of Ong, he works to calculate how much fuel the jet carries. That way, he may be able to predict where the hijackers will take the flight. But at 8:46 a.m., the North Carolina agent abruptly loses Ong's call. Marquis' calculations no longer matter.

At Newark's tower, just across the Hudson River from Manhattan, controller Rick Tepper, 41, stands at a console behind a group of other controllers.

There, he answers phones and troubleshoots problems. He and the other controllers often wear jeans and polo shirts. The attire belies their intense work ethic.

When Tepper looks past the controllers, he sees it out the window: a mushroom cloud rising from the World Trade Center's north tower.

"Wow! Look at that," he says to no one in particular. Flames shoot from the building. "How are they going to put that out?"

He didn't see what caused the explosion, but on the chance that it was a plane, he begins calling airports nearby.

"Did you lose anybody?" he asks over and over. No one has.

Then, a phone rings: the "shout line," set up for speedy calls among controllers in the region. Tepper answers. "We've lost an aircraft over Manhattan," someone at the New York center says. "Can you see anything out your window?"

"No, I don't see anything ... " Tepper pauses. "But one of the towers, one of the trade towers, is on fire.

"I'll call you back."

### 9 a.m.: 4,205 planes

**"This is not a drill!"**

At the New York center, McCormick struggles to keep up with the barrage of information, most of it annoyingly vague.

*That must have been American 11*, McCormick thinks. *Could it be terrorism?*

Just three days before, celebrating his 45th birthday, he had taken his 8-year-old son Nicholas to the Trade Center. There they stood, toes touching one tower, peering toward the sky.

Now he tries to figure out why an airliner would've hit the building. Just before American disappeared, controllers heard an emergency beacon. *From what?* McCormick wonders. And controllers can't find a helicopter that has disappeared from radar over the city. *Did it hit the Trade Center, too?*

In Herndon, national operations manager Sliney receives word from officials in New York: A small plane has crashed into the Trade Center. One of the room's 10-by-14-foot TV monitors comes to life with CNN. Black smoke gushes from the north tower. The hole is huge. And the smoke!

*That was no small plane*, Sliney thinks.

At United Airlines headquarters outside Chicago, Andy Studdert rushes to the airline's crisis center, a windowless room with a large screen on one wall. To those who work there, the room resembles the bridge on *Star Trek*'s starship Enterprise.

"Confirm American into the Trade Center!"

Workers don't need to look up to recognize the booming baritone of Studdert, 45, the airline's chief operating officer.

Ten days earlier, he had popped a surprise drill on the staff. He told them a flight over the Pacific had suffered a potentially disastrous engine failure and radio contact had been lost. For 30 minutes, workers believed the story. Then Studdert told them the truth.

On this day, he makes certain everyone knows the stakes. "This is not a drill!" he shouts, but the staff already

knows.

What they are about to tell Studdert is even worse than what brought their boss to the crisis center. Controllers have lost radio contact with a second flight — a United jet that, like American Flight 11, took off from Boston bound for Los Angeles.

On the giant screen at the front of the room, airline workers can only watch as United Flight 175, northwest of New York, heads toward Manhattan.

Then ... it vanishes.

**"There was another one!"**

In the Newark tower, the shout line rings again.

Where's United Flight 175? "Can you see him out the window?" the caller asks Tepper, the Newark controller.

Beyond the New Jersey shipyards, Tepper spots the jet flying north, up the Hudson River. His eyes track it toward the Manhattan skyline. It's moving fast. Too fast. And rocking. Its nose points down in a dive and now it's banking left and then right and moving as Tepper has never seen a jet move and then it starts to level and ....

"Oh my God! He just hit the building," Tepper tells the caller.

In Herndon, a shout: "There was another one!" and the giant TV monitor glows orange from the fireball. Scores of workers gasp, as if sucking the air from the room.

*It can't be a second one.* At the New York control center, McCormick's deputy, Bruce Barrett, sits incredulous at the watch desk, the facility's nerve center.

For a moment, Barrett can think only of his daughter, Carissa, who works in lower Manhattan. *Could she be visiting someone at the Trade Center?* Then he sweeps the thought from his mind. *Stay calm,* he tells himself.



By H. Darr Beiser, USA TODAY
As Bruce Barrett gave the order for "ATC Zero" in the Northwest, he worried about his daughter working in Manhattan.

Someone has to. Controllers who had been watching TV in the break room are rushing onto the floor. They saw the jet hit the other tower. Is there really any question what he should do?

"We're declaring ATC zero," he tells air traffic managers. McCormick approves the order. Clear the skies over the region.

If they have overreacted, the decision could ruin both their careers. But after what they just witnessed, they give little thought to asking for permission. A call to Washington could take minutes, and they aren't sure they have that long. They aren't certain of anything, except that they need to do something.

A handful of managers spread the word to controllers. *It doesn't seem like enough,* Barrett thinks, but it's the most he can do.

The time: 9:03 a.m.

**A radical decision**

On its face, the order seems incredible. Not a single flight in or out of New York? Some of the nation's biggest airports shut down?

Controllers had gone to "air traffic control zero" before, but only when their radar shut down or their radio transmitters went silent. The planes kept flying then, and controllers in other centers guided them.

This time, ATC zero means something far more drastic. It means emptying the skies — something that has never been attempted. And not just the skies over Manhattan. Controllers must clear the air from southern New England to Maryland, from Long Island to central Pennsylvania — every mile of the region they control.

The move reverberates through almost every part of the nation. Controllers from Cleveland to Corpus Christi must reroute jets headed to the region and put some in holding patterns.

In the windowless room of the New York control center, Barrett, at 56 one of the facility's most senior managers, scans the faces of the other managers. Most pride themselves on their macho, can-do attitudes. Cool under pressure. Calm during the worst. *But this ... who has prepared for this?* In the dim light, Barrett sees that they're looking at him strangely, as though they can't believe what he's saying.

One controller begins to sob and shake. "I don't understand how come I'm reacting like this," the controller says. It reminds Barrett of the traumatized troops he saw as a photojournalist in Vietnam.

*You're scared,* Barrett thinks, but he can't afford to be. He needs to concentrate. To focus. But his phone! It won't stop ringing. Everyone wants to know what's going on, including his wife, Denise. She asks about their daughter.

"I don't have time to talk to you," Barrett tells her. "Just call and find out if she's OK."

**The white board**

At the FAA's command center in Herndon, attention shifts from the weather maps and the radar displays.

The new focus: a white dry-erase board propped at the front of the room.

On it, staffers have begun to scribble the call letters of every flight that controllers around the nation fear might be in the hands of hijackers.

Weather experts and the specialists who normally work on reducing flight delays have been drafted to investigate. They badger airlines to find out whether anyone knows what's happening aboard a number of flights. On this day, the routine glitches of the air traffic system — a missed radio call, even a pilot who seems uncooperative — raise suspicions. Unless a controller or airline official can assure them the glitch is simply routine — that the captain is responding and everyone is safe — the flight's letters won't be crossed out.

The phone bridges between air traffic facilities have become emergency hotlines of sorts, and the reports of possible hijackings — many of them sketchy — flow at a frenetic pace.

As Sliney, the operation's manager, moves around the room, a handful of air traffic specialists follow. Together, they have decades of experience, and no one hesitates to share an opinion. But without good information, Sliney knows that any decision might be risky. Amid the shouts and chatter and conflicting reports, he reminds himself: *Don't jump to conclusions. Sort it out.*

Now, during a massive conference call among air traffic facilities, officials in Herndon learn about a third jet that might be in the hands of hijackers: American Airlines Flight 77, bound for Los Angeles.

The jet departed from Washington's Dulles International Airport. It stopped talking to controllers somewhere near the Ohio-Kentucky border. Moments later, it disappeared from radar. Its call letters join the list on the white board — a list that will eventually swell to 11.

But why? What is this about? Across the nation, controllers and airline and aviation officials struggle to understand.

These weren't typical hijackings. Terrorists weren't seeking political asylum or a trip to Havana. They were using the two jets as guided missiles. They *meant* to hit the World Trade Center. No question about that.

Most of the pilots in the air don't know what has happened. Or why. How could they? Officials on the ground are still trying to make sense of it.

Pilots have always been trained to cooperate with terrorists, to do whatever they want in order to save lives. That means a crew probably won't fight back, at least not at first. And who knows how many other flights have terrorists aboard?

Again, Sliney hears them: the words that came from Flight 11.

*"We have some planes."*

**9:15 a.m.: 4,360 planes**

**Unprecedented decisions**

From the moment air traffic managers McCormick and Barrett start to clear the airspace over New York, government and airline officials across the nation — almost in unison — begin to take similar, unprecedented steps.

In Fort Worth, American operations managers huddle, talking breathlessly about their options. They already have lost one flight. And now, Flight 77 has disappeared. Do they have a choice?

Manager Marquis' voice booms over the loudspeaker. "Anything that hasn't taken off in the Northeast," he says, "don't take off."

At the FAA's command center in Herndon, officials worry about what might be unfolding. *Maybe there's another wave of hijacked jets coming off the West Coast. And what about the international flights?*

The center halts takeoffs of all flights bound for New York and New England. Then officials stop takeoffs for any flight headed to Washington, D.C. Moments later, they freeze takeoffs headed to Los Angeles, the destination of the two hijacked flights that crashed into the Trade Center. Then to San Francisco.

The orders will keep hundreds of flights on the ground. As in surgery, each step clamps shut another artery of the air traffic system.

But the moves aren't strong enough for some of the air traffic specialists at the center, who bombard Sliney with advice.

"Just stop everything! Just stop it!"

The words ring true to Sliney. It doesn't matter who said them — with the noise in the room, it's hard even to know. *But stopping everything*, he thinks. *That makes sense.*

At 9:25 a.m., with Flight 77 still unaccounted for, Sliney issues another order that no one has ever given: full groundstop. No commercial or private flight in the country is allowed to take off.

The decision is sweeping, but Sliney has no doubt he has made the right call. And if he's wrong? At least he has erred on the side of safety. If higher-ups want to second-guess him, so be it. He has left the agency before to practice law, and he knows if he has to depart again — if someone thinks he's screwed up — he can leave with no regrets.

What he doesn't know — what no one knows — is how crucial this order to ground planes will prove when controllers are asked later to clear the skies.

**9:25 a.m.: 4,452 planes**

**Watch and wait**

In the New York control center, Bruce Barrett wonders what lies ahead. Scores of overseas flights are heading to New York. Though many are hours from landing, rerouting them from the now-closed airspace will be far more difficult than clearing the skies over the area had been.

Over land, controllers can see jets on radar and reach them by radio. But those tools are useless beyond a 200-mile band near the shoreline. The New York center's oceanic controllers must use a complicated system to guide jets. They estimate a jet's position and issue commands to a private company, which relays them to the jet. If the jet doesn't follow a command, controllers might never know.

Barrett already has told the oceanic supervisor to turn every jet away from U.S. airspace. The primary option: Canada.

"Are you sure this is where we want to go?" the supervisor asked.

Yes, he was certain. But now, he learns that Canadian authorities are not. An official there tells the supervisor that Canada cannot accept all the arrivals streaming across the North Atlantic.

"Just be emphatic," Barrett tells the supervisor, "and tell them they're not coming here."

In Herndon, Sliney considers his options. *Do something. Make a decision. That's the credo of the air traffic controller. Make a decision.*

But what? What should he do? Already, they have stopped takeoffs nationwide. What else can they do? Land every plane?

Throughout the morning, few had agreed what the right move was. Officials in Herndon initially questioned whether managers in New York had overstepped their authority when they cleared the airspace there. But all of the moves had proved right. And now, a consensus is building: They should land every plane.

Then, just before 9:30 a.m., a report comes from a controller at Washington Dulles International Airport. She has a jet on radar, heading toward Washington and without a transponder signal to identify it. It's flying fast, she says: almost 500 mph. And it's heading straight for the heart of the city. Could it be American Flight 77?

The FAA warns the Secret Service. Fighter jets from Langley Air Force Base in Virginia race toward Washington. They won't get there in time.

### 'Get to the nearest airport'

On his way to the office in Fort Worth, Don Carty, American's CEO, talks on his cell phone. Flight 77 has vanished, he is told.

He was at home when Flight 11 hit the Trade Center. The TV in the kitchen was on. "Could that be your airplane?" his wife asked. Her face went pale.

Carty, 55, told her no. No, of course not; it couldn't have been. But even he didn't believe what he was saying. By the time Carty reaches the office, a jet is bearing down on Washington. *Is it Flight 77?* A groundstop will keep flights from taking off. *But what about the ones in the air?* he wonders.

At the airline's operations center in Fort Worth, vice president Arpey takes charge. "I think we better get everything on the deck," Arpey says. *What the hell am I doing?* he thinks, but Carty concurs when he arrives minutes later.

"Do it," he says, and Arpey puts the order out to land every American plane.

At United headquarters in Elk Grove, Ill., operations head Studdert issues a similar order: "Tell them to get to the nearest airport they can."

Before this day, no airline has ordered all of its planes from the sky.

### 'Where's it going?'

At FAA headquarters, less than a half-mile from the White House and Capitol, Dave Canoles paces before a

speakerphone.

The head of air traffic investigations, Canoles has set up phone connections with air traffic facilities. As different regions come on the line, the reports of suspicious planes accumulate. *We might be at war by afternoon*, Canoles thinks. *The FAA had better be ready.* Already, some air traffic centers had considered evacuating. Canoles told them to stay put.

Now, about 9:35 a.m., he and others on the conference call listen as an official watching a radarscope tracks the progress of the jet heading for Washington.

Canoles sends an investigator who works for him to an adjoining office with a view to the west. "See if you can spot it," he tells him.

"Six miles from the White House," a voice on the phone says.

Canoles glances outside, through a window facing north. He wonders if he and his co-workers are in danger. At 500 mph, the jet is traveling a mile every seven seconds.

"Five miles from the White House."

*No way the FAA is a target*, Canoles thinks. *It can't be.*

"Four miles from the White House."

*They'd never choose to hit us. No way.*

"The aircraft is circling. It's turning away from the White House."

*Where? Where's it going?*

Then: "It's gone."

In the adjoining office, the investigator spots smoke to the west of the city.

The jet has hit the Pentagon. The time: 9:38 a.m.

**'Order everyone to land'**

For the last 30 minutes, since the second Trade Center tower was hit, Sliney has considered bringing every flight down. Now, the manager in charge of the nation's air traffic system is certain.

He has no time to consult with FAA officials in Washington.

*The skies are filled with guided missiles*, he thinks. *Filled with them.* The words he cannot shake have proved true. The hijackers did have more planes.

"Order everyone to land! Regardless of destination!" Sliney shouts.

Twenty feet away, his boss, Linda Schuessler, simply nods. She had organized the command center earlier that day, trying to create order from the chaos so Sliney could focus on what had to be done.

"OK, let's get them on the ground!" Sliney booms.

Within seconds, specialists pass the order on to facilities across the country. For the first time in history, the government has ordered every commercial and private plane from the sky.

*9:45 a.m.: 3,949 planes*

Case 2:02-cv-01258-KJD-RJJ   Document 38-4009   Filed 05/27/04   Page 273 of 352

USATODAY.com - Part I: Terror ....acks brought drastic decision: Clear the sk.                Page 10 of 11

**A misunderstanding**

In Washington, FAA Administrator Jane Garvey and her deputy, Monte Belger, have been moving back and forth between a secret operations center and their offices.

Throughout the morning, staffers have kept Garvey and Belger apprised of Sliney's decisions.



By Paul Whyte, USA TODAY

FAA Administrator Jane Garvey approved the order to clear the skies.

Now, they tell them of the order to clear the skies. With little discussion, the FAA leaders approve.

Minutes later, Transportation Secretary Norman Mineta calls from a bunker beneath the White House, where he has joined Vice President Cheney. Belger explains that the FAA plans to land each plane at the closest airport, regardless of its destination.

Mineta concurs. FAA staffers, following the conversation over the speakerphone with Belger, pump their fists. Then the conversation sours.

Mineta asks exactly what the order means.

Belger says pilots will retain some discretion. All the FAA deputy means is that under long-standing aviation regulations, pilots always have some discretion in the event of an emergency aboard their aircraft. But the secretary assumes the FAA is not being tough enough. "F—- pilot discretion," Mineta says. "Monte, bring down all the planes."

**Ready for a fight**

Aboard United Flight 890 over the Pacific, Capt. Hosking and another pilot, Doug Price, wait anxiously for news.

A third pilot, "Flash" Blackman, sleeps in the bunkroom in the cockpit of the 747, unaware of what's unfolding.

"Why don't we just let him sleep?" Hosking suggests. Price, set for the next break, agrees.

"I couldn't go to sleep if I wanted to," Hosking says.

The message about the hijackings arrived only minutes ago, but the two already have decided: Hijackers are aboard their flight.

They don't know that for sure. But they decide to believe it, if only to keep the jet safe. For years, they had been instructed to cooperate with hijackers. No longer. This time, they won't give up without a fight, not when they know someone might try to hijack the jet.

Quickly, they wedge their bags between a jump seat and the flimsy cockpit door. The door opens inward and, with the suitcases there, no one can budge it. Not without a lot of effort.

And if someone does manage to get through the cockpit door?

Price will be waiting as Hosking flies the jet. He has the cockpit's hatchet-sized crash ax in hand, along with orders to use it

"If someone tries to come in that door, I don't want you to hurt him," Hosking says. "Kill him."

*Tuesday: Searching for more hijackers*

**Find this article at:**
http://www.usatoday.com/news/sept11/2002-08-12-clearskies_x.htm

☐ Check the box to include the list of links referenced in the article.

**EXHIBIT 3**

**Victor White**

| From: | DOT NEWS Services [DOTNEWS@listserv.dot.gov] on behalf of Kunkle, Jennifer (JJ) [Jennifer.Kunkle@OST.DOT.GOV] |
|---|---|
| Sent: | Tuesday, September 11, 2001 8:21 PM |
| To: | DOTNEWS@mdspub01.dot.gov |
| Subject: | Statement of Secretary of Transportation Norman Y. Mineta |

Tuesday, September 11, 2001
7:30 p.m. (EST)
Contact: Chet Lunner
Tel.: (202) 366-4570
DOT 93-01

Statement of Secretary of Transportation Norman Y. Mineta

One of the most cherished American freedoms is the freedom of movement, the ability to move freely and safely. Today that freedom has been attacked. We will restore that freedom throughout the national transportation system as soon as possible. And we will restore the highest possible degree of safety.

These terrorist acts are designed to steal the confidence of Americans. We will restore that confidence. We have already taken some first steps. As a precaution, I have ordered the FAA to ground all commercial air traffic until at least tomorrow afternoon.

After the attacks, some of our aircraft were diverted to Canada. We owe our Canadian neighbors a debt of gratitude for helping us redirect over 120 flights and their passengers to airports in Canada.

As of 6:00 p.m., AMTRAK resumed its passenger rail service. Major railroads have taken steps to protect their assets, as well.

The United States Coast Guard is taking all necessary actions to control the movement of any vessel in any navigable water in the United States. Coast Guard helicopters have been assisting with medical and national security tasks.

We are currently looking at a wide variety of additional security measures to increase traveler security.

Travelers will see increased security measures at our airports, train stations and other key sites. There will be higher levels of surveillance, more stringent searches. Airport curbside luggage check-in will no longer be allowed. There will be more security officers, random identification checks. Travelers may experience some inconveniences. We ask for your patience. But we must do whatever it takes, with safety as our highest priority.



FM-C 00075

The Department of Transportation is working closely with the White House and appropriate federal agencies to mount a coordinated, nationwide recovery effort.

Each American must know that we will restore our national transportation system to a safe and efficient status as quickly as possible. Our system has been severely burdened by the stress of these horrendous attacks, but we will recover.

   In a democracy, there is always a balance between freedom and security. Our transportation systems, reflecting the values of our society, have always operated in an open and accessible manner. And, they will again.

Please be assured that we are activating all of our resources on an emergency basis, and services will be restored as soon as possible.

FM-C 00076

**EXHIBIT 4**

**Victor White**

| | |
|---|---|
| From: | DOT NEWS Services [DOTNEWS@listserv.dot.gov] on behalf of DOT News [DOT.News@OST.DOT.GOV] |
| Sent: | Wednesday, September 12, 2001 2:04 PM |
| To: | DOTNEWS@mdspub01.dot.gov |
| Subject: | AIRPORTS TO REMAIN CLOSED, MINETA SAYS |

Wednesday, September 12, 2001
DOT 95-01
Contact:  Chet Lunner

Tel.:  (202) 366-4570

AIRPORTS TO REMAIN CLOSED, MINETA SAYS

Secretary of Transportation Norman Y. Mineta has announced the Federal Aviation Administration will allow a limited reopening of the nation's commercial airspace system in order to allow flights that were diverted yesterday to continue to their original destinations.

The Secretary also announced that the FAA is temporarily extending the ground stop order imposed yesterday while additional security measures are being completed.

"Safety is always of paramount importance, and in these extraordinary times we intend to be vigilant," Mineta said. "We remain committed to resuming commercial flights as soon as possible.

"As the President said last night, these despicable terrorist attacks have shaken the foundation of our greatest buildings, but have not shaken the foundation of this great nation," the Secretary said.

"As America watches the efforts of our heroic emergency responders and rescue personnel, we keep the victims and their families in our prayers," he also said.

Mineta said the FAA would permit flights today only in special limited circumstances. Flights diverted as a result of yesterday's order will be allowed to continue to their original destination under vastly tightened security guidelines. Only passengers on the original flights will be allowed to re-board, and only after airports and airlines have implemented strict screening measures. Airlines will also be allowed to reposition empty aircraft, he said.

Mineta said a variety of stepped-up security measures will be instituted at the airports once they re-open.  These measures include:



EXHIBIT
4
4/22/03

9/12/2001                                    1                              2:31 PM

FM-C 00079



**News**
U.S. Department of Transportation

Thursday, September 13, 2001
Contact: Chet Lunner
Tel.: 202/366-4570
DOT: 96-01

### Statement of U.S. Secretary of Transportation Norman Y. Mineta

Secretary of Transportation Norman Y. Mineta has ordered the national airspace system re-opened to commercial aviation, effective at 11 a.m. Eastern time Thursday.

The Secretary's decision was made after a series of meetings throughout the day and night Wednesday with White House and Cabinet officials, Federal Aviation Administration Administrator Jane Garvey, aviation industry leaders, as well as intelligence and law enforcement representatives.

"The re-opening of our national airspace is good news for travelers, for the airlines and for our economy," Secretary Mineta said. "But I must caution everyone that a system as diverse and complex as ours cannot be brought back up instantly. We will re-open airports and resume flights on a case-by-case basis, only after they implement our more stringent levels of security. This phased approach will assure the highest levels of safety, which remains our primary goal.

"Anyone planning on flying should check with their airline regarding the level of service and flight schedules, and be sure to allow plenty of time to deal with our new security procedures. There will be some inconveniences, but safety will be the first element of our system to be restored," the Secretary said.

On Wednesday, Secretary Mineta had approved a limited re-opening of the system, allowing aircraft diverted during Tuesday's terrorist attacks to continue to their destinations or be repositioned in anticipation of today's decision.

At the same time, he announced a series of heightened security measures, including a ban on curbside luggage check-in and off-airport passenger check-in. Before being allowed to re-open, airports must clear their terminals of people and conduct thorough searches. Once re-opened, airports will feature an increased presence of law enforcement officers, restricted access beyond the screening area and other restrictions.

###

<u>Briefing Room</u>



EXHIBIT
S

FM-C 00214

**STATEMENT BY**
**THE HONORABLE NORMAN Y. MINETA**
**SECRETARY OF TRANSPORTATION**
**Before the**
**COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION**
**UNITED STATES SENATE**
**September 20, 2001**

Mr. Chairman, Members of the Committee, it is with both sadness and resolve that I appear before you today. Obviously, our lives, and the life of our nation, changed dramatically as a result of the terrible attack of September 11.

Though we will never overcome the sorrow we feel for the families and friends who lost loved ones, we will be able to ensure public safety.

And, while it may take time to recreate comfortable confidence in air travel, I assure this committee that we can—and will—enjoy a transportation system that is safe, secure, and stable. The effort being expended by the government, the carriers, airport authorities, local police forces, and others on behalf of aviation will continue, and the traveling public can count on this.

That is the President's commitment, and I will marshal all resources of the Department of Transportation to accomplish that fundamental goal.

I should begin by taking this public opportunity to express my profound gratitude and pride in the performance of the employees throughout the Department of Transportation. I want to emphasize particularly my appreciation for the professionalism displayed by the FAA from top-to-bottom since the attack. From Administrator Garvey on down, the FAA has performed magnificently, as have other crucial players in our Department, including the Coast Guard and all those who worked with the well-prepared DOT Crisis Management Center.

I hope here briefly to outline some of the key activities of our Department on September 11 and then to move to essential plans for our future.

On the morning of September 11th, on first word of the attack, I moved directly to the Presidential Emergency Operations Center in the White House. As soon as I was aware of the nature and scale of the attack, I called from the White House to order the air traffic system to land all aircraft, immediately and without exception. That was an unprecedented step. But with the risk of additional flights that might be used as terrorist weapons, I believe that it was the right and necessary step to take.

In the moments that followed my call, countless brave, tough, and smart Federal air traffic controllers worked with courageous and calm pilots and flight crews to land over 4,500 aircraft. Though all these emergency landings were entirely unplanned, they were

safely and successfully accomplished. That was an historic feat in crisis management, and it illustrated the magnificent skill of key players in our transportation systems.

This Committee should also be aware of the extraordinarily rapid response achieved with respect to all modes of transportation throughout our country on September 11th.

Thanks to elaborate simulation and preparation, the Department of Transportation's Crisis Management Center took only minutes to kick into action. The first crash occurred at 8:46 am, and the Crisis Management Center was fully operational--with secure lines of communication, initiation of security procedures, and key contacts on line--by 9 am. Then, in a pre-planned fashion, the Department rapidly secured thousands of transportation hubs and corridors across the United States--including bridges and rail lines, roads and harbors.

Of course, as we move forward, we must dramatically alter our approach. As President Bush has said: the world has changed. I add: so too has the very nature of our national transportation system.

The events of the past several days require us to take new steps to move people and commerce safely and efficiently, despite the fact that the nature of the threat has clearly changed. It is a mission we cannot afford to leave for a later time.

This Administration is already moving to restore and enhance our air transportation system. On September 13th, I announced the gradual restoration of flights within the national airspace system. We took immediate steps to develop heightened security measures to ensure the safety of airline passengers as well as people on the ground.

All of the country's major airports have resumed scheduled domestic commercial and cargo service operations, with the exception of Reagan National Airport, which remains temporarily closed. Scheduled passenger airline service is operating at about 78 percent of normal levels. General aviation operations have also resumed except for visual flight rules operations in the immediate vicinity of our nation's 30 largest airports. We are currently increasing access to international commercial and general aviation flights.

Because safety is of paramount importance, I required that heightened security measures be in place before any air service resumed. A thorough search and security check of all airplanes and airports took place before passengers are allowed to enter and board aircraft.

We discontinued curbside check-in at every airport. We discontinued off-airport check-in. We no longer allow passengers to check in for their flights at hotels or other locations. All passengers are now required to go to the ticket counters to check baggage. Only ticketed passengers and authorized personnel are allowed to proceed past airport screeners--well-wishers must stay out of the secured areas.

Let there be no doubt: we will soon be taking additional steps to increase security beyond those already taken.

Now we must deal more broadly with the aftermath of September 11th. We have already turned toward development of long-term, sustainable security improvements within our airports and on our aircraft to ensure American passengers are provided with the highest possible levels of safety.

Consistent with the strict security measures imposed upon startup last week, I announced on Sunday the creation of two Rapid Response teams to make specific recommendations for the further improvement of security within the national aviation system. Their conclusions are due October 1, at the latest. One team is focusing on ways to increase security at our nation's airports. The other is focusing on aircraft integrity and security. Among those areas that will be addressed will be making airport screening a more credible deterrent, expanding the Federal Air Marshal program, and enhancing cockpit security. Both teams are now undertaking their tasks with a sense of urgency.

As they work on these teams, our own experts at the Federal Aviation Administration and Department of Transportation will have input from a distinguished group of Americans with a wide range of expertise in many different aspects of air transportation and law enforcement.

I understand the complexity of these issues, and I know there have been numerous studies on many of these issues. Yet the larger context has changed dramatically. We now face a different security threat not only in transportation, but in all aspects of American life. We have to be willing to meet that changed threat with additional counter-measures, and still find ways to keep our transportation systems the efficient and vital circulation system of our economy. We must therefore judge our security options in a different light than we might have judged them in the past.

What I expect now are good, unambiguous answers to the new questions and heightened risks. The Department of Transportation has acted promptly in response to the changed circumstances, and we will take further actions promptly.

Broader Security Concerns

We also need to keep a broad perspective as we address both security and commerce. The events of September 11th have focused media and public attention almost exclusively on aviation , which is understandable. Yet, as Vice President Cheney has noted, the odds are good that terrorists may use entirely new lines of attack. The Department I am honored to direct is focusing on all modes of transportation, including but not limited to airplanes and airports.

Thus, under authority from the Ports and Waterways Safety Act, we have taken action to control the movement of all vessels in the navigable waters of the United States.

All ports and waterways have remained open and secure since Sept. 12 with very limited exceptions. We put pipeline operators on alert.  And with the resources provided to the U.S. Coast Guard, it has performed with monumental efficiency.

In the New York City area, our employees have worked selflessly for days to bring services back, provide alternative means of access to the City, and, at the same time, guard against possible further acts of terrorism.

I want to emphasize the over-arching threat we now face.  The new security measures we have already implemented -- and those we will implement both publicly and discreetly -- are not designed simply to deal with threats of further attacks like those of September 11th.

For example, the President has asked our Department to help protect the integrity of our nation's entire transportation infrastructure.  And that is what we are doing.  But we also have to recognize that we have to meet the challenge of new and different security threats not only in transportation, but throughout our society.

We will have to take precautions in transportation that we have never taken before, and we will have to do the same in virtually every aspect of American life.  We will find ways to preserve the best of our transportation systems - the freedom of movement, the safe and efficient movement of goods and people that is so necessary to our economy. We will find ways to accomplish both heightened security and the benefits of efficient transportation system.

<u>Economic Response</u>

I turn now to another critical topic--maintaining the air transportation system in the face of severe financial problems. The current situation in the airline industry is that access to credit markets is greatly restricted and revenues dramatically diminished.

I would emphasize that the task at hand is not to prop up one or another of the carriers. It is not to "make whole" the industry as if September 11th had never occurred. Rather it is to recognize that this key part of the economy of this country requires new foundations in security and confidence as solid as they were once before. I believe the Federal Government has a responsibility for the safety of the public, airline passengers and crews in particular, and to ensure the foundation of security, insurance, and other necessities that will help this key part of the U.S. economy function. This nation needs a vital, viable, and competitive airline industry.

Accordingly, we are proposing on an expedited basis an initial package to provide strength, security, and confidence in air transportation.

Our proposal includes:

- $3 billion to airlines to help offset the substantial new costs they are incurring

because of tightened security requirements.
- $5 billion in direct and immediate payments to airlines, roughly in proportion to their size.
- Authorization for the War Risk Insurance Program to be invoked, at the President's discretion, in the domestic arena as well as the international.
- Limited modifications to certain aspects of collateral liability, in order to avert a near-term threat to the continued availability of insurance coverage.  The main purpose is to give us a brief period of time in which to try to resolve that threat.

We have additional steps under consideration, some of would take additional time to fully sort out.  We believe that on the measures we are now proposing, time is of the essence. We believe these proposals should move forward immediately, and we would then have additional days to consider and to consult with you on additional measures that may be needed.

I would like to close by taking this occasion to thank this Congress for its swift, bipartisan action last week in providing  needed supplemental appropriations to get action underway across the Government. I look forward to of working closely with each of you as we face and meet the challenges ahead.

 This completes my prepared statement. I would be pleased to respond to the Committee's questions.

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT

G

STATEMENT OF JANE F. GARVEY, ADMINISTRATOR, FEDERAL AVIATION
ADMINISTRATION BEFORE THE SUBCOMMITTEE ON AVIATION, COMMITTEE ON
TRANSPORTATION AND INFRASTRUCTURE, ON AVIATION SECURITY FOLLOWING THE
TERRORIST ATTACK ON SEPTEMBER 11TH. SEPTEMBER 21, 2001.


Chairman Mica, Congressman Oberstar, Members of the Subcommittee:

I appear before you today to discuss the events of the September 11th that were so unspeakable that they
were virtually unimaginable a few weeks ago. The world has been forever changed. As President Bush
said, "Great tragedy has come to us, and we are meeting it with the best that is in our country, with
courage and concern for others."

As a nation, we have suffered horrific losses, but we are resolved not to allow those losses to overwhelm
us. We can be proud of America's response to this crisis; the stories of heroism, generosity, and
patriotism are countless and compelling. We must gain strength from these examples as we face the
many challenges that lie ahead of us. On behalf of the Federal Aviation Administration (FAA) and its
employees, some of who have suffered their own devastating losses, I would like to extend my
sympathies to the many thousands of Americans who were victimized by the terrorists' actions. I assure
you that all 48,425 employees of the FAA will continue to work night and day to make the air
transportation system safe, secure, and ready to meet the needs of our travelling public. We are
committed to meeting the challenges that the tragic events of September 11th present. Our energies are
focused on maintaining a safe air traffic system.

The nature of the threat facing America has changed. What we faced on September 11th was a new
phenomenon--hijackers taking over commercial flights for the sole purpose of turning them into human-
guided terrorist bombs of massive explosive power. Given the events of last week, assumptions
underlying aviation security have fundamentally changed.

We are working with others in government to develop a full picture of what happened on September
11th. Federal investigators continue to sift through the wreckage for additional information. Analysis of
the flight data and cockpit voice recorders is underway. I cannot provide a detailed description of what
we have been able learn so far in an open forum. However, what I would like to do is briefly discuss
how we shut down the civil air traffic system, what new security measures are in place and how we have
brought our aviation system back into operation.

On the morning of September 11th, there were 4,873 instrument flight rule (IFR) flights operating in
U.S. airspace. As soon as Secretary Mineta was aware of the nature and scale of the terrorist attack on
New York and Washington--that we were faced with, not one, but four possible hijackings, and several
other rumors of missing or unidentified aircraft--the Secretary ordered the air traffic system shut down
for all civil operations. Our Air Traffic Control System Command Center (ATCSCC) sent a verbal
notice to all air traffic facilities about the first suspected hijacked aircraft at 9:06 a.m. At 9:08 a.m., a
written advisory was issued that "sterilized" the New York airspace, meaning that all aircraft operating
in the airspace of the New York Center were ordered to leave that airspace. At 9:26 a.m., before either
American Airlines Flight 77 or United Airlines Flight 93 had crashed, a national ground stop was issued
that prevented any aircraft from taking off. At 9:45 a.m. all airborne aircraft were told to land at the
nearest airport--the first time in our history that all civil aircraft in the United States were grounded. At
10:39 a.m., a formal Notice to Airmen (NOTAM) was issued closing all operations at all airports.

In response to last week's unprecedented attacks, the FAA substantially increased the required security

measures for U.S. airports and U.S. air carriers and foreign carriers with flights to the U.S. These measures were implemented immediately. Some are visible to the public, others are not. As you know, before we allowed our airports to reopen and air carriers to resume operations last week, airports and carriers had to meet these stringent new security measures through a certification process. I must tell you that we have had an unprecedented level of cooperation between the Federal government and the airport operators and carriers to implement these procedures so quickly and effectively.

Although the investigation of how the hijackers were able to gain control of the aircraft and what means they used to do so is still ongoing, it is apparent that enhanced security measures are essential to ensuring the security and safety of the U.S. travelling public. Following the attacks, the FAA ordered all airport terminals evacuated and required a thorough search for explosives and other dangerous weapons or objects in the terminal, using K-9 teams if they were available. Similarly, all aircraft were thoroughly inspected. Before the airports reopened (except for Reagan National Airport) and air carriers returned to the skies, new security requirements were in place.

Passengers will now find they have to adjust to new restrictions and go through more steps before boarding an aircraft—and they must adjust their arrival times at airports accordingly. Vehicles near terminals are now monitored more closely, and unauthorized vehicles near the terminal area will be removed. We have ordered the discontinuance of curbside check-in and all off-airport check-in locations. We can no longer allow passengers to check in for their flights at hotels or other locations. Instead, we ask that all passengers with luggage go to the ticket counters to check in. Passengers without checked-in luggage can check in at the gate, but are required to show boarding passes or e-ticket confirmation letters and photo identification to pass through security checkpoints. All planes must undergo a thorough search and security check before passenger boarding can begin, and we must reserve boarding areas for passengers only. Only ticketed passengers will be allowed to proceed past airport screeners to board their flights.

At all airports, increased numbers of uniformed and plainclothes security and law enforcement officers have been deployed to provide greater deterrence, surveillance, and response in the case of an emergency. Access points to secured areas of airports have been reduced to the operational minimum and airports have increased random security checks and ID checks throughout their entire terminal areas. Knives or other dangerous objects may no longer be sold or used in the "sterile" terminal areas— those areas beyond the security checkpoints. Similarly, all cutting instruments, including knives, scissors, and razor blades, plastic or otherwise, are banned from carry-on luggage. Although initially no cargo or mail was permitted on passenger flights, we have now allowed a carrier to accept cargo from shipping companies with well-documented, established relationships with the air carrier, or from freight forwarders with FAA-approved security programs. Letter class mail, certified as such by the U.S. Postal Service, is also being accepted for transport on passenger flights.

With respect to cargo only flights, we have allowed them to resume operations after thorough searches of all aircraft and cargo containers. Carriers must verify the identification of and search crewmembers as well as guard and secure planes overnight.

Finally, I would like to briefly mention the FAA's Federal Air Marshal (FAM) program. It has been a valuable component in our efforts to deter terrorist hijackings outside the U.S., which is where we believed the main threat to be, based upon available intelligence. In addition to their deterrent value, Federal Air Marshals are extremely well prepared to deal with any attempt to hijack an aircraft upon which they are deployed. The events of September 11th clearly show us that the threat within the United States of terrorist team hijackings is much higher than we had previously known and that we must make every possible effort to prevent further attacks and to deal with them should they occur. Accordingly, the President has directed the expansion of the FAM program to provide a substantially increased level

of coverage within the United States.

Because some aspects of this program are highly sensitive, I cannot provide details of this action in an open forum. What can be said publicly is that Federal Air Marshals are a full-time dedicated force that is continuously deployed throughout the world on all the major U.S. carriers in areas where terrorist activities indicate the highest probability of attacks. We believe that the FAM program is and will continue to be a critical element in enhancing the security of our air transportation system.

It has only been a few days since these enhanced security measures were ordered. As air carrier operations gradually increase and the system is brought back to a more normal level of activity, we will continuously monitor the effectiveness of these measures and work with airports and carriers to refine them, and expand them, if necessary. At the same time, we recognize that there are still lessons to be learned from the events of September 11th. We know that, in addition to the steps we took immediately following the attacks, we also need a more deliberative examination of what we have done and what we still can do to provide all Americans with the highest possible levels of safety and security. To that end, last Sunday, Secretary Mineta created two Rapid Response Teams to provide in the near term other recommendations for improving security in the national aviation system. Working with senior DOT and FAA experts will be eight national leaders from the aviation and law enforcement communities—individuals who this Committee knows quite well. One Team will focus on increasing security at the nation's airports; the other will examine security on board an aircraft, with particular attention to cockpit access. We look forward to their recommendations, which are due no later than October 1st.

As unprecedented as shutting down the civil aviation system was, bringing it back up was a challenge we have never before faced. As Secretary Mineta directed, we have been working to incrementally restore access to our customers and the users of our National Airspace System (NAS), balancing national security, economic and operational considerations. Once new security restrictions were met, airports (with the exception of Reagan National Airport), and commercial airlines were authorized to resume civil operations, including international flights that had been stranded outside our borders, and flights that had been suspended. Repositioning of aircraft was also authorized.

We began by coordinating and authorizing all military operations, and prioritizing other aviation operations as follows:
- recovery of diverted commercial aircraft;
- repositioning of commercial aviation aircraft;
- resumption of domestic U.S. flag carrier operations;
- resumption of cargo operations;
- resumption of air taxi and IFR general aviation;
- opening of Alaska airspace to all IFR and visual flight rule (VFR) operations;
- resumption of Hawaii IFR operations;
- resumption of Canadian/American international flights;
- resumption of international U.S. Flag carrier operations;
- resumption of IFR business flight operations such as agricultural flights/crop dusters and scenic tour flights;
- resumption of certain foreign-flag IFR overflights of the U.S.; and
- resumption of most VFR general aviation (Part 91) operations (exclusions include VFR operations within the immediate vicinity of our nation's 30 largest airports, banner towing, traffic watch/reporting, airships/blimps, news reporting flight training, and sight seeing operations conducted for compensation).

We are continuing to work to restore more international commercial operations as they come into compliance with the new security requirements, and to review the remaining restrictions on VFR general aviation operations and prioritize their return to the NAS.

Conclusion

Mr. Chairman, I want to assure you that the Secretary and I are doing everything in our power to bring the Nation's air transportation system back into full operation with the highest levels of safety possible. Working together--Government, industry and American citizens--we will do it. In a democracy, there is always a balance between freedom and security. Our transportation systems, reflecting the value of our society, have always operated in an open and accessible manner. And, they will do so again.

Finally, Mr. Chairman, the President said last week "[A]dversity introduces us to ourselves. . . .[O]ur fellow Americans are generous and kind, resourceful and brave." I would like to include the men and women of the FAA and DOT in that company.

That concludes my prepared remarks. I would be happy to answer any questions you may have.

COPY

1                                                                    1

UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4   COUNTY OF CLARK, a political      )
    subdivision of the State of       )
5   Nevada, on behalf of CLARK        )
    COUNTY DEPARTMENT OF AVIATION,    )
6                                     )
7                  Plaintiff,         )
                                      )
8          vs.                        )NO.  CV-S-02-1258-KJD-RJJ
                                      )
9   FACTORY MUTUAL INSURANCE          )
    COMPANY, a Rhode Island           )
10  corporation, and Does 1-10,       )
                                      )
11                 Defendants.        )
    _____    )

12

13

14      VIDEOTAPED RULE 30(b)(6) DEPOSITION OF CLARK COUNTY
    DEPARTMENT OF AVIATION, Represented by RANDALL H. WALKER
15      and VIDEOTAPED DEPOSITION OF RANDALL H. WALKER

16           Taken on Tuesday, April 13, 2004

17                    9:19 a.m.

18       At McCarran International Airport
          5757 Wayne Newton Boulevard
19              Las Vegas, Nevada

20

21

22

23

24

25  Reported by:  Michelle C. Johnson, CCR 771, RPR-CRR

2

1    **APPEARANCES:**

2    For the Plaintiff:

3            STEPHEN V. MASTERSON, Attorney at Law
             HOWREY, SIMON, ARNOLD & WHITE LLP
4            550 South Hope Street, Suite 1100
             Los Angeles, California 90071-2627
5

6    For the Defendant:

7            SCOTT G. JOHNSON, Attorney at Law
             ROBINS, KAPLAN, MILLER & CIRESI LLP
8            2800 LaSalle Plaza
             800 LaSalle Avenue
9            Minneapolis, Minnesota 55402-2015

10

     Also Present:   Becky Ulrey, Certified Legal Videography
11

12                   * * * * * * *

13

14                     I N D E X

15   **WITNESS**
                                                    **PAGE**
16   RANDALL H. WALKER

17   EXAMINATION

18       BY MR. JOHNSON
                                                      5
19

20

21

22

23

24

25

3

**E X H I B I T S**

| NUMBER | DESCRIPTION | MARKED FOR ID |
|---|---|---|
| Walker | | |
| 1 | "Notice of Deposition of Clark County Department of Aviation" | 10 |
| 2 | Internet printout of 9/12/01 "News Release" (FM 00021) | 23 |
| 3 | Internet printout of 9/13/01 "Statement of U.S. Secretary of Transportation Norman Y. Mineta" (FM-C 00214) | 25 |
| 4 | Internet printout of 9/13/01 Las Vegas Sun article, "McCarran Airport Reopens Today" | 26 |
| 5 | FM Global Policy No. UA864 (FM-C 00013 - 68) | 51 |
| 6 | 11/7/01 "Property Loss Notice" (FM-C 00484 - 487) | 54 |
| 7 | 11/27/01 letter to Walker from Casillas (FM-C 00203 - 207) | 65 |
| 8 | 12/11/01 letter to Casillas from Walker (FM-C 00194) | 66 |
| 9 | 1/2/02 letter to Walker from Casillas (FM-C 00190 - 193) | 70 |
| 10 | 2/11/02 letter to Walker from Casillas (FM-C 00177 - 179) | 71 |
| 11 | 2/22/02 letter to Casillas from Walker, with attachments (FM-C 00167 - 175) | 73 |
| 12 | 4/16/02 letter to Johnson from Casillas, with attachments (FM-C 00111 - 120) | 75 |

4

1       THE VIDEOGRAPHER:  This is the beginning of the

2   deposition of Randall Walker.  Today's date is

3   April 13th, 2004, and the time on the video monitor is

4   9:18 a.m.  We are at the administration offices at

5   McCarran International Airport, in Las Vegas, Nevada.

6       And this case is in the United States District

7   Court, District of Nevada, Case

8   No. CV-S-02-1258-KJD-RJJ, and it's entitled Clark --

9   sorry -- County of Clark, a political subdivision of the

10  State of Nevada, on behalf of Clark County Department of

11  Aviation versus Factory Mutual Insurance Company, et al.

12      My name is Becky Ulrey, from Certified Legal

13  Videography, in Las Vegas, Nevada, and the court

14  reporter is Michelle Johnson, from Western Reporting

15  Services, Incorporated, in Las Vegas, Nevada.

16      Will counsel please identify yourselves for

17  voice identification.

18      MR. JOHNSON:  Scott Johnson, representing

19  Factory Mutual Insurance Company.

20      MR. MASTERSON:  Steve Masterson, from Howrey

21  Simon, Arnold & White, representing Clark County

22  Department of Aviation.

23      THE VIDEOGRAPHER:  The reporter will now

24  administer the oath.

25                      *  *  *  *  *  *

5

RANDALL H. WALKER,

having been first duly sworn, was

examined and testified as follows:

EXAMINATION

BY MR. JOHNSON:

    Q.  Please state your full name.

    A.  Randall H. Walker.

    Q.  And where do you live, sir?

    A.  In Henderson, Nevada.

    Q.  Can you give us your address, please?

    A.  12 --

    MR. MASTERSON:  If you need to contact him,

business address I think is probably better.

BY MR. JOHNSON:

    Q.  Can you give us your business address, please?

    A.  McCarran airport.

    Q.  Las Vegas, Nevada?

    A.  Yeah, Las Vegas, Nevada.

    Q.  I introduced myself earlier.  My name is Scott

Johnson.  I'm the attorney representing Factory Mutual

Insurance Company in the matter.

    Have you had your deposition taken before?

    A.  Yes.

    Q.  On how many occasions?

    A.  A number.  I never kept count.  More than a

10

1     Q.   Okay.  What was that?

2     A.   I was systems analyst for Exxon Oil Company at

3 Houston, Texas from May of 1977 until I went to work for

4 the county.

5     Q.   Prior to that, you were at school, right?

6     A.   Prior to that, I was a student.  I had a few

7 part-time jobs, but I don't think they're relevant.

8     MR. JOHNSON:  I'm going to mark as Exhibit 1 a

9 deposition notice.

10     (Walker Exhibit 1 was marked for

11     identification.)

12 BY MR. JOHNSON:

13     Q.   This is a Notice of Deposition to the Clark

14 County Department of Aviation.  And I understand that

15 you are going to be the designated witness to testify to

16 these subject matters.  Is that right?

17     A.   Yes, that's what I understand.

18     Q.   Have you seen Exhibit 1 before?

19     A.   Yes, I have.

20     Q.   When did you first see it?

21     A.   I don't recall exactly when I first saw it, but

22 I saw it again yesterday.

23     Q.   What did you do to prepare to give testimony on

24 the six subject matters in Exhibit 1?

25     A.   Talked to my attorney here to my right, and

18

1    in a manual or a book somewhere.

2        Q.    Is that how security directives are kept, in a

3    manual?

4        A.    Generally, they keep track of them in a -- in a

5    binder.

6        Q.    Let's move on to subject matter 2 in Exhibit 1:

7                    "The manner by which CCDOA claims that

8              ingress to or egress from its airports was

9              prevented on September 11th through the

10             13th, 2001."

11             Can you describe the manner in which CCDOA

12   claims that ingress to or egress from its airports was

13   prevented on September 11th, 2001?

14       A.    First off, all airplanes were prohibited by

15   federal order from flying, so no airplanes could arrive

16   at our airport or leave from our airport under federal

17   order.

18             In addition to that, the terminal needed to be

19   vacated for security reasons, so the terminal was closed

20   to all nonbadged individuals, and the roadways into the

21   airport were blocked and -- to allow the airport to be

22   able to have control of the airport in a sterile

23   environment and be able to do its security checks in

24   accordance with the FAA directives.

25       Q.    So you're saying planes could not arrive or

20

1   terminal.

2        Q.   What security rules are you referring to there?

3        A.   Those would have been whatever directives came

4   out, security directives, subsequent to 9/11 in that

5   time period.

6        Q.   Who determined that the roadways into the

7   airport should be blocked?

8        A.   That would have been Rosemary's decision.

9        Q.   And why was that decision made; do you know?

10       A.   You'll need to talk to her.  I could surmise,

11  but it would be better if you ask her.

12       Q.   When do you claim that the prevention of

13  ingress and egress by aircraft began?

14       A.   As soon as the FAA grounded all the aircraft.

15       Q.   Do you mean at the time it issued its order?

16       A.   At the time it issued its order.  Planes that

17  were on its way to Las Vegas never made it to Las Vegas;

18  planes that were supposed to leave couldn't take off.

19       Q.   And when do you claim that the prevention of

20  ingress and egress by aircraft ended?

21       A.   When the FAA authorized aircraft to begin

22  operations into McCarran once again.

23       Q.   And when was that?

24       A.   I believe that was on the 13th.

25       Q.   Do you recall what time of day on the 13th?

22

1    Q.    Are you aware of any planes that took off after

2    the FAA order?

3    A.    No, not on the 11th.

4    Q.    What prevented a plane from taking off from any

5    of the CCDOA airports on September 11 after the order?

6    A.    It was in violation of federal directives.

7    Q.    There was nothing wrong with the runways at any

8    of the airports, right?

9    A.    No, runways all functioned fine.

10   Q.    But there was an order from the FAA that said

11   planes could not take off, right?

12   A.    Planes were prohibited from being in the air

13   space, so therefore they couldn't take off or land.

14   Q.    Do you know if any planes took off from the

15   other general aviation airports that CCDOA operates?

16   A.    I'm not personally aware.  They should not

17   have, but I'm not personally aware whether they did or

18   not.

19   Q.    Did any planes land at McCarran on

20   September 11, 2001?

21   A.    As indicated before, certainly before the order

22   was given, we had normal operations.  And I believe

23   after the order was given, there would have been planes

24   who landed because this would have been the closest

25   airport that would have been able to safely handle that

30

1     Q.   Let's move on to the third subject matter in

2   Exhibit 1:

3              "The existence of any physical loss or

4         damage to property at any of CCDOA's

5         airports on September 11, 2001."

6         Was there any damage at any of the CCDOA

7   airports on September 11, 2001?

8     A.   Are you talking about actual physical damage?

9     Q.   Right.

10    A.   No, not that I'm aware of.

11    Q.   Let's move on to exhibit -- I'm sorry, subject

12  matter 4 in Exhibit 1:

13             "The existence of any immediately

14        impending physical loss or damage to

15        property at any of CCDOA's airports on

16        September 11, 2001."

17        Are you aware of any immediately impending

18  physical loss or damage at any of the CCDOA airports on

19  September 11, 2001?

20    A.   Not any more so than any other property

21  throughout the United States, given the fact that

22  airplanes had been crashing into buildings.

23    Q.   What does that mean?

24    A.   Well, airplanes had been crashing into

25  buildings.  That was a concern they had for any

35

1    A.   I don't recall what they were.  That would be

2    in the manual.

3    Q.   Was the county placed on any alert on

4    September 11, 2001?

5    A.   No, I do not know.

6    Q.   Let's move on to subject No. 5 in Exhibit 1.

7    That's:

8        "The existence of physical loss or

9        damage to property at locations of CCDOA's

10       direct suppliers or customers on

11       September 11th, 2001."

12       Was there any physical loss or damage at the

13   locations of any of CCDOA's direct suppliers or

14   customers on September 11, 2001?

15   A.   Certainly.  Airlines are our customers; they

16   had significant damage.

17   Q.   What was their damage?

18   A.   I know some of them had offices in the World

19   Trade Center, for example.

20   Q.   Who had offices in the World Trade Center?

21   A.   I know Delta did specifically.

22   Q.   Anybody else?

23   A.   Not that I recall.  But I know Delta did.  Some

24   travel agencies I know were in the World Trade Center.

25   New York is a very popular market for Las Vegas in terms

36

1    of customers, and there were travel-related tour

2    wholesalers, travel agents and those kinds of things

3    that had offices in the World Trade Center, yes.

4         Q.   Any other customers or suppliers that were

5    damaged on September 11, 2001?

6         A.   I don't specifically know every single one, no.

7         Q.   Are you saying that the CCDOA airports were

8    closed because of the damage to the Delta office in the

9    World Trade Center and those travel agencies in the

10   World Trade Center?

11        A.   I think the CCDOA was closed because of the

12   orders from the Federal Aviation Administration that

13   shut down the national air system.

14        Q.   Let's move on to the sixth subject matter in

15   Exhibit 1:

16              "The extent of any loss or damage to

17              CCDOA caused by any physical loss or

18              damage to property at locations of CCDOA's

19              direct suppliers or customers on

20              September 11, 2001."

21         You identified the Delta office in the World

22   Trade Center and some travel agencies.  What was the

23   effect of the damage on the Delta office or to the Delta

24   office on CCDOA?

25        A.   You mean a direct, their office was damaged so

1  Richard J. Pocker
    Nevada Bar No. 003568
2  DICKERSON, DICKERSON, CONSUL & POCKER
    777 N. Rainbow Blvd., Suite 350
3  Las Vegas, NV 89108
    Telephone:   (702) 338-8600
4  Facsimile:    (702) 388-0210

5  Patrick E. Shipstead (CSB #087170) Admitted Pro Hac Vice
    Scott G. Johnson (CSB #087170) Admitted Pro Hac Vice
6  David E. Bland (CSB #150581) Admitted Pro Hac Vice
    ROBINS, KAPLAN, MILLER & CIRESI L.L.P.
7  800 LaSalle Avenue, Suite 2800
    Minneapolis, MN 55402
8  Telephone:   (612) 349-8500
    Facsimile:    (612) 339-4181

9

10  Attorneys for Defendant Factory Mutual Insurance Company

11

12

13            **UNITED STATES DISTRICT COURT**

14               **DISTRICT OF NEVADA**

15

16  COUNTY OF CLARK, A POLITICAL   )  **CASE NO. CV-S-02-1258-KJD-RJJ**
    SUBDIVISION OF THE STATE OF   )
17  NEVADA, ON BEHALF OF CLARK   )
    COUNTY DEPARTMENT OF      )
18  AVIATION,                )
                   )  **NOTICE OF DEPOSITION OF CLARK**
19         Plaintiff(s),    )  **COUNTY DEPARTMENT OF**
                   )  **AVIATION**
20  vs.                 )
                   )
21  FACTORY MUTUAL INSURANCE   )
    COMPANY, a Rhode Island Corporation, )
22  and Does 1-10,
                   
23         Defendant(s).

24  _____

25

         TO PLAINTIFF COUNTY OF CLARK, A POLITICAL SUBDIVISION OF THE
26

    STATE OF NEVADA, ON BEHALF OF CLARK COUNTY DEPARTMENT OF AVIATION:
27

28

                                    **EXHIBIT**
                                     *1*
                                  *Walker*
                              *8/13/04*    *mes*

PLEASE TAKE NOTICE that on April 15, 2004, at 2:00 P.M., at the McCarran International Airport, 5757 Wayne Newton Blvd., Las Vegas, Nevada, 89119, in a confere....e room to be determined, Defendant Factory Mutual Insurance Company, through its attorneys of record, will take the deposition Clark County Department of Aviation ("CCDOA") through duly designated person(s) most knowledgeable regarding:

1.  All orders on which CCDOA bases any claim for damages in this litigation including, but not limited to, the date of each such order, the agency issuing each such order, the identity of the recipient of each such order, and the actions taken by CCDOA in response to each such order;

2.  The manner by which CCDOA claims that ingress to or egress from its airports was prevented on September 11-13, 2001;

3.  The existence of any physical loss or damage to property at any of CCDOA's airports on September 11, 2001;

4.  The existence of any immediately impending physical loss or damage to property at any of CCDOA's airports on September 11, 2001;

5.  The existence of any physical loss or damage to property at locations of CCDOA's direct suppliers or customers on September 11, 2001;

6.  The extent of any loss or damage to CCDOA caused by any physical loss or damage to property at locations of CCDOA's direct suppliers or customers on September 11, 2001.

The deposition will be taken before a certified reporter or other officer authorized by law to take depositions, duly authorized to administer oaths and transcribe the testimony of the deponent and will be videotaped. The deposition will continue from day to day until completed. You are invited to attend and cross-examine.

Dated: March ⸍ 8 , 2004.

Richard J. Pocker
Dickerson, Dickerson, Consul & Pocker

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Patrick E. Shipstead
Scott G. Johnson
David E. Bland
ROBINS, KAPLAN, MILLER & CIRESI L.L.P.

_____
SCOTT G. JOHNSON
Attorneys for Defendant
Factory Mutual Insurance Company

3

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT

*B*

COPY

1

UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

COUNTY OF CLARK, a political )
subdivision of the State of )
Nevada, on behalf of CLARK )
COUNTY DEPARTMENT OF AVIATION, )
                               )
             Plaintiff,        )
                               )
      vs.                      )NO. CV-S-02-1258-KJD-RJJ
                               )
FACTORY MUTUAL INSURANCE       )
COMPANY, a Rhode Island        )
corporation, and Does 1-10,    )
                               )
             Defendants.       )
_____)

**VIDEOTAPED DEPOSITION OF ROSEMARY VASSILIADIS**

Taken on Thursday, April 15, 2004

10:12 a.m.

At McCarran International Airport
5757 Wayne Newton Boulevard
Las Vegas, Nevada

Reported by:  Michelle C. Johnson, CCR 771, RPR-CRR

2

1   **APPEARANCES:**

2   For the Plaintiff:

3        STEPHEN V. MASTERSON, Attorney at Law
         HOWREY, SIMON, ARNOLD & WHITE LLP
4        550 South Hope Street, Suite 1100
         Los Angeles, California 90071-2627
5

6   For the Defendant:

7        SCOTT G. JOHNSON, Attorney at Law
         ROBINS, KAPLAN, MILLER & CIRESI LLP
8        2800 LaSalle Plaza
         800 LaSalle Avenue
9        Minneapolis, Minnesota 55402-2015

10

11   Also Present:   Becky Ulrey, Certified Legal Videography

12                        * * * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                               **I N D E X**

2   **WITNESS**

                                                        **PAGE**

3   ROSEMARY VASSILIADIS

4   EXAMINATION

5       BY MR. JOHNSON                                      5

6

7

8                             **E X H I B I T S**

9   **NUMBER    DESCRIPTION**                     **MARKED FOR ID**

10  Vassiliadis

11      1     Internet printout of 8/12/02 FAA          8
            News "Fact Sheet, Chronology of Events
12          on September 11, 2001" (FM 00004 - 5)

13      2     Internet printout of 9/11/01 Las Vegas -   22
            McCarran International Airport News
14          Release, "Media Advisory" (FM 00019)

15      3     Internet printout of 9/14/01 News,         38
            U.S. Department of Transportation
16          article, "Secretary Mineta Reopens
            Skies to General Aviation" (FM-C 00213)
17

18

19

20

21

22

23

24

25

4

1      THE VIDEOGRAPHER:  This is the beginning of the

2   deposition of Rosemary A. Vassiliadis.  Today's date is

3   April 15th, 2004, and the time on video monitor is

4   10:11 a.m.  We're in the administrative offices at

5   McCarran International Airport in Las Vegas, Nevada.

6          And this case is in the United States District

7   Court, District of Nevada, Case

8   No. CV-S-02-1258-KJD-RJJ, entitled County of Clark, a

9   political subdivision of the State of Nevada, on behalf

10   of Clark County Department of Aviation versus Factory

11   Mutual Insurance Company, et al.

12          My name is Becky Ulrey, from Certified Legal

13   Videography, and the court reporter is Michelle Johnson,

14   from Western Reporting Services, Incorporated.

15          Will counsel please identify yourselves for

16   voice identification.

17          MR. JOHNSON:  Scott Johnson, representing

18   Factory Mutual Insurance Company.

19          MR. MASTERSON:  Steve Masterson, from Howrey,

20   Simon, Arnold & White, representing Clark County

21   Department of Aviation.

22          THE VIDEOGRAPHER:  The reporter will please

23   administer the oath.

24              ROSEMARY VASSILIADIS,

25          having been first duly sworn, was

5

1      examined and testified as follows:

2                    EXAMINATION

3  BY MR. JOHNSON:

4      Q.   Can you please state your full name.

5      A.   Rosemary Vassiliadis.

6      Q.   What is your present business address?

7      A.   5757 Wayne Newton Boulevard.  I'm sorry, we go

8  by the PO Box usually.

9      Q.   That's McCarran International Airport, right?

10     A.   Yes.

11     Q.   Have you had your deposition taken before?

12     A.   No.

13     Q.   Just let me give you a few of the basic rules

14  of the deposition.  You've probably heard these already,

15  but I'll just remind you of them in the event that

16  you've forgotten them.

17          I'll be asking you some questions this morning.

18  If at any time my questions aren't clear to you or you

19  don't understand them, please let me know, and I'll

20  attempt to restate the question for you.  All right?

21     A.   Okay.

22     Q.   Otherwise, I'm going to have to assume that

23  you've understood my question.  All right?

24     A.   All right.

25     Q.   All of your answers must be with words, rather

13

1    Q.   To the best of your recollection, was it a

2    little before 8 a.m. Pacific time?

3         MR. MASTERSON:  Objection, vague and ambiguous

4    as to "it."

5    BY MR. JOHNSON:

6    Q.   When did you learn that the FAA had banned

7    takeoffs of all civilian aircraft regardless of

8    destination?

9    A.   The best that I can remember was sometime that

10   morning.  So I got to the airport a little after

11   8:00 a.m. our local time, and it was sometime that

12   morning.  I just don't remember what time exactly.

13   Q.   Did you become aware of the order for aircraft

14   to land at the nearest airport first?  Is that the first

15   order that you learned of?

16   A.   I would believe so, yes.

17   Q.   And then at some point, you received security

18   directives from the FAA, right?

19   A.   That is correct.

20   Q.   And how were they received?

21   A.   They came to our local -- it was a civil

22   division at that time of the FAA.  And our special agent

23   in charge received them directly from a secured fax

24   machine, and she brought them over and hand-delivered

25   them to me.

14

1    Q.   And this was a letter before noon on

2    September 11, 2001, right?

3    A.   It was, yes, in that morning time.

4    Q.   What did these security directives say?

5    A.   Well, there were several of them.

6    Q.   Okay.

7    A.   And one of -- they went from indicating --

8    letting us know that the national air space was closed,

9    what we were to do on airport property with commercial

10   aircraft and general aviation aircraft, and then they

11   proceeded as the day went on, what we needed to do as an

12   airport operator.

13   Q.   So that wasn't just one security directive, it

14   was several?

15   A.   It was -- correct.

16   Q.   How many?  Can you estimate for me?

17   A.   Not on that day.  We received so many in that

18   period.  The first day, I would just guesstimate a half

19   dozen.

20   Q.   Are these security directives that you

21   mentioned, are they able to be shown to me, for example?

22   A.   No, they're not.  They are security-sensitive

23   information.

24   Q.   Are you able to describe the contents of them?

25   A.   Generally.

15

1    Q.   Generally, what were airports supposed to do

2    because the national air space was closed?

3    A.   Airports needed to clear everybody out, and we

4    had to recertify and sterilize the airport.  So in order

5    to do that, we had to, again, clear everyone out, which

6    we did, including vehicles.  I mean, we had to tow

7    vehicles out of the garage to be on a perimeter.  And

8    they gave us each and every point that we needed to do.

9    And then go through a sterilization and a

10   recertification process.

11   Q.   When did you clear everyone out of McCarran?

12   A.   We did that the next day, on the 12th.

13   Q.   So people were able to stay at McCarran on

14   September 11th?

15   A.   There were people in the terminal, yes.

16   Q.   Passengers who couldn't get on their planes and

17   stuff, right?

18   A.   Correct.

19   Q.   And then on September 12th, you actually

20   cleared the terminal?

21   A.   Yes.  We started to clear the terminal on the

22   11th, knowing that the air space was going to remain

23   closed.  Again, a lot of this was just real-time

24   information coming, and so the next set of information

25   superceded what we were currently doing.

16

1      Q.   When on September 11th did you start clearing

2   the terminal?

3      A.   Later that -- late afternoon, early evening.

4   Knowing that planes were not going to take off, we

5   worked with the local community and the convention

6   authority to get people back to hotels because we knew

7   that there was not a chance for them to get to -- to go

8   back home.

9      Q.   And before the terminal was cleared, did some

10   of the concessionaires remain open?

11      A.   You know, I really don't know.  I wasn't

12   downstairs.  They -- I don't know.

13      Q.   And then you had to sterilize the airport.

14   What does that mean?

15      A.   That means we had to clear everybody and every

16   unidentified object out.

17      Q.   When was that done?

18      A.   That was done -- it started on the 12th and

19   proceeded to the 13th.  It includes property as well,

20   not just buildings.

21      Q.   What do you mean it includes property not

22   just --

23      A.   Perimeter areas as well, just not physical

24   buildings.

25      Q.   Approximately when did it start on September

17

1    12th?

2        A.   I'm just guestimating that it started early
3    afternoon.

4        Q.   And you completed it sometime on September
5    13th?

6        A.   Yes.

7        Q.   Approximately when?

8        A.   In the early hours, early morning hours.

9        Q.   And then you also mentioned you had to be
10   recertified.

11       A.   That's correct.

12       Q.   What does certification mean?

13       A.   The ability to operate, to be the public use
14   facility that we are.

15       Q.   Is that an FAA certification?

16       A.   That is correct.

17       Q.   What was involved in the recertification?

18       A.   We had to fulfill all the measures of our
19   airport security plan, which was also a
20   security-sensitive document, but it is certified and
21   approved by the FAA.  Every airport has to submit that.
22   In addition -- in addition to that, there were
23   additional measures that we had to go through that came
24   through -- that came to us by these security directives.

25       Q.   There were additional security measures that

19

1    Q.   Do you remember any other security directives

2    that you can just describe generally for me that you

3    received on September 11, 2001?

4    A.   All the security directives that we received

5    were measures to secure each property.  You know, each

6    airport.  And that was what was contained in them, the

7    measures that we had to take to assure the best that we

8    could that there wasn't an act of terrorism being

9    planned for that location.  I can't really get into the

10   specifics of how they directed us and exactly what they

11   directed us to do.

12   Q.   Because that's confidential, right?

13   A.   Because that's security sensitive, correct.

14   Q.   Did you retain copies of these security

15   directives?

16   A.   Yes.

17   Q.   Do they go into a book of some sort?

18   A.   They go into a secure file.

19   Q.   You still have them today?

20   A.   Actually, my airport security manager retains

21   that for me.

22   Q.   Did any planes take off from McCarran on

23   September 11, 2001?

24   MR. MASTERSON:  Objection, vague and ambiguous

25   as to time.

27

1   property on which it was standing on.  So we secured the

2   gates and all the entry and exit points; they secured

3   their aircraft.

4       Q.   So when you talked about having to sterilize

5   the airport, you didn't have to worry about the planes?

6           MR. MASTERSON:  Objection, vague and ambiguous

7   as to "worry about."

8   BY MR. JOHNSON:

9       Q.   When you talked about sterilizing the airport,

10  did you also have to sterilize the aircraft that

11  were parked --

12      A.   I did not.  The airport operator did not.

13      Q.   Okay.  Were there any flights leaving McCarran

14  on September 11th that were carrying blood or medical

15  supplies to New York or Washington, D.C.?

16      A.   I do not know.  That would be the airlines.

17      Q.   You're not aware of any, right?

18      A.   I don't know what their normal -- the cargo

19  operations are.

20      Q.   Were you aware of any threats, terrorist

21  threats, against McCarran International on September 11,

22  2001?

23      A.   No.

24      Q.   Other than the security directives that you

25  already told me about, were there any other orders that

30

1      Q.    Were airline employees at the terminal on
2  September 12th?
3      A.    I believe many of them were.  Certainly, the
4  station managers were.
5      Q.    What are the station managers?
6      A.    They're the highest person in charge of that
7  particular airline company at this station here locally.
8      Q.    How many airlines use McCarran?
9      A.    A little over 40.
10     Q.    And these people that you mentioned, they were
11 able to get through the roadblocks, right?
12     A.    Yes.
13     Q.    Take a look at -- I guess it's Walker Exhibit
14 2.  You'll see a pile of Walker exhibits.
15         This is another McCarran News Release, this one
16 dated September 12, 2001.  Right?
17     A.    Yes.
18     Q.    It talks about, in the first paragraph, a
19 directive from the FAA to allow airlines to begin
20 ferrying empty aircraft in anticipation of a start-up on
21 operations on September 13, 2001, right?
22     A.    Yes.
23     Q.    Do you remember when that directive was
24 received?
25     A.    Let me think.  I would guesstimate shortly

31

1   before we released this.

2       Q.   Do you have an estimate of when you released

3   Walker Exhibit 2?

4           MR. MASTERSON:  Objection, calls for

5   speculation.

6           THE WITNESS:  Yeah, I don't.

7   BY MR. JOHNSON:

8       Q.   The second paragraph says:

9               "Residents may see extremely limited

10              flight activity at McCarran International

11              Airport in the overnight hours as a result

12              of this directive."

13          Was there any such activity?

14      A.   There was -- we did have three aircraft that

15  were ferried off of our property, off of the airport,

16  containing no passengers, to get them to wherever they

17  were directed to go.

18      Q.   And those three aircraft flew out of McCarran

19  sometime on September 12th?

20          MR. MASTERSON:  Objection, calls for

21  speculation.

22          THE WITNESS:  I don't recall.

23  BY MR. JOHNSON:

24      Q.   Do you remember what --

25      A.   I really thought it was Thursday, that evening.

32

1    Q.   You thought the fer- --

2    A.   That's what I recollect.

3    Q.   Do you remember what three aircraft were

4    ferried off the property?

5    A.   No, I don't.

6    Q.   Did any aircraft reposition to McCarran on

7    September 12, 2001?

8    A.   No.

9    Q.   And in the third paragraph of Walker Exhibit 2,

10   it says that you anticipated that airport facilities may

11   open as early at 5:00 a.m. Pacific Standard Time.

12        Did that in fact occur?

13   A.   We did open that morning.  I don't recall the

14   exact time.

15   Q.   What was involved in the reopening?  Roadblocks

16   were removed, right?

17   A.   It was the series that I mentioned before.  We

18   had to fulfill all aspects of our airport security plan,

19   in addition to several measures that were given to us by

20   the FAA.

21   Q.   Take a look at Walker Exhibit 3, please.  This

22   is a statement of U.S. Secretary of Transportation,

23   Norman Mineta, dated September 13, 2001.

24        Have you seen this before?

25   A.   I'm sure I have.

33

1    Q.   Does this refresh your recollection that the

2  national air space was reopened effective 11:00 a.m.

3  Eastern time Thursday?

4    A.   I must have been off a whole day.

5    Q.   That would have been 8:00 a.m. Pacific time,

6  right?

7    A.   That's correct.

8    Q.   Do you know whether McCarran opened before

9  8:00 a.m. Pacific time on Thursday, September 13th?

10   A.   I believe that we did, to allow the passengers

11  to be processed.  We did not resume normal activity.  We

12  did not go right to our normal daily flight activity,

13  however.

14   Q.   I think there is mention in one of these

15  articles that McCarran was one of the first airports to

16  be recertified.

17   A.   That's correct.

18   Q.   Like in the top ten somewhere, right?

19   A.   I don't know.  They would never tell us.

20   Q.   What's your best estimate of when that

21  recertification occurred?

22        MR. MASTERSON:  Objection, calls for

23  speculation.

24  BY MR. JOHNSON:

25   Q.   You can answer.

34

1      A.    I believe it was sometime that morning.

2      Q.    The morning of September 13, 2001?

3      A.    That Thursday.

4      Q.    Before you reopened, right?

5      A.    I thought you just asked me when did we reopen.

6      Q.    No, it was actually when --

7      A.    When did we recertify.

8      Q.    Right.

9      A.    Oh, yes, absolutely.

10            You'll have to forgive me, we were here around

11     the clock; one day just bled into another day without

12     any date ever being recorded.

13     Q.    Do you recall any planes taking off from

14     McCarran on Thursday, September 13th?

15     A.    Well, yes.  We had limited activity; I do not

16     recall which ones.

17     Q.    Do you remember when the first one was?

18     A.    No.

19     Q.    Did planes land at McCarran on September 13th?

20     A.    Yes.

21     Q.    Do you remember when the first one was?

22     A.    No.

23     Q.    Were you involved at all in CCDOA's insurance

24     claim to Factory Mutual?

25     A.    Not directly in the preparation of the claim,

36

1      A.    Okay.

2      Q.    Walker Exhibit 4 is a September 13, 2001

3   article from the Las Vegas Sun entitled, "McCarran

4   Airport Reopens Today."

5           I don't know if you've seen this before or not.

6      A.    I have.

7      Q.    Looks like in the fourth paragraph Hilarie Grey

8   talked about some of those repositioning flights that

9   you had mentioned.

10      A.    Uh-huh.  Yes.

11      Q.    Does that refresh your recollection, it says:

12              "There were two such flights Wednesday

13              night: a Southwest Airlines flight that

14              arrived, and a Federal Express cargo plane

15              that departed."

16      A.    I had thought there were three.

17      Q.    And Wednesday night was September 12, 2001,

18   right?

19      A.    Correct.

20      Q.    And at the bottom of the first page, continuing

21   on to the second page, there are some, I guess, changes.

22   Talks about -- the first one is a 300-foot perimeter has

23   been established for parked vehicles.  The next one was

24   curbside check-ins had been suspended.  Third one, there

25   will be more frequent hand searches on carry-on baggage.

37

1    Fourth one, there will be increased presence of

2    plainclothes and uniformed security officers.  Fifth one

3    is passengers will be required to show a ticket for a

4    flight and identification in order to pass through

5    security checks for the gates.  And the sixth one is

6    persons greeting arriving passengers won't be allowed to

7    go past security checkpoints.

8         Can you tell me whether those were part of the

9    new security directives that CCDOA received?

10        A.   Yes, they were.

11        Q.   I think you mentioned earlier that there had

12   been some vehicles that were towed.  Was that in that

13   300-foot perimeter?

14        A.   Yes.

15        Q.   Where did those vehicles go?

16        A.   We brought them to our remote lot, our

17   regularly operated remote lot on Russell Road.

18        Q.   Were the owners of those towed vehicles allowed

19   to retrieve them?

20        A.   Yes.

21        Q.   I mean between September 11th and September

22   13th.

23        A.   Although they were stuck out of town.  So once

24   they retuned.

25        Q.   Oh, Okay.

RECYCLED PAPER MADE FROM 30% POST CONSUMER CONTENT



# Press Release

close window

Contact: Chet Lunner
Phone: 202-366-4570

Date Posted: September 12, 2001

### Airports to Remain Closed, Mineta Says

Secretary of Transportation Norman Y. Mineta has announced the
Federal Aviation Administration will allow a limited reopening of the
nation's commercial airspace system in order to allow flights that
were diverted yesterday to continue to their original destinations.

The Secretary also announced that the FAA is temporarily
extending the ground stop order imposed yesterday while
additional security measures are being completed.

"Safety is always of paramount importance, and in these
extraordinary times we intend to be vigilant," Mineta said. "We
remain committed to resuming commercial flights as soon as
possible.

"As the President said last night, these despicable terrorist attacks
have shaken the foundation of our greatest buildings, but have
not shaken the foundation of this great nation," the Secretary
said.

"As America watches the efforts of our heroic emergency
responders and rescue personnel, we keep the victims and their
families in our prayers," he also said.

Mineta said the FAA would permit flights today only in special
limited circumstances. Flights diverted as a result of yesterday's
order will be allowed to continue to their original destination under
vastly tightened security guidelines. Only passengers on the
original flights will be allowed to re-board, and only after airports
and airlines have implemented strict screening measures. Airlines
will also be allowed to reposition empty aircraft, he said.

Mineta said a variety of stepped-up security measures will be
instituted at the airports once they re-open. These measures
include:

- A thorough search and security check of all airplanes and
airports before passengers are allowed to enter and board aircraft.

- We will discontinue curbside check-in at the airport. We would
ask that all passengers go to the ticket counters to check in.

- We will also discontinue off-airport check in. We can no longer
allow passengers to check in for their flights at hotels or other
venues. Passengers must check in at the airports.

- We must reserve boarding areas for passengers only. Only
ticketed passengers will be allowed to proceed past airport
screeners to catch their flights.

- Vehicles near airport terminals will be monitored more closely.

Case 2:02-cv-01258-KJD-RJJ   Document 38-4009   Filed 05/27/04   Page 328 of 352

"I know all Americans want us to move as quickly and prudently as possible to return our transportation system to normal," Mineta said, "and we will as soon as we can do so safely."

-30-

Questions About This Page

Case 2:02-cv-01258-KJD-PAL Document 38-4009 Filed 05/27/04 Page 329 of 352
Statement of U.S. Secretary of Transportation Norman Y. Mineta
Page 1 of 1



**News**
U.S. Department of Transportation

Thursday, September 13, 2001
Contact: Chet Lunner
Tel.: 202/366-4570
DOT: 96-01

## Statement of U.S. Secretary of Transportation Norman Y. Mineta

Secretary of Transportation Norman Y. Mineta has ordered the national airspace system re-opened to commercial aviation, effective at 11 a.m. Eastern time Thursday.

The Secretary's decision was made after a series of meetings throughout the day and night Wednesday with White House and Cabinet officials, Federal Aviation Administration Administrator Jane Garvey, aviation industry leaders, as well as intelligence and law enforcement representatives.

"The re-opening of our national airspace is good news for travelers, for the airlines and for our economy," Secretary Mineta said. "But I must caution everyone that a system as diverse and complex as ours cannot be brought back up instantly. We will re-open airports and resume flights on a case-by-case basis, only after they implement our more stringent levels of security. This phased approach will assure the highest levels of safety, which remains our primary goal.

"Anyone planning on flying should check with their airline regarding the level of service and flight schedules, and be sure to allow plenty of time to deal with our new security procedures. There will be some inconveniences, but safety will be the first element of our system to be restored," the Secretary said.

On Wednesday, Secretary Mineta had approved a limited re-opening of the system, allowing aircraft diverted during Tuesday's terrorist attacks to continue to their destinations or be repositioned in anticipation of today's decision.

At the same time, he announced a series of heightened security measures, including a ban on curbside luggage check-in and off-airport passenger check-in. Before being allowed to re-open, airports must clear their terminals of people and conduct thorough searches. Once re-opened, airports will feature an increased presence of law enforcement officers, restricted access beyond the screening area and other restrictions.

### ###

Briefing Room

EXHIBIT
3
Walker
4/12/04    UAS

FM-C 00214



*Las Vegas # McCarran International Airport*

# NEWS RELEASE

*Clark County Department of Aviation - Randall H. Walker, Director*

**CONTACT:    HILARIE GREY**

**(702) 261-3094**

**FOR IMMEDIATE RELEASE**
**SEPTEMBER 13, 2001**

## McCARRAN AIRPORT OPEN;
## FLIGHTS RESUME ON LIMITED BASIS

### Passengers Advised to Call Airline Before Coming to the Airport

- McCarran Airport is currently open, having been certified by the FAA to be in compliance with all current security directives.

- The FAA Air Traffic Control system is now releasing flights on a case-by-case basis. Our local airline operators anticipate that it may take several days to resume full flight schedules.

- We are advising all travelers to continue to contact their airline customer service number for the latest information on specific flights **before coming to the airport.**

- We have the following information to report from some of our local airline offices regarding schedules:

   The following airlines have **canceled all scheduled flights for today – Thursday, September 13: Southwest, Continental, American Trans Air**

   **Southwest** is planning to resume service at 9 AM Pacific Time on Friday, September 14. Initial schedules may be limited – Passengers should call the airline for confirmation before coming to the airport.

   **Continental** anticipates operating a limited schedule on Friday, September 14, estimating that about half of its Las Vegas departures will occur. Passengers should call the airline for confirmation before coming to the airport.

   **America West** is currently flying a reduced schedule, and advises passengers to contact their reservation center for information about specific flights.

   **Alaska Airlines** has resumed limited service and would like passengers to know specifically that their **5:30 PM departure to Seattle** will be operating. Call for further details on other flights.

   **Allegiant Airlines** is at this point operating its regular schedule.

**(continued)**



*P.O. Box 11005 # Las Vegas, NV 89111-1005 # 702-261-3094 # Fax 702-261-5645*
*E-Mail: webmaster2@mccarran.com*

*Clark County Department of Aviation*
*McCarran International Airport – status update*
*Thursday, September 13, 2001*

**Additional information from the FAA:**

- General Aviation activity (including flights at Henderson Executive Airport and North Las Vegas Airport) is grounded for today with the exception of some authorized emergency flights.

- Grand Canyon tour flights considered "air taxis" / commercial carriers, and may operate with clearance from the FAA, determined on a case-by-case basis.


- **Once passengers receive confirmation from their airline that their flight is departing, they can anticipate additional security procedures at the airport. They should allow additional time.**

    o **No curb-side or off-airport check in: all passengers checking baggage must proceed to the ticket counter.**

    o **Travelers MUST bring photo identification and any documentation related to their flight – printed ticket, e-ticket receipt, printed itinerary etc. Upon arrival at the airport, passengers should consult the information displays to determine whether they need to proceed to the ticket counter or the security checkpoint.**

    o **Parents of unaccompanied minors, caregivers for disabled passengers and interpreters/guides for tour groups must check in at the ticket counter to receive documented authorization to proceed through the security checkpoint.**

    o **As much as possible, to accommodate security protocols, please limit airport access to actual travelers. Please limit friends & family and greeters.**

-30-

11/07/2001   10:59   7029203233                    KELLOGG CUTLER INS                    PAGE  01/04

# ACORD® PROPERTY LOSS NOTICE

DATE (MM/DD/YY)
11/07/2001

| PRODUCER | PHONE (A/C, No, Ext): | (702) 384-6601 | MISCELLANEOUS INFO (Site & location code) | | DATE OF LOSS AND TIME | AM | PREVIOUSLY REPORTED |
|---|---|---|---|---|---|---|---|
| | FAX | (702) 384-4043 | | | 09/11/2001 | PM | YES X NO |

Kellogg-Cutler & Associates
330 E. Charleston Blvd.
Las Vegas, NV 89104

| | POLICY TYPE | COMPANY AND POLICY NUMBER | EFFECTIVE DATE | EXPIRATION DATE |
|---|---|---|---|---|
| | PROP/HOME | CO: Factory Mutual Insurance | 10/01/2000 | 10/01/2001 |
| | | POL: UA864 | | |
| | FLOOD | CO: | | |
| | | POL: | | |
| | WIND | CO: | | |
| | | POL: | | |

CODE:   06916        SUB CODE:
AGENCY CUSTOMER ID
00000049

| INSURED | CONTACT | CONTACT INSURED | WHERE TO CONTACT |
|---|---|---|---|
| NAME AND ADDRESS | NAME AND ADDRESS | | |

Clark County Department of Aviation
P.O. Box 11005
Las Vegas, NV 89111-1005

Lloyd Cutler, 702-384-6601

WHEN TO CONTACT

| RESIDENCE PHONE (A/C, No) | BUSINESS PHONE (A/C, No, Ext) | RESIDENCE PHONE (A/C, No) | BUSINESS PHONE (A/C, No, Ext) |
|---|---|---|---|

## LOSS

POLICE OR FIRE DEPT TO WHICH REPORTED

| LOCATION LOSS | | | | | PROBABLE AMOUNT ENTIRE LOSS |
|---|---|---|---|---|---|
| KIND OF LOSS | FIRE | LIGHTNING | FLOOD | OTHER (explain) | |
| | THEFT | HAIL | WIND | | |

DESCRIPTION OF LOSS & DAMAGE (Use reverse side, if necessary)
Business Interruption loss due to terrorist attack in New York and Washington, DC (see attached).

## POLICY INFORMATION

MORTGAGEE
  NO MORTGAGEE

HOMEOWNER POLICIES SECTION 1 ONLY (Complete for coverages A, B, C, D & additional coverages. For Homeowners Section II Liability Losses, use ACORD 3.)

| A. DWELLING | B. OTHER STRUCTURES | C. PERSONAL PROPERTY | D. LOSS OF USE | DEDUCTIBLES | DESCRIBE ADDITIONAL COVERAGES PROVIDED |
|---|---|---|---|---|---|
| | | | | | ON |

COVERAGE A EXCLUDES WIND
SUBJECT TO FORMS (insert form numbers and edition dates, special deductibles)

E. ALLIED LINES & MULTI-PERIL POLICIES (Complete only those items involved in loss)

| ITEM | SUBJECT OF INSURANCE | AMOUNT | % COINS | DEDUCTIBLE | COVERAGE AND/OR DESCRIPTION OF PROPERTY INSURED |
|---|---|---|---|---|---|
| | BLDG | CNTS | | | |
| | BLDG | CNTS | | | |
| | BLDG | CNTS | | | |

SUBJECT TO FORMS (insert form numbers and edition dates, special deductibles)

NOV 0 7 2001
WESTERN REGION
CLAIMS DEPT

| FLOOD POLICY | BUILDING: | DEDUCTIBLE: | | ZONE | PRE FIRM | DIFF IN ELEV | FORM TYPE | GENERAL DWELLING | CONDO |
|---|---|---|---|---|---|---|---|---|---|
| | CONTENTS: | DEDUCTIBLE: | | | POST FIRM | | | | |
| WIND POLICY | BUILDING | DEDUCTIBLE | CONTENTS | ZONE | FORM TYPE | GENERAL DWELLING | CONDO | | |

REMARKS/OTHER INSURANCE (List companies, policy numbers, coverages & policy amounts)

EXHIBIT
6
Walker
4/12/04

| CAT # | FICO # | ADJUSTER ASSIGNED | | ADJUSTER # | DATE ASSIGNED |
|---|---|---|---|---|---|

| REPORTED BY | REPORTED TO | SIGNATURE OF PRODUCER OR INSURED |
|---|---|---|
| Insured | Agency | Lloyd W. Cutler |

ACORD 1 (12/93)   NOTE: IMPORTANT STATE INFORMATION ON REVERSE SIDE   ©ACORD CORPORATION 1993



**LAS VEGAS**

McCARRAN INTERNATIONAL AIRPORT

**Department of Aviation**

**RANDALL H. WALKER**
DIRECTOR

**ROSEMARY A. VASSILIADIS**
DEPUTY DIRECTOR

POSTAL BOX 11005
LAS VEGAS, NEVADA 89111-1005
(702) 261-5211
FAX (702) 597-9553
E-MAIL: webmaster@mccarran.com

November 2, 2001

Lloyd W. Cutler, CPCU
Kellogg, cutler, Yenchek, LaDuke, Holmes
Insurance Services
330 E. Charleston Blvd.
Las Vegas, NV 89104

Dear Lloyd:

As you are aware the Clark County Airport System, including McCarran International Airport, the North Las Vegas Airport and the Henderson Executive Airport, was closed by the Federal Aviation Administration for about two and a half days due to the aviation related terrorist attacks in New York and Washington, DC on September 11, 2001. This event has caused a significant interruption and reduction in the number of passengers and airport revenue generating activities for the foreseeable future.

Please see the attached graph of Total Monthly Passengers by Fiscal Year. The decrease in passengers from September 2000 is 28.3%; however, the decrease from September 2001 projected passengers (2000p) is 31.1%. It is the intention of the Clark County Department of Aviation (CCDOA) to file a loss claim under the Business Interruption clauses of the Factory Mutual (FM) Global Insurance Policy in effect at the time. Currently the extent of loss is not known as airport tenants report activity and revenue up to two months subsequent to their activity; therefore, it may be necessary for the CCDOA to request an extension of time, in addition to the 90 day limit outlined in the policy, in order to accurately calculate the related loss of revenue and additional expense related to this interruption.

Your guidance in filing an accurate and complete claim with FM Global will be sincerely appreciated. Please feel free to call Marc Traasdahl at 261-5113 or Gwyn Taylor at 261-5182 with any questions.

Sincerely,

Randall H. Walker
Director of Aviation

Attachment

cc:   Rosemary Vassiliadis
       R. Ross Johnson
       Marc Traasdahl
       Gwyn Taylor



**Clark County Board of Commissioners**
Dario Herrera, Chairman • Myrna Williams, Vice Chair
Yvonne Atkinson Gates • Erin Kenny • Mary J. Kincaid • Chip Maxfield • Bruce L. Woodbury

**FM-C 00485**



## McCarran Total Monthly Passengers by Fiscal Year

| | JULY | AUG | SEPT | OCT | NOV | DEC. | JAN | FEB | MARCH | APRIL | MAY | JUNE |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1998 | 2514645 | 2651048 | 2409604 | 2655328 | 2463545 | 2301168 | 2294829 | 2348652 | 2733283 | 2571603 | 2815388 | 2485008 |
| 1999 | 2529206 | 2623829 | 2376670 | 2680213 | 2558746 | 2429980 | 2504187 | 2522545 | 2984584 | 2799590 | 2886268 | 2707032 |
| 2000 | 2870214 | 2972785 | 2882842 | 3112179 | 2856829 | 2575196 | 2679892 | 2829910 | 3279056 | 3097450 | 3091466 | 3148366 |
| 2001 | 3160226 | 3219016 | 2965021 | 3327791 | 3110377 | 2963322 | 2706701 | 2847677 | 3448826 | 3168220 | 3130897 | 3186408 |
| 2002 | 3244366 | 3379378 | 2124864 | | | | | | | | | |
| 2002p | 3,224,366 | 3,379,378 | 3,083,622 | 3,460,903 | | | | | | | | |

Mo. Decrease - 28.3%, FYTD Decrease - 6.3%

FM-C 00486

# Lloyd Cutler

**To:** randyw@mccarran.com
**Cc:** Gwyn Taylor; Marc Traasdahl; rosemaryv@mccarran.com; rossj@mccarran.com
**Subject:** Business Interruption CCDOA 9/11/01

Dear Randy,

I am in receipt of your letter outlining a claim to be presented for the above captioned. We are forwarding the information this day to FM Global in order to initiate the process.

It is my expectation that there is great detail to be involved in gathering all the relevant information for this very comprehensive situation.

Unless I hear otherwise, we are designating Marc Traasdahl and Gwyn Taylor to be the primary contacts for FM Global, as they deem necessary. We are advising FM Global of your request for time needed to get everything in order.

Please understand that it is my intent for all parties, to see this through to a good conclusion on behalf of all concerned, and it is a pleasure to be of service. I will maintain an up to date data base on this claim and remain at your disposal at all times for any need you may have.

Very truly yours,

Lloyd Cutler

1

FM-C 00487

COPY

1

1   UNITED STATES DISTRICT COURT

2                  DISTRICT OF NEVADA

3

4   COUNTY OF CLARK, a political      )
    subdivision of the State of       )
5   Nevada, on behalf of CLARK        )
    COUNTY DEPARTMENT OF AVIATION,    )
6                                     )
7                 Plaintiff,          )
                                      )
8         vs.                         ) NO. CV-S-02-1258-KJD-RJJ
                                      )
9   FACTORY MUTUAL INSURANCE          )
    COMPANY, a Rhode Island           )
10  corporation, and Does 1-10,       )
                                      )
11                Defendants.         )
    _____ )

12

13

14           **VIDEOTAPED DEPOSITION OF LLOYD W. CUTLER**

15              Taken on Tuesday, April 13, 2004

16                      2:13 p.m.

17            At McCarran International Airport
                5757 Wayne Newton Boulevard
18                  Las Vegas, Nevada

19

20

21

22

23

24

25  Reported by:  Michelle C. Johnson, CCR 771, RPR-CRR

2

1    **APPEARANCES:**

2    For the Plaintiff:

3            STEPHEN V. MASTERSON, Attorney at Law
             HOWREY, SIMON, ARNOLD & WHITE LLP
4            550 South Hope Street, Suite 1100
             Los Angeles, California 90071-2627
5

6    For the Defendant:

7            SCOTT G. JOHNSON, Attorney at Law
             ROBINS, KAPLAN, MILLER & CIRESI LLP
8            2800 LaSalle Plaza
             800 LaSalle Avenue
9            Minneapolis, Minnesota 55402-2015

10

     Also Present:   Becky Ulrey, Certified Legal Videography
11

12                        * * * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                    **I N D E X**

2   **WITNESS**                                    **PAGE**

3   LLOYD W. CUTLER

4   EXAMINATION

5       BY MR. JOHNSON                               5

6

7

8                  **E X H I B I T S**

9   **NUMBER   DESCRIPTION**              **MARKED FOR ID**

10  Cutler

11      1    4/15/02 LegalTimes article, "Terrorism    13
              Insurance"
12
        2    3/22/02 letter to Casillas from Johnson,  46
13            with attachments (FM-C 00145 - 162)

14      3    8/7/02 handwritten document (FM-C 00088)   49

15

16

17

18

19

20

21

22

23

24

25

4

1    THE VIDEOGRAPHER:  This is the beginning of the

2  deposition of Lloyd Cutler.  Today's date is April 13th,

3  2004, and the time on the video monitor is 2:12 p.m.

4  We're at the administration offices at McCarran

5  International Airport in Las Vegas, Nevada.

6    And this case is in the United States District

7  Court, District of Nevada, Case

8  No. CV-S-02-1258-KJD-RJJ, entitled County of Clark, a

9  political subdivision of the State of Nevada, on behalf

10  of Clark County Department of Aviation versus Factory

11  Mutual Insurance Company, et al.

12    My name is Becky Ulrey, a certified legal

13  videographer, and the court reporter is Michelle

14  Johnson, from Western Reporting Services, Incorporated.

15    Will counsel please identify yourselves for

16  voice identification.

17    MR. JOHNSON:  Scott Johnson, representing

18  Factory Mutual Insurance Company.

19    MR. MASTERSON:  Steve Masterson, from Howrey,

20  Simon, Arnold & White, representing Clark County

21  Department of Aviation.

22    THE VIDEOGRAPHER:  The reporter will please

23  administer the oath.

24    LLOYD W. CUTLER,

25    having been first duly sworn, was

5

1               examined and testified as follows:

2                         EXAMINATION

3    BY MR. JOHNSON:

4         Q.    Could you please state your full name.

5         A.    Lloyd Wendell Cutler.

6         Q.    What is your current business address?

7         A.    330 East Charleston, Las Vegas, Nevada, 89104.

8         Q.    How long have been at that business address?

9         A.    Ten years.

10        Q.    Do you have any plans to --

11        A.    11 years.

12        Q.    Do you have any plans to move from that

13   address?

14        A.    No.

15        Q.    Have you had your deposition taken before?

16        A.    Never.

17        Q.    Let me then give you a few of the ground rules

18   that we'll want you to adhere to during the course of

19   the deposition.  I'll be asking you some questions.  If

20   at any time one of my questions isn't clear to you,

21   please let me know, and I'll try to rephrase the

22   question for you.  All right?

23        A.    Yes.

24        Q.    And if you don't, I'll have to assume that you

25   understood my question.  All right?

34

1    related losses?

2       A.   No.

3       Q.   Did you ever hear that the City of Chicago

4    submitted a claim to Factory Mutual for its airport's

5    September 11, 2001 related losses?

6       A.   I read about it.

7       Q.   Where did you read about it?

8       A.   I think in the newspaper.  I'm not sure,

9    though.  I'm really not sure.  It might have been an

10   insurance trade journal.  Might have been an aviation

11   trade journal.  I read constantly.

12      Q.   Do you know what happened in that case?

13      A.   I have no idea.

14      Q.   You're not aware that the federal District

15   Court in Illinois granted summary judgment in favor of

16   Factory Mutual and against the City of Chicago?

17      A.   Not aware of it.

18      Q.   If you could, Mr. Cutler, take a look at

19   Exhibit 6, Walker Exhibit 6.

20           MR. MASTERSON:  Let me grab that door because I

21   think we're picking up some office sound.

22           THE WITNESS:  That looks familiar.

23   BY MR. JOHNSON:

24      Q.   Walker Exhibit 6 looks familiar?

25      A.   It does.

35

1    Q.   At least the first page you prepared, right?

2    A.   I did.

3    Q.   And the first page of Exhibit 6 is dated

4    November 7, 2001, right?

5    A.   Yes.

6    Q.   Why did you wait until November 7, 2001 to

7    notify Factory Mutual?

8    A.   I'm not the one that waited.  I functioned

9    under direction of the airport in filing the claim.

10   Q.   Do you have any understanding of why the Clark

11   County Department of Aviation waited nearly two months

12   after 9/11 to notify Factory Mutual?

13   A.   I don't know.  I do see under Exhibit 6 that

14   they explain to me in a letter what their -- what their

15   position was.  Maybe -- you're calling for speculation.

16   Do I get involved in speculation?

17   Q.   No, we don't want you to guess.  If you know,

18   please tell us.

19   A.   I don't know.

20   Q.   Okay.

21   A.   I believe that research was provided and the

22   claim was filed in a timely fashion, according to the

23   policy language.  It's not like an automobile accident.

24   Q.   Going back to the first page of Walker Exhibit

25   6.  Under a description of the loss and damage, it says,

COPY

1

1 UNITED STATES DISTRICT COURT

2     DISTRICT OF NEVADA

3

4 COUNTY OF CLARK, a political  )
  subdivision of the State of   )
5 Nevada, on behalf of CLARK   )
  COUNTY DEPARTMENT OF AVIATION, )
6                )
                )
7       Plaintiff,    )
                )
8   vs.          )NO. CV-S-02-1258-KJD-RJJ
                )
9 FACTORY MUTUAL INSURANCE   )
  COMPANY, a Rhode Island    )
  corporation, and Does 1-10,  )
10               )
       Defendants.   )
11 _____)

12

13

14    VIDEOTAPED DEPOSITION OF R. ROSS JOHNSON

15     Taken on Wednesday, April 14, 2004

16        2:03 p.m.

17    At McCarran International Airport
      5757 Wayne Newton Boulevard
18       Las Vegas, Nevada

19

20

21

22

23

24

25 Reported by:  Michelle C. Johnson, CCR 771, RPR-CRR

2

1    **APPEARANCES:**

2    For the Plaintiff and the Witness:

3            STEPHEN V. MASTERSON, Attorney at Law
             HOWREY, SIMON, ARNOLD & WHITE LLP
4            550 South Hope Street, Suite 1100
             Los Angeles, California 90071-2627
5

6    For the Defendant:

7            SCOTT G. JOHNSON, Attorney at Law
             ROBINS, KAPLAN, MILLER & CIRESI LLP
8            2800 LaSalle Plaza
             800 LaSalle Avenue
9            Minneapolis, Minnesota 55402-2015

10

11   Also Present:   Becky Ulrey, Certified Legal Videography

12                        * * * * * * *

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1                          I N D E X

2    **WITNESS**                                        **PAGE**

3    R. ROSS JOHNSON

4    EXAMINATION

5        BY MR. JOHNSON                                    5

6

7

8                        E X H I B I T S

9    **NUMBER**    **DESCRIPTION**              **MARKED FOR ID**

10   Johnson

11       1     "Declaration of R. Ross Johnson in          10
             Support of Motion for Partial Summary
12           Judgment of Plaintiff County of Clark,
             a Political Subdivision of the State of
13           Nevada, on Behalf of Clark County
             Department of Aviation," with attachments
14
         2     4/30/02 letter to Casillas from Johnson     39
15             (FM-C 00108 - 110)

16       3     5/28/02 letter to Johnson from Casillas,    40
             with attachment (FM-C 00100 - 103)
17
         4     6/19/02 letter to Casillas from Johnson     42
18             (FM-C 00097 - 099)

19       5     7/11/02 letter to Johnson from Casillas     43
             (FM-C 00090 - 093)
20

21

22

23

24

25

4

1    THE VIDEOGRAPHER:  Good afternoon.  This is the

2  beginning of the deposition of R. Ross Johnson.  Today's

3  date is April 14th, 2004.  And the time on the video

4  monitor is 2:06 p.m.  We are at the administrative

5  offices of McCarran International Airport, in Las Vegas,

6  Nevada.

7    And this case is in the United States District

8  Court, District of Nevada, Case No.

9  CV-S-02-1258-KJD-RJJ, entitled County of Clark, a

10  political subdivision of the State of Nevada, on behalf

11  of Clark County Department of Aviation versus Factory

12  Mutual Insurance Company, et al.

13    My name is Becky Ulrey, from Certified Legal

14  Videography.  And the court reporter is Michelle

15  Johnson, from Western Reporting Services, Incorporated.

16    Will counsel please identify yourselves for

17  voice identification.

18    MR. JOHNSON:  Scott Johnson, representing

19  Factory Mutual Insurance Company.

20    MR. MASTERSON:  Steve Masterson, from Howrey,

21  Simon, Arnold & White, representing Clark County

22  Department of Aviation and Mr. Johnson.

23    THE VIDEOGRAPHER:  The court reporter will now

24  administer the oath.

25                        *  *  *  *  *  *

5

1                        R. ROSS JOHNSON,

2              having been first duly sworn, was

3              examined and testified as follows:

4                          EXAMINATION

5    BY MR. JOHNSON:

6        Q.   Could you please state your full name.

7        A.   R. Ross Johnson.

8        Q.   What is your current address?

9             MR. MASTERSON:  Business address.

10            MR. JOHNSON:  Business address is fine.

11            THE WITNESS:  Corner of Paradise and Twain.

12   3720 Howard Hughes Parkway, Suite 200.

13   BY MR. JOHNSON:

14       Q.   In Las Vegas?

15       A.   Las Vegas, Nevada.

16       Q.   And the ZIP code?

17       A.   89109.

18       Q.   Mr. Johnson, have you had your deposition taken

19   before?

20       A.   Yes.

21       Q.   On how many occasions?

22       A.   Probably two.

23       Q.   When was the most recent of those?

24       A.   Oh, six, seven years ago.

25       Q.   You're probably familiar with the process, at

24

1      Q.   Did you prepare this letter?

2      A.   I'm not sure what you mean, prepare the letter.

3      Q.   Did you write it?

4      A.   I did not personally write the letter.

5      Q.   Who did?

6      A.   This is a letter that was part of the group

7   effort, including some consultants.

8      Q.   When you say it was a group effort, who was

9   involved -- who comprised that group?

10      A.   Ross Johnson, Marc Traasdahl, and then our

11   consultants.

12      Q.   What consultants?

13      A.   The letter is copied to Mr. Thomas Mury, of

14   Deloitte & Touche; and a Mr. Lloyd Cutler, of Cutler,

15   Kellogg, Yenchek, LaDuke, Holmes Insurance Services.

16      Q.   Can you tell me what portions of Walker Exhibit

17   11 that you actually wrote?

18      A.   My name.

19      Q.   Was that it?

20      A.   Yeah.

21      Q.   That's a yes?

22      A.   Yes.

23      Q.   In the second paragraph of the letter, there's

24   a reference to a number of different provisions in the

25   Factory Mutual policy, right?

25

1    A.   Yes.

2    Q.   There's the Protection and Preservation of

3    Property section, right?

4    A.   Yes.

5    Q.   The Contingent Time Element Extension section,

6    right?

7    A.   Yes.

8    Q.   And the Ingress/Egress Time Element Extension,

9    right?

10   A.   Yes.

11   Q.   Were there any other provisions under which

12   Clark County Department of Aviation believed there was

13   coverage?

14        MR. MASTERSON:   Objection, calls for

15   speculation.

16        THE WITNESS:   I'm not -- I don't know.

17   BY MR. JOHNSON:

18   Q.   Are you aware of any others?

19   A.   You know, right now, I'm not.

20   Q.   Are you familiar with those coverages?

21   A.   I was familiar with them at the time.

22   Q.   What was the Protection and Preservation of

23   Property section?

24        MR. MASTERSON:   Objection, compound, calls for

25   speculation.

1    Richard J. Pocker
     Nevada Bar No. 003568
2    Dickerson, Dickerson, Consul & Pocker
     777 N. Rainbow Blvd., Suite 350
3    Las Vegas, Nevada  89107
     Telephone: (702) 388-8600
4    Facsimile: (702) 388-0210

5    Scott G. Johnson (CSB #153735) Admitted Pro Hac Vice
     David E. Bland (CSB #150581) Admitted Pro Hac Vice
6    Robins, Kaplan, Miller & Ciresi L.L.P.
     2800 LaSalle Plaza
7    800 LaSalle Ave.
     Minneapolis, Minnesota 955402-2015
8    Telephone:  (612) 349-8500
     Facsimile:  (612) 339-4181

9
     Attorneys for Defendant FACTORY
10   MUTUAL INSURANCE COMPANY

11                 IN THE UNITED STATES DISTRICT COURT

12                     FOR THE DISTRICT OF NEVADA

13

14   COUNTY OF CLARK, a political          )  Case No:  CV-S-02-1258-KJD-RJJ
     subdivision of the State of Nevada, on )
15   behalf of Clark County Department of  )  **[PROPOSED]   ORDER   ON
     Aviation,                             )  FACTORY  MUTUAL  INSURANCE
16                                         )  COMPANY'S   MOTION   FOR
          Plaintiff,                       )  SUMMARY JUDGMENT**
17                                         )
     vs.                                   )
18                                         )
     FACTORY MUTUAL INSURANCE              )
19   COMPANY, a Rhode Island               )
     Corporation, and DOES 1-10,           )
20                                         )
          Defendant.                       )
21                                         )
     _____ )
22

23        Defendant FACTORY MUTUAL INSURANCE COMPANY's Motion for

24   Summary Judgment came on regularly for hearing before this Court.   After

25   considering the moving and opposition papers, arguments of counsel and all other

26   matters presented to the Court,

27        IT IS HEREBY ORDERED THAT FACTORY MUTUAL INSURANCE

28   COMPANY's Motion for Summary Judgment is GRANTED.

20086514.1

1   THEREFORE, Judgment is entered in favor of FACTORY MUTUAL

2   INSURANCE COMPANY.

3

4   Dated: _____                    _____

5                                              Honorable Kent J. Dawson
                                               United States District Judge
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## PROOF OF SERVICE

I am employed in the county of Hennepin, state of Minnesota. I am over the age of 18 and not a party to the within action; my business address is 800 LaSalle Avenue, Suite 2800, Minneapolis, Minnesota 55402.

On May 26, 2004 I served the following documents described as: ***Defendant Factory Mutual Insurance Company's Notice of Motion and Motion for Summary Judgment; Supporting Memorandum of Points and Authorities; Statement of Uncontroverted Facts in Support of Its Motion for Summary Judgment; Affidavit of Scott G. Johnson and proposed Order***

by placing true copies hereof enclosed in a sealed envelope addressed as follows:

> Stephen Masterson, Esq.
> Howrey, Simon, Arnold & White
> 550 South Hope Street, Suite 1400
> Los Angeles, California 90071-2627

**BY MAIL:** I caused such envelope to be deposited in the mail at Minneapolis, Minnesota.. This envelope was mailed with postage thereon fully prepaid. I am readily familiar with this firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with U.S. postal service on that same day with postage thereon fully prepaid at Minneapolis, Minnesota in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on May 26, 2004 at Minneapolis, Minnesota.

Maggie Boesel

20092400.1